**CASE NO. 23-1069**

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

STEPHEN FOOTE, individually and as Guardian and next friend of B.F. and G.F.,
minors and MARISSA SILVESTRI, individually and as Guardian and next friend
of B.F. and G.F., minors,
Plaintiffs - Appellants,
v.
LUDLOW SCHOOL COMMITTEE; TODD GAZDA, former Superintendent;
LISA NEMETH, Interim Superintendent; STACY MONETTE, Principal, Baird
Middle School; MARIE-CLAIRE FOLEY, school counselor, Baird Middle
School; JORDAN FUNKE, former librarian, Baird Middle School; TOWN OF
LUDLOW

Defendants - Appellees.

Appeal from the United States District Court for the District of Massachusetts
Springfield Division

Case No. 3:22-cv-30041-MGM

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

Andrew Beckwith
Samuel J. Whiting
Massachusetts Family Institute
401 Edgewater Place, Suite 580
Wakefield, MA 01880
781.569.0400
andrew@mafamily.org
sam@mafamily.org

Mary E. McAlister
Vernadette R. Broyles
Child & Parental Rights Campaign, Inc.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
mmcalister@childparentrights.org
vbroyles@childparentrights.org
Attorneys for Plaintiffs - Appellants

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a), Appellants Stephen Foote and Marissa Silvestri state that they are individuals.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES .......................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................... 1

JURISDICTIONAL STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......................... 1

STATEMENT OF THE CASE .......................................................................... 2

   I.  Statement Of Facts ................................................................................ 2

   II. Procedural History ............................................................................ 10

SUMMARY OF ARGUMENT ........................................................................ 10

STANDARD OF REVIEW .............................................................................. 12

ARGUMENT .................................................................................................... 13

   I.  The District Court Erred By Selectively Disregarding Certain
   Allegations As Conclusory And Analyzing the Facts Adversatively
   Toward Plaintiffs When It Dismissed Plaintiffs' Claim For Violation
   Of Their Fundamental Right To Direct Their Children's Mental
   Health Care. .......................................................................................... 13

      A.   The  District  Court  Erred  in  Mischaracterizing  and
      Disregarding Plaintiffs' Allegations Regarding Social Transitioning
      as Conclusory ................................................................................... 15

      B.    The District Court Failed to View the Factual Allegations in a
      Light Most Favorable to Plaintiffs. .................................................. 19

   II. The  District  Court  Mischaracterized  Plaintiffs'  Claims  for
   Interference With Their Fundamental Parental Rights As An Attempt
   To Interfere With Defendants' Curricular Decisions. ............................ 22

**A.    The District Court Erred In Labeling Defendants' Protocol As "Curriculum."** ......................................................................23

**B.    The Court Erred In Implicitly Condoning A Duty on the Part of Defendants To Protect Transgender Children From Their Own Parents.** .......................................................................26

**III. The District Court Erred In Its Application Of The "Shocks The Conscience" Test To Plaintiffs' Claims For Violations Of Fundamental Parental Rights.** ..............................................................30

**A.    Significant Interference With A Protected Relationship Is Itself "Conscience Shocking" Conduct Not Something Upon Which To Superimpose A "Conscience Shocking" Analysis.** .......................................32

**B. "Deliberate Indifference" Can Constitute "Conscience-Shocking" Conduct In Deliberative Executive Action Situations Such As Implementation Of A School Protocol.** ....................................38

**IV. The District Court Erred When It Subordinated Fundamental Parental Rights To Massachusetts' Non-Discrimination Law To Justify Defendants' Violation Of Plaintiffs' Rights.** ...................................42

**V.  The Court Erred In Concluding (Without Deciding) That Qualified Immunity Would Shield Individual Defendants From Liability For Violating Plaintiffs' Fundamental Parental Rights.** .......................................46

**CONCLUSION** ..................................................................49

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS** ...51

**CERTIFICATE OF SERVICE** ........................................................52

# TABLE OF AUTHORITIES

**Cases**

*A.G. v. Elsevier, Inc.*
  732 F.3d 77 (1st Cir. 2013) ...................................................................12

*Arnold v. Escambia County,*
  880 F.2d 305 (11th Cir. 1989) ................................................ 33, 35, 37

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................... 13, 16, 17, 19

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................... 16, 17, 19, 20

*Brown v. Hot, Sexy & Safer,*
  68 F.3d. 525 (1st Cir. 1995) .......................................................... 23-26

*City of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ....................................................... 32, 36, 38-41

*Colon v. Collazo,*
  729 F.2d 32 (1st Cir. 1984) ................................................ 14, 24, 29, 47

*Conlogue v. Hamilton,*
  906 F.3d 150 (1st Cir. 2018) ................................................................47

*Cruz-Erazo v. Rivera-Montanez,*
  212 F.3d 617 (1st Cir. 2000) ...................................................... 35, 39

*DePoutot v. Raffaelly,*
  424 F.3d 112 (1st Cir. 2005) ................................................................41

*DeShaney v. Winnebago County,*
  489 U.S. 189 (1989) .................................................................. 27-28

*Doe v. Pawtucket School Department,*
  969 F.3d 1 (1st Cir. 2020) ...................................................................12

*Dorothy J. v. Little Rock Sch. Dist.,*
  7 F.3d 729 (8th Cir. 1993) ..................................................................28

*D.R. v. Middle Bucks Area Voc. Tech. Sch.*,
972 F.2d 1364 (3d Cir. 1992) .............................................................28

*Dubbs v. Head Start*,
336 F.3d 1194 (10th Cir. 2003) ..................................................... 33, 35

*Gonzalez-Fuentes v. Molina*,
607 F.3d 864 (1st Cir. 2010) ................................................. 30, 39, 40

*Grendell v. Gillway*,
974 F. Supp. 46 (D. Me. 1997)....................................................... 33-35

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020) .............................................................18

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ....................................................... 33, 35-37

*Hasenfus v. LaJeunesse*,
175 F.3d 68 (1st Cir. 1999) .......................................................... 27-29

*Hoggard v. Rhodes*,
141 S. Ct. 2421 (2021).......................................................................48

*J.O. v. Alton Community Unit Sch. Dist. 11*,
909 F.2d 267 (7th Cir. 1990) ...................................................... 28-29

*J.R. v. Gloria*,
593 F.3d 73 (1st Cir. 2010) ........................................................ 39, 40

*Lyman v. Baker*,
954 F.3d 351 (1st Cir. 2020) .............................................................14

*Martinez v. Cui*,
608 F.3d 54 (1st Cir. 2010) ...............................................................32

*McConkie v. Nichols*,
446 F.3d 258 (1st Cir. 2006) ........................................................ 30, 33

*McKenney v. Mangino*,
873 F.3d 75 (1st Cir. 2017) ...............................................................47

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ...................................................................... 23, 24

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ...................................................................... 20, 22

*Ocasio-Hernández v. Fortuño-Burset*,
   640 F.3d 1 (1st Cir. 2011) ........................................... 13, 16,17, 19, 21

*Parham v. J. R.*,
   442 U.S. 584 (1979) ................................................ 14, 24, 29, 44, 47

*Parker v. Hurley*,
   514 F.3d 87 (1st Cir. 2008). ........................................................ 24-26, 49

*Penate v. Hanchett*,
   944 F.3d 358 (1st Cir. 2019) .................................................................12

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ....................................................... 23, 24, 37, 49

*Pittsley v. Warish*,
   927 F.2d 3 (1st Cir. 1991) .....................................................................35

*Rivera v. Rhode Island*,
   402 F.3d 27 (1st Cir. 2005) ......................................................... 39, 40

*Sanford v. Stiles*,
   456 F.3d 298 (3d Cir. 2006) .................................................................41

*SEC v. Tambone*,
   597 F.3d 436 (1st Cir. 2010) ................................................................12

*Troxel v. Granville*,
   530 U.S. 57 (2000) ................................................................... passim

*Vernonia Sch. Dist. v. Acton*,
   515 U.S. 646 (1995) ................................................................... 29, 44

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) .............................................................................32

*Wyke v. Polk County School Board*,
  129 F.3d 560 (11th Cir. 1997) ..............................................................................28

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ........................................................................................48

**Rules**

Fed. R. Civ. P. 8 ....................................................................................................13

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), Appellants respectfully request that oral argument be permitted in this appeal because it would assist the Court in understanding and deciding the complex constitutional questions raised by this emerging cultural issue.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision in a district court. The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     The district court erred when it mischaracterized and disregarded factual allegations as conclusory and improperly viewed the facts adversely toward Plaintiffs to wrongly conclude that Plaintiffs failed to state a claim for violation of Plaintiffs' fundamental parental right to direct the mental health care for their children.

2.     The district court erred when it dismissed Plaintiffs' substantive due process claims based on an improper and erroneous delineation of Defendants' Protocol as "curriculum."

3.     The district court erred when it dismissed Plaintiffs' substantive due process claims by improperly superimposing the "intentional harms" version of the "shock the conscience" test for hyper-pressure circumstances onto Defendants'

deliberative actions aimed at interfering with Plaintiffs' fundamental parental rights, which itself is conscience-shocking behavior.

4.     The district court erred in subordinating Plaintiffs' fundamental constitutional parental rights to Massachusetts' non-discrimination statute, regulations and administrative guidance.

5.     The district court erred in concluding that qualified immunity would apply to individual defendants based on the underlying errors in the substantive analysis.

## STATEMENT OF THE CASE

### I.  Statement Of Facts

Plaintiffs' daughter, B.F., and son, G.F were age 11 and 12, respectively, and students at Baird Middle School, one of the schools operated by Defendant Ludlow School Committee in the 2020-2021 school year. (First Amended Complaint, "FAC" ¶¶ 11, 12, 58, 78, Appx. pp. 15, 26, 30-31). After looking at unsolicited LGBT-themed videos on her school computer, B.F. began questioning whether she might be attracted to girls and whether she might have "gender identity" issues. (FAC ¶ 61, Appx. p. 27). She had also been experiencing insecurity, low self-esteem, poor self-image, and a perceived lack of popularity, which she reported to a teacher, Bonnie Manchester, during a virtual meeting on December 15, 2020. (FAC ¶¶ 58, 59, Appx. pp. 26, 27). B.F. also told Ms. Manchester she was depressed and did not know how

to talk to her parents. (FAC ¶ 62, Appx. p. 27). B.F. agreed with Ms. Manchester's suggestion that she could speak to B.F.'s parents about her concerns. (FAC ¶ 63, Appx. p. 27).

Ms. Manchester told Mrs. Silvestri about B.F. feeling depressed, that B.F. had said that she might be attracted to the same sex, and that B.F. was having issues with self-image. (FAC ¶ 66, Appx. p. 28). Mrs. Silvestri said she was grateful that Ms. Manchester had contacted her so that she and Mr. Foote, not the school, could make decisions about B.F.'s mental health issues. (FAC ¶ 68, Appx. p. 28). Mrs. Silvestri and Mr. Foote retained a private therapist for B.F. (FAC ¶ 68, Appx. p. 28). Shortly thereafter, on December 21, 2020, Mrs. Silvestri notified the School Committee, Mr. Gazda, then superintendent of Ludlow Public Schools, Ms. Monette, then principal of Baird Middle School, and B.F.'s teachers, that she and Mr. Foote had exercised their parental right to make decisions regarding B.F.'s mental health and requested that school staff respect that decision. (FAC ¶¶ 69-70, Appx. p. 28). In particular, Mrs. Silvestri wrote:

> It has been brought to the attention of both Stephen and myself that some of B's teachers are concerned with her mental health. I appreciate your concern and would like to let you know that her father and I will be getting her the professional help she needs at this time. With that being said, **we request that you do not have any private conversations with B. in regards to this matter**. Please allow us to address this as a family and with the proper professionals. (FAC ¶¶ 69-70, Appx. p. 28) (emphasis added).

No one to whom the email was addressed responded, including to confirm that the message had been received and that the parents' request would be honored, or that, as was the case, the request would be disregarded. (FAC ¶¶ 106-107, Appx. pp. 37-38).

At some time before December 2020, Ludlow Public Schools developed a protocol which provides that, unless the children consent, parents will not be told if their children report that they wish to socially transition to a discordant gender identity (*i.e.*, identify as something other than their biological sex) and want school staff to affirm that identity, including by using sex-discordant names and pronouns and permitting use of sex-discordant privacy facilities. (FAC ¶¶ 34-40, Appx. pp. 20-22) ("Parental Concealment Protocol"). The Protocol also provides that school staff should deliberately deceive parents by referring to their children by sex-consistent names and pronouns in the parents' presence, but by the child's preferred sex-discordant names and pronouns otherwise. (FAC ¶ 41, Appx. p. 22).

Defendants claim that the Parental Concealment Protocol was developed in compliance with the Department of Elementary and Secondary Education's ("DESE") "Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment." ("Guidance") (FAC ¶¶ 22-24, 34-36, Appx. pp. 17, 20). The DESE Guidance provides:

> Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance.

> School personnel **should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian**. For the same reasons, school personnel should discuss with the student how the school should refer to the student, *e.g.,* appropriate pronoun use, in written communication to the student's parent or guardian.

(FAC ¶ 28, Appx. p. 17; citing DESE Guidance, Addendum, p. 32) (emphasis added). Defendants re-interpreted the DESE Guidance to provide that parents cannot be informed about their children's desire to social transition to a discordant gender identity, including requests to use alternate names and pronouns and District actions in response to those requests unless the child consents. (FAC ¶ 34, Appx. p. 17).

Unbeknownst to Mr. Foote and Mrs. Silvestri, on February 28, 2021, B.F. sent an email to Defendant Foley, Defendant Gazda, and teachers at Baird Middle School, including Ms. Manchester, announcing that she was "genderqueer" and had changed her name and pronouns. (FAC ¶ 81, Appx., pp. 31-32). The next day Defendant Foley sent an email after meeting privately with B.F., in direct contradiction to her parents' explicit instructions. Ms. Foley wrote that B.F. was still in the process of telling her parents and that she requested that staff use her name and female pronouns when communicating with Plaintiffs, but alternate name and pronouns at school. (FAC ¶ 83, Appx. p. 32). In a later email, Defendant Foley explicitly instructed staff that Plaintiffs were not to be told about B.F.'s requests. (FAC ¶ 88, p. 33). Ms. Foley advised teachers during a meeting that "the law" says that school staff do not have to tell parents about their children's requests to change

their name or otherwise be affirmed in an asserted transgender identity, even, in Plaintiffs' case, when their children are 11 and 12 years old. (FAC ¶¶ 91, 93, Appx. p. 33).

B.F.'s parents only learned about B.F.'s February 28, 2021 email after a conversation with Ms. Manchester, for which Ms. Manchester was subsequently fired by Defendants. (FAC ¶¶ 87, 135, Appx. pp.33, 44). Plaintiffs later learned that teachers and staff at Baird Middle School were also concealing information about their son G.F. (FAC ¶ 89, Appx. p.33). Importantly, G.F. had been diagnosed with ADHD and had in place an Accommodation Plan under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et. seq.* ("504 Plan") (FAC ¶ 76, Appx., p. 30). G.F.'s status as a 504 Plan recipient meant that G.F. had underlying mental health issues which required parental notice and input for any treatment. (FAC ¶ 77, Appx., p. 30).

Immediately after B.F.'s February 28, 2021 email, Ms. Foley began weekly private one-on-one counseling sessions with B.F. without the knowledge and consent of her parents. (FAC ¶¶ 95, 98, 118, Appx. pp. 35-36, 40). In those sessions, Ms. Foley applauded and affirmed B.F.'s decision, discussed B.F.'s gender identity issues, and facilitated B.F.'s social transition. (FAC ¶¶ 95, 98, 118, Appx. pp. 35-36, 40). Even though Plaintiffs repeatedly instructed district staff not to discuss the gender identity issue with their children and that they were addressing these issues

as a family with the help of a mental health professional, Ms. Foley continued to have at least weekly private sessions with B.F. throughout the spring semester 2021. (FAC ¶¶ 69-70, 118-127, Appx. pp. 28, 40-42). Ms. Foley's sessions with B.F. became increasingly intrusive and critical of B.F.'s parents. (FAC ¶¶ 118-127, Appx. pp. 40-42). Ms. Foley repeatedly told B.F. that she (Ms. Foley) was concerned for B.F.'s safety when Ms. Foley was not available and accessible, questioned whether B.F.'s therapist (chosen by her parents) was providing appropriate care and questioned whether B.F.'s parents were providing proper support. (FAC ¶¶ 118-127, Appx. pp. 40-42).

Plaintiffs attempted to discuss the disregard and violation of their explicit parental instructions regarding their children's mental health care and the active concealment and deception by district staff with Ms. Monette and Mr. Gazda. (FAC ¶¶ 99-114, Appx., pp. 36-39). However, the parents' concerns were rebuffed with assertions that Ms. Foley and others were acting appropriately and in accordance with DESE guidance. (FAC ¶¶ 99-114, Appx., pp. 36-39).

