**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

STEPHEN FOOTE, individually and as Guardian and next friend of B.F. and G.F., minors; MARISSA SILVESTRI, individually and as Guardian and next friend of B.F. and G.F., minors,

*Plaintiffs-Appellants,*

JONATHAN FELICIANO; SANDRA SALMERON,

*Plaintiffs,*

v.

LUDLOW SCHOOL COMMITTEE; TODD GAZDA, former Superintendent; LISA NEMETH, Interim Superintendent; STACY MONETTE, Principal, Baird Middle School; MARIE-CLAIRE FOLEY, school counselor, Baird Middle School; JORDAN FUNKE, former librarian, Baird Middle School; TOWN OF LUDLOW,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts
The Honorable Mark G. Mastroianni
Case No. 3:22-cv-30041-MGM

**BRIEF OF ALLIANCE DEFENDING FREEDOM AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-
APPELLANTS AND REVERSAL**

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
  Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

Vincent M. Wagner
Tina Seideman
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
vwagner@ADFlegal.org
tseideman@ADFlegal.org

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* Alliance Defending Freedom (ADF) is a nonprofit organization, does not have a parent corporation, and does not issue stock. ADF is not aware of any publicly owned corporation, not a party to the appeal, with a financial interest in the outcome of this case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES .................................................... iii

INTEREST OF AMICUS CURIAE .......................................... 1

ARGUMENT ................................................................ 4

I. Parental rights are fundamental, so strict scrutiny applies to state action infringing them. ........................................ 4

    A. In *Glucksberg* and *Troxel*, the Supreme Court made clear that the parental rights protected by the Due Process Clause are fundamental. ............................ 5

    B. Like other fundamental rights protected by the Due Process Clause, parental rights trigger strict scrutiny. ......... 8

    C. Parental rights trigger strict scrutiny even when asserted against school officials. ........................ 10

II. At a bare minimum, parents have a fundamental right to receive notification that their child's school has decided to counsel and treat their child for gender dysphoria. ....................... 15

CONCLUSION ............................................................ 23

CERTIFICATE OF COMPLIANCE ....................................... 24

CERTIFICATE OF SERVICE ............................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Abdisamad v. City of Lewiston,*
　960 F.3d 56 (1st Cir. 2020) ........................................................ 11, 14

*Alfonso v. Fernandez,*
　195 A.D.2d 46, 606 N.Y.S.2d 259 (N.Y. App. Div. 1993) ....... 20, 21, 22

*Arnold v. Board of Education,*
　880 F.2d 305 (11th Cir. 1989) ................................................................. 9

*Blixt v. Blixt,*
　437 Mass. 649, 774 N.E.2d 1052 (Mass. 2002) ................................... 10

*County of Sacramento v. Lewis,*
　523 U.S. 833 (1998) .......................................................................... 11, 12

*DePoutot v. Raffaelly,*
　424 F.3d 112 (1st Cir. 2005) ............................................................... 12

*Doe v. Settle,*
　24 F.4th 932 (4th Cir. 2022) ................................................................. 8

*Gruenke v. Seip,*
　225 F.3d 290 (3d Cir. 2000) ................................................................. 9

*Hiller v. Fausey,*
　588 Pa. 342, 904 A.2d 875 (Pa. 2006) ............................................... 10

*Hodgson v. Minnesota,*
　497 U.S. 417 (1990) .............................................................................. 20

*In re A.A.L.,*
　387 Wis.2d 1, 927 N.W.2d 486 (Wis. 2019) ...................................... 10

*Irish v. Fowler,*
　979 F.3d 65 (1st Cir. 2020) ................................................................. 10

*Jones v. Jones,*
　359 P.3d 603 (Utah 2015) .................................................................... 10

*Kenyon v. Cedeno-Rivera,*
    47 F.4th 12 (1st Cir. 2022).................................................. 4, 8, 12, 15

*Martinez v. Cui,*
    608 F.3d 54 (1st Cir. 2010) ........................................................14

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021)........................................................2

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) .....................................................................4

*Parham v. J.R.,*
    442 U.S. 584 (1979) .............................................................. 16, 17

*Reno v. Flores,*
    507 U.S. 292 (1993) .....................................................................8

*Ricard v. USD 475 Geary County School Board,*
    No. 5:22-CV-04015, 2022 WL 1471372 (D. Kan. May 9, 2022)..........2