During public school committee meetings, parents and other community members raised concerns about the Protocol. (FAC ¶¶ 136-149, Appx. pp. 44-48). Mr. Gazda offered prepared remarks which publicly disparaged Plaintiffs and other parents who were    raising concerns about the District's conduct related to students' gender identity. (FAC ¶¶ 136-149, Appx. pp. 44-48). Mr. Gazda said, "Right now

we have a situation where intolerance, prejudice and bigotry against LGBTQ individuals by members of our community is being thinly veiled behind a camouflage of what is being asserted as "parental rights." (Statement of Todd Gazda, Appendix, p. 98) In a thinly veiled attempt to disparage Plaintiffs and other concerned parents as "uncaring" and "unsafe," Mr. Gazda said publicly:

> At it's core this current controversy isn't about sex, it's about identity. It is about ensuring a safe environment with caring adults that students can rely on to discuss problems, issues or questions they might have. For many of our students school IS their only safe place and that safety evaporates when they leave the confines of our buildings.

(Appendix, p. 98). School Committee Chairman Mr. Kelliher also publicly disparaged parents, stating that parents who were making their concerns known to the Committee were "under the spell" of "outside groups." (FAC ¶ 147, Appx. p. 48).

As Plaintiffs allege in the First Amended Complaint, the actions of Defendants in affirming minor children's requests to be identified as something other than their biological sex, including the use of gender discordant names and pronouns, is part of "social transitioning," which is recognized as part of the treatment for children and adults who say they are transgender. (FAC ¶ 42, Appx., pp. 22-23).

> For young transgender children, the treatment of gender dysphoria consists of **social transition, which involves changes that bring the child's outer appearance and lived experience into alignment with the child's core gender.** Changes often associated with a social

transition include **changes in** clothing, **name, pronouns**, and hairstyle. Adams v. The Sch. Bd. of St. Johns Cty, Fla., No. 3:17-cv-00739, (M.D.Fla. June 28, 2017), Diane Ehrensaft Exp. Rep. 10-11 ECF 137-2.

"**Social role transition is a critical component of the treatment** for Gender Dysphoria" for adults and children. G.G. v. Gloucester Cty Sch. Bd., No. 4:15-cv-54 (E.D.Va. June 11, 2015) Randi Ettner Correct Exp. Decl. 5, ECF 58-2.

(FAC, ¶ 42, Appx., pp. 22-23 (emphasis added)).

By engaging in "social transitioning" with children, as provided in the Protocol, Defendants are "implementing a psychosocial treatment..." without the knowledge or consent of parents.

(FAC ¶ 43, Appx., p. 23, citing Kenneth Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al*., 19:2 INTERNATIONAL JOURNAL OF TRANSGENDERISM 231 (2018), https://www.researchgate.net/publication/325443416). Under Massachusetts law, parents must consent to medical treatment, including mental health treatment, of their children under age 18 unless the child is emancipated, married, in the armed forces, pregnant or contracted a sexually transmitted disease, none of which applies to Plaintiffs' children. (FAC ¶ 44, Appx., p. 23). Defendants' Parental Concealment Protocol operates contrary to the law by deliberately concealing from Plaintiffs that their minor children are receiving mental health care, in the form of social transitioning to a discordant gender identity, at school without the parents'

knowledge or consent and over their explicit objections. (FAC ¶ 45, Appx., p. 23).

It also operates contrary to law and to Plaintiffs' fundamental parental rights under

the United States Constitution by instructing staff that parents are to be deliberately

deceived by the use of their children's legal name and pronouns corresponding to

their sex when speaking with parents, but children's preferred alternative names and

pronouns at all other times in school-related communications. (FAC ¶ 153, Appx.

pp. 48-49).

## II. Procedural History

Plaintiffs filed a First Amended Complaint on June 21, 2022. Defendants filed

a Motion to Dismiss on July 29, 2022. Following oral argument on October 17, 2022,

the district court granted the Motion to Dismiss in an order dated December 14, 2022

[Dkt. 51]. Plaintiffs filed a timely Notice of Appeal of the district court's final order

on January 11, 2023. [Dkt. 52].

## SUMMARY OF ARGUMENT

The District Court veered far off course procedurally and substantively when

it granted Defendants' Motion to Dismiss. It disregarded and departed from

established protocol for Rule 12(b)6 motions by mischaracterizing a number of

Plaintiffs' significant allegations as conclusory and failing to review the remaining

allegations in the light most favorable to Plaintiffs. As a result, the district court

disregarded Supreme Court and First Circuit precedent establishing the primacy of

parental rights to direct the upbringing and care and to make mental health decisions for their children. The district court mislabeled Defendants' Parental Concealment Protocol as "curriculum" and thereby impermissibly expanded Defendants' *in loco parentis* role to create a duty to protect children from unsupportive parents. In so doing, the district court flipped Supreme Court and First Circuit precedents on their head to grant Defendants the right to usurp fundamental parental rights.

Even while agreeing with Plaintiffs that Defendants' Parental Concealment Protocol was ill-advised and not supported by statute or the DESE Guidance, the district court dismissed Plaintiffs' substantive due process claims by misapplying the "shocks the conscience" test. The court superimposed an "intentional harm" shock the conscience analysis onto an alleged interference with a protected relationship (the parent-child relationship), which itself shocks the conscience. The district court used the "intentional harms" standard for hyper-pressure circumstances instead of the "deliberate indifference" standard for deliberative executive decisions.

The district court also erred by trivializing fundamental parental rights by subordinating them to the state's non-discrimination statute, regulations, and DESE Guidance. The court elevated the state non-discrimination law above the United States Constitution in a manner that would eviscerate parental rights in the education context.

Finally, the district court erred in stating that qualified immunity would protect individual Defendants from liability. The court relied on its errors in the substantive analysis of Plaintiffs' claims to conclude that there were no clearly established rights violated by Defendants.

## STANDARD OF REVIEW

This Court reviews the district court's analysis of Defendants' motion *de novo*. *Doe v. Pawtucket School Department*, 969 F.3d 1,7 (1st Cir. 2020) (citing *Penate v. Hanchett*, 944 F.3d 358, 365 (1st Cir. 2019)). The analysis turns on whether Plaintiffs' complaint plausibly alleges that Defendants violated Plaintiffs' fundamental rights to direct the upbringing and care of their children, including making mental health decisions, and right to familial privacy. *See id.* "In other words, we simply assume that well-pleaded facts are true and ask whether such facts and inferences reasonably drawn from those facts plausibly state a claim." *Id.*

As was required of the district court, this Court must accept as true all well-pleaded facts in the Complaint and draw all reasonable inferences in favor of Plaintiffs. *SEC v. Tambone,* 597 F.3d 436, 441 (1st Cir. 2010) (en banc). The Court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *A.G. v. Elsevier, Inc.* 732 F.3d 77, 80 (1st Cir. 2013).

**ARGUMENT**

**I. The District Court Erred By Selectively Disregarding Certain Allegations As Conclusory And Analyzing The Facts Adversatively Toward Plaintiffs When It Dismissed Plaintiffs' Claim For Violation Of Their Fundamental Right To Direct Their Children's Mental Health Care.**

While professing to follow the required analytical roadmap for a Rule 12(b)6 motion, the district court in fact veered far off course to arrive at the destination of dismissal of Plaintiffs' claim that Defendants violated Plaintiffs' fundamental parental right to make decisions regarding their children's mental health care. (Order Granting Motion to Dismiss, pp. 8-10; Addendum, pp. 8-10). Under the Supreme Court's familiar framework for analyzing the sufficiency of a complaint, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing Fed. R. Civ. P. 8). Complaints need not have "detailed factual allegations," but must contain more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," an "unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertion[s]" devoid of "further factual enhancement." *Id.* A plaintiff's complaint need only be "sufficiently detailed to provide the defendants fair notice of what the claim is and the grounds upon which it rests." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011).

The question confronting a court on a motion to dismiss is whether all the facts alleged, *when viewed in the light most favorable to the plaintiffs*, render the

plaintiffs' entitlement to relief plausible. *Id.* The district court must evaluate the cumulative effect of the factual allegations, rather than engaging in a piecemeal review of isolated allegations for plausibility. *Id.* The district court may disregard "legal conclusions couched as fact" or "threadbare recitals of the elements of a cause of action," but must accept non-    conclusory allegations as true, even if seemingly incredible. *Id.* at 12. *See also, Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020) ("For the purposes of our review, we isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements.").

While claiming to be adhering to this standard, the district court in fact disregarded and departed from it in two significant ways: First, it mischaracterized a number of Plaintiffs' allegations as conclusory. Second, the court failed to view the allegations it did not disregard in the light most favorable to Plaintiffs. As a result, the court wrongly determined that Plaintiffs did not state a claim for violation of their fundamental parental rights to make mental health decisions for their children as delineated in *Parham v. J.R.,* 442 U.S. 584, 604 (1979) and *Colon v. Collazo*, 729 F.2d 32, 34 (1st Cir. 1984).

### A. *The District Court Erred In Mischaracterizing And Disregarding Plaintiffs' Allegations Regarding Social Transitioning As Conclusory.*

The District Court erred when it labeled and disregarded "many" allegations in the FAC as "conclusory." (Order, pp. 8-9, Add. pp. 8-9). The court did not specify the "many" allegations which were disregarded. (Order pp. 8-9, Add. pp. 8-9). Instead, the court listed eight out of 162 factual allegations as examples of facts that were disregarded. (Order, p. 9, Add. p.9). The eight identified paragraphs address the issue of "social transitioning," a protocol that includes, *inter alia*, use of alternate gender discordant names and pronouns, adoption of gender discordant dress and appearance and use of gender discordant privacy facilities. (FAC, ¶¶ 42, 43, 45, 46, 56, 74, 78, 84, Appx. pp. 22-24. 26, 29-31, 32). Those paragraphs quote court decisions and a peer-reviewed journal stating that "social transitioning" is recognized as mental health treatment (FAC, ¶¶ 42, 43, Appx. pp. 22-23), so that by engaging in social transitioning with Plaintiffs' children through use of alternate names and pronouns Defendants were implementing mental health treatment without the knowledge or consent of the child's parents. (FAC, ¶¶ 43, 45, 46, 56, 74, 78, 84, Appx. pp. 22-24. 26, 29-31, 32). None of the exemplar paragraphs can be characterized as "conclusory" as defined by the Supreme Court and this Court.

Allegations which are a "legal conclusion couched as fact" or a "threadbare recital of the elements of a cause of action" are regarded as "conclusory" and need

not be presumed to be true for purposes of motions to dismiss. *Ocasio-Hernandez*, 640 F.3d at 12. As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly,* the propriety of dismissal under Rule 12(b)(6) turns on the complaint's compliance with Fed.R.Civ.P. 8(a)(2), which mandates that every complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." 550 U.S. 544, 555 (2007). Rule 8(a)(2) requires more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* Utilizing that measuring stick, the *Twombly* court found that allegations that the defendants had "entered into a contract, combination or conspiracy" and had "agreed not to compete with one another" were merely legal conclusions resting on prior allegations and not independent factual allegations to be presumed true for purposes of Rule 12(b)6. *Id.* at 564.

In *Iqbal,* the Supreme Court identified and disregarded as conclusory an allegation that defendants "knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff] to harsh conditions of confinement as a matter of policy, solely on account of his religion, race, and/or national origin." 556 U.S. at 680. "These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim" and are not subject to an assumption of truth. *Id.* at 681. "Rule 8 does not empower [the plaintiff] to plead the bare elements of his cause of action,

affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.* at 687.

By contrast, allegations of discrete factual events such as, in *Ocasio-Hernández,* defendants questioning the plaintiffs and replacing the plaintiffs with new employees are not "conclusory" in the relevant sense. 640 F.3d at 14. In *Ocasio-Hernández,* this Court rejected the district court's determination that the allegations were conclusory and not presumed to be true. *Id.* This Court explained that while the allegations did not provide specifics regarding the identity of the speakers, dates, times or other details, they did provide sufficient facts to satisfy Rule 8. *Id.* The plaintiffs' allegations were sufficiently detailed to provide the defendants '"fair notice of what the . . . claim is and the grounds upon which it rests.' Those allegations should not have been disregarded." *Id.* (citations omitted). Furthermore, the district court failed to evaluate the cumulative effect of the factual allegations. "The question confronting a court on a motion to dismiss is whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiffs' entitlement to relief plausible." *Id.*

Here, the factual descriptions in the eight allegations described by the district court as "conclusory" are unlike the allegations deemed conclusory in *Twombly* and *Iqbal*. Instead, like the allegations in *Ocasio-Hernández,* Plaintiffs' allegations are discrete factual statements, founded on precedent and peer-reviewed literature, of

the nature of the actions Defendants engaged in. Paragraph 42 states that Defendants were engaging in "social transitioning," and then goes on to quote federal district court decisions' citations to evidence describing "social transitioning" as a medical/mental health treatment for transgender children or children with gender dysphoria. (FAC, ¶ 42, Appx. p. 22-23).[1] Similarly, Paragraph 43 states that "social transitioning" is a "psychosocial treatment," citing to research by an expert on gender identity issues published in a peer-reviewed journal. (FAC, ¶ 43, Appx. pp. 22-23). Furthermore, Paragraphs 74 and 78 state:

> 74. Plaintiffs Foote and Silvestri have learned that, in reckless disregard of their parental rights to make mental health decisions for their children and in direct contravention to their explicit instructions, Baird Middle School staff, and in particular Defendant Foley, **have engaged in regular private meetings and conversations with B.F. in which B.F. has talked about having a discordant gender identity and requested to be affirmed in that identity and called by a male name "R,"** *i.e.,* engage in gender-affirming social transitioning (mental health treatment). In addition, **Baird Middle School staff and Defendant Foley in particular intentionally concealed that information from Plaintiffs in accordance with the Protocol**. (Appx. pp. 29-30) (emphasis added).

> 78. Plaintiffs Foote and Silverstri are informed and believe and based thereon allege that **Defendants Funke and Monette and other Baird Middle School staff**, knowing that G.F. had underlying mental health

---

[1] Notably, one of the cases cited in Paragraph 42 is the district court opinion in *Grimm (G.G.) v. Gloucester County School Board.* Both Defendants and the district court cited to the appellate decision, *Grimm v. Gloucester County School Board*, 972 F.3d 586, 594-597 (4th Cir. 2020) (Memorandum in Support of Motion to Dismiss, [Dkt 26-1] at pp. 1, 9, 20, 23; Order on Motion to Dismiss, [Dkt 51] at p. 9). This substantiates the statement in Paragraph 42 that Defendants knew or should have known that social transitioning is recognized as mental health care.

issues requiring parental notice and input, **engaged in private meetings and conversations with G.F. on multiple occasions to promote experimenting with alternative genders and facilitate his gender-affirming social transitioning**, *i.e.* offer mental health treatment. (Appx. pp. 30-31) (emphasis added).

The emphasized statements above are discrete statements of fact specifying actions taken by Defendants, not recitations of the elements of a substantive due process claim.

None of the exemplar allegations makes a legal conclusion or merely recites the elements of a cause of action as was the case in *Twombly* and *Iqbal*. Therefore, as to those eight paragraphs, the district court's determination that they were conclusory and should be disregarded constitutes clear error. The court did not specify which other allegations it disregarded as conclusory. Therefore, neither Plaintiffs nor this Court can further analyze the district court's finding that Plaintiffs failed to allege sufficient facts to state a claim for violation of parental rights to direct their child's mental health care, which constitutes further error.

### B. The District Court Failed To View The Factual Allegations In A Light Most Favorable To Plaintiffs.

Neither Plaintiffs nor this Court can ascertain which allegations were actually evaluated by the district court, other than the eight paragraphs described immediately above. Whatever factual allegations were reviewed by the district court were not viewed in a light most favorable to Plaintiffs as required under Rule 12(b)6. *Ocasio-Hernández,* 640 F.3d at 7. In fact, "[t]he sole inquiry under Rule 12(b)(6) is whether,

construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted. Fed.R.Civ.P. 12(b)(6)." *Id.* The district court cannot base its conclusion on extraneous considerations. *Id.* at 12. "[T]he court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable" or "recovery is very remote and unlikely." *Id.* at 12-13 (citing *Twombly*, 550 U.S. at 556). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

Examining the district court's order leads, inexorably, to the conclusion that it failed to objectively review the allegations of the Complaint in the light most favorable to Plaintiffs. Instead, the court's statements regarding Plaintiffs' allegations reflect the judge's disbelief of, or disagreement with, the factual allegations and/or belief that proof of the facts is improbable. The court claimed that at the hearing on the motion to dismiss "Plaintiffs were equivocal as to whether Defendants' actions constituted actual mental health treatment or if either of their children had an actual existing mental health condition related to gender identity." (Order, p. 9, Add. p. 9). However, the transcript of the hearing reveals:

> THE COURT: So you're saying that the school is or is not providing mental health treatment?
> ATTORNEY McALISTER: Is providing mental health treatment.
> THE COURT: Is?

ATTORNEY McALISTER: Yes.

(Transcript of Oral Argument, p. 15, lines 4-9, Appx. p. 114). Plaintiffs' counsel went on to say that cases, standards of care and other references in the complaint state that "social transitioning" is mental health treatment. (Transcript, p. 29, line 14 to p. 30, line 10, Appx. pp. 128-129). Nevertheless, the district court claimed that there were no "non conclusory" allegations that "social transitioning" was occurring, or that "social transitioning" includes "supportive actions taken by third parties." (Order, p. 10, Add. p. 10).