*Rochin v. California,*
    342 U.S. 165 (1952) ...................................................................11

*Seal v. Morgan,*
    229 F.3d 567 (6th Cir. 2000)........................................................8

*Seegmiller v. LaVerkin City,*
    528 F.3d 762 (10th Cir. 2008) ....................................................15

*Stewart v. City of Oklahoma City,*
    47 F.4th 1125 (10th Cir. 2022) .....................................................8

*Suboh v. District Attorney's Office of Suffolk District,*
    298 F.3d 81 (1st Cir. 2002) .....................................................6, 13

*Tatel v. Mt. Lebanon School District.,*
    No. 2:22-CV-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022) .........9

*Troxel v. Granville,*
    530 U.S. 57 (2000)............................................................... passim

iv

*Vlaming v. West Point School Board*,
   No. 211061 (Va. argued Nov. 4, 2022) ................................................3

*Walsh v. Walsh*,
   221 F.3d 204 (1st Cir. 2000) ........................................................6

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ..................................................... passim

*Watts v. BellSouth Telecommunications, Inc.*,
   316 F.3d 1203 (11th Cir. 2003) ...........................................14

## Statutes

13 Del. Code § 707 ..........................................................16

22 Me. Rev. Stat. § 1503....................................................16

Ala. Code § 22-8-4..........................................................16

Cal. Fam. Code § 6922.......................................................16

Mass. Gen. Laws ch. 112, § 12F..............................................16

N.Y. Pub. Health Law § 2504.................................................16

## Other Authorities

1 William Blackstone, *Commentaries on the Laws of England*,
   http://bit.ly/3leX7za....................................................4

Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*,
   25 Child and Adolescent Mental Health (2020) .......................18, 20

Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*,
   81 N.Y.U. L. Rev. 1249 (2006) .........................................14

Rosalie Berger Levinson, *Time to Bury the Shocks the Conscience
   Test*,
   13 Chap. L. Rev. 307, 319 (2010).......................................11

Russell B. Toomey et al., *Transgender Adolescent Suicide Behavior*,
142 Pediatrics (2018),
perma.cc/3Q5B-CCKG ............................................................... 18, 19

WPATH, *Standards of Care for the Health of Transgender and
Gender Diverse People* (2022 v.8),
http://bit.ly/3JkBDc7 ................................................................. 17

WPATH, *Standards of Care for the Health of Transsexual,
Transgender, and Gender Nonconforming People* (2011 v.7),
https://bit.ly/2Qfw2Lx ................................................................ 18

**INTEREST OF AMICUS CURIAE**[1]

Alliance Defending Freedom (ADF) is a nonprofit, public-interest legal organization that provides strategic planning, training, funding, and litigation services to protect Americans' constitutional rights, including parents' fundamental right to direct the education and upbringing of their children.

For example, as co-counsel with the Wisconsin Institute for Law and Liberty, ADF represents parents challenging a school district policy that requires staff—without parental consent and even over an express parental objection—to treat students as though they were a gender identity that differs from their biological sex. *See* Compl. ¶ 1, *T.F. v. Kettle Moraine Sch. Dist.*, No. 2021CV001650 (Wis. Cir. Ct. Waukesha Cnty. filed Nov. 17, 2021), ECF No. 2, https://bit.ly/3JQRLUc. Denying the school district's motion to dismiss that lawsuit, the Wisconsin state circuit court ruled that one set of parents had standing to challenge that policy despite their lack of any allegation "that they have a child grappling with gender dysphoria or that they have already suffered harm from the current [district] policy." Decision & Order 4, *Kettle Moraine Sch. Dist.*, No. 2021CV001650 (June 1, 2022), ECF No. 57, http://bit.ly/3YAJUhz. The court reasoned that parents "need not wait

---

[1] No counsel for a party authored this brief in whole or in part; no one, other than *amicus* and its counsel, made a monetary contribution for its preparation or submission; and all parties have consented to its filing.

for potential harm from [the district's] policy to occur for their children before they are entitled to seek declaratory relief on whether the policy violates their parental rights." *Id.* at 5.

ADF also represents teachers challenging actions by schools that threaten parental rights. In *Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-CV-04015, 2022 WL 1471372 (D. Kan. May 9, 2022), ADF represented a teacher whose school forced her to deceive parents about their child's gender identity and expression at school. ADF secured a preliminary injunction, in part based on the district court's holding that the policy was "intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit," including the right to "have a say" in what their minor children were called at school. *Id.* at *8.