The court went on to make its own observations, unsupported by any factual allegations, that, *e.g.,* "Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally, and, more specifically, in Massachusetts public schools where discrimination on the basis of gender identity is not permitted." (Order, p. 10, Add. p. 10). The court's disregard for Plaintiffs' clear statements, supported by case citations and peer-reviewed research cited in the Complaint that social transitioning, which includes name and pronoun preferences (FAC, ¶¶ 42, 43. Appx. pp. 22-23), is mental health treatment and that Defendants were engaging in social transitioning (FAC, ¶¶ 45, 46, 56, 74, 78, 84, Appx. pp. 22-24. 26, 29-31, 32) establishes that it failed to look at the factual allegations in the light most favorable to Plaintiffs, contrary to Rule 12(b)6. *Ocasio-Hernández,* 640 F.3d at 12. The court's recitation

of its own assessment of the meaning of alternate names and pronouns shows that its dismissal was based on its disbelief of or disagreement with the factual allegations contrary to the Supreme Court's admonition in *Neitzke.*

The district court disregarded this Court's and Supreme Court precedents regarding the scope of the Rule 12(b)6 analysis of Plaintiffs' allegations that Defendants violated their rights to make mental health decisions for their children. Its wholesale dismissal of "many" unenumerated factual allegations and creation of its own opinion of Defendants' actions exceed, indeed violate, the required boundaries for a motion to dismiss and should be reversed.

## II. The District Court Mischaracterized Plaintiffs' Claims for Interference With Their Fundamental Parental Rights As An Attempt To Interfere With Defendants' Curricular Decisions.

The district court's mislabeling of Defendants' parental concealment protocol as "curriculum" is further evidence that it reviewed the allegations of the Complaint in the light most favorable to Defendants instead of, as required by Rule 12(b)6, in the light most favorable to Plaintiffs. The court's description of Defendants' Protocol as "a curriculum designed to promote tolerance and provide a safe learning environment for all students" (Order, p. 6, Add. p. 6), coupled with Defendants' statements to Plaintiffs' children about Plaintiffs being "unsafe," (FAC ¶¶ 118-127, Appx. 40-42, 139-146, Appx. pp. 45-48), evidence an attempt to expand Defendants' *in loco parentis* role to include a duty to "protect" transgender children from their

own parents. Since such duties to protect from third party conduct have been rejected by this Court and the Supreme Court, the district court's decision implicitly creating the duty is clear error.

### A. The District Court Erred In Labeling Defendants' Protocol As "Curriculum."

Beginning with its opening statement regarding laws, regulations and guidance related to gender identity, the district court cast Plaintiffs' Complaint as an attempt to interfere with Defendants' rights to prescribe curriculum instead of claims for interference with Plaintiffs' fundamental right to direct the upbringing of their children:

> States enjoy a general power to regulate the schools they support. *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008)., This includes the power to prescribe a curriculum designed to promote tolerance and provide a safe learning environment for all students. *Id*. While parents do not have to send their children to public school, those who make that choice "do not have a constitutional right to direct *how* a public school teaches their child." *Id.* (internal quotation marks omitted) (emphasis in original).

(Order, p. 6, Add. p. 6). The district court conflated the fundamental parental right to direct education as delineated in *Meyer v. Nebraska*, 262 U.S. 390 (1923), *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), *Parker v. Hurley* 514 F.3d 87 (1st Cir. 2008) and *Brown v. Hot, Sexy & Safer*, 68 F.3d 525 (1st Cir. 1995) with the fundamental parental right to direct the upbringing of their children, including making mental health decisions, described in *Troxel v. Granville*, 530 U.S. 57

(2000), *Parham v. J. R.*, 442 U.S. 584 (1979), and *Colon v. Collazo*, 729 F.2d 32

(1st Cir. 1984):

> "[C]onsistent with principles established in *Meyer v. Nebraska*, 262
> U.S. 390 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925),
> Plaintiffs' right to direct the upbringing of their children allows them to
> "choose between public and private schools," but does not give them a
> right "to interfere with the general power of the state to regulate
> education." *Parker*, 514 F.3d at 102."

(Order p. 18, Add. p. 18).

The district court failed to acknowledge the distinction between the

Defendants' right to determine curriculum standards that this Court described in

*Parker* and *Brown* and the actual right asserted by Plaintiffs to direct the upbringing

of their children, including making decisions regarding their mental health and well-

being, as described by this Court in *Colon*, 729 F.2d at 34 and the Supreme Court in

*Parham*, 442 U.S. at 604, and *Troxel*, 530 U.S. at 66-68. Plaintiffs made clear in

their Amended Complaint, briefing and at oral argument that they were asserting the

latter right to direct upbringing, not a right to direct education, as in *Parker* and

*Brown*:

> THE COURT: Under your first count, are you directing your first count
> specifically towards parental right to upbringing or parental right to
> direct an education?
> ATTORNEY McALISTER: Upbringing.
> THE COURT: Upbringing? Because for parental education, the parent
> wouldn't have a right, for example, to say, I don't want you, the school,
> to use a certain book or to teach a certain class. So you're focusing on
> the upbringing?

> ATTORNEY McALISTER: On the upbringing, yes, your Honor. Of course, under *Brown* and *Parker* in the circuit, the First Circuit has been very clear that the right to direct education lies primarily with the school in terms of governance, curriculum, the day-to-day of how school is managed, that that is -- that that is within the purview of the school.
>
> THE COURT: All right.
>
> ATTORNEY McALISTER: But when we get into the personal, how the child is feeling and experiencing, that goes to the upbringing and the values and what the child -- how the child feels, how that is dealt with appropriately.

(Transcript, p. 8, lines 4-25, Appx. p. 107). Notably, during oral argument the court recognized that decisions regarding a child's well-being are the purview of the parents, but claimed that they can be the purview of the school in the context of non-discrimination law[2]:

> ATTORNEY McALISTER: ….This is their interior sense of who they are and that their interior sense of who they are conflicts with their bodies, and that is an inner struggle, mental, emotional, psychological struggle the child is having. And it really doesn't have anything to do with their academics. It has to do with their personal well-being, and that's the purview of the parents. That's what *Troxel* says, if the parents are fit.
>
> THE COURT: Certainly no doubt it is the purview of the parents, **but I think** it is also the purview of the schools as well. And there's -- and I'm sure the defense will cite to the discrimination statute.

(Transcript, p. 9, lines 10-21, Appx. p. 108 (emphasis added)).

This Court's statements in *Brown* and *Parker* elucidate the district court's error in categorizing Plaintiffs' claims as curriculum challenges. "We do not think,

---

[2] The district court's use of the non-discrimination law to supersede parental rights was a further error which Plaintiffs address *infra*.

however, that this freedom [to direct upbringing of children] encompasses a fundamental constitutional right **to dictate the curriculum** at the public school to which they have chosen to send their children." *Brown*, 68 F.3d at 533 (emphasis added). "We have found no federal case under the Due Process Clause which has permitted parents to demand an exemption for their children from **exposure to certain books used in public schools**." *Parker,* 514 F.3d at 102 (emphasis added). However, Plaintiffs are not alleging a right to dictate curriculum or exempt their children from exposure to certain books, nor are they seeking "to restrict the flow of information in the public schools," *Brown*, 68 F. 3d at 534. Instead, they are challenging the Defendants' usurpation of their right to make decisions regarding their children's mental health and well-being and to direct their children's upbringing free of interference from the state. The district court's attempt to recast the relevant rights asserted by Plaintiffs to fit the *Parker/Brown* mold showed its bias and failure to adhere to the requirements of Rule 12(b)6, and to instead look at Plaintiffs' allegations in a light most favorable to Defendants.

### B. The Court Erred In Implicitly Condoning A Duty On The Part Of Defendants To Protect Transgender Children From Their Own Parents.

The district court further condoned Defendants' usurpation of Plaintiffs' fundamental parental rights by relabeling Defendants' protocol as not merely "curriculum," but as "a curriculum designed to promote tolerance and provide a safe

learning environment for all students." (Order, p. 6, Add. p. 6). The district court did not explain how a protocol governing the behavior of school staff could be equated with an academic study plan. Furthermore, when coupled with Defendants' statements that Plaintiffs' children and other students expressing a discordant gender identity are "unsafe at home,"[3] the court is implicitly promoting Defendants' assertion they have a duty to "protect" gender discordant children from their parents. This Court and the Supreme Court have soundly rejected attempts to create a duty to protect students from "harms" by private actors.[4] The district court offers no justification for carving out an exception for gender discordant children with what school officials deem to be "unsupportive" parents.

In *Hasenfus v. LaJeunesse*, this Court rejected parents' claims arising out of school district staff failing to address the bullying of their student daughter and a rash of attempted suicides in relation to their daughter's attempted suicide at school. 175 F.3d 68, 71-72 (1st Cir. 1999). As this Court explained, in *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), the Supreme Court held that ordinarily a state's failure to intervene to prevent harm to an individual by a private actor is not

---

[3]     *See* FAC ¶¶ 118-127, 139-146, Appx. pp. 39-42, 45-47 especially ¶142 quoting Defendant Gazda's public statement that "schools, not homes, are the true 'safe space' for children because schools supply 'caring adults' where students can discuss problems and find support for their 'true identities.'"

[4]     Plaintiffs dispute the implication that the mental health care they chose for their children was harmful to their children or made their children "unsafe."

a constitutional violation, except when a special duty arises, as is the case with prisoners or involuntarily committed mental patients. *DeShaney,* 489 U.S. at 197-200.

The plaintiffs in *Hasenfus* argued that compulsory school attendance and the schools' role as *in loco parentis* created liability for violation of substantive due process akin to the liability for prisons and mental institutions vis-à-vis inmates and patients. 175 F.3d at 71-72. This Court disagreed. *Id.* "The circuits that have confronted this issue have uniformly rejected this argument, holding that school children are not captives of the school authorities and **the basic responsibility for their care remains with their parents**." *Id.* at 71(emphasis added) (citing *Wyke v. Polk County School Board*, 129 F.3d 560, 569 (11th Cir. 1997); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *D.R. v. Middle Bucks Area Voc. Tech. Sch.*, 972 F.2d 1364, 1371-73 (3d Cir. 1992) (per curiam): *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990)). The language in *J.O.* is particularly apropos to this case.

> **The parents still retain primary responsibility for feeding, clothing, sheltering, and caring for the child.** By mandating school attendance for children under the age of sixteen, the state of Illinois has not assumed responsibility for their entire personal lives; these children and their parents retain substantial freedom to act. The analogy of a school yard to a prison may be a popular one for school-age children, but we cannot recognize constitutional duties on a child's lament. Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them.

909 F.2d at 272 (emphasis added). This Court also noted that the *Hasenfus* parents' claim was "especially difficult to accept outright" in light of the Supreme Court's statement in *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 655 (1995): 'we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Hasenfus*, 175 F.3d at 71-72.

Neither Defendants nor the district court provided any authority for their proposition that, contrary to this long-standing precedent, Defendants are required to "protect" Plaintiffs' children who assert a discordant gender identity from their parents who might take a different view of their children's assertions.. As the Seventh Circuit said, "we cannot recognize constitutional duties on a child's lament. Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them." *J.O.*, 909 F.2d at 272. That is particularly true where, as here, such an affirmative duty would collide head-on with parents' fundamental constitutional right to direct the care and upbringing of their children, including making medical and mental health decisions. *Troxel*, 530 U.S. at 66-68, *Parham v. J. R.*, 442 U.S. at 604, and *Colon*, 729 F.2d at 34.

The district court's rendering of the District's protocol as "curriculum," and therefore untouchable by parents, conflicts with this Court's precedent in a way that undermines long-standing fundamental parental rights. The implication that the

District is justified in hiding information from parents to keep children "safe" defies long-standing First Circuit and Supreme Court precedent rejecting affirmative duties on the part of school officials to "protect" children from private parties, and certainly not from their own parents. The district court's order should be overturned.

III.    **The District Court Erred In Its Application Of The "Shocks The Conscience" Test To Plaintiffs' Claims For Violations Of Fundamental Parental Rights.**

The district court's patently inconsistent short cut analysis of Plaintiffs' substantive due process parental rights claims reveals the court's error in superimposing an "intentional harm" shock the conscience analysis onto an alleged interference with a constitutionally protected relationship (the parent-child relationship), which itself shocks the conscience. *McConkie v. Nichols*, 446 F.3d 258, 261 (1st Cir. 2006). The district court also erred in using the "intentional harms" standard for hyper-pressure circumstances instead of the "deliberate indifference" standard for deliberative executive decisions. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010).

The district court agreed with Plaintiffs that Defendants' Parental Concealment Protocol was legally flawed. It even stated that "it is disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child." (Order p. 13, Add. p. 13). However, it still rejected

Plaintiffs' parental rights claims by utilizing a flawed interpretation of precedent regarding the "shocks the conscience" standard.

> The Court agrees that the [district] policy, as described by Plaintiffs, was based on a flawed interpretation of the DESE Guidance and ignored the plain language advising that parents be informed after the student is advised that such communication will occur….Students and parents would almost certainly be better served by a more thoughtful policy that facilitated a supportive and safe disclosure by the student, with support and education available for students and parents, as needed and when accepted.

> Unlike the alleged Ludlow Public Schools policy, a policy that facilitates communication between students and parents would be consistent with the DESE Guidance and its recommendation to avoid surprising students when informing parents about the matter. (Order, p. 16, Add. p. 16).

> While the court is apprehensive about the alleged policy and actions of the Ludlow Public Schools with regard to parental notification, it cannot conclude the decision to withhold information about B.F. and G.F. from Plaintiffs was "so extreme, egregious, or outrageously offensive as to shock the contemporary conscience," given the difficulties this issue presents and the competing interests involved. As conscience-shocking conduct is a necessary element for a substantive due process claim, the court ends its analysis here, without assessing whether Plaintiffs have adequately identified their protected rights and established they were offended under these facts. (Order, p. 17, Add. p. 17).

The court did not identify any "competing interests" to the parents' rights, as there was no concrete allegation of the parents causing or threatening harm to the children. Instead, the court and Defendants were apparently relying on an unspoken assumption that if parents are not supportive of their children's assertion of a

discordant gender identity, then there is suspected abuse or neglect lurking in the background.

In other words, according to the district court, school committees can disregard state law, administrative guidance and parents' fundamental constitutional rights with impunity provided they do so in a way that is not "extreme" or "egregious" in the eyes of the court. If that statement of the law is permitted to stand, then parents will be compelled to surrender their fundamental right to direct the upbringing and mental health care of their children when they enroll them in public school. That is precisely the kind of Hobson's choice that the Supreme Court has soundly and consistently rejected. *See e.g., Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972) ("We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests.").

### A. *Significant interference with a protected relationship is itself "conscience shocking" conduct not something upon which to superimpose a "conscience shocking" analysis.*

The district court correctly stated that "'an exact analysis of circumstances' is needed 'before any abuse of power [can be] condemned as conscience shocking,'" and that "the nature of the right violated" informs the analysis of whether executive action shocks the conscience. (Order, pp. 12-13, Add. pp. 12-13, citing *City of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) and *Martinez v. Cui,* 608 F.3d 54,

64 (1st Cir. 2010), respectively). However, the court failed to analyze the circumstances and nature of the right violated — in this case, Defendants' interference with the fundamental constitutional right of parents to direct the upbringing of their children. *Troxel*, 530 U.S. at 66-68. Had it done so, it would have concluded, consistent with rulings from courts in this Circuit and sister circuits, that interference with a protected relationship, particularly, the parent-child relationship, is itself conscience-shocking. *McConkie*, 446 F.3d at 261; *Grendell v. Gillway*, 974 F. Supp. 46 (D. Me. 1997); *Dubbs v. Head Start*, 336 F.3d 1194, 1202-03 (10th Cir. 2003); *Arnold v. Escambia County,* 880 F.2d 305, 312-14 (11th Cir. 1989); *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000).

As this Court said in *McConkie,* "[c]onscience-shocking conduct usually entails physical or psychological abuse, **or significant interference with a protected relationship, such as the parent-child relationship**." 446 F.3d at 261(citing, *inter alia, Grendell*, 974 F. Supp. at 51) (emphasis added). In *Grendell,* the district court found conscience-shocking behavior in a police officer's intrusive and threatening interrogation of a child regarding her parents' drug use. 974 F. Supp. at 51. "The alleged conduct here…strikes at the basic fabric of all parent-child relationships: love, trust, and faith. Each of these may have been irreparably harmed, not as a result of independent and voluntary actions by either Grendell or her parents,

but because Gillway threatened Grendell in such a way as to turn her into an unwilling informant against her own parents." *Id.*

*Grendell* is particularly instructive in this case in that the tactics employed by the police interrogator resemble the actions Plaintiffs allege Defendants engaged in with their children. The officer in *Grendell* told the child not to tell her parents about talking to the police. *Id.* Here, Defendants established a protocol that directly interfered with the parent-child relationship in that staff were directed not to tell parents about their children's conversations with school staff regarding gender identity.[5] (FAC ¶¶ 36, 45-46, 79, 80, 83, 84, 89, 109; Appx. pp. 20, 23-24, 31, 32, 33, 38). Similar to *Grendell,* in this case Defendants' conversations with Plaintiffs' children, particularly B.F., became increasingly intrusive to the point of turning the children against their parents by questioning whether their parents could be trusted to keep them "safe" and to provide adequate care, mental health assistance, and support. (FAC ¶¶ 118-128, Appx. pp. 40-43). The intrusive conversations coupled with Defendant Gazda's public statements that children's homes were not safe and parents like the Plaintiffs were intolerant bigots hiding behind a "camouflage" of parent rights (FAC ¶ 142, Appx. p. 46), tore apart the fabric of love, trust, and faith

---

[5] That protocol was enforced stringently, as exemplified by teacher Bonnie Manchester whose employment was terminated when she told Plaintiffs about B.F.'s email regarding her assertion of a discordant gender identity. (FAC, ¶ 135, Appx., pp. 44-45).

between Plaintiffs and their children. This damage might not carry the visible scars of a physical assault, but, as the court said in *Grendell,* it cannot be repaired by bandages and medication, *i.e.,* it is irreparable. *See id.* Such irreparable damage based on verbal conduct can and does constitute conscience-shocking behavior. *Id.*

This Court has repeatedly stated that "[a]lthough the cases in which we have found governmental conduct to shock the conscience have often involved state action that was highly physically intrusive, we have pointedly left open the possibility that verbal or other less physical harassment such as that alleged by appellants [falsification of documents and adversely possessing homes] might rise to a conscience-shocking level." *Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 622 (1st Cir. 2000). "We expressly leave open the question of whether verbal harassment and intimidation of this general type [including striking at the fabric of a protected relationship as in *Grendell*] might, under appropriate circumstances, be found to violate due process." *Id. See also, Pittsley v. Warish,* 927 F.2d 3, 7 n.3 (1st Cir. 1991) ("This does not mean that under no circumstances will verbal threats or harassment rise to the level of a constitutional violation.").