ADF also regularly represents teachers and professors challenging similar policies that force them to use pronouns in violation of their core beliefs. ADF secured a victory for Shawnee State University professor Nicholas Meriwether in the Sixth Circuit Court of Appeals after he was disciplined for respectfully declining to use pronouns that did not correspond with a student's biological sex. *See Meriwether v. Hartop*, 992 F.3d 492, 511–12 (6th Cir. 2021) (reinstating complaint and holding university had "violated Meriwether's free-speech rights" by rejecting his proposed "win-win" solution of using the student's last name in place of pronouns).

And in the Virginia Supreme Court, ADF currently represents a high-school French teacher who was fired after school officials rejected his request for a similar accommodation, which would have allowed him to refer to a student using the student's new chosen name while avoiding the use of pronouns altogether. *See Vlaming v. W. Point Sch. Bd.*, No. 211061 (Va. argued Nov. 4, 2022).

In these cases, ADF explains that it is both possible and constitutionally required to find a solution to the challenges posed by competing views of sex and gender identity that respects the rights of parents, students, and teachers. Here, the challenged policy does not honor parents' rights. To the contrary, the school superintendent expressed his view that parental rights are nothing more than "intolerance of LGBTQ people thinly veiled." Appellants' App. 46.

The superintendent is wrong. Parents' right to "direct the education and upbringing of [their] children" is no less fundamental than any other unenumerated right. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (listing the right alongside other "fundamental rights and liberty interests"). It "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). So this Court should hold that the district court's failure to apply strict scrutiny to Plaintiffs' parental-rights claim was error, *see* Addendum 16–17, reverse the judgment below, and remand for further proceedings.

# ARGUMENT

## I. Parental rights are fundamental, so strict scrutiny applies to state action infringing them.

For claimed violations of unenumerated rights protected by the Fourteenth Amendment to the U.S. Constitution, the analysis has two steps: First, a court should ask whether the asserted right is one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21(cleaned up). Second, if the challenged conduct "interferes with a fundamental right," then "generally speaking," it "will be reviewed for strict scrutiny." *Kenyon v. Cedeno-Rivera*, 47 F.4th 12, 24 (1st Cir. 2022).

The district court erred at each step. First, it did not acknowledge the century of constitutional precedent—buttressed by centuries more of common-law history—supporting the fundamental nature of a parental-rights claim. *See Troxel*, 530 U.S. at 65–66 (plurality opinion) (tracing that precedent back to *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see also* 1 William Blackstone, *Commentaries on the Laws of England* *446–53 (describing the rights of parents at common law), http://bit.ly/3leX7za. Second, the district court failed to ask whether the policy Plaintiffs challenge is narrowly tailored to serve any compelling state interest, as required by strict scrutiny. *Glucksberg*, 521 U.S. at 721. And finally, this Court has not held, as the district court thought, that some other standard applies to claims against schools.

This Court should confirm that parents' rights are fundamental. And it should reaffirm that state action infringing parents' rights receives strict scrutiny, as it would if it infringed any other fundamental rights. Therefore, this Court should reverse.

**A. In *Glucksberg* and *Troxel*, the Supreme Court made clear that parental rights are fundamental and protected by the Due Process Clause.**

This lawsuit rests on Plaintiffs' right to make decisions about how best to raise their children. *See, e.g.*, Appellants' App. 51–76. And the fundamental nature of that right—the right to "direct the education and upbringing of [their] children"—is well settled. *Glucksberg*, 521 U.S. at 720.

Over 25 years ago in *Glucksberg*, the Supreme Court reaffirmed that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* Most relevant here, the Court *specifically included* the right to "direct the education and upbringing of one's children" on its list of unenumerated fundamental rights. *Id.* Because that right is fundamental, the government may not infringe it "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* at 721 (cleaned up).

Three years after *Glucksberg*, the Supreme Court reaffirmed that parents have a "fundamental liberty interest[]" in the "care, custody,

and control of their children." *Troxel*, 530 U.S. at 65 (plurality opinion); *see id.* at 80 (Thomas, J., concurring) (agreeing with "plurality that [the] Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case").