The Tenth, Third and Eleventh circuits have concluded that interference with the protected parent-child relationship meets the criteria for a substantive due process claim without a separate "shocks the conscience" analysis. *Dubbs*, 336 F.3d at 1202-03; *Gruenke*, 225 F.3d at 305; *Arnold,* 880 F.2d at 312-14. In *Dubbs,* the

Tenth Circuit overruled the district court's determination that nonconsensual intrusive physical examinations of plaintiffs' preschool children did not state a claim for substantive due process because the conduct did not "shock the conscience." 336 F.3d at 1202. "[T]he district court misapprehended the legal standard applicable to purported substantive due process rights that — like the right to consent to medical treatment for oneself and one's minor children — may be 'objectively, deeply rooted in this Nation's history and tradition'." *Id.* (citations omitted). "It is not implausible to think that the rights invoked here — the right to refuse a medical exam and the parent's right to control the upbringing, including the medical care, of a child — fall within this sphere of protected liberty." *Id.* (citing, *inter alia, Troxel,* 530 U.S. at 66-68). "While the 'shocks the conscience' standard applies to tortious conduct challenged under the Fourteenth Amendment, … it does not exhaust the category of protections under the Supreme Court's substantive due process jurisprudence or eliminate **more categorical protection for 'fundamental rights'** as defined by the tradition and experience of the nation." *Id.* at 1203 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 848-51 (1998)) (emphasis added).

In *Gruenke*, the Third Circuit found that parents' allegations of school staff interference with their decision-making regarding their daughter's pregnancy had sufficiently alleged a constitutional violation of their fundamental parental rights without applying the "shocks the conscience" test. 225 F.3d at 305. Citing *Troxel,*

the Third Circuit reiterated that the parental interest in "the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this [Supreme] Court." *Id.* at 304.

> It is not unforeseeable that a school's policies might come into conflict with the fundamental right of parents to raise and nurture their child. But when such collisions occur, **the primacy of the parents' authority must be recognized** and should yield only where the school's action is tied to a compelling interest.

*Id.* at 305 (emphasis added). "School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Id.* at 307. "Public schools must not forget that 'in loco parentis' does not mean 'displace parents.'" *Id.*

> It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights. State deference to parental control over children is underscored by the Court's admonitions that "[t]he child is not the mere creature of the State," *Pierce*, 268 U.S. at 535, 45 S.Ct. 571, and that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship."

*Id.*

*Arnold* was cited by the *Gruenke* court as an egregious example of "arrogation of the parental role by a school." *Id.* at 306. In *Arnold,* the Eleventh Circuit found "that a parent's constitutional right to direct the upbringing of a minor is violated when the minor is coerced [by school counselors] to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion." 880 F.2d at 312.

"Coercing a minor to obtain an abortion or to assist in procuring an abortion and to refrain from discussing the matter with the parents unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* at 313. The court overturned the district court's dismissal of the plaintiffs' familial privacy claim without engaging in a "shocks the conscience" analysis.

Contrary to the district court's conclusion, an intent to harm "shocks the conscience" finding is not a requirement for a substantive due process claim based on interference with fundamental parental rights. When, as is true here, plaintiffs allege that defendants' conduct strikes at the fabric of the constitutionally protected parent-child relationship, no further "shocks the conscience" analysis is required.

> **B.** **"Deliberate indifference" can constitute "conscience-shocking" conduct in deliberative executive action situations such as implementation of a school protocol.**

Even if a "shocks the conscience" analysis were appropriate for a school district's violation of fundamental parental rights, it would not require proof of "a brutal and inhumane abuse of official power" as described by the district court. (Order, p. 12, Add. p. 12). To the contrary, as the Supreme Court and this Court have said, when the challenged executive action is deliberative, *i.e.,* implemented over the course of time after consideration and review, then deliberate indifference can be sufficient to establish conscience-shocking conduct. *Lewis,* 523 U.S. at 850-52;

*Cruz-Erazo*, 212 F.3d at 622; *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010); *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005). The "intent to harm" standard utilized by the district court is applied to "hyper-pressure" situations where first responders have to make split-second decisions often involving life or death. *Lewis,* 523 U.S. at 847-48; *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010) However, when, as is true here, decision makers have time to research the issue they are seeking to regulate and formulate a policy, then they can be liable for substantive due process violations if their actions amount to deliberate indifference. *Gonzalez-Fuentes*, 607 F.3d at 881.

     *Lewis,* the seminal Supreme Court case defining the "shocks the conscience" standard, is often cited for the proposition, adopted by the district court, that in every case challenging executive, as opposed to legislative, action only a purpose to cause harm unjustified by any governmental interest will constitute conscience-shocking conduct sufficient to state a substantive due process claim. (Order, pp. 11-12, Add. pp. 11-12 citing *Lewis*, 523 U.S. at 849). In fact, *Lewis* does not support such a "one size fits all" approach. *Lewis,* like most of the cases cited by the district court, addressed first responders in high pressure situations, such as high-speed chases, who must make split-second life or death decisions. In **those** circumstances, only conduct that is intentional and aimed at harming the other party in an unjustifiably egregious manner will be found to "shock the conscience." 523 U.S. at 849.

(emphasis added). Absent such exigent circumstances, a lower standard of culpability such as "deliberate indifference" might suffice for a substantive due process violation based on executive action. *Id.* at 850. "[P]reserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* When decision makers have the "luxury of time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," and fail to do the right thing, then "indifference is truly shocking." *Id.* at 853.

Citing *Lewis,* this Court said, "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, **deliberately indifferent behavior may suffice to 'shock the conscience.'**" *Rivera* 402 F.3d at 36 (emphasis added); *see also, J.R. v. Gloria,* 593 F.3d at 80 (citing the language from *Rivera* and finding plaintiffs' evidence did not show the defendants acted even with deliberate indifference). Similarly, in *Gonzalez-Fuentes*, this Court described the differential standard for "shocks the conscience" prescribed by *Lewis*:

> In situations "where government officials must act in haste, under pressure, and without an opportunity for reflection, even applications of deadly force by those officials cannot be conscience-shocking unless undertaken maliciously and sadistically for the very purpose of causing harm." On the other hand, **in situations "where actual deliberation on the part of a governmental defendant is practical, the defendant may be held to have engaged in conscience-shocking activity" by exercising "deliberate indifference**."

607 F.3d at 881 (emphasis added). In other words, the question of whether an executive action "shocks the conscience" is not a "one size fits all" proposition as posited by the district court. Instead, it is a context specific analysis that differs with the nature of action and the type of decision faced by the executive. *Sanford v. Stiles*, 456 F.3d 298, 308 (3d Cir. 2006) (citing *Lewis,* 523 at 850).

> The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. In a "hyperpressurized environment," an intent to cause harm is usually required. On the other hand, in cases where deliberation is possible and officials have the time to make "unhurried judgments," deliberate indifference is sufficient.

*Id.* at 309.

In this case, Defendants were not under pressure to create a protocol related to parental consent and involvement in the context of their children's assertion of a discordant gender identity. DESE had developed guidelines for school committees to follow when children asserted a discordant gender identity. Defendants could have simply implemented those guidelines verbatim, or, as they chose to do, develop their own protocol over the course of time after deliberation. Such unhurried judgments do not involve, as did the situations in *Lewis* and *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005), (cited by the district court), split-second decision-making. Therefore, Defendants are not entitled to avoid liability with the deferential "intent to harm" standard employed by the district court. Instead, their conduct should be evaluated under the "deliberate indifference" standard. The district court's failure to

employ the proper analytical test to Defendants' deliberative actions contradicts precedent. Its resulting decision dismissing Plaintiffs' substantive due process claims should be overturned.

## IV.  The District Court Erred When It Subordinated Fundamental Parental Rights To Massachusetts' Non-Discrimination Law To Justify Defendants' Violation Of Plaintiffs' Rights.

Eschewing decades of Supreme Court precedent, the district court trivialized fundamental parental rights when it subordinated them to the state's non-discrimination law, regulations, and guidance from the Department of Elementary and Secondary Education ("DESE").[6]

> Since July 1, 2012, Massachusetts law has provided that "[n]o person shall be excluded from or discriminated against . . . in obtaining the advantages, privileges and courses of study of [a] public school on account of . . . gender identity." Mass. Gen. Laws ch. 76, § 5. (Order, p. 6 Add. p. 6).

> The regulations implementing the anti-discrimination statute applicable to schools state that "[a]ll public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of . . . gender identity." 603 C.M.R. § 26.05. School committees are also required to "establish policies and procedures . . . that insure that all obstacles to equal access to school programs for all students regardless of . . . gender identity, are removed." 603 C.M.R. § 26.07(1). Although these laws and regulations

---

[6]  As Plaintiffs made clear and the district court acknowledged, they are not challenging the constitutionality of the non-discrimination statutes, regulations or DESE Guidance. *See* Electronic Order granting in part and denying in part Defendants' Motion for Extension of Time [Dkt. 17], referencing Plaintiffs' Memorandum of Law in Opposition to Motion for Extension of Time [Dkt 16]. Instead, they are challenging the Defendants' and district court's use of them to justify violating Plaintiffs' fundamental parental rights.

were adopted before there was universal support for the values they protect, **none were written to provide exceptions to permit parents to override a school's decision to support students who identify as transgender or gender nonconforming**. (Order p. 7, Add. p. 7) (emphasis added).

The district court said that the statutes and regulations do not differentiate based on age. "Neither the statute defining gender identity, nor the statute prohibiting schools from discriminating based on gender identity, limit the age at which a person can assert a gender identity that 'is different from that traditionally associated with the person's physiology or assigned sex at birth.'" (Order, p. 6, Add. p. 6). The district court also cited the DESE Guidance as authority for the proposition that minor students' decisions regarding their gender identity predominate and supersede parents' decisions.

> The DESE Guidance provides that "[t]he responsibility for determining a student's gender identity rests with the student, or in the case of young students not yet able to advocate for themselves, with the parent." …. Other than describing younger students as unable to advocate for themselves, the DESE Guidance does not advise schools to treat students of certain ages or grades differently from older students.

(Order, p.7, Add. p. 7).

While the state laws, regulations and DESE Guidance might not differentiate the right to unilaterally assert a discordant gender identity on the basis of age, Supreme Court precedent does.

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More

> important, historically it has recognized that natural bonds of affection
> lead parents to act in the best interests of their children.

*Parham,* 442 U.S. at 602. "Accordingly, so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 U.S. at 68-69. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 65-66 (citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). That includes obligations related to a child's assertion of a discordant gender identity, particularly in the school setting. "Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." *Vernonia Sch. Dist. v. Acton*, 515 U.S. at 654-55. "Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination — including even the right of liberty in its narrow sense, *i.e.*, the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents or guardians." *Id.*

Therefore, contrary to the district court's statement, socially transitioning a child including by addressing a student by a preferred name and pronouns of the opposite sex is **NOT** "simply accord[ing] a person the basic level of respect expected

in a civil society" that is "true regardless of an individual's age." (Order, p. 10, Add. p. 10). Addressing an 11- or 12-year-old child by gender-discordant names and pronouns without notifying and over the objections of the parents is not "respecting" the child, but disrespecting the parents. More than that, it is violating "perhaps the oldest of the fundamental liberty interests recognized by this [Supreme] Court." *Troxel,* 530 U.S. at 65. Defendants and the district court have abused the state's non-discrimination statutes, regulations, and DESE Guidance to imbue children with rights of self-determination that supersede their parents' fundamental rights to act in the best interests of their minor children to determine their care and upbringing. The Constitution does not permit such a unilateral redistribution of rights.

If the district court's decision is permitted to stand, then state nondiscrimination laws would become roving (and ever expanding) authorizations to deprive parents of their fundamental right to raise their children in accordance with their beliefs and judgment whenever parental decisions do not support the state's viewpoint. Non-discrimination laws are enacted to shield members of protected classes from adverse treatment by state actors. Under the district court's paradigm, non-discrimination laws can be used by state actors to deprive children of their parents' care and protection through the exercise of their fundamental right to direct their children's upbringing. There is no support for that unconstitutional expansion of state authority. The district court's decision should be reversed.

**V. The Court Erred In Concluding (Without Deciding) That Qualified Immunity Would Shield Individual Defendants From Liability For Violating Plaintiffs' Fundamental Parental Rights.**

The District Court's conflation of parents' fundamental right to direct the upbringing and mental health care of their children with the right to direct the school's curriculum and its supported conclusion that Plaintiffs did not allege interference with mental health decision-making claims led to a further error of concluding that the alleged constitutional violations were somehow not clearly established so that the individual defendants would be protected by qualified immunity. (Order, pp. 17-18, Add. pp. 17-18). The district court ignored decades of binding precedent protecting parents from conduct (such as that engaged in by Defendants) that interferes with fundamental parental rights to make decisions regarding their children's well-being to instead *protect Defendants from parents* who might question the district's gender identity protocol. Even while acknowledging that Defendants misinterpreted state guidance to justify prohibiting parental notification regarding their children's gender identity (Order, p. 16, Add. p. 16), the district court labored to shield Defendants from liability for their actions.

When Plaintiffs' allegations are properly analyzed and the relevant constitutional principles properly defined, it is clear that Plaintiffs met their burden to identify authority binding in Massachusetts that put the individual Defendants on notice that their actions violated Plaintiffs' fundamental parental rights inherent in

the Fourteenth Amendment's substantive due process protections. *McKenney v. Mangino*, 873 F.3d 75, 82-83 (1st Cir. 2017); *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018). However, because the Court erroneously concluded that Plaintiffs did not allege a violation of their right to make mental health decisions, it enabled itself to conclude that there was no binding precedent establishing that Defendants' actions violated Plaintiffs' constitutional rights. In fact, both the Supreme Court (*Parham*, 442 U.S. at 604) and this Court (*Colon*, 729 F.2d at 34) have established for decades that parents, not children, have the fundamental right to direct decisions affecting their children's mental health. (Transcript, p. 25 line 16 to 26 line 20. Appx., pp.124-125). By improperly disregarding the allegations regarding social transitioning as mental health treatment, the Court improperly ignored these binding precedents to shield the individual defendants from liability. Similarly, by conflating and rebranding the relevant parental right as the right to direct education instead of the right to direct the upbringing of children, the Court allowed itself to ignore precedent such as *Troxel*, 530 U.S. at 66-68, which clearly established parents' fundamental rights to direct the upbringing of their children more than 20 years ago.

The district court's ease in simply ignoring precedents in order to find that rights are not clearly established exemplifies a trend of improperly expanding the concept of qualified immunity to protect administrators who took deliberative action

while knowing (or they should have known) that they were violating constitutional rights. Much like the "shock the conscience" standard, the "clearly established" factor in qualified immunity has become a "one size fits all" yardstick for all manner of executive decision-makers who exercise a wide range of responsibilities and functions under varying circumstances. *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas J. dissenting from denial of petition for certiorari). "But why should university officers [or in this case K-12 school administrators], who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting? We have never offered a satisfactory explanation to this question." *Id.* "Because our analysis is no longer grounded in the common-law backdrop against which Congress enacted" Section 1983, "we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act. Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J. concurring).

Defendants should not be permitted to engage in "freewheeling policy choices" to preserve Defendants' Protocol by recasting Plaintiffs' fundamental parental rights claims as curriculum challenges and dismissing factual allegations regarding social transitioning as mental health care as "conclusory" to conclude that

these restated rights are not clearly established. Defendants should not escape liability for their deliberate acts of interference with Plaintiffs' parental decision-making.

## CONCLUSION

For nearly 100 years, the Supreme Court has recognized that "[t]he child is not the mere creature of the state," *Pierce,* 268 U.S. at 535. Consequently, while recognizing the state's right to regulate public schools, courts have maintained the "distinction between actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that, although perhaps unwise and offensive, are not of constitutional dimension." *Parker*, 514 F.3d at 102. Defendants' Parental Concealment Protocol strikes at the heart of Plaintiffs' right of parental decision-making on matters of great importance, *i.e.*, children's well-being, and inflicts irreparable injury.