That liberty interest "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Id.* at 65 (plurality opinion). And as the plurality expressly acknowledged, the Due Process Clause "provides heightened protection against government inter-ference with [such] fundamental rights and liberty interests." *Id.*; *accord id.* at 80 (Thomas, J., concurring) (endorsing "strict scrutiny" as the correct test for infringements on the "fundamental right of parents to direct the upbringing of their children").

Relying on *Glucksberg* and *Troxel*, this Court has held, time and again, that "parents have a fundamental interest in their relationships with their children." *Walsh v. Walsh*, 221 F.3d 204, 216 (1st Cir. 2000). Echoing *Troxel*, this Court said over 20 years ago that "[a] parent's liberty interest in the care and custody of her child was established long before the facts of this case arose." *Suboh v. Dist. Att'y's Off. of Suffolk Dist.*, 298 F.3d 81, 93 (1st Cir. 2002).

Despite *Glucksberg* and *Troxel*'s controlling language—and this Court's repeated application of that language—the district court did not even cite *Troxel*. *Cf., e.g.*, Addendum 10–12 & n.3 (analyzing Plaintiffs' fundamental-rights claim but making no mention of *Troxel*). Regarding

*Glucksberg*, although the district court did cite it, the citation was only in passing. The district court quoted once from that decision's high-level description of fundamental rights as "deeply rooted in this Nation's history and tradition." Addendum 10 (quoting *Glucksberg*, 521 U.S. at 721). And the only other place *Glucksberg* appears is in a footnote criticizing Plaintiffs' description of their claimed fundamental right as "relatively vague." Addendum 11 n.3. That footnote contains no discussion of *Glucksberg* and makes no mention of its express holding that parents have a fundamental right "to direct the education and upbringing of [their] children." 521 U.S. at 720.

Taken together, *Glucksberg* and *Troxel* support one conclusion: whether described as the right to "direct the education and upbringing of one's children," *Glucksberg*, 521 U.S. at 720, or the liberty "interest of parents in the care, custody, and control of their children," *Troxel*, 530 U.S. at 65 (plurality opinion), the rights of parents protected by the Due Process Clause easily qualify as "fundamental rights and liberty interests" for purposes of determining the appropriate level of review, *Glucksberg*, 521 U.S. at 720; *accord Troxel*, 530 U.S. at 65 (plurality opinion); *id.* at 80 (Thomas, J., concurring in the judgment). The district court erred in failing to acknowledge this fundamental right.

**B.** **Like other fundamental rights protected by the Due Process Clause, parental rights trigger strict scrutiny.**

Once the fundamental nature of the right is established, the standard of review clicks into place: "[G]enerally speaking, under the federal Due Process Clause, a state action will be reviewed for strict scrutiny only where it interferes with a fundamental right; otherwise, it is reviewed under the more lenient rational basis standard." *Kenyon*, 47 F.4th at 24. As the Supreme Court has said, the Due Process Clause "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

Federal and state courts regularly discuss how this rule applies to fundamental rights, including parental rights. Federal courts hold that "[g]overnment actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000); *accord, e.g., Stewart v. City of Okla. City*, 47 F.4th 1125, 1138 (10th Cir. 2022) ("[I]f a right has been infringed, we generally apply either strict scrutiny (if the right is funda-mental) or rational basis review (if the right is not fundamental)."); *Doe v. Settle,* 24 F.4th 932, 953 (4th Cir. 2022) ("A substantive due process challenge is considered under rational-basis review unless some funda-mental right is implicated.").

They have also applied this rule to claims like Plaintiffs' claims. The Third Circuit, for example, has said "[i]t is not unforeseeable . . . that a school's policies might come into conflict with the fundamental right of parents to raise and nurture their child." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000). "But when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a *compelling interest.*" *Id.* (emphasis added); *accord Arnold v. Bd. of Educ.*, 880 F.2d 305, 313 (11th Cir. 1989) (holding that "the parental freedom to inculcate one's children with values and standards which the parents deem desirable" falls within "a private realm of family life which the state cannot enter *without compelling justification*" (emphasis added)).