The district court trivialized that fundamental right and failed to properly analyze Plaintiffs' claims as required by Rule 12(b)6. Its order dismissing Plaintiffs' claims based on those errors must be reversed.

Dated: March 13, 2023.

Andrew Beckwith
Samuel J. Whiting
Massachusetts Family Institute
401 Edgewater Place, Suite 580
Wakefield, MA 01880
781.569.0400
andrew@mafamily.org
sam@mafamily.org

/s/ *Mary E. McAlister*
Mary E. McAlister
Vernadette R. Broyles
Child & Parental Rights Campaign, Inc.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
mmcalister@childparentrights.org
vbroyles@childparentrights.org
Attorneys for Plaintiffs – Appellants

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). Not counting the items excluded from the length by Fed. R. App. P. 32(f), this document contains 12,158 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared using Microsoft Word in 14-point Times New Roman font.

DATED:  March 13, 2023

> /s/ *Mary E. McAlister*
> Mary E. McAlister
> *Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, I caused the foregoing to be filed electronically with this Court. Service will be effectuated on the following via the Court's ECF/electronic notification system:

David S. Lawless
Nancy Frankel Pelletier
ROBINSON DONOVAN, P.C
1500 Main Street, Suite 2300
Springfield, MA 01115
dlawless@robinsondonovan.com
npelletier@robinsondonovan.com
Tel. (413) 732-2301
Attorneys for Defendants-Appellees

/s/ *Mary E. McAlister*
Mary E. McAlister
*Attorney for Plaintiffs-Appellants*

**ADDENDUM**

**TABLE OF CONTENTS**

Opinion Below

1. Order on Defendants' Motion to Dismiss ............................................................................1

     Issued 12/14/2022

Statutes

2. M.G.L. c. 76, § 5 ..............................................................................................................20

3. M.G.L. c. 4, § 7(59), "Gender identity" ..........................................................................21

4. M.G.L. c. 112, § 275 ........................................................................................................23

Regulations and Guidance

5. 603 CMR 26.00 ................................................................................................................25

6. DESE "Guidance for Massachusetts Public Schools" .....................................................29

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN FOOTE., et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 22-30041-MGM |
| | * | |
| TOWN OF LUDLOW, LUDLOW SCHOOL | * | |
| COMMITTEE, et al., | * | |
| | * | |
| Defendants. | * | |

ORDER ON DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 25)

December 14, 2022

MASTROIANNI, U.S.D.J.

## I.     INTRODUCTION

Stephen Foote and Marissa Silvestri ("Plaintiffs") have alleged that during the 2020-2021 school year, staff employed by Ludlow Public Schools (1) spoke about gender identity with two of their children, who were then eleven and twelve years old and students at Baird Middle School; (2) complied with the children's requests to use alternative names and pronouns; and (3) did not share information with Plaintiffs about the children's expressed preferences regarding their names and pronouns. Plaintiffs allege these actions, and inactions, violated their fundamental, parental rights protected by the Fourteenth Amendment to the United States Constitution. They filed this action pursuant to 42 U.S.C. § 1983 to seek redress for their alleged injuries.

Plaintiffs assert three claims against the Town of Ludlow; the Ludlow School Committee; Lisa Nemeth, Interim Superintendent; Todd Gazda, former Superintendent; Stacy Monette, Principal of Baird Middle School; Marie-Claire Foley, school counselor at Baird Middle School; and

Jordan Funke, former librarian at Baird Middle School (collectively "Defendants"). First, they allege Defendants violated their fundamental parental right to direct the education and upbringing of their children. Second, they allege Defendants violated their fundamental parental right to direct the medical and mental health decision-making for their children. Finally, they assert Defendants violated their fundamental right to familial privacy.

Defendants have moved for dismissal of Plaintiffs' claims.[1] The court grants Defendants' motion for the reasons that follow.

## II.    MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor, but "do[es] not credit legal labels or conclusory statements." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022). Dismissal is appropriate if the complaint fails to establish at least one "material element necessary to sustain recovery under some actionable legal theory." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir. 2005) (internal citation omitted).

---

[1] The court has also received and reviewed amici curiae memoranda submitted by GLBTQ Legal Advocates and Defenders and the Massachusetts Association of School Superintendents in support of Defendants and the Family Institute of Connecticut in support of Plaintiffs.

### III.   Factual Allegations[2]

During the 2020-2021 school year, Plaintiffs' children B.F. and G.F. were eleven and twelve years old and were students at Baird Middle School in Ludlow, Massachusetts. Early in the school year, school librarian Jordan Funke gave students in B.F.'s sixth grade class an assignment to make biographical videos. Funke invited students to include their gender identity and preferred pronouns in their videos. The students also received instruction about language that is inclusive of students with different gender identities.

In December 2020, B.F. spoke with a teacher and asked for help talking to Plaintiffs about concerns about depression, low self-esteem, poor self-image, and possible same-sex attraction. The teacher spoke with Silvestri, B.F.'s mother, and shared B.F.'s concerns with her. Shortly after that conversation, Silvestri sent an email to B.F.'s other teachers, Stacy Monette, Todd Gazda, and several members of the Ludlow School Committee. In her email, she stated that Plaintiffs were aware of the teacher's concerns about B.F.'s mental health, they would be getting B.F. professional help, and requested that no one receiving the email "have any private conversations with B.[F.] in regards to this matter." (Dkt. No. 22, Am. Compl. ¶ 70.)

On February 28, 2021, B.F. sent an email to Gazda, Marie-Claire Foley, and several teachers. In that email, B.F. identified as genderqueer and announced a new preferred name, one typically used by members of the opposite sex, and a list of preferred pronouns. Foley met with B.F. and, after their meeting, sent an email stating that B.F. was "still in the process of telling" Plaintiffs about B.F.'s gender identity and instructed school staff that they should not use B.F.'s new preferred name and pronouns when communicating with B.F.'s parents. Foley's position was consistent with a

---

[2] Plaintiffs' Amended Complaint included a section entitled "Factual Allegations" that contained a mix of "non-conclusory, non-speculative factual allegations" together with conclusory statements about the legal significance of various factual allegations. *Cheng*, 51 F.4th at 443. The court summarizes the factual allegations, which the court must credit at this stage, but omits the legal conclusions promoted by Plaintiffs. *Id.*

policy sanctioned by the School Committee, pursuant to which school personnel would only share information about a student's expressed gender identity with the student's parents if the student consented to such communication. After Foley sent her email, teachers at Baird Middle School began using B.F.'s new preferred name and pronouns.

In early March, the same teacher who had spoken with Silvestri in December informed Plaintiffs about B.F.'s email, despite the policy and B.F.'s request that Plaintiffs not be told. On March 8, 2021, Foley sent another email to school staff in which she reiterated that B.F. had expressly requested that Plaintiffs not be told about B.F.'s new first name. Several days later, Foley gave B.F. permission to use boys' bathrooms, girls' bathrooms, or gender-neutral bathrooms. Around this same time, G.F. also began using a different preferred name and school staff did not inform Plaintiffs.

On March 18, 2021, Monette met with Plaintiffs. During their meeting, Plaintiffs asserted that Defendants had disregarded their parental rights by not complying with Silvestri's December 2020 request that staff not engage with B.F. regarding mental health issues and by failing to notify them about their children's use of alternate names and pronouns. Plaintiffs also conveyed to Monette their belief that school staff were acting improperly by affirming B.F.'s and G.F.'s self-asserted gender identities. Monette refused to discuss the issues raised by Plaintiffs and ended the meeting abruptly.

Plaintiffs met with Gazda on March 21, 2021. During that meeting, they expressed concerns about negative consequences their children might experience as a result of being able to use names and pronouns associated with the opposite sex. They objected to the way school staff had disregarded their instructions and supported the children's use of different names and pronouns at school. Plaintiffs also told Gazda that they believed school staff violated their rights with respect to their children's student records by concealing information about their children from them.

4

In response, Gazda told Plaintiffs that school staff acted appropriately and consistently with policies approved by the School Committee when they began using the children's new names and pronouns without consulting with or notifying Plaintiffs. Gazda also asserted that school staff had not violated the Massachusetts regulation protecting parents' "rights of confidentiality, inspection, amendment, and destruction of student records" for students under the age of fourteen and not yet in ninth grade. 603 C.M.R. § 23.01. Gazda took the same positions when he met with Plaintiffs again on March 26, 2021.

Foley met with B.F. weekly throughout the spring of 2021. They discussed B.F.'s gender identity and mental health issues. During their conversations, Foley consistently affirmed B.F.'s gender identity. On some occasions, Foley expressed concern about whether Plaintiffs were providing appropriate care for B.F. and whether B.F. had sufficient support to stay safe. She asked whether B.F. was as comfortable discussing issues with the counselor chosen by Plaintiffs as with her and encouraged B.F. to speak with another counselor to increase sources of support. Foley did not communicate with Plaintiffs about B.F.'s gender identity or any other issues they discussed. B.F. also talked about gender identity with Funke. Funke was affiliated with an organization that shares resources related to gender and gender identity and Funke encouraged B.F. to visit the organization's website.

Later in the spring, Gazda publicly defended the Ludlow Public Schools policy. During School Committee meetings on May 25, 2021 and June 8, 2021, Gazda expressed support for the policy that instructed school staff to respect students' expressed gender identities and follow a student's preferences about whether to share information about the student's gender identity with the student's parents. He described the types of "parental rights" concerns raised by Plaintiffs as thinly-veiled intolerance and asserted that for some students who are transgender or gender nonconforming, school is the only safe place to express who they are.

5

IV.     STATE LAWS, REGULATIONS, AND GUIDANCE REGARDING GENDER IDENTITY

States enjoy a general power to regulate the schools they support. *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008). This includes the power to prescribe a curriculum designed to promote tolerance and provide a safe learning environment for all students. *Id.* While parents do not have to send their children to public school, those who make that choice "do not have a constitutional right to direct *how* a public school teaches their child." *Id.* (internal quotation marks omitted) (emphasis in original).

The Commonwealth of Massachusetts recognizes gender identity as a personal characteristic deserving of protection from discrimination. Since July 1, 2012, Massachusetts law has provided that "[n]o person shall be excluded from or discriminated against . . . in obtaining the advantages, privileges and courses of study of [a] public school on account of . . . gender identity." Mass. Gen. Laws ch. 76, § 5. As defined under Massachusetts law, "gender identity" means "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth." Mass. Gen. Laws ch. 4, § 7.

A person's "gender-related identity may be shown by providing . . . any . . . evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose." *Id.*; *see also* 603 C.M.R. § 26.01.  Neither the statute defining gender identity, nor the statute prohibiting schools from discriminating based on gender identity, limit the age at which a person can assert a gender identity that "is different from that traditionally associated with the person's physiology or assigned sex at birth." *Id.* Similarly, a separate provision of Massachusetts law related to minors and gender identity does not distinguish between children of different ages and, instead, provides a blanket prohibition against health care providers engaging in any practice, with any patient under the age of eighteen,

"that attempts or purports to impose change of an individual's . . . gender identity." Gen. Laws ch. 112, § 275.

The regulations implementing the anti-discrimination statute applicable to schools state that "[a]ll public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of . . . gender identity." 603 C.M.R. § 26.05. School committees are also required to "establish policies and procedures . . . that insure that all obstacles to equal access to school programs for all students regardless of . . . gender identity, are removed." 603 C.M.R. § 26.07(1). Although these laws and regulations were adopted before there was universal support for the values they protect, none were written to provide exceptions to permit parents to override a school's decision to support students who identify as transgender or gender nonconforming.

Additional, non-binding guidance for schools has been provided by the Massachusetts Department of Elementary and Secondary Education (DESE). The DESE Guidance provides that "[t]he responsibility for determining a student's gender identity rests with the student, or in the case of young students not yet able to advocate for themselves, with the parent." DESE, GUIDANCE FOR MASSACHUSETTS PUBLIC SCHOOLS CREATING A SAFE AND SUPPORTIVE SCHOOL ENVIRONMENT (hereafter "DESE Guidance"), https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html#5. Schools are advised that "[t]here is no threshold medical or mental health diagnosis or treatment requirement that any student must meet in order to have his or her gender identity recognized and respected by a school." *Id.* The DESE Guidance also encourages schools to "engage the student, and in the case of a younger student, the parent, with respect to name and pronoun use." *Id.* Other than describing younger students as unable to advocate for themselves, the DESE Guidance does not advise schools to treat students of certain ages or grades differently from older students.

The DESE Guidance advises that not all transgender and gender nonconforming students are open about their gender identities with their families for reasons that can include safety concerns

and lack of acceptance. *Id.* When students self-identify to a school as transgender or gender nonconforming, the DESE Guidance advises that "[s]chool personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian" and "discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian." *Id.* The provisions of the DESE Guidance related to communications with a student's family do not distinguish between older and younger students.

## V.   DISCUSSION

Plaintiffs have alleged Defendants' conduct violated three different fundamental parental rights protected under the substantive due process clause of the Fourteenth Amendment: (1) the right to direct the education and upbringing of their children (Count I), (2) the right to make medical and mental health decisions for their children (Count II), and (3) the right to family integrity (Count III). Defendants have moved for dismissal, pursuant to Fed. R. Civ. P. 12(b)(6), of all three of Plaintiffs' claims, as to all Defendants. They assert that even when the court credits the well-pleaded factual allegations, Plaintiffs' Amended Complaint fails to identify a substantive due process claim cognizable under 42 U.S.C. § 1983. Defendants also argue that any claims asserted against the individual defendants should be dismissed pursuant to the doctrine of qualified immunity.

The court begins its analysis by assuming the truth of Plaintiffs' factual allegations and identifying any statements in the complaint that merely offer legal conclusions couched as fact, since such conclusory statements are not entitled to the presumption of truth. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). Many factual allegations set forth in Plaintiffs' Amended Complaint are followed by statements that draw a conclusion about the nature or significance of the alleged fact. For example, the Amended Complaint contains factual allegations

about Defendants' responses to B.F.'s and G.F.'s requests to use their preferred names and pronouns followed by brief descriptors identifying the actions as "social transitioning," "mental health treatment" and, in one instance, as "psychosocial treatment." (*See e.g.* Dkt. No. 22, Am. Compl. ¶¶ 42, 43, 45, 46, 56, 74, 78, 84.) At the hearing on Defendants' Motion to Dismiss, Plaintiffs were equivocal as to whether Defendants' actions constituted actual mental health treatment or if either of their children had an actual existing mental health condition related to gender identity. While Plaintiffs maintained that Defendants were providing mental health treatment when they "permit[ted] [B.F. and G.F.] to be identified as either nonbinary or the opposite sex of what their bodies are," the Amended Complaint alleges insufficient facts for the court to conclude that the conduct at issue constituted mental health treatment. (Dkt. No. 48, Tr. Oct. 17, 2022 Hr'g, 14.) Although "social transitioning," "mental health treatment," and "psychosocial treatment" all appear to be terms of art, Plaintiffs have not provided the context necessary for the court to infer the alleged conduct had clinical significance, as the Amended Complaint describes the terms in a conclusory manner and contains no allegations that either minor had a diagnosed mental health condition related to gender identity.

"Being transgender is . . . not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), as amended (Aug. 28, 2020) (internal quotation marks omitted). Gender dysphoria is a recognized mental health disorder, but Plaintiffs have not alleged either child has been diagnosed with gender dysphoria, or even that Defendants erroneously believed the children suffered from gender dysphoria. *Id.* at 594-95. Plaintiffs have not alleged Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when there is no treatment plan or diagnosis in place. Similarly, there

are no non-conclusory allegations that social transitioning was actually occurring or includes supportive actions taken by third parties, as opposed to actions a person takes to understand or align their external gender presentation with their gender identity. Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally, and, more specifically, in Massachusetts public schools where discrimination on the basis of gender identity is not permitted. *See* Mass. Gen. Laws ch. 76, § 5. This is true regardless of an individual's age, provided the individual does not have a fraudulent purpose for using a new preferred name or pronouns. *Id.*

In the absence of supporting factual allegations, such as a relevant medically-recognized diagnosis and treatment plan, the court disregards Plaintiffs' conclusory statements describing the use of preferred names and pronouns as mental health treatment. Plaintiffs have failed to adequately allege that Defendants provided medical or mental health treatment to B.F. and G.F. simply by honoring their requests to use preferred names and pronouns at school. Accordingly, Plaintiffs have not adequately stated a claim that Defendants usurped their right to make medical and mental health treatment decisions for their children. Count II is, therefore, dismissed.

The court next considers whether the factual allegations are sufficient to state the substantive due process claims asserted in Counts I and III. The substantive due process guarantees of the Fourteenth Amendment protect individuals from arbitrary government actions that interfere with "those fundamental rights . . . which are . . . deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks omitted). The Due Process Clause protects against egregious abuses by government actors, but does not "impos[e] liability whenever someone cloaked with state authority causes harm" or guarantee that officials will use care when acting on behalf of the state. *County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998). The vehicle for enforcing the substantive rights guaranteed under the Fourteenth

10

Amendment is 42 U.S.C. § 1983, which "affords a private right of action in favor of persons whose federally assured rights are abridged by state actors." *Kando v. Rhode Island State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018).