In *Gruenke*, a swim coach violated the rights of a girl's parents by failing to notify them or seek their consent before forcing her to undergo a pregnancy test, although the Third Circuit granted him qualified immunity. *See* 225 F.3d at 306–07. Today, however, "the contours of Third Circuit precedent put a reasonable defendant on notice that" allegations like those in *Gruenke* (and like those of Plaintiffs in this case) "would—absent a compelling interest—plausibly infringe" parental rights. *Tatel v. Mt. Lebanon Sch. Dist.*, No. 2:22-CV-837, 2022 WL 15523185, at *28 (W.D. Pa. Oct. 27, 2022).

State courts, like their federal counterparts, routinely apply the rule that, "[w]hen a fundamental right is at stake, the so-called 'strict

scrutiny' formula for examining the constitutionality of State infringe-ment on that right comes into play." *Blixt v. Blixt*, 437 Mass. 649, 655–56, 774 N.E.2d 1052, 1059 (Mass. 2002). For example, in *Blixt*, the Supreme Judicial Court of Massachusetts relied on *Troxel* to apply strict scrutiny to a parental-rights claim. *See id.* "[T]he majority of courts" that have applied *Troxel* have understood it to require strict scrutiny. *In re A.A.L.*, 387 Wis.2d 1, 18, 927 N.W.2d 486, 494 (Wis. 2019) (collecting cases from state courts of last resort); *accord Jones v. Jones*, 359 P.3d 603, 610 n.10 (Utah 2015) ("Other courts have reached similar conclusions."); *Hiller v. Fausey*, 588 Pa. 342, 358, 358 n.18, 904 A.2d 875, 885, 885 n.18 (Pa. 2006) (same).

Because parental rights are fundamental, a robust consensus of federal and state authority supports applying strict scrutiny here. *Cf. Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) (holding that a "robust consensus of cases of persuasive authority" can show a right is clearly established for qualified-immunity analysis (cleaned up)).

### C.   Parental rights trigger strict scrutiny even when asserted against school officials.

The district court chose not to apply strict scrutiny based on Defendants' identities as a school committee and its employees rather than a state legislature. *See* Addendum 11–12. But none of the decisions it cited justified its failure to follow the lead of the many

federal and state courts holding that fundamental rights in general—
and parental rights in particular—trigger strict scrutiny.

According to the district court, before determining whether Plain-
tiffs have invoked a fundamental right, it needed to determine whether
Defendants' conduct is "so extreme and egregious as to shock the
contemporary conscience." Addendum 11 (quoting *Abdisamad v. City of
Lewiston*, 960 F.3d 56, 59–60 (1st Cir. 2020)). But that test was devised
to hold executive officers—usually police officers—accountable for
"conduct that shocks the conscience," no matter whether it implicates a
fundamental right. *Rochin v. California*, 342 U.S. 165, 172 (1952); *see*
Rosalie Berger Levinson, *Time to Bury the Shocks the Conscience Test*,
13 Chap. L. Rev. 307, 319 (2010) ("[C]onscience-shocking behavior that
deprives a person of liberty itself violates substantive due process.").

In *County of Sacramento v. Lewis*, for example, the Supreme
Court considered "whether a police officer violates the Fourteenth
Amendment's guarantee of substantive due process by causing death
through deliberate or reckless indifference to life in a high-speed
automobile chase aimed at apprehending a suspected offender." 523
U.S. 833, 836 (1998). Despite following only a year after *Glucksberg*,
*Lewis* never asked whether the police officer's deliberately or recklessly
indifferent action violated a fundamental right; in fact, the term
"fundamental rights" appears only in a concurrence. *See* 523 U.S. at
860–61 (Scalia, J., concurring in the judgment). *Lewis* only asked

11

whether the high-speed chase in question was an "abuse of power" that "shocks the conscience." *Id.* at 846 (majority opinion).

In other words, the shocks-the-conscience test operates to *expand* executive officers' potential liability under the Due Process Clause, not *limit* it. So, when suing an executive officer—in contrast to a legislature—under the Due Process Clause, the plaintiff's failure to invoke a fundamental right does not necessarily consign the claim to "the more lenient rational basis standard." *Kenyon*, 47 F.4th at 24. A plaintiff can still obtain more searching constitutional review, if the officer's conduct shocks the conscience. *Lewis*, 523 U.S. at 846–47.

The district court misread *Lewis* to shield executive officers from liability for violating fundamental rights when the constitutional violation does not "shock the contemporary conscience." Addendum 17 (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005)). But that approach would mean Americans' fundamental rights are always in flux, depending on "the contemporary conscience." *Glucksberg*'s insistence that "fundamental rights" are those "found to be deeply rooted in our legal tradition" does not allow for such an indeterminate approach. 521 U.S. at 722.