"To be cognizable, a substantive due process claim under 42 U.S.C. § 1983 must allege facts so extreme and egregious as to shock the contemporary conscience." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59-60 (1st Cir. 2020) (internal quotation marks omitted); *see also Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) ("[T]he shocks-the-conscience test . . . governs *all* substantive due process claims based on executive, as opposed to legislative, action."). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

At the motion to dismiss phase, substantive due process claims "must be carefully scrutinized to determine if the alleged facts support the conclusion that the state has violated an individual's constitutional rights." *Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir. 2005). Courts in the First Circuit take a "two-tiered approach" to substantive due process claims based on the behavior of state actors. *Martinez*, 608 F.3d at 64. Under this approach, a plaintiff must establish both conscience-shocking behavior by the defendant and "that a protected right was offended" by the defendant's conduct. *Id.* at 65. Generally, courts first determine whether the alleged conduct was sufficiently egregious because it is "[o]nly after 'show[ing]' a constitutionally significant level of culpability' [that] a plaintiff [may] 'turn to establishing that a protected right was offended.'"[3] *Abdisamad*, 960 F.3d at 60 (quoting *Martinez*, 608 F.3d at 65).

---

[3] Prior to *Abdisamad*, the First Circuit stated that while courts have "typically looked first to whether the acts alleged were conscience-shocking," the two-tiered process need not be applied rigidly. *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011). However, as the Supreme Court explained in *Lewis*, courts do not need to determine whether "to recogniz[e] a substantive due process right to be free of [the alleged] executive action" unless they first determine the "necessary condition of egregious behavior" has been satisfied. *Lewis*, 523 U.S. at 847 n.8. There is no reason to depart from the typical analytical framework in this case given the relatively vague manner in which Plaintiffs have described the asserted fundamental liberty interests allegedly violated by Defendants and connected those interests to historically-established fundamental rights and liberties. *See Glucksberg*, 521 U.S. at 721 (1997); *see also Martinez*, 608 F.3d at 65 n.9

During the hearing on Defendants' Motion to Dismiss, the court asked Plaintiffs to identify the specific allegations of conscience-shocking conduct supporting their claims. Plaintiffs argued generally that Defendants' adoption and implementation of a policy of withholding information about a student's gender identity deprived Plaintiffs of their rights to make decisions about the upbringing of their children and intentionally undermined the parent/child relationship in a manner that shocks the conscience. The court understands this conduct, as alleged, to be offered in support of Plaintiffs' claims in Counts I and III.

There is no precise definition for conscience-shocking behavior that can be applied mechanistically to Plaintiffs' allegations. *See DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005). However, a "stunning" level of arbitrariness that goes beyond "[m]ere violations of state law" is required. *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006) (internal quotation marks omitted). Bad faith may help tip the scale, but "the contemporary conscience is much more likely" to be shocked by conduct that was "intended to injure in some way unjustifiable by any government interest." *DePoutot*, 424 F.3d at 119 (internal quotation marks omitted). The nature of the right violated and the government's competing interests, if any, may inform the determination of whether particular behavior shocks the conscience. *See Martinez*, 608 F.3d at 66. "Indeed, '[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *González-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010)) (alterations in original).

(describing the two-tiered approach as beginning with the level of culpability, while also observing "some tension between how *Lewis* and *Glucksberg* described the order in which courts should proceed to identify whether a plaintiff has identified a protected right").

Often, "an exact analysis of circumstances" is needed "before any abuse of power [can be] condemned as conscience shocking." *Lewis*, 523 U.S. at 850. Here, the circumstances certainly include the facts Plaintiffs have alleged about the conduct of various defendants. These include: inviting students to provide their preferred pronouns as part of a personal biography project; sharing information about gender identity with B.F.; failing to respond to Silvestri's December 2020 email; engaging in supportive discussions with B.F. about gender identity; facilitating B.F.'s and G.F.'s use of their preferred names and pronouns while at school; deciding not to notify Plaintiffs when B.F. and G.F. began using different preferred names and pronouns; and publicly describing the views of individuals, including parents, who oppose Ludlow Public School policies for supporting transgender and gender nonconforming students, as intolerant and hateful. The relevant circumstances also include Massachusetts laws and regulations regarding gender identity, which establish a significant government interest in providing students with a school environment in which they may safely express their gender identities,[4] regardless of their ages or the preferences of their parents. Plaintiffs have not challenged the constitutionality of these laws.

Plaintiffs have framed their claims in the context of their rights as parents to make decisions for their children without state interference. Defendants have framed their actions in the context of obligations under Massachusetts law to provide a nondiscriminatory environment to all their students. At the hearing on Defendants' motion, Plaintiffs acknowledged that Defendants were not permitted to discriminate on the basis of gender identity, but asserted that Defendants' adoption and implementation of a policy of withholding information about their children's gender identity from parents went beyond what the law required and intentionally undermined the parent/child relationship in a manner that shocks the conscience.

---

[4] Provided, of course, that there was no evidence that a student had asserted a particular gender identity for an improper purpose. *See* Mass. Gen. Laws ch. 4, § 7.

On its face, the Massachusetts non-discrimination statute does not require such a policy and it is disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child. Indeed, in an earlier case, this court recognized that deception by school officials could shock the conscience where the conduct obscured risks to a person's bodily integrity and was not justified by any government interest. *See Hootstein v. Amherst-Pelham Reg. Sch. Comm.*, 361 F. Supp. 3d 94, 112 (D. Mass. 2019). In that case, the plaintiff alleged school officials made deceptive statements about the safety of school drinking water that obscured the risks he faced when he drank water at the school and the deception violated his right to bodily integrity.[5] *Id.* Here, the court must consider the specific facts of this case—including the government interest, if any, served by Defendants' conduct—to determine whether Plaintiffs have met their burden of identifying conscience-shocking conduct.

In December 2020, B.F. talked with a teacher about mental health concerns and possible same-sex attraction and expressed relief and gratitude when the teacher offered to talk with Plaintiffs about those concerns. The teacher then contacted B.F.'s mother (Silvestri), who responded by sending an email to B.F.'s teachers, Monette, Gazda, and members of the School Committee, in which she stated that Plaintiffs were getting B.F. professional help and requested that school staff not have any further private conversations with B.F. related to the concerns the teacher and B.F. had discussed. Two months later, B.F. identified as genderqueer, announced a new preferred name and list of preferred pronouns and, in contrast to December, did not ask for help talking with Plaintiffs. Instead, B.F. asked school staff to wait to use the new name and pronouns with Plaintiffs until after B.F. told Plaintiffs about them. Despite B.F.'s request and the alleged policy, the same teacher who

---

[5] The plaintiff in *Hootstein* was a grandparent proceeding pro se and only his own bodily integrity claim survived the motion to dismiss because, as a pro se litigant, he could not bring claims on behalf of others.

14

talked with Silvestri in December 2020 informed Silvestri about Plaintiff's gender identity. This contact with B.F.'s parents was made in violation of school policy and without administrative approval. Upon learning that B.F. was using a new name and pronouns at school, Plaintiffs met with Monette. They asserted school staff were acting illegally by allowing their children to use preferred names and pronouns without parental permission. Following that meeting, Defendants deferred to the preferences of B.F. and G.F. and did not share any information about their gender identities with Plaintiffs.

Massachusetts has identified a strong government interest in providing all students, regardless of age, with a school environment safe from discrimination based on gender identity. Under Massachusetts law, a person may establish their gender identity with "any . . . evidence that the gender-related identity is sincerely held as part of [the] person's core identity," except that "gender-related identity shall not be asserted for any improper purpose." Mass. Gen. Laws ch. 4, § 7; *see also* 603 C.M.R. § 26.01. There is no statutory limitation on the age at which an individual may assert a gender identity "different from that traditionally associated with the person's physiology or assigned sex at birth," and no exception that would allow a parent's beliefs to supersede a minor's sincerely held beliefs. *Id.; see also* Mass. Gen. Laws ch. 112, § 275 (barring gender conversion therapy for all minors).

Though non-binding, the DESE Guidance related to gender identity also provides relevant context for Defendants' actions. The DESE Guidance emphasizes the importance of creating a safe and supportive environment for students and encourages schools to work with students to develop plans for use of preferred names and pronouns. "[I]n the case of a younger student," DESE advises schools to create a plan with input from parents, but DESE has not defined younger students, other than by describing them as "not yet able to advocate for themselves." DESE Guidance, https://www.doe.mass. edu/sfs/lgbtq/genderidentity.html#5. The DESE Guidance also

encourages schools to consult with students who assert a different gender identity at school before disclosing information about a student's gender identity to the student's family.

Plaintiffs assert the Ludlow Public Schools adopted and implemented a policy that went beyond the DESE Guidance and rigidly prohibited any communication with parents about a student's gender identity unless the student consented and this policy shocked the conscience, at least when applied to students in middle school. The court agrees that the policy, as described by Plaintiffs, was based on a flawed interpretation of the DESE Guidance and ignored the plain language advising that parents be informed after the student is advised that such communication will occur. *See id.* ("School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian."). Students and parents would almost certainly be better served by a more thoughtful policy that facilitated a supportive and safe disclosure by the student, with support and education available for students and parents, as needed and when accepted. Such a policy should also consider the many complicated and emotional issues and scenarios that may arise when this type of information is shared. Beliefs, understanding, and opinions surrounding this subject may evolve in a positive way with the benefit of information and honest dialogue. But, currently, the topic may also evoke negative or harmful reactions, which also must be considered. This is especially true when, as in this case, the students are old enough to independently assert their transgender or gender nonconforming identity, but still many years away from adulthood. Unlike the alleged Ludlow Public Schools policy, a policy that facilitates communication between students and parents would be consistent with the DESE Guidance and its recommendation to avoid surprising students when informing parents about the matter.

However, even if Defendants' policy was imperfect and contrary to the non-binding DESE Guidance, the alleged policy was consistent with Massachusetts law and the goal of providing

transgender and gender nonconforming students with a safe school environment. This case involves a difficult and developing issue; schools, and society as a whole, are currently grappling with this issue, especially as it relates to children and parents. *See Martinez*, 608 F.3d at 66 ("[W]hether behavior is conscience-shocking may be informed . . . by the nature of the right violated."). While the court is apprehensive about the alleged policy and actions of the Ludlow Public Schools with regard to parental notification, it cannot conclude the decision to withhold information about B.F. and G.F. from Plaintiffs was "so extreme, egregious, or outrageously offensive as to shock the contemporary conscience," given the difficulties this issue presents and the competing interests involved. *DePoutot*, 424 F.3d at 119. As conscience-shocking conduct is a necessary element for a substantive due process claim, the court ends its analysis here, without assessing whether Plaintiffs have adequately identified their protected rights and established they were offended under these facts. *See Abdisamad*, 960 F.3d at 60.

Finally, having determined that Plaintiffs' Amended Complaint should be dismissed on substantive grounds, it is not necessary for the court to address Defendants' arguments regarding qualified immunity. However, the court briefly notes that had Plaintiffs' Amended Complaint survived the substantive analysis, qualified immunity would warrant dismissal of the claims asserted against all individual defendants. *See id.* ("Individual government officials may be sued 'for federal constitutional or statutory violations under § 1983,' though 'they are generally shielded from civil damages liability under the principle of qualified immunity.'"). Qualified immunity shields individual government actors from liability unless the plaintiff can demonstrate both that the "the defendant violated the plaintiff's constitutional rights" and that "the right at issue was 'clearly established' at the time of the alleged violation." *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022).

To satisfy the "clearly established" prong, a "plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put [a state actor] on notice that his

conduct fell short of the constitutional norm.'" *Id.* (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)). While "there need not be a case directly on point," a plaintiff must be able to identify "precedents existing at the time of the incident [that] establish[ed] the applicable legal rule with sufficient clarity and specificity" that the defendant was on notice that their conduct would violate the rule. *McKenney v. Mangino*, 873 F.3d 75, 82-83 (1st Cir. 2017) (internal quotation marks omitted). Here, Plaintiffs would have to identify authority addressing sufficiently similar facts occurring where similar state laws applied. That authority would either need to be binding in Massachusetts or demonstrate a consensus among persuasive authorities such that the individual defendants should have known their actions violated Plaintiffs' parental rights protected by substantive due process.

Having reviewed all the cases cited by Plaintiffs, the court finds they do not meet this burden. First, the court observes that legal protections for gender identity are a recent development and a broad awareness of issues surrounding the topic of gender identity is still growing. Second, as discussed above, Defendants did not provide mental healthcare to Plaintiffs' children when supporting their use of preferred names and pronouns. Finally, consistent with principles established in *Meyer v. Nebraska*, 262 U.S. 390 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), Plaintiffs' right to direct the upbringing of their children allows them to "choose between public and private schools," but does not give them a right "to interfere with the general power of the state to regulate education." *Parker*, 514 F.3d at 102. Here, the individual defendants' respective decisions not to share information with Plaintiffs about their children's gender identities complied with a Ludlow Public Schools policy which, though not required by, was consistent with Massachusetts laws that have not been challenged by Plaintiffs.

**VI.    CONCLUSION**

For the reasons discussed above, Defendants' Motion to Dismiss (Dkt. No. 25) is

ALLOWED. Plaintiffs' Amended Complaint (Dkt. No. 22) is dismissed and this case may now be

closed.

It is so Ordered.

> _/s/ Mark G. Mastroianni_
> MARK G. MASTROIANNI
> United States District Judge

19

| **Part I** | ADMINISTRATION OF THE GOVERNMENT |
|---|---|
| **Title XII** | EDUCATION |
| **Chapter 76** | SCHOOL ATTENDANCE |
| **Section 5** | PLACE OF ATTENDANCE; VIOLATIONS; DISCRIMINATION |

---

Section 5. Every person shall have a right to attend the public schools of the town where he actually resides, subject to the following section. No school committee is required to enroll a person who does not actually reside in the town unless said enrollment is authorized by law or by the school committee. Any person who violates or assists in the violation of this provision may be required to remit full restitution to the town of the improperly-attended public schools. No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation.

| **Part I** | ADMINISTRATION OF THE GOVERNMENT |
|---|---|
| **Title I** | JURISDICTION AND EMBLEMS OF THE COMMONWEALTH, THE GENERAL COURT, STATUTES AND PUBLIC DOCUMENTS |
| **Chapter 4** | STATUTES |
| **Section 7** | DEFINITIONS OF STATUTORY TERMS; STATUTORY CONSTRUCTION |

Section 7. In construing statutes the following words shall have the meanings herein given, unless a contrary intention clearly appears:

First, "Aldermen", "board of aldermen", "mayor and aldermen", "city council" or "mayor" shall, in a city which has no such body or officer, mean the board or officer having like powers or duties.

Second, "Annual meeting", when applied to towns, shall mean the annual meeting required by law to be held in the month of February, March or April.

Second A, "Appointing authority", when used in connection with the operation of municipal governments shall include the mayor of a city and the board of selectmen of a town unless some other local office is designated as the appointing authority under the provisions of a local charter.

Third, "Assessor" shall include any person chosen or appointed in accordance with law to perform the duties of an assessor.

Fifty-fifth, "Housing court" shall mean a division of the housing court department of the trial court, or a session thereof for holding court.

Fifty-sixth, "District court" or "municipal court" shall mean a division of the district court department of the trial court, or a session thereof for holding court, except that when the context means something to the contrary, said words shall include the Boston municipal court department.

Fifty-seventh, "Municipal court of the city of Boston" shall mean the Boston municipal court department of the trial court, or a session thereof for holding court.

Fifty-eighth, "Juvenile court" shall mean a division of the juvenile court department of the trial court, or a session thereof for holding court.

Fifty-ninth, "Gender identity" shall mean a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth. Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose.

Sixtieth, "Age of criminal majority" shall mean the age of 18.

Sixty-first, "Offense-based tracking number" shall mean a unique number assigned by a criminal justice agency, as defined in section 167 of chapter 6, for an arrest or charge; provided, however, that any such

| **Part I** | ADMINISTRATION OF THE GOVERNMENT |
|---|---|
| **Title XVI** | PUBLIC HEALTH |
| **Chapter 112** | REGISTRATION OF CERTAIN PROFESSIONS AND OCCUPATIONS |
| **Section 275** | SEXUAL ORIENTATION AND GENDER IDENTITY CHANGE EFFORTS |

---

Section 275. (a) As used in this section, the following words shall, unless the context clearly requires otherwise, have the following meanings:-

"Gender identity", shall have the same meaning as under clause Fifty-ninth of section 7 of chapter 4.

"Health care provider", a health care professional licensed under this chapter including, but not limited to, a physician, psychologist, social worker, nurse or allied mental health and human services professional, including marriage and family therapist, rehabilitation counselor, mental health counselor or educational psychologist.

"Sexual orientation", having an orientation for or being identified as having an orientation for heterosexuality, bisexuality or homosexuality.

"Sexual orientation and gender identity change efforts", any practice by a health care provider that attempts or purports to impose change of an individual's sexual orientation or gender identity including, but not limited to, efforts to change behaviors or gender expressions or to

eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex; provided, however, that "sexual orientation and gender identity change efforts" shall not include practices that: (i) (A) provide acceptance, support and understanding of an individual's sexual orientation, gender identity or gender expression; (B) facilitate an individual's coping, social support and identity exploration and development; or (C) are sexual orientation-neutral or gender identity-neutral, including interventions to prevent or address unlawful conduct or unsafe sexual practices; and (ii) do not attempt or purport to impose change of an individual's sexual orientation or gender identity.