This Court's precedent likewise does not support the district court's failure to take account of the fundamental nature of Plaintiffs' asserted rights. Consider *Suboh*, where this Court reviewed a parental-rights claim under the procedural and substantive protections of the

Due Process Clause brought against a police officer and an assistant district attorney, among others. *See Suboh*, 298 F.3d at 85, 91. Although the Court "focus[ed] [its] analysis primarily on the procedural aspect," *id*. at 91, it described "[t]he constitutional right at issue [t]here" as "the right to procedural and substantive due process before the state takes a child away from his or her parent," *id*. at 93.

*Suboh* began by identifying the purported constitutional right at stake; namely, "the interest of parents in the care, custody, and control of their children." *Id*. at 91 (cleaned up). It then noted that "[t]his liberty interest is protected both by the substantive component of the Due Process Clause, which constrains governmental interference with certain fundamental rights and liberty interests," and the procedural component of that clause. *Id*. After holding that "a clearly established constitutional right [was] at stake," *id*. at 94, the Court determined that the assistant district attorney was entitled to qualified immunity, while the police officer was not, *id*. at 95, 97.

Although *Suboh* was decided four years after *Lewis*, *Suboh* nowhere used the term "shocks the conscience" and cited *Lewis* only for the qualified-immunity standard. *See id*. at 90. And *Suboh* nowhere suggested that the defendants' identities as executive officers affected the analysis of the parental-rights claim in that case. *Contra* Addendum 10–12. Adopting the district court's reading of more recent decisions

interpreting the Due Process Clause would mean *Suboh*'s analysis has been overruled *sub silentio*, which is ridiculous.

Neither *Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010), nor *Abdisamad*, 960 F.3d 56, considered claims that an officer had violated a person's parental rights, or another fundamental right. Like the Supreme Court itself in *Lewis*, this Court in those cases was discussing the standard for liability of an officer even in the *absence* of a fundamental rights claim. *See, e.g.*, *Abdisamad*, 960 F.3d at 60; *Martinez*, 608 F.3d at 65–66. Because this Court did not consider the question of how to analyze a fundamental rights claim in *Martinez* and *Abdisamad*, the district court was wrong to treat them as dispositive of Plaintiffs' fundamental rights claim here. *See, e.g.*, Addendum 11, 17; *see also Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); *see* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1263 (2006) ("Among the most common manifestations of disguised dictum occurs where the court ventures beyond the issue in controversy to declare the solution to a further problem—one that will arise in another case, or in a later phase of the same case.").

Following the district court's reading of *Martinez* and *Abdisamad* would create an unnecessary circuit conflict. The Tenth Circuit, for

14

example, has discussed "two strands of the substantive due process doctrine." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008). "One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience." *Id.* According to the Tenth Circuit, "[b]y satisfying either the 'fundamental right' or the 'shocks the conscience' standards, a plaintiff states a valid substantive due process claim under the Fourteenth Amendment." *Id.*

There can be no doubt that Plaintiffs have invoked a fundamental right. *See Troxel*, 530 U.S. at 65 (plurality opinion); *Glucksberg*, 521 U.S. at 720. And courts routinely apply strict scrutiny to fundamental rights claims. *See Kenyon*, 47 F.4th at 24. Because the district court failed to apply that standard here, this Court should reverse.

**II.    At a bare minimum, parents have a fundamental right to receive notification that their child's school has decided to counsel and treat their child for gender dysphoria.**

In its most narrow sense, this case asks whether parents' fundamental right to direct the education and upbringing of their child includes the right to receive notification from their child's school that officials have decided to counsel and treat the child for gender dysphoria. *See* Appellants' Br. 26, 46. Yet the district court mischaracterized Plaintiffs' asserted interest as the overbroad right "to direct *how* a public school teaches their child" and to "interfere with the

15

general power of the state to regulate education." Addendum 6, 18 (cleaned up). Plaintiffs' complaint asserts no such thing; rather it asserts the right to be notified that school officials are treating their child as a gender identity that differs from their child's sex. The district court refused to recognize a right that Plaintiffs were not asserting.