(b) A health care provider shall not advertise for or engage in sexual orientation and gender identity change efforts with a patient who is less than 18 years of age.

(c) A health care provider who violates this section shall be subject to discipline by the appropriate licensing board. Such discipline may include suspension or revocation of license.

(d) A violation of this section by a health care provider shall be a violation of section 2 of chapter 93A. Such a claim brought under this section shall be subject to sections 5A and 7 of chapter 260.

603 CMR:   DEPARTMENT OF EDUCATION

**603 CMR 26.00:     ACCESS TO EQUAL EDUCATIONAL OPPORTUNITY**

Section

26.01:   Purpose and Construction; Definition
26.02:   School Admissions
26.03:   Admission to Courses of Study
26.04:   Career and Educational Guidance
26.05:   Curricula
26.06:   Extra-curricular Activities
26.07:   Active Efforts
26.08:   Notification and Complaint Procedure
26.09:   Private Right of Enforcement

26.01:   Purpose and Construction; Definition

(1)   603 CMR 26.00 is promulgated to insure that the public schools of the Commonwealth do not discriminate against students on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation and that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges and courses of study at such schools. 603 CMR 26.00 shall be liberally construed for these purposes.

(2)   The obligation to comply with 603 CMR 26.00 is not obviated or alleviated by any local law or rule or regulation of any organization, club, athletic or other league or association that would limit the eligibility or participation of any student on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.

(3)   For purposes of 603 CMR 26.01, gender identity shall mean a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth.  Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose.

26.02:   School Admissions

(1)   All public schools in the Commonwealth shall admit students without regard to race, color, sex, gender identity, religion, national origin or sexual orientation.  This includes, but is not limited to charter, elementary, secondary, trade, regional vocational-technical schools and selective academic high schools.

(2)   No school shall discourage in any express or implied manner, applicants for admission because of race, color, sex, gender identity, religion, national origin or sexual orientation. Written materials and other media used to publicize a school shall specifically affirm that the school does not discriminate on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.

(3)   The national citizenship of any applicant shall not be a criterion for admission to any public school nor shall national citizenship be a factor in the assignment or availability of courses of study or extra-curricular activities.

(4)   Any standards used as part of the admissions process, including but not limited to testing, the use of recommendations and interviewing, to any public school (as referred to in 603 CMR 26.02(1)) shall not discriminate on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.  A student's limited English-speaking ability (as defined by M.G.L. c. 71A) shall not be a deterrent to or limitation on a student's admission to a public school.

603 CMR:   DEPARTMENT OF EDUCATION

26.02:   continued

(5)  In determining whether a student satisfies any criteria for admission to selective academic high schools, regional vocational technical schools, trade schools and charter schools, or in making any offer of admission to such a school, public school officials shall not treat a student differently from another based on the student's race, color, sex, gender identity, religion, national origin or sexual orientation.  Public schools shall not use admission criteria that have the effect of subjecting students to discrimination because of their race, color, sex, gender identity, religion, national origin or sexual orientation.

(6)   Nothing in 603 CMR 26.00 shall control the interpretation of or interfere with the implementation of M.G.L. c. 71, § 37C and related statutes, providing for the elimination of racial imbalance in public schools, or M.G.L. c. 71A, providing for the establishment of transitional bilingual education programs in public schools, all rules and regulations promulgated in respect thereto and all court and administrative decisions construing or relating thereto.

26.03:   Admission to Courses of Study

(1)   All courses of study offered by a public school shall be open and available to students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation.

(2)   A public school shall determine what courses or units of study are required of a student without regard to the race, color, sex, gender identity, religion, national origin or sexual orientation of that student.

(3)   A public school shall not schedule students into courses or units of study on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.

(4)   No student, on the basis of race, color, sex, gender identity, religion, national origin, limited English-speaking ability or sexual orientation, shall be discriminated against in accessing the courses of study and other opportunities available through the school system of the city or town in which he or she resides.

(5)   Nothing in 603 CMR 26.03 shall be construed to prevent schools from providing separately to each sex those segments of a program of instruction dealing exclusively with human sexuality.

26.04:   Career and Educational Guidance

(1)   Guidance counselors and other personnel shall represent to students a broad spectrum of education and career opportunities.  School personnel shall not present race, color, sex, gender identity, religion, national origin or sexual orientation as limiting factors in career determination.

(2)   No materials, tests or procedures shall be employed for guidance purposes that discriminate and/or limit choices on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.

26.05:   Curricula

(1)   All public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of race, color, sex, gender identity, religion, national origin or sexual orientation.

(2)   Teachers shall review all instructional and educational materials for simplistic and demeaning generalizations, lacking intellectual merit, on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.  Appropriate activities, discussions and/or supplementary materials shall be used to provide balance and context for any such stereotypes depicted in such materials.

(3)   Each school shall provide equal opportunity for physical education for all students.  Goals, objectives and skill development standards, where used, shall neither be designated on the basis of sex, gender identity, nor designed to have an adverse impact on members of either sex.

603 CMR:   DEPARTMENT OF EDUCATION

**26.06:   Extra-curricular Activities**

(1)   Advantages and privileges of public schools include all extra-curricular activities made available, sponsored or supervised by any public school.  No school shall sponsor or participate in the organization of outside extra-curricular activities conducted at such school that restrict student participation on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.  603 CMR 26.06(1) does not prohibit school committees from allowing use of school premises by independent groups with restrictive membership.

(2)   No student shall be denied the opportunity in any implied or explicit manner to participate in an extra-curricular activity because of the race, color, sex, gender identity, religion, national origin or sexual orientation of the student except as provided in 603 CMR 26.06(5). Participation in extra-curricular activities shall be actively encouraged by each school for all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation.

(3)   Each school system shall provide equal opportunity for male and female students to participate in intramural and interscholastic sports.

(4)   In order to provide equal athletic opportunity, public schools that operate or sponsor intramural or interscholastic sports teams shall ensure that budgetary allocations and the provision of athletic activities and services are fairly distributed between students of both sexes based upon student interests and abilities.

(5)   A school may establish or sponsor separate teams for males and females for interscholastic and intramural competition in a particular sport where selection for the team is based upon competitive skill provided that the requirements of 603 CMR 26.06(6) are satisfied.  A student shall have the opportunity to participate on the team that is consistent with the student's gender identity.

(6)   Teams comprised primarily or solely of students of one sex shall be granted equal instruction, training, coaching, access to available facilities, equipment and opportunities to practice and compete as teams engaged in a similar activity comprised primarily or solely of students of the opposite sex.

**26.07:   Active Efforts**

(1)   The school committee of each school district shall establish policies and procedures, and implement monitoring and evaluation practices that insure that all obstacles to equal access to school programs for all students regardless of race, color, sex, gender identity, religion, national origin, limited English-speaking ability or sexual orientation, are removed.  Such policies shall include a requirement for an annual evaluation of all aspects of the K through 12 school program to insure that all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation are given an opportunity to participate in all programs offered by the school including athletics and other extra-curricular activities.

(2)   All public schools shall strive to prevent harassment or discrimination based upon students' race, color, sex, gender identity, religion, national origin or sexual orientation, and all public schools shall respond promptly to such discrimination or harassment when they have knowledge of its occurrence.

(3)   The school committee and the superintendent shall provide in-service training for all school personnel at least annually regarding the prevention of discrimination and harassment based upon race, color, sex, gender identity, religion, national origin and sexual orientation, and the appropriate methods for responding to such discrimination and harassment in a school setting.

(4)   The superintendent, as an agent of the school committee, shall promote and direct effective procedures for the full implementation of 603 CMR 26.00, and shall make recommendations to the school committee for the necessary policies, program changes, and budget resource allocations needed to achieve adherence to 603 CMR 26.00.

603 CMR:   DEPARTMENT OF EDUCATION

26.07:   continued

(5)   The superintendent of each school system shall require employers who recruit new employees in and through the schools of that district to sign a statement that the employer complies with applicable federal and state laws prohibiting discrimination in hiring or employment practices.

(6)   Adults serving on athletic regulatory boards shall fairly represent the interest of all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation.

(7)   Any contributions to a school for activities and monetary awards within or sponsored by the school or for scholarships administered by the school by any person, group or organization shall be free from any restrictions based upon race, color, sex, gender identity, religion, national origin or sexual orientation.   Schools may post or print information regarding private restricted scholarships as long as no preferential treatment is given to any particular scholarship offered and as long as the school does not endorse or recommend any such scholarship nor advise or suggest to a particular student that he or she apply for such a scholarship.

(8)   The opportunity to receive guidance and counseling in a student's primary language should be made available to students from homes where English is not the primary language spoken.

26.08:   Notification and Complaint Procedure

(1)   The superintendent shall be responsible for ensuring that all school handbooks and codes of conduct reference M.G.L. c. 76, § 5 and affirmatively state and explain the school's obligations under M.G.L. c. 76, § 5.   In order to ensure that such obligations are fulfilled, all school handbooks and codes of conduct shall also contain the following:
(a)   A nondiscrimination policy that is consistent with M.G.L. c. 76, § 5 and affirms the school's non-tolerance for harassment or discrimination, including that based upon race, color, sex, gender identity, religion, national origin or sexual orientation; and
(b)   The school's procedure for accepting, investigating and resolving complaints alleging discrimination or harassment; and
(c)   The disciplinary measures that the school may impose if it determines that harassment or discrimination has occurred.

(2)   The principal shall ensure that the applicable school handbook and district code of conduct are annually distributed to students, parents and school personnel and, when requested, ensure that such school handbook and district code of conduct are available in the primary language of a parent or student whose primary language is not English.

26.09:   Private Right of Enforcement

Nothing in 603 CMR 26.00 shall abridge or in any way limit the right of a parent, guardian, or person affected to seek enforcement of M.G.L. c. 76, § 5 in any court or administrative agency of competent jurisdiction.


REGULATORY AUTHORITY

603 CMR 26.00:   M.G.L. c. 76, § 5.


(PAGES 235 AND 236 ARE RESERVED FOR FUTURE USE.)



MASSACHUSETTS
Department of Elementary
and Secondary Education

English

## Student and Family Support (SFS)

# Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment

## Nondiscrimination on the Basis of Gender Identity

*An Act Relative to Gender Identity* (Chapter 199 of the Acts of 2011),[1] which became effective on July 1, 2012, amended several Massachusetts statutes prohibiting discrimination on the basis of specified categories, to include discrimination on the basis of gender identity. Among the statutes amended is G.L. c. 76, § 5, prohibiting discrimination on the basis of gender identity against students who enroll in or attend the public schools. G.L. c. 76, §5 now reads as follows:

> **Every person shall have a right to attend the public schools of the town where he actually resides, subject to the following section. No school committee is required to enroll a person who does not actually reside in the town unless said enrollment is authorized by law or by the school committee. Any person who violates or assists in the violation of this provision may be required to remit full restitution to the town of the improperly-attended public schools. No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, *gender identity*, religion, national origin or sexual orientation.** (Emphasis added)

In June 2012, the Massachusetts Board of Elementary and Secondary Education (Board) adopted revised Access to Equal Education Opportunity Regulations, 603 CMR 26.00, and Charter School Regulations, 603 CMR 1.00, to reflect the broadened student anti-discrimination provision in G.L. c. 76, §5. The Board also directed the Department of Elementary and Secondary Education (Department) to provide guidance to school districts to assist in implementing the gender identity provision.

All students need a safe and supportive school environment to progress academically and developmentally. Administrators, faculty, staff, and students each play an important part in creating and sustaining that environment. This guidance is intended to help school and district administrators take steps to create a culture in which transgender and gender nonconforming students feel safe, supported, and fully included, and to meet each school's obligation to provide equal educational opportunities for all students, in compliance with G.L. c. 76, §5 and the state regulations. The guidance sets out general principles based on the law, and addresses common issues regarding transgender and gender nonconforming students. It offers case studies based on experiences of schools and students in Massachusetts, and reflects the need to consider issues on a case-by-case basis. The list of issues is not exhaustive, and the examples are intended to be illustrative, not prescriptive.

In preparing this guidance, the Department reviewed policies and guidance from several states, organizations, and athletic associations and consulted with the field. We appreciate the input we received from school and district administrators, advocacy groups, parents, students, and other interested constituents.

## Definitions

Understanding the terminology associated with gender identity is important to providing a safe and supportive school environment for students whose rights are protected under the law. The following terms appear in this document and are defined to assist in understanding the guidance presented. Although these are the most commonly used terms, students may prefer other terms to describe their gender identity, appearance, or behavior. The term "gender identity" is specifically defined in the Mass. General Laws, as amended by *An Act Relative to Gender Identity* (the gender identity law).

3/3/23, 12:42 PM      Guidance for MA Public Schools Creating a Safe and Supportive School Environment - Student and Family Support      Addendum 30

English

- **Gender expression**: the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, or mannerisms.

- **Gender identity**: as defined in part at G.L. c. 4, § 7, is "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth ..."

- **Gender nonconforming**: a term used to describe people whose gender expression differs from stereotypic expectations. The terms "gender variant" or "gender atypical" are also used.

- **Transgender**: an umbrella term used to describe a person whose gender identity or gender expression is different from that traditionally associated with the assigned sex at birth.

## The Law

The gender identity law amended G.L. c. 76, § 5,[2] to establish that no person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of *gender identity*, among other characteristics. The amended Access to Equal Educational Opportunity regulations, 603 CMR 26.00, and the non-discrimination provision of the Charter School regulations, 603 CMR 1.00, require schools to establish policies and procedures, provide training, and implement and monitor practices to ensure that obstacles to equal access to school programs are removed for all students, including transgender and gender nonconforming students.

All districts and schools should review existing policies, handbooks, and other written materials to ensure that they are updated to reflect the new law. At a minimum, this means including the category of "gender identity" within the identification of legally protected characteristics. For example:

> The [   ] Public Schools strives to provide a safe, respectful, and supportive learning environment in which all students can thrive and succeed in its schools. The [   ] Public Schools prohibits discrimination on the basis of race, color, sex, gender identity, religion, national origin, or sexual orientation and ensures that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges, and courses of study.

The gender identity law reflects the reality that transgender and gender nonconforming students are enrolled in Massachusetts public schools. These students, because of widespread misunderstanding and lack of knowledge about their lives, are at a higher risk for peer ostracism, victimization, and bullying. The 2011 National School Climate Survey by the Gay, Lesbian & Straight Education Network (GLSEN), found that 75.4% of transgender students had been verbally harassed in the previous year, 32.1% had been physically harassed, and 16.8% had been physically assaulted. Educators play an essential role in advocating for the well-being of these students and creating a school culture that supports them.

## Understanding Gender Identity

The gender identity law defines "gender identity" to mean "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth."[3] The law also states that " [g]ender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose."[4]

Transgender youth are those whose assigned birth sex does not match their internalized sense of their gender (their "gender-related identity"), and gender nonconforming youth are those whose gender-related identity does not meet the stereotypically expected norms associated with their assigned sex at birth. A transgender boy, for example, is a youth who was assigned the sex of female at birth but has a clear and persistent identity as male. A transgender girl is a youth who was assigned the sex of male at birth but has a clear and persistent identity as female. Gender nonconforming youth range in the ways in which they identify as male, female, some combination of both, or neither.

The responsibility for determining a student's gender identity rests with the student or, in the case of young students not yet able to advocate for themselves, with the parent.[5] One's gender identity is an innate, largely inflexible characteristic of each individual's personality that is generally established by age

3/3/23, 12:42 PM      Guidance for MA Public Schools Creating a Safe and Supportive School Environment - Student and Family Support      Addendum 31

English

four, although the age at which individuals come to understand and express their gender identity may vary based on each person's social and familial social development.[6] As a result, the person best situated to determine a student's gender identity is that student himself or herself.

> *In one Massachusetts town, the parents of a pre-school-age biologically female child noted throughout the child's early years that their child identified as a boy. For as long as the parents could remember, the child preferred to play with boys rather than girls, wanted a short haircut, rejected wearing any clothing that the child identified as "something a girl would wear," and ignored anyone who called him by his stereotypically feminine name. When it was time for the child to enter kindergarten, the child said to his parents, "You have to tell them when I go to kindergarten that I'm a boy."*

Consistent with the statutory standard, a school should accept a student's assertion of his or her gender identity when there is "consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity." If a student's gender-related identity, appearance, or behavior meets this standard, the only circumstance in which a school may question a student's asserted gender identity is where school personnel have a credible basis for believing that the student's gender-related identity is being asserted for some improper purpose.

In most situations, determining a student's gender identity is simple. A student who says she is a girl and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of her life, should be respected and treated like a girl. So too with a student who says he is a boy and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of his life. Such a student should be respected and treated like a boy.

The statute does not *require* consistent and uniform assertion of gender identity as long as there is "other evidence that the gender-related identity is sincerely held as part of [the] person's core identity." Many transgender people experience discrimination, and some experience violence due to their status. Some environments may feel safe and inclusive, and others less so, challenging a person's ability to live consistently with one gender identity in all aspects of life. For example, it is possible that a biologically male student with a female gender identity who lives as a girl does not express her female gender identity all the time. In one case, such a student agreed to present as a boy when visiting relatives until the student's parents could explain the student's transgender identity to them. The fact that the student did not exclusively assert her female identity did not alter the fact that she had a female gender identity.