As Plaintiffs explain, the dual principles that (1) minor children are not capable of making certain decisions without a parent's consent, and (2) parents are entrusted and presumed to act in their children's best interest, are well established principles of common law, deeply embedded in statutory law, and have been recognized repeatedly by the Supreme Court. Appellants' Br. 43–44. "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.*

That explains why even today most minors cannot unilaterally consent to most forms of medical and mental healthcare. *See* Mass. Gen. Laws ch. 112, § 12F (outlining certain exceptions to general rule against minors consenting to healthcare); *accord, e.g.*, Cal. Fam. Code § 6922; 13 Del. Code § 707; 22 Me. Rev. Stat. § 1503; N.Y. Pub. Health Law § 2504. Included within parents' fundamental right and duty to prepare their children for life's challenges and obligations is the duty "to

16

recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. For centuries, our laws have operated based on the assumption "that natural bonds of affection lead parents to act in the best interests of their children." *Id.* (citing Blackstone and Kent).

Importantly, that has remained true despite the unfortunate reality that *some* parents may at times act against the best interests of their children. *Id.* "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id.* at 603. And "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Id.* "Parents can and must make those judgments." *Id.* And "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* at 604.

All of that applies with equal force here. The World Professional Association for Transgender Health (WPATH), is a transgender advocacy organization that has produced guidelines for medical and surgical interventions related to gender. *See generally* WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People* (2022 v.8), http://bit.ly/3JkBDc7. Those guidelines define "gender

dysphoria" as the "distress or discomfort that may be experienced because a person's gender identity differs from that which is physically and/or socially attributed to their sex assigned at birth." *Id.* at S252. And a "gender social transition in prepubertal children," like Defendants' use of new chosen names and pronouns for students who identify as transgender, is a "form of psychosocial treatment that aims to reduce gender dysphoria" in children. Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 Child and Adolescent Mental Health 36 (2020).

Many studies have found that the vast majority of children (roughly 80–95%) who experience gender dysphoria during childhood ultimately find comfort with their biological sex as they enter into adulthood; such children are said to "desist." WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 11 (2011 v.7), https://bit.ly/2Qfw2Lx. At the same time, children who *have* transitioned report significantly higher rates of suicidal ideation, suicide attempts, and suicide. *See* Russell B. Toomey et al., *Transgender Adolescent Suicide Behavior*, 142 Pediatrics 1, 1–3 (2018),perma.cc/3Q5B-CCKG. A heartbreaking 50.8% of adolescents in the study who identified as "female to male transgender" reported having attempted suicide. *Id.* By comparison, 27.9% of all respondents who were "not sure" about their gender identity reported having

attempted suicide, and 17.6% of female respondents who did not identify as transgender or questioning reported the same. *Id.*

*Amicus curiae* ADF has seen equally troubling research findings in its own cases. For example, in Virginia state court, ADF proffered an expert report from Dr. Stephen B. Levine, former WPATH committee chairman, detailing the findings of one "cohort study by authors from Harvard and Boston Children's Hospital" finding that youth and young adults who self-identified as transgender "had an elevated risk of depression (50.6% vs. 20.6%) and anxiety (26.7% vs. 10.0%)," and a "higher risk of suicidal ideation (31.1% vs. 11.1%), suicide attempts (17.2% vs. 6.1%), and self-harm without lethal intent (16.7% vs. 4.4%) relative to the matched controls." Report of Stephen B. Levine, MD, at 45, *Figliola v. Sch. Bd. of Harrisonburg*, No. CL22-1304 (Va. Cir. Ct. Rockingham Cnty. filed Aug. 30, 2022), http://bit.ly/42hdcVt.

Summarizing the results of numerous studies, Dr. Levine warned that, "as we look ahead to the patient's life as a young adult and adult, the prognosis for the physical health, mental health, and social well-being of the child or adolescent who transitions to live in a transgender identity is not good." *Id.* at 47. "Meanwhile, *no studies* show that affirmation of pre-pubescent children or adolescents leads to more positive outcomes" later in life compared to other forms of ordinary therapy. *Id.* (emphasis added). Not surprisingly then, parents often "hold different philosophical views on what is the best way to help

reduce [their child's] gender dysphoria," and those views "require both respect and understanding." Zucker, *Different Strokes*, *supra*, at 36.

Against this backdrop, Defendants' policy of counseling and treating students for gender dysphoria *without ever notifying* their parents infringes parents' fundamental right to "direct the education and upbringing of [their] children." *Glucksberg*, 521 U.S. at 720. As shown above, "[t]he common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf." *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring and dissenting).