Confirmation of a student's asserted gender identity may include a letter from a parent, health care provider, school staff member familiar with the student (a teacher, guidance counselor, or school psychologist, among others), or other family members or friends. A letter from a social worker, doctor, nurse practitioner, or other health care provider stating that a student is being provided medical care or treatment relating to her/his gender identity is one form of confirmation of an asserted gender identity. It is not, however, the exclusive form upon which the school or student may rely. A letter from a clergy member, coach, family friend, or relative stating that the student has asked to be treated consistent with her/his asserted gender identity, or photographs at public events or family gatherings, are other potential forms of confirmation. These examples are intended to be illustrative rather than comprehensive.

> *In one Massachusetts middle school, a biologically male student explained to her guidance counselor that she was a transgender girl who expressed her female gender identity only at home. The stress associated with having to hide her female gender identity at school was having a negative impact on her mental health, as well as on her academic performance. The student and her parents asked if it would be okay if she expressed her female gender identity at school. The guidance counselor assured the student and her parents that she could do so. The fact that the student presented no documentation to support her gender identity was not a concern since the school had no reason to believe the request was based on anything other than a sincerely held belief that she had a female gender identity.*

## Gender Transition

Many, though not all, transgender youth undergo the experience of gender transition. The term "gender transition" describes the experience by which a person goes from living and identifying as one gender to living and identifying as another. For most youth, and for all young children, the experience of gender transition involves no medical intervention. Rather, most transgender youth will undergo gender transition through a process commonly referred to as "social transition," whereby they begin to live and identify as the gender consistent with their gender-related identity. Some transgender youth who are close to reaching puberty, or after commencing puberty, may complement social transition with medical intervention that may include hormone suppressants, cross-gender hormone therapy, and, for a small

3/3/23, 12:42 PM                Guidance for MA Public Schools Creating a Safe and Supportive School Environment - Student and Family Support                Addendum 32

English

number of young people, a range of gender-confirming surgeries. The decision about whether and how to undergo gender transition is personal and depends on the unique circumstances of each individual. There is no threshold medical or mental health diagnosis or treatment requirement that any student must meet in order to have his or her gender identity recognized and respected by a school.

Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance. School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian. For the same reasons, school personnel should discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian.

## Names and Pronouns

The issue of the name and pronoun to use in referring to a transgender student is one of the first that schools must resolve to create an environment in which that student feels safe and supported. Transgender students often choose to change the name assigned to them at birth to a name that is associated with their gender identity. As with most other issues involved with creating a safe and supportive environment for transgender students, the best course is to engage the student, and in the case of a younger student, the parent, with respect to name and pronoun use, and agree on a plan to initiate that name and pronoun use within the school. The plan also could include when and how this is communicated to students and their parents. In the case of a transgender student who is enrolling at a new school, it is important that the school respect the student's privacy (see the following section) and chosen name.

> *In one situation where a transgender girl was entering high school, she and her parent asked the principal to inform her teachers that even though her school records indicate that her name is John, she goes by the name Jane and uses female pronouns. The school principal sent the following memorandum to the student's classroom teachers: "The student John Smith wishes to be referred to by the name Jane Smith, a name that is consistent with the student's female gender identity. Please be certain to use the student's preferred name in all contexts, as well as the corresponding pronouns. It is my expectation that students will similarly refer to the student by her chosen name and preferred pronouns. Your role modeling will help make a smooth transition for all concerned. If students do not act accordingly, you may speak to them privately after class to request that they do. Continued, repeated, and intentional misuse of names and pronouns may erode the educational environment for Jane. It should not be tolerated and can be grounds for student discipline. If you need any assistance to make sure that Jane Smith experiences a safe, nondiscriminatory classroom atmosphere, please contact me or Ms. O'Neill. - Mr. Jones, Principal."*

Massachusetts' law recognizes common law name changes. An individual may adopt a name that is different from the name that appears on his or her birth certificate provided the change of name is done for an honest reason, with no fraudulent intent. Nothing more formal than usage is required.[7] Hence, when requested, schools should accurately record the student's chosen name on all records, whether or not the student, parent, or guardian provides the school with a court order formalizing a name change.

The Department has a procedure in place to update name changes and gender markers in the Student Information Management System (SIMS) upon request. The document *Assigning State Assigned Student Identifiers (SASIDs) to Massachusetts' Public School Students* guides schools through changing names and gender markers on school records.

In sum, school personnel should use the student's chosen name and pronouns appropriate to a student's gender identity, regardless of the student's assigned birth sex. For those students who have been attending a school and undergo gender transition while attending the same school, it is important to develop a plan for initiating use of the chosen name and pronouns consistent with the student's gender identity.

## Privacy, Confidentiality, and Student Records

Under state law, information about a student's assigned birth sex, name change for gender identity purposes, gender transition, medical or mental health treatment related to gender identity, or any other information of a similar nature, regardless of its form, is part of the individual's student record (*see* Massachusetts Student Records Regulations, 603 CMR 23.00), is confidential, and must be kept private and secure, except in limited circumstances. 603 CMR § 23.04.[8] One circumstance is when authorized school personnel require the information to provide administrative, teaching, counseling, or other services to the student in the performance of their official duties. For transgender students, authorized school personnel could include individuals such as the principal, school nurse, classroom teacher(s), or guidance or adjustment counselor.

3/3/23, 12:42 PM                    Guidance for MA Public Schools Creating a Safe and Supportive School Environment - Student and Family Support          Addendum 33

                                                                                                                                                                English

When a student new to a school is using a chosen name, the birth name is considered private information and may be disclosed only with authorization as provided under the Massachusetts Student Records Regulations. If the student has previously been known at school or in school records by his or her birth name, the principal should direct school personnel to use the student's chosen name. Every effort should be made to update student records (for example, Individualized Education Programs) with the student's chosen name and not circulate records with the student's assigned birth name. Records with the student's assigned birth name should be kept in a separate, confidential file.

> One school nurse dealt with information in the student's file by starting a new file with the student's chosen name, entered previous medical information (for example, immunizations) under the student's chosen name, and created a separate, confidential folder that contained the student's past information and birth name.

When determining which, if any, staff or students should be informed that a student's gender identity is different from the assigned birth sex, decisions should be made in consultation with the student, or in the case of a young student, the student's parent or guardian. The key question is whether and how sharing the information will benefit the student.

> In one case, parents of a transgender male-to-female elementary school student requested that only the school principal and the school nurse be aware that the student was assigned the sex of male at birth. After a discussion with the school principal, the parents agreed that the student's teacher, the school secretary, and the district superintendent would also be informed. In this situation, the school principal kept the student's birth certificate in a separate, locked file that only the principal could access, and put a note in the student's other file saying that the principal had viewed the student's birth certificate. In another situation, where a biological male came to school after April vacation as a girl, the school principal and guidance counselor, in collaboration with the student and her parents, developed a plan for communicating information regarding the student's transition to staff, parents, and students. The plan included who was going to say what to whom, and when the communication would take place.

Transgender and gender nonconforming students may decide to discuss and express their gender identity openly and may decide when, with whom, and how much to share private information. A student who is 14 years of age or older, or who has entered the ninth grade, may consent to disclosure of information from his or her student record. If a student is under 14 and is not yet in the ninth grade, the student's parent (alone) has the authority to decide on disclosures and other student record matters.[9]

## Gender Markers on Student Records

A gender marker is the designation on school and other records that indicates a student's gender. For most students, records that include an indication of a student's gender will reflect a student's assigned birth sex. For transgender students, however, a documented gender marker (for example, "male" or "female" on a permanent record) should reflect the student's gender identity, not the student's assigned sex. This means that if a transgender student whose gender identity is male has a school record that reflects an assigned birth sex as female, then upon request by the student or, in the case of young students not yet able to advocate for themselves, by the parent or guardian, the school should change the gender marker on the record to male.[10] Schools are advised to collect or maintain information about students' gender only when necessary.

> One school reviewed the documentation requests it sent out to families and noticed that field trip permission forms included a line to fill in indicating the student's gender. Upon consideration, the school determined that the requested information was irrelevant to the field trip activities and deleted the line with the gender marker request.

In addition, transgender students who transition after having completed high school, may ask their previous schools to amend school records or a diploma or transcript that include the student's birth name and gender. When requested, and when satisfied with the gender identity information provided, schools should amend the student's record, including reissuing a high school diploma or transcript, to reflect the student's current name and gender.

## Restrooms, Locker Rooms, and Changing Facilities

All students are entitled to have access to restrooms, locker rooms and changing facilities that are sanitary, safe, and adequate, so they can comfortably and fully engage in their school program and activities. In meeting with the transgender student (and parent) to discuss the issues set forth in this memorandum, it is essential that the principal and student address the student's access to the restrooms, locker room and changing facility. Each situation needs to be reviewed and addressed based on the particular

3/3/23, 12:42 PM                    Guidance for MA Public Schools Creating a Safe and Supportive School Environment - Student and Family Support                    Addendum 34

English

circumstances of the student and the school facilities. In all cases, the principal should be clear with the student (and parent) that the student may access the restroom, locker room, and changing facility that corresponds to the student's gender identity. While some transgender students will want that arrangement, others will not be comfortable with it. Transgender students who are uncomfortable using a sex-segregated restroom should be provided with a safe and adequate alternative, such as a single "unisex" restroom or the nurse's restroom. Similarly, some transgender students may not be comfortable undressing in the changing facilities that correspond to the student's gender identity. The following are examples of ways in which school officials have responded to these situations:

> In one elementary school, a transgender second-grader socially transitioned from female to male. The principal informed the staff: For the remainder of this year, he will use Nurse Margaret's restroom, and toward the end of the year we will make future determinations of restroom use in consultation with his family.

> In one middle school, a male-to-female transgender sixth-grader socially transitioned after spring break. For the rest of the school year, she used the nurse's restroom and the other unisex restrooms at the school. Beginning in seventh grade, she used the girls' restroom.

> In one high school, a transgender male-to-female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility.

Some students may feel uncomfortable with a transgender student using the same sex-segregated restroom, locker room or changing facility. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff should work with students to address the discomfort and to foster understanding of gender identity, to create a school culture that respects and values all students.

The Department strongly recommends that districts include an appropriate number of gender-neutral restrooms commensurate with the size of the school, and at least one gender-neutral changing facility, into the design of new schools and school renovations.

School staff as well as students and their families may find the use of restrooms and changing facilities to be among the more challenging issues presented by the gender identity law, perhaps due to issues of personal privacy. As emphasized in other sections of this guidance, these issues should be resolved on a case-by-case basis, through dialogue with students and parents, and through leadership in creating safe and supportive learning environments.

## Physical Education Classes and Intramural and Interscholastic Athletic Activities

Physical education is a required course in all grades in Massachusetts' public schools, and school-based athletics are an important part of many students' lives. Most physical education classes in Massachusetts' schools are coed, so the gender identity of students should not be an issue with respect to these classes. Where there are sex-segregated classes or athletic activities, including intramural and interscholastic athletics, all students must be allowed to participate in a manner consistent with their gender identity. With respect to interscholastic athletics, the Massachusetts Interscholastic Athletic Association will rely on the gender determination made by the student's district; it will not make separate gender identity determinations.

> At one school, a transgender girl joined the girls' cheerleading squad. The school supported the student's participation on the team. When the team was going to a regional competition, however, several of the team members raised a concern that the school would be made to compete in the coed cheerleading portion of the competition rather than in the all-girls portion for which they prepared. With the permission of the student, the principal wrote a letter that she gave to the coach to take to the competition in case officials at the competition questioned the team's participation in the all-girls' portion of the event. The letter explained: "Student, Jane Smith, is a transgender girl who has been a member of the girls' team since (date). Jane has a sincerely held female gender identity and, therefore, according to state law must be permitted to participate as a girl on the girls' cheerleading team." The team participated in the regional competition without incident.

# Other Gender-Based Activities, Rules, Policies, and Practices

As a general matter, schools should evaluate all gender-based policies, rules, and practices and maintain only those that have a clear and sound pedagogical purpose. Gender-based policies, rules, and practices can have the effect of marginalizing, stigmatizing, and excluding students, whether they are gender nonconforming or not. In some circumstances, these policies, rules, and practices may violate federal and state law. For these reasons, schools should consider alternatives to them.

Whenever students are separated by gender in school activities or are subject to an otherwise lawful gender-specific rule, policy, or practice, students must be permitted to participate in such activities or conform to such rule, policy, or practice consistent with their gender identity.

The new law on gender identity provides a good opportunity for schools to review their gender-distinct policies. For example, some schools require students to wear gender-based garb for graduation or have gender-based dress codes for prom, special events, and daily attire. Schools should eliminate gendered policies and practices such as these. For example, one school that previously had blue graduation gowns for boys and white ones for girls switched to blue gowns for all graduates. The school also changed its gender-based dress code for the National Honor Society ceremony, which had required girls to wear dresses.

Similarly, some classroom teachers may routinely include gender-based practices in the classroom. For example, some teachers may have boys and girls line up separately to leave the classroom to go to lunch, the gymnasium, restrooms, or recess, and may never have considered the educational value of non-gendered alternatives, such as having students line up in the order of their birthdays, or alphabetically by name, or in the order in which they are sitting.[11]

# Education and Training

In order to further a safe and supportive school environment for all students, schools should incorporate education and training about transgender and gender nonconforming students into their anti-bullying curriculum, student leadership trainings, and staff professional development.

As with other efforts to promote a positive school culture, it is important that student leaders and school personnel, particularly school administrators, become familiar with the gender identity law, regulations, guidance, and related resources, and that they communicate and model respect for the gender identity of all students.

Professional development for school staff could include topics on gender identity and gender nonconformity such as: the *Massachusetts Student Anti-discrimination Law and Regulations*; the DESE Guidance on *Notifying Parents When a Student Has Been Bullied Based on Sexual Orientation or Gender Identity/Expression*; key terms related to gender identity and expression; the development of gender identity; the experiences of transgender and other gender nonconforming students; risk and resilience data regarding transgender and gender nonconforming students; ways to support transgender students and to improve the school climate for gender nonconforming students; gender-neutral language and practices; and this guidance.

# Communication with School Community and Families

Superintendents and principals need to review existing policies, handbooks, and other written materials to ensure that they are updated to reflect the inclusion of *gender identity* in the student antidiscrimination law, and may wish to inform all members of the school community, including school personnel, students, and families, of the recent change to state law and its implications for school policy and practice. This could take the form of a letter that states the school's commitment to being a supportive, inclusive environment for all students, as well as the school's legal obligation to provide equal educational opportunities for all students. Such a letter might include the definitions provided at the beginning of this document and some basic information about transgender and gender nonconforming youth; a link to the school's anti-bullying and anti-harassment policies; a link to this guidance; and other resources, including individuals to contact with additional questions.[12]

# Conclusion

This guidance cannot anticipate every situation in which questions may come up in the implementation of this law, and the needs of each transgender or gender nonconforming student should be assessed and addressed on a case-by-case basis. The Department will continue to provide assistance, support, and resources as we work together to create a safe and supportive school environment for all students.

3/3/23, 12:42 PM                    Guidance for MA Public Schools Creating a Safe and Supportive School Environment - Student and Family Support

Addendum 36

English

For further information or questions about the content of this guidance, please contact the Safe Schools Program for LGBTQ Students via Safeschoolsprogram@doe.mass.edu ✉.

---

**Note:**

[1] The Act can be found at An Act Relative to Gender Identity

[2] The Act amends several other statutes as well, including G.L. c. 151B (governing nondiscrimination in employment), to prohibit discrimination on the basis of gender identity.

[3] Mass. Gen. Laws. Ch. 4, § 7 (2012).

[4] *Id.*

[5] When used in this document, the term "parent" refers to parent as well as legal guardian.

[6] *See* Gerald P. Mallon, "Practice with Transgendered Children," in *Social Services with Transgendered Youth* 49, 55-58 (Gerald P. Mallon ed., 1999). *See also* Stephanie Brill & Rachel Pepper, "Developmental Stages and the Transgender Child," in The *Transgender Child*, 61-64.

[7] For certain transactions, such as banking and applying for governmental benefits or licenses, it may be necessary to have a formal legal document establishing one's change of name for identity and other purposes.

[8] The federal Family Educational Rights and Privacy Act, 20 USC 1232g, also protects the privacy of education records and requires that personally identifiable information be kept secure and confidential.

[9] See 603 CMR §§23.01 and 23.07. If a student is from 14 through 17 years of age or has entered ninth grade, both the parent and the student may make decisions concerning the student record, or either the student or the parent acting alone may decide.

[10] As discussed in the section on Names and Pronouns, the Department's publication *Assigning State Assigned Student Identifiers (SASIDs) to Massachusetts' Public School Students* guides district staff through the process of adding or revising SIMS data.

[11] Gender and Children: A Place to Begin for Educators

[12] For example, a letter from one principal explained: "*All people have a gender identity. For most people, their gender identity matches their assigned sex at birth. For transgender people, that is not the case. Transgender girls are individuals who were assigned the male sex at birth but whose lived experience of who they are is female. Transgender boys are individuals who were assigned the female sex at birth but whose lived experience of who they are is male. As a school community, we want to provide a safe environment and support all of our students so they can achieve academically. That means making sure that our school's policies and practices are inclusive and respectful of all students, including transgender students. Toward that end, we have' [describe steps taken to implement the law].*"

Last Updated: October 28, 2021