By denying parents their right even to be notified about the school's decision to intervene in their child's mental health, the policy here closely resembles the one at issue in *Alfonso v. Fernandez*, 195 A.D.2d 46, 606 N.Y.S.2d 259 (N.Y. App. Div. 1993). There, the reviewing court held that a "plan to dispense condoms" to minor students "without the consent of their parents or guardians, or an opt-out provision," violated parents' fundamental rights. *Alfonso*, 195 A.D.2d at 48, 606 N.Y.S.2d at 261.

"Through its public schools," New York "made a judgment that minors should have unrestricted access to contraceptives, a decision which is clearly within the purview of the petitioners' constitutionally protected right to rear their children, and then [had] forced that judgment on them." *Id.* at 57–58, 606 N.Y.S.2d at 266. As a result, after

finding the plan failed strict scrutiny, the reviewing court correctly held that it "violate[d] the petitioners' constitutional due process rights to direct the upbringing of their children." *Id.* at 59, 606 N.Y.S.2d at 267.

As the court explained, "[a]t common law it was for parents to consent or withhold their consent to the rendition of health services to their children." *Id.* at 50, 606 N.Y.S.2d at 262. And distributing condoms was not "an aspect of education in disease prevention." *Id.* at 52, 606 N.Y.S.2d at 263. It was a "means" of disease prevention. *Id.* at 52, 606 N.Y.S.2d at 263. As a result, *Alfonso* was not about parents complaining that their children were being exposed to ideas they found offensive. *Id.* at 57, 606 N.Y.S.2d at 266. It was about parents "being forced to surrender a parenting right," namely the right to "influence and guide the sexual activity of their children without State interference." *Id.* at 56, 606 N.Y.S.2d at 266. Thus, "[n]o matter how laudable its purpose," excluding parents "impermissibly trespass[ed]" on their fundamental rights. *Id.* at 56, 606 N.Y.S.2d at 265.

If a school cannot dispense condoms without notifying parents, then surely it cannot treat their child as a gender identity that differs from the child's sex without parental notification and consent. The school is sending students down a path that could lead to lifelong infertility, mental illness, and even suicide, yet insisting that parents have no right to know.

To be clear, Plaintiffs do not merely object to their children being taught ideas they disagree with about sex and gender identity. The parts of the policy they oppose are not merely "an aspect of education." *Id.* at 52, 606 N.Y.S.2d at 263. Instead, they object to the "means" Defendants have chosen to socially transition their children to a different gender identity without the parents' knowledge or consent. *Id.* at 52, 606 N.Y.S.2d at 263.

As in *Alfonso*, the solution here is simple: the school's policy "can go forward without interfering with the [plaintiffs'] rights simply by allowing parents who are interested in providing appropriate guidance and discipline to their children to 'opt out' by instructing the school not to [socially transition] their children without their consent." *Id.* at 58, 606 N.Y.S.2d at 267. The Constitution demands nothing less.

## CONCLUSION

This Court should hold reverse the judgment below and remand for further proceedings.

Dated: March 23, 2023        Respectfully submitted,

/s/ *David A. Cortman*

Katherine L. Anderson

ALLIANCE DEFENDING FREEDOM

15100 N. 90th Street

Scottsdale, AZ 85260

(480) 444-0020

kanderson@ADFlegal.org

Vincent M. Wagner

Tina Seideman

ALLIANCE DEFENDING FREEDOM

44180 Riverside Parkway

Lansdowne, Virginia 20176

(571) 707-4655

vwagner@ADFlegal.org

tseideman@adflegal.org

David A. Cortman

ALLIANCE DEFENDING FREEDOM

1000 Hurricane Shoals Road NE,

  Suite D1100

Lawrenceville, Georgia 30043

(770) 339-0774

dcortman@ADFlegal.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word-count limitation of Fed. R. App. P. 29(a)(5) because, according to the word-count feature of the program used to prepare it and excluding the items listed in Fed. R. App. P. 32(f), it contains 5,083 words and does not exceed 6,500 words.

This amicus brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ *David A. Cortman*

David A. Cortman
*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I electronically filed the foregoing brief with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *David A. Cortman*

David A. Cortman
*Counsel for Amicus Curiae*