No. 23-1069

# United States Court of Appeals for the First Circuit

STEPHEN FOOTE, individually and as Guardian and next friend of B.F. and G.F., minors; MARISSA SILVESTRI, individually and as Guardian and next friend of B.F. and G.F., minors,
Plaintiffs - Appellants,

JONATHAN FELICIANO; SANDRA SALMERON,
Plaintiffs,

v.

LUDLOW SCHOOL COMMITTEE; TODD GAZDA, former Superintendent; LISA NEMETH, Interim Superintendent; STACY MONETTE, Principal, Baird Middle School; MARIE-CLAIRE FOLEY, school counselor, Baird Middle School; JORDAN FUNKE, former librarian, Baird Middle School; TOWN OF LUDLOW,
Defendants - Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, WESTERN DIVISION

## BRIEF FOR THE DEFENDANTS – APPELLEES

David S. Lawless, 1st Circuit #119792
Nancy Frankel Pelletier, 1st Circuit #86904
Robinson Donovan, P.C.
1500 Main Street, Suite 2300
Springfield, Massachusetts 01115
Phone (413) 732-2301
Direct Fax (413) 452-0342
dlawless@robinsondonovan.com
npelletier@robinsondonovan.com

Dated: June 20, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE.................................................................2

    I.    Facts as Alleged in the Amended Complaint.......................................2

    II.    Procedural Posture................................................................8

SUMMARY OF ARGUMENT ...............................................................9

STANDARD OF REVIEW ..................................................................11

ARGUMENT ................................................................................12

    I.    The District Court Correctly Applied the Appropriate Standard of Review in Dismissing Count II.................................................12

        A.    The District Court Correctly Applied the Two-Pronged Approach Suggested by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................................13

        B.    The District Court Viewed the Facts Alleged in the Light Most Favorable to Plaintiffs.......................................16

            1.    Being Transgender is Not a Mental Health Condition. ....................................................17

    II.    Nothing in the District Court's Decision Indicates that it Viewed Plaintiffs' Claims as an Attempt to Interfere with Curricular Decisions...........................................................19

        A.    The District Court Did Not Label the Policy Alleged to Exist by Plaintiffs as "Curriculum." .........................19

        B.    Plaintiffs' Reliance on *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), and its Progeny is Misplaced. ...............21

III.    The District Court Properly Applied the Shocks the Conscience Test. ...................................................................................22

    A.    Plaintiffs Have Waived Their Argument that They Are Not Required to Allege Conduct that Shocks the Conscience. ..................................................................22

    B.    Plaintiffs' Current Position is Wrong. ......................................23

    C.    The District Court's Determination that Defendants' Alleged Conduct Does Not Shock the Conscience Should Be Affirmed. ............................................................31

IV.    Defendants' Alleged Conduct Cannot Be Evaluated Without Considering the Massachusetts Law and Regulations Governing Public Schools. ..............................................................35

V.    The District Court Correctly Concluded that the Doctrine of Qualified Immunity Precludes the Imposition of Liability as Against the Individual Defendants. .......................................40

    1.    Plaintiffs Have Failed to Meet Their Burden of Identifying Authority Sufficient to Put Defendants on Notice that Their Alleged Conduct Was Unconstitutional. ......42

    2.    Plaintiffs Have Failed to Show that an Objectively Reasonable Educator Would Have Known that Defendants' Alleged Conduct Violated the Law. .....................48

    3.    Plaintiffs Have Waived Any Challenge to the Application of the Doctrine of Qualified Immunity. ....................................50

CONCLUSION....................................................................51

CERTIFICATE OF COMPLIANCE........................................................52

CERTIFICATE OF SERVICE ............................................................53

ADDENDUM

# TABLE OF AUTHORITIES

CASES:

*Abdisamad v. City of Lewiston*,
 960 F.3d 56 (1st Cir. 2020) .................................................................. 25

*Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*,
 880 F.2d 305 (11th Cir. 1989)............................................................... 29

*Arroyo Gonzalez v. Rossello Nevares*,
 305 F. Supp. 3d 327 (D.P.R. 2018)........................................................ 39

*Ashcroft v. al-Kidd*,
 563 U.S. 731 (2011) ............................................................................. 43

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...................................................................... 13, 16

*Barrington Cove, Ltd. Partnership v. Rhode Island Housing & Mortgage Finance
 Corp.*, 246 F.3d 1 (1st Cir. 2001)........................................................... 31

*Bostock v. Clayton Cnty., Georgia*,
 140 S. Ct. 1731 (2020) ......................................................................... 49

*Brown v. Hot, Sexy & Safer Productions, Inc.*,
 68 F.3d 525 (1st Cir. 1995) ....................................................... 44, 45, 47

*Carrozza v. CVS Pharmacy, Inc.*,
 992 F.3d 44 (1st Cir. 2021) .................................................................. 22

*Chainey v. Street*,
 523 F.3d 200 (3d Cir. 2008).................................................................. 28

*Chongris v. Bd. of Appeals of Town of Andover*,
 811 F.2d 36 (1st Cir. 1987) .................................................................. 18

*Colon v. Collazo*,
 729 F.2d 32 (1st Cir. 1984) ........................................................... 46, 47

iii

*Conlogue v. Hamilton*,
    906 F.3d 150 (1st Cir. 2018) ................................................................. 42

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ..................................................................... *passim*

*Coyne v. City of Somerville*,
    972 F.2d 440 (1st Cir. 1992) ......................................................... 31, 34

*Cruz-Erazo v. Rivera-Montanez*,
    212 F.3d 617 (1st Cir. 2000) ............................................................... 31

*DePoutot v. Raffaelly*,
    424 F.3d 112 (1st Cir. 2005) ............................................... 24, 25, 35

*DeShaney v. Winnebago County*,
    489 U.S. 189 (1989) ...................................................................... 9, 21

*DiMarco-Zappa v. Cabanillas*,
    238 F.3d 25 (1st Cir. 2001) ............................................................ 22, 51

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 ..................... 18-19, 49

*Doe v. Hopkinton Pub.*,
    19 F.4th 493 (1st Cir. 2021) ............................................................... 24

*Doe v. Woodard*,
    912 F.3d 1278 (10th Cir. 2019) .......................................................... 28

*Dubbs v. Head Start*,
    366 F.3d (10th Cir. 2003) .................................................................. 27

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) .............................................................. 15

*Fernandez-Salicrup v. Figueroa-Sancha*,
    790 F.3d 312 (1st Cir. 2015) .............................................................. 40

*FTC v. Phoebe Putney Health Sys., Inc.*,
  568 U.S. 216 (2013) ............................................................................ 24

*Gonzalez-Droz v. Gonzalez-Colon*,
  660 F.3d 1 (1st Cir. 2011) .................................................................. 24

*Gonzalez-Fuentes v. Molina*,
  607 F.3d 864 (1st Cir. 2010) .............................................................. 32

*Grendell v. Gillway*,
  974 F. Supp. 46 (D. Me. 1997) ..................................................... 26, 27

*Grimm v. Gloucester County School Board*,
  972 F.3d 586 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878 ............. 15, 19, 49, 50

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000) ................................................................ 28

*Harron v. Town of Franklin*,
  660 F.3d 531 (1st Cir. 2011) .......................................................... 25, 33

*Irish v. Fowler*,
  979 F.3d 65 (1st Cir. 2020), *cert. denied*, 142 S. Ct. 74 (2021) ............. 35, 36, 50

*J.R. v. Gloria*,
  593 F.3d 73 (1st Cir. 2010) ........................................................... 32, 33

*Kane v. Barger*,
  902 F.3d 185 (3d Cir. 2018) ................................................................ 28

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018) ........................................................................ 43

*Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*,
  No. 4:21CV415-MW/MJF, 2022 WL 18670372 (N.D. Fla. Dec. 22, 2022) ...... 30

*Lyman v. Baker*,
  954 F.3d 351 (1st Cir. 2020) ......................................................... 11, 12

*Maddox v. Stephens*,
    727 F.3d 1109 (11th Cir. 2013)........................................................................ 29-30

*Maldonado v. Fontanes*,
    568 F.3d 263 (1st Cir. 2009) ........................................................................... 40-41

*Mammaro v. New Jersey Div. of Child Prot. & Permanency*,
    814 F.3d 164 (3d Cir. 2016)........................................................................... 28, 29

*Martinez v. Cui*,
    608 F.3d 54 (1st Cir. 2010) ............................................................................ *passim*

*McConkie v. Nichols*,
    446 F.3d 258 (1st Cir. 2006) .......................................................................... 25, 26

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ............................................................................... 44, 45, 47

*Mongeau v. City of Marlborough*,
    492 F.3d 14 (1st Cir. 2007) .................................................................................. 25

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ................................................................................... 42, 43, 45

*Ocasio-Hernández v. Fortuño-Burset*,
    640 F.3d 1 (1st Cir. 2011) ............................................................................. 13, 16

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir.), *cert. denied*, 141 S. Ct. 894 (2020)...... 44, 45-46, 47, 49

*Parham v. J.R.*,
    442 U.S. 584 (1979) ..................................................................................... 46, 47

*Parker v. Hurley*,
    514 F.3d 87 (1st Cir. 2008), *cert. denied*, 555 U.S. 815 .............................. *passim*

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925) ............................................................................... 44, 45, 47

*Reichle v. Howards*,
   566 U.S. 658 (2012) ........................................................................... 42

*Reno v. Flores*,
   507 U.S. 292 (1993) ........................................................................... 41

*Rivas-Villegas v. Cortesluna*,
   142 S. Ct. 4 (2021) ............................................................................ 43

*Rochin v. California*,
   342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) ........................... 24, 25

*Thomas v. Rhode Island*,
   542 F.3d 944 (1st Cir. 2008) ............................................................. 22

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*,
   393 U.S. 503 (1969) ........................................................................... 48

*Troxel v. Granville*,
   530 U.S. 57 (2000) ................................................................. 44, 45, 46

*United States v. Sturm, Ruger & Co.*,
   84 F.3d 1 (1st Cir. 1996) ................................................................... 24

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ........................................................................... 41

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ........................................................... 49

*White v. Pauly*,
   137 S. Ct. 548 (2017) ......................................................................... 43

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ........................................................................... 45

## CONSTITUTIONAL PROVISIONS:

First Amendment ............................................................................ 45
Fourteenth Amendment ............................................................... *passim*

## STATUTES:

20 U.S.C. § 1681(a) ................................................................... 48-49

M.G.L. c. 71, §§ 34, 37 ................................................................. 24
M.G.L. c. 71, § 38G ..................................................................... 35
M.G.L. c. 76, § 5 .................................................................... *passim*
M.G.L. c. 112, § 275 .................................................................... 18

## REGULATIONS:

603 CMR 23.01 ............................................................................. 6
603 CMR 26.00 ........................................................... 2, 36, 37, 48
603 CMR 26.01 ........................................................................... 37
603 CMR 26.03 ........................................................................... 37
603 CMR 26.07 ........................................................................... 37

## RULES:

Federal Rule of Civil Procedure 12(b)(6) .................................... 2, 8, 11

D. Mass. L.R. 7.1 ......................................................................... 8

Local Rule 7.1 ............................................................................. 8

## OTHER AUTHORITIES:

Merriam-Webster https://www.merriam-webster.com/dictionary/deadname
    (last visited June 16, 2023) ......................................................4

Merriam-Webster https://www.merriam-webster.com/dictionary/cisgender
    (last visited June 15, 2023) ....................................................19

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.   Whether the district court correctly applied the appropriate standard of review in dismissing Count II of plaintiffs' amended complaint.

II.  Whether the district court characterized plaintiffs' claims as challenging curriculum or plaintiffs' have simply misread its decision.

III. Whether plaintiffs have waived their argument that they are not required to allege conduct that shocks the conscience to support their substantive due process claims and whether that position (if considered for the first time now) is correct.

IV.  Whether the district court erred when it concluded that defendants' conduct, as alleged, does not shock the conscience.

V.   Whether defendants' alleged conduct can be evaluated without considering the relevant (and unchallenged) background law, regulations, and regulatory guidance.

VI.  Whether the district court correctly concluded that plaintiffs did not meet their burden of showing that the rights that they have asserted are "clearly established" for purposes of the doctrine of qualified immunity, and whether plaintiffs have waived their argument that the doctrine should be limited or abrogated.

## STATEMENT OF THE CASE

### I.    Facts as Alleged in the Amended Complaint.

Defendants accept as true the facts, as opposed to conclusions, alleged in plaintiffs' Amended Complaint for Injunctive Relief, Declaratory Judgment, and Damages for purposes of plaintiffs' appeal from the district court's order allowing defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants note that both the conclusory and factual allegations contained in the amended complaint are inaccurate and misleading. Defendants only accept the factual allegations in the amended complaint to the extent that they must do so for the limited purposes of this appeal.

The Massachusetts Department of Elementary and Secondary Education ("DESE") has issued non-binding guidance to school districts to assist them in implementing the provisions of M.G.L. c. 76, § 5 and 603 CMR 26.00 that bar discrimination on the basis of gender identity in Massachusetts public schools, Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment (the "DESE Guidance"). See A.17-18 at ¶¶ 22-30; Add.1-8.

The amended complaint alleges that the Town of Ludlow ("Ludlow"), through its school committee adopted a "Protocol," based on its interpretation of the DESE Guidance, that "parents are not to be informed of their child's transgender status and gender-affirming social transition . . . unless the child, of any age, consents." See

2

A.20 at ¶ 36.  See also, *Id*. at ¶¶ 34-35.  It alleges that the children of plaintiffs, Stephen Foote and Marissa Silvestri, "G.F." and "B.F.," were 11 and 12 years old, respectively, at the time of the alleged events.  See A.26 at ¶ 58, A.34 at ¶ 93, A.35 at ¶ 97, A.39 at ¶ 111.  Both were enrolled in a Ludlow middle school.  See *Id.*

In December of 2020, B.F. told a teacher that B.F. was "experiencing insecurity, low self-esteem, poor self-image, and a perceived lack of popularity." See A.27 at ¶ 59.  B.F. also told the teacher that B.F. was depressed and needed help but was unsure how to ask the plaintiffs for help.  See *Id*. at ¶ 62.  The teacher offered to contact the plaintiffs and B.F. accepted the offer.  See *Id.* at ¶ 63.  The teacher spoke to Silvestri and shared B.F.'s concerns.  See A.28 at ¶¶ 65-66.  Silvestri then emailed defendants, Principal Stacy Monette and Superintendent Todd Gazda, B.F.'s teachers, and the members of the Ludlow School Committee:

> It has been brought to the attention of both Stephen and myself that some of B's teachers are concerned with her mental health. I appreciate your concern and would like to let you know that her father and I will be getting her the professional help she needs at this time. With that being said, we request that you do not have any private conversations with B. in regards to this matter. Please allow us to address this as a family and with the proper professionals.

See A.28 at ¶ 70.

On February 28, 2021, without the knowledge of plaintiffs, B.F. sent an email to defendants, Superintendent Todd Gazda and School Counselor Marie-Claire Foley, and teachers at "B.F.'s" middle school, asserting:

> Hello everyone, If you are reading this you are either my teacher or guidance counselor. I have an announcement to make and I trust you guys with this information. I am genderqueer. Basically, it means I use any pronouns (other than it/its). This also means I have a name change. My new name will be R****. Please call me by that name. If you deadname[1] me or use any pronouns I am not comfortable with I will politely tell you. I am telling you this because I feel like I can trust you. A list of pronouns you can use are: she/her he/him they/them fae/faerae/aer ve/ver xe/xem ze/zir. I have added a link so you can look at how to say them. Please only use the ones I have listed and not the other ones. I do not like them. Thank you. R*** F***.

See A.31-32 at ¶ 81.

On March 1, 2021, Foley met with B.F. and then sent an email to school staff, "'R**** [B****] is still in the process of telling his . . . parents and is requesting that school staff refer to him . . . as B**** and use she/her pronouns with her parents and in written emails/letters home.'" See A.32 at ¶ 83. Following the email, teachers began using B.F.'s preferred name and pronouns. See A.32-33 at ¶ 85. Sometime before March 8, 2021, the teacher who spoke with Silvestri in December told plaintiffs about B.F.'s February 28, 2021, email. See A.33 at ¶¶ 87-88. On March 8, 2021, Foley sent another email to school staff "informing them of B.F.'s request to be called 'R***' and explicitly instructing staff that [B.F.'s] parents were not to be told." See *Id*. at ¶ 88.

---

[1] Merriam-Webster defines "deadname" as "the name that a transgender person was given at birth and no longer uses upon transitioning." https://www.merriam-webster.com/dictionary/deadname (last visited June 16, 2023).

At or about this time, G.F. also began using a preferred name; staff did not inform plaintiffs. See A.34 at ¶¶ 90-91.

During a meeting on March 10, 2021, Foley told teachers "that 'the law' says that school staff do not have to tell parents about their children's requests to change their name or otherwise be socially affirmed in an asserted transgender identity." See A.34, ¶ 91. On March 11, 2021, Foley told B.F. that B.F. could use the boys' bathroom, girls' bathroom, or a gender-neutral bathroom and offered to show B.F. where the school's gender-neutral bathrooms were located. See A.35 at ¶ 96.

On March 18, 2021, plaintiffs met with Principal Monette. See A.36 at ¶ 99. Plaintiffs attempted to convey that defendants had disregarded plaintiffs' parental rights and plaintiffs' instructions that staff not engage with plaintiffs' children regarding mental health issues. See *Id*. at ¶¶ 99-100. Plaintiffs also complained, or attempted to complain, that they had not been notified of their children's assertion of their gender identities and preferred names. See *Id*. at ¶ 100. Principal Monette refused to discuss these issues and ended the meeting abruptly. See *Id*. at ¶ 101.

On March 21, 2021, Silvestri informed Superintendent Gazda that plaintiffs objected to staff's disregard of their rights "to make decisions regarding their children's mental health and upbringing." See A.36-37 at ¶ 102. Silvestri also said that the fact that plaintiffs' children "'want to be called by a different name (of the opposite sex) is something that will follow the children through school and not be

forgotten by classmates.'" See A.37 at ¶ 103. She stated that excluding plaintiffs from decision making with respect to decisions with long-term effects was unacceptable. See *Id*. at ¶ 104. Silvestri reminded Gazda that her December email had not received a response and stated that plaintiffs' instructions that staff should not engage in conversations with their children regarding their mental health had been disregarded. See *Id*. at ¶ 105. Gazda told plaintiffs that staff, particularly Foley, had properly followed the DESE Guidance in not notifying plaintiffs of B.F.'s February 28, 2021, email and instructing others not to do so. See A.38 at ¶¶ 107-110. Superintendent Gazda also stated that there had been no violation of 603 CMR § 23.01, which governs student records. See A.39 at ¶ 111. In a subsequent meeting on March 26, 2021, Superintendent Gazda repeated his positions, without explaining how the school committee's interpretation of the DESE Guidance was correct. See *Id*. at ¶ 113. Plaintiffs repeated their demands that staff not talk to their children about gender identity and that staff not use their children's preferred names but received no response. See *Id*. at ¶ 114.

School Counselor Foley met with B.F. throughout the spring of 2021. See A.40 at ¶ 118. Foley was supportive of B.F.'s expression of B.F.'s gender identity. See *Id*. On one occasion Foley told B.F. that she was worried about B.F. and wanted B.F. to speak to another counselor. See A.40 at ¶¶ 119-120. Foley also questioned whether B.F. was as comfortable speaking with a counselor chosen by plaintiffs as

6

B.F. was speaking to Foley.  See A.41 at ¶ 122.  Foley stated she believed B.F. "needed to get help and support."  See *Id*. at ¶ 124.  On some occasions, Foley questioned whether B.F.'s parents were providing B.F. with appropriate care.  See A.42 at ¶¶ 125-126.

B.F. also discussed gender identity with school librarian, defendant, Jordan Funke.  See A.39-40 at ¶ 115.  Funke directed B.F. to the website of an organization Funke is affiliated with, translategender.org.  See *Id*. at ¶¶ 115-116.

At the May 25, 2021, meeting of the Ludlow School Committee, Superintendent Gazda read a statement in rebuttal to a public comment that had been submitted by a tenth-grade student (not plaintiffs).  See A.45 at ¶¶ 136-138; A.98-99.  Gazda also stated that the school committee's alleged policy was "'in compliance' with the laws and regulations of Massachusetts and DESE Guidance" and that parents' concerns about concealment of information was thinly veiled intolerance.  See A.46 at ¶¶ 140-141.  Gazda stated that school is the only safe place for many children and that "the middle school would absolutely continue to help the children 'express who they are' despite parents' wishes to the contrary."  See *Id*. at ¶¶ 142-143.

At the June 8, 2021, school committee meeting, the chair stated that the school district's alleged policy was "'in compliance'" with state and federal laws.  See A.47 at ¶ 146.  At that meeting, Gazda characterized "parents' concerns about not being

notified and their decisions not being honored regarding their children's upbringing and gender identity issues as 'prejudice and bigotry.'"  See *Id*. at ¶ 148.

## II.     Procedural Posture.

Plaintiffs' original complaint was filed in the United States District Court for the District of Massachusetts on April 12, 2022.  See A.5.  Following consultation with defendants' counsel pursuant to Local Rule 7.1, plaintiffs filed an amended complaint on June 21, 2022.  See A.7; D. Mass. L.R. 7.1.  Defendants moved to dismiss all plaintiffs' claims.  In their opposition to the motion, Foote and Silvestri conceded or agreed that the amended complaint did not state claims on behalf of B.F. and G.F.  See Supp. A.9 ("Defendants rightly state that 'The Amended Complaint asserts only parental rights' (MTD p. 20), since those are rights belonging to the Plaintiff parents that Defendants have violated'").

The motion to dismiss was heard by the district court on October 17, 2022.  See A.9.  At the hearing, the district court allowed plaintiffs' request to dismiss the claims of named plaintiffs Jonathan Feliciano and Sandra Salmeron.  See A.103.  The district court allowed defendants' motion to dismiss Foote and Silvestri's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 14, 2022, and this timely appeal followed.  See A.10.

## SUMMARY OF ARGUMENT

The district court, after identifying and discarding the conclusory allegations in plaintiffs' complaint, correctly held that the facts alleged in the amended complaint will not support an inference that defendants usurped plaintiffs' rights to make medical and mental health decisions for their children. Contrary to plaintiffs' assertions, there are no facts alleged in the amended complaint that could serve to establish that using a person's preferred name and pronouns constitutes the provision of health care services. The district court did not show a lack of objectivity or bias when it came to that conclusion. As it recognized, being transgender is not a mental health condition. The district court's dismissal of Count II of the amended complaint should be affirmed.

Plaintiffs' argument that the district court mischaracterized plaintiffs' claims as attacks on public school curriculum represents an obvious misreading of its decision. Similarly, nothing in the district court's opinion can be read to suggest that defendants had a duty to protect plaintiffs' children from them. *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), has no application to this case whatsoever.

Plaintiffs have waived their current argument that they are not required to show conduct that shocks the conscience in order to support their substantive due process claims by failing to raise it before the district court. To the extent that the Court considers the argument, it is contrary to controlling precedent of the Supreme

Court of the United States and a robust body of this Court's precedent. It is also contrary to the state of the law in the Third, Tenth, and Eleventh Circuits, upon whose authority plaintiffs purport to rely.

The district court properly held that defendants' conduct, as alleged, does not shock the conscience. Plaintiffs confuse the shocks the conscience and deliberate indifference inquiries. They incorrectly assume that, where there is time for reflection, deliberate indifference always shocks the conscience. Plaintiffs have not attempted to demonstrate that defendants' alleged conduct, analyzed as deliberate indifference or otherwise, shocks the conscience. As alleged, it did not, and the district court was correct to conclude that Counts I and III of the amended complaint were subject to dismissal on that basis.

As it was required to do, the district court conducted an "exact analysis of circumstances" in analyzing counts I and III of the amended complaint. Those circumstances here include Massachusetts laws, regulations, and regulatory guidance relative to the rights of transgender students in public schools. Plaintiffs have explicitly and repeatedly waived any challenge to Massachusetts' protections for transgender students but that does not mean that those protections can be ignored where they provide relevant context to plaintiffs' allegations. Further, to the extent that defendants' alleged conduct was mandated by or consistent with the protections that Massachusetts law affords, such cannot shock the conscience.

The district court's conclusion that the constitutional law governing defendants' alleged conduct was not "clearly established" for purposes of qualified immunity should be affirmed. Plaintiffs have failed to meet their burden of proffering authority that clearly establishes that, in the circumstances as alleged, defendants' alleged conduct was unconstitutional, and they have failed to show that every reasonable educator would have understood as much. Their late attempt to argue that the doctrine of qualified immunity should be limited or eliminated as applied to educators has been waived. The district court's order dismissing the amended complaint should be affirmed.

## STANDARD OF REVIEW

This court applies *de novo* review to a district court's order allowing a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. See *Lyman v. Baker*, 954 F.3d 351, 359 (1st Cir. 2020). As the Court has recently stated:

> For the purposes of our review, we "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz* [*v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)] (citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7, 12 (1st Cir. 2011) (discussing, among other cases, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))); see also *Hochendoner*, [*v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016)]. Second, we "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz*, 669 F.3d at 55 (citing *Ocasio-Hernández*, 640 F.3d at 12); see also *Blum* [*v. Holder*, 744 F.3d 790, 795 (1st Cir. 2014)]. "Plausible,

11

of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels us 'to draw on' our 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937); see also *Hochendoner*, 823 F.3d at 730-31. Finally, in the course of our review, "we can consider (a) 'implications from documents' attached to or fairly 'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in [the] plaintiff's 'response to the motion to dismiss.'" *Schatz*, 669 F.3d at 55-56 (footnote omitted) (quoting *Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005)).

*Id.* at 360.

## ARGUMENT

### I. The District Court Correctly Applied the Appropriate Standard of Review in Dismissing Count II.

The district court dismissed Count II, which alleges violation of plaintiffs' rights to make medical and mental health care decisions for their children, because "Plaintiffs have failed to adequately allege that Defendants provided medical or mental health treatment to B.F. and G.F. simply by honoring their requests to use preferred names and pronouns at school. Accordingly, Plaintiffs have not adequately stated a claim that Defendants usurped their right to make medical and mental health treatment decisions for their children." See A.160. The district court reached this conclusion after applying the appropriate standard of review and its dismissal of Count II should be affirmed.

A. **The District Court Correctly Applied the Two-Pronged Approach Suggested by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).**

The district court was clear that it began "its analysis by assuming the truth of Plaintiffs' factual allegations and identifying any statements in the complaint that merely offer legal conclusions couched as fact, since such conclusory statements are not entitled to the presumption of truth." See A.158, citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). This is the two-pronged approach suggested by *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and required by *Ocasio-Hernandez*. See *Ocasio- Hernández*, 640 F.3d at 12.

According to the district court:

> Many factual allegations set forth in Plaintiffs' Amended Complaint are followed by statements that draw a conclusion about the nature or significance of the alleged fact. For example, the Amended Complaint contains factual allegations about Defendants' responses to B.F.'s and G.F.'s requests to use their preferred names and pronouns followed by brief descriptors identifying the actions as "social transitioning," "mental health treatment" and, in one instance, as "psychosocial treatment." (*See e.g.* Dkt. No. 22, Am. Compl. ¶¶ 42, 43, 45, 46, 56, 74, 78, 84.)

See A.158-159. Plaintiffs' brief before this court confirms that the allegations identified by the district court (paragraphs 42, 43, 45, 46, 56, 74, 78, and 84 of the amended complaint) are intended to state or support the conclusion that "through use of alternate names and pronouns Defendants were implementing mental health treatment without the knowledge or consent of the child's parents." Plaintiffs' Brief at 15.

13

The district court appropriately recognized that the amended complaint does not allege that either of plaintiffs' children "had a diagnosed mental health condition related to gender identity" and that "Plaintiffs have not alleged Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when no treatment plan or diagnosis is in place." See A.159. The district court properly disregarded plaintiffs' conclusory allegation that defendants engaged in mental health care when they addressed plaintiffs' children using the names and pronouns that the children requested.

In their brief, plaintiffs particularly rely on four paragraphs of the amended complaint that they assert support their position that the district court erred. First, they repeat the conclusions that appear in paragraphs 42 and 43 of the amended complaint and appear to argue that because these conclusions are accompanied by citations to judicial decisions and an academic journal they are entitled to a presumption of truth. See A.22-23 at ¶¶ 42-43.

Paragraph 42 of the amended complaint alleges "Defendants have known or have reason to know that 'social transitioning,' including assertion of an alternate name and pronouns, is recognized as a medical/mental health treatment for children with gender dysphoria." See A.22 at ¶ 42 (footnote omitted). It goes on to provide two brief quotations from judicial decisions that reference gender dysphoria.

14

See *Id*.  As stated by the district court, the amended complaint does not allege that either of plaintiffs' children has been diagnosed with dysphoria.[2]  Paragraph 42 cannot be read as anything other than a conclusory statement.

Paragraph 43 of the amended complaint alleges "By engaging in 'social transitioning' with children, as provided in the Protocol, Defendants are 'implementing a psychosocial treatment. . .' without the knowledge or consent of parents." See A.23 at ¶ 43 (footnote omitted).  It includes a footnote that cites to an academic journal, but a conclusion supported by a four-word quotation from a journal article offered without any context remains a conclusion.  Plaintiffs have failed to cite any authority for the proposition that a conclusion is entitled to a presumption of truth when it is accompanied by a citation or a brief quotation.

Plaintiffs' brief also quotes paragraphs 74 and 78 of the amended complaint and highlights the facts (as opposed to conclusions) contained within them.  See Plaintiffs' Brief at 18-19.  However, the district court specifically noted that certain paragraphs of the amended complaint contain both factual allegations and

---

[2] According to the Fourth Circuit, gender dysphoria is "a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Grimm v. Gloucester County School Board,* 972 F.3d 586, 594-595 (4th Cir. 2020) (citation omitted; internal quotation marks omitted).  See also, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768-770 (9th Cir. 2019).  "Although some transgender individuals experience gender dysphoria, and that could cause some level of impairment, not all transgender persons have gender dysphoria, and gender dysphoria is treatable." *Grimm,* 972 F.3d at 612.

conclusions.  The district court included the facts that are highlighted in bold in plaintiffs' brief in its summary of the factual allegations contained in the amended complaint.  See A.153-155.  Plaintiffs have not identified any error in the manner in which it did so.  Plaintiffs' reliance on paragraphs 74 and 78 of the amended complaint to assert that the district court erred is misplaced.  Their argument merely serves to demonstrate that the district court employed the appropriate two-pronged analysis by separating the amended complaint's factual allegations from conclusions and disregarding the latter.  See *Iqbal*, 556 U.S. at 679; *Ocasio-Hernández*, 640 F.3d at 12.

**B.** **The District Court Viewed the Facts Alleged in the Light Most Favorable to Plaintiffs.**

Plaintiffs' assertion that it is impossible to determine which facts were considered by the district court and which allegations it disregarded as conclusory is without merit.  The district court provided a clear statement of the facts alleged in the amended complaint at the beginning of its decision and applied the facts as alleged in analyzing plaintiffs' claims, as appropriate.  See A.153-155, 164-165.

Plaintiffs' attack on the district court's objectivity is without merit.  At hearing on the motion to dismiss, plaintiffs were, in fact, equivocal as to whether defendants' alleged conduct constitutes mental health treatment.  See A.111-115.  While plaintiff's counsel did eventually plainly assert that defendants alleged conduct

16

constituted mental health treatment, the district court's efforts to obtain clarity regarding plaintiffs' allegations does not show a lack of impartiality. See *Id.*

The district court's observation that "addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally and, more specifically, in Massachusetts public schools where discrimination on the basis of gender identity is not permitted" does not show that it failed to view plaintiff's allegations in the light most favorable to them. See A.160, citing M.G.L. c. 76, § 5. Plaintiffs have waived any challenge to M.G.L. c. 76, § 5 and the allegations in the amended complaint cannot alter its mandate. See A.6-7; Plaintiffs' Brief at 42 n.6. The district court's recognition that discrimination on the basis of gender identity is prohibited in Massachusetts public schools does not reveal bias towards plaintiffs. Plaintiffs have failed to identify a factual allegation in the amended complaint that, taken in the light most favorable to plaintiffs, supports an inference that the use of plaintiffs' children's preferred names and pronouns constituted the provision of medical care.

### 1.    Being Transgender is Not a Mental Health Condition.

It must also be noted that the implicit or explicit conclusion on which all of plaintiffs' claims rest, that being transgender itself is a mental health condition, is used in the amended complaint as an epithet and is not entitled to a presumption of

truth.  See, e.g., A.24 at ¶ 24; A.25 at ¶¶ 52-53; A.26 at ¶ 56.  See also, *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir. 1987).

Plaintiffs' conclusion is foreclosed by M.G.L. c. 112, § 275, which prohibits gender conversion therapy for patients under eighteen years old.  Specifically, it prohibits "sexual orientation and gender identity change efforts," defined as "any practice by a health care provider that attempts or purports to impose change of an individual's sexual orientation or gender identity."  See M.G.L. c. 112, § 275. Pursuant to the statute:

> (b) A health care provider shall not advertise for or engage in sexual orientation and gender identity change efforts with a patient who is less than 18 years of age.
>
> (c) A health care provider who violates this section shall be subject to discipline by the appropriate licensing board. Such discipline may include suspension or revocation of license.
>
> (d) A violation of this section by a health care provider shall be a violation of section 2 of chapter 93A. Such a claim brought under this section shall be subject to sections 5A and 7 of chapter 260.

M.G.L. c. 112, § 275.  The conclusion that being transgender is a mental health condition in children is not entitled to a presumption of truth and is strongly contradicted by Massachusetts law.

The conclusion that being transgender is a mental illness is also implausible based on the growing judicial recognition of the nature of transgender identity.  See *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522-524 (3d

18

Cir. 2018), *cert. denied*, 139 S. Ct. 2636; *Grimm v. Gloucester County School Board,* 972 F.3d 586, 594-597 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878.  The Fourth Circuit has found that "[j]ust like being cisgender,[3] being transgender is natural and is not a choice.  Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  *Grimm,* 972 F.3d at 594 (citations omitted; internal quotation marks omitted).  See also, *Id*. at 596, 612-613.  Being transgender does not constitute a mental health condition.  Plaintiffs' conclusory and implausible allegations to the contrary should be disregarded.

## II.  Nothing in the District Court's Decision Indicates that it Viewed Plaintiffs' Claims as an Attempt to Interfere with Curricular Decisions.

### A.  The District Court Did Not Label the Policy Alleged to Exist by Plaintiffs as "Curriculum."

Plaintiffs have misrepresented the contents of the district court's decision. The district court provided an overview of the relevant background law, regulations, and the DESE Guidance.  See A.156-157.  It was appropriate for the district court to identify the legal context in which plaintiffs' specific claims arise.  See generally, *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).  Absent any claimed

---

[3] Merriam-Webster defines "cisgender" as "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth."  https://www.merriam-webster.com/dictionary/cisgender (last visited June 15, 2023).  See also, *Grimm*, 972 F.3d at 594.

material error in the district court's summary, its synopsis provides no grounds for reversing its decision.  Plaintiffs do not challenge the district court's description as inaccurate, and they have waived any challenge to the validity of the authority discussed by the district court.  See A.6-7; Plaintiffs' Brief at 42 n.6.  Therefore, plaintiffs' attack on the district court's description of the relevant state laws, regulations, and guidance concerning gender identity in schools is without merit.

The district court did not describe the policy alleged by plaintiffs as "a curriculum designed to promote tolerance and provide a safe learning environment for all students."  Rather, it stated that the states have the power to prescribe such curricula.  See A.156, citing *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008).  The statutes and regulations described by the district court are the means by which the Commonwealth of Massachusetts does so.  See A.156-158.  Plaintiffs have misread the district court's decision.

As the plaintiffs' brief indicates, the district court was careful at oral argument to obtain a description of the basis for Count I and to clarify that plaintiffs were not asserting a right to control curriculum.  See A.107.  That does not provide grounds for reversing its decision.  The district court simply did not cast the rights asserted by plaintiffs as the right to dictate curriculum and nothing in its decision can be accurately read to suggest that it did.

To the extent that plaintiffs assert that Massachusetts anti-discrimination laws and implementing regulations violate their rights to "direct their children's upbringing free of interference from the state" they have waived any challenge to those laws and regulations. Plaintiffs' waiver does not render Massachusetts law irrelevant, and the district court did not err in placing plaintiffs' claims in the context of the applicable legal and regulatory requirements governing defendants' alleged conduct.

**B.    Plaintiffs' Reliance on *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), and its Progeny is Misplaced.**

Once again, plaintiffs rely on a tortured misreading of the district court's decision to assert that the district court "promoted" the concept that defendants had a "duty to 'protect' gender discordant children from their parents." See Plaintiffs' Brief at 27. It did not and defendants have never taken the position that they acted under a legal obligation to protect plaintiffs' children from them. Defendants did act in accordance with Massachusetts anti-discrimination law and plaintiffs have no right (at least in the absence of a constitutional challenge to M.G.L. c. 76, § 5) to insist on conduct on the part of defendants that is inconsistent with M.G.L. c. 76, § 5. However, the rule established by *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989), and the exceptions to that rule were not referenced by the district court in its decision or advanced by the defendants. The *DeShaney* rule is completely irrelevant to this case.

21

The district court did not hold that the amended complaint fails to state a claim upon which relief can be granted because the policy that plaintiffs have alleged constitutes curriculum or because defendants' alleged conduct was justified by a need to keep plaintiffs' children safe.  In fact, it criticized the policy that plaintiffs allege to have existed but found that plaintiffs had nonetheless failed to state claims for violation of their Fourteenth Amendment rights upon which relief can be granted. See A.166.  Plaintiffs' misreading of the district court's decision does not provide grounds for reversal.

## III.    The District Court Properly Applied the Shocks the Conscience Test.

### A.    Plaintiffs Have Waived Their Argument that They Are Not Required to Allege Conduct that Shocks the Conscience.

Plaintiffs did not argue before the district court that all violations of parental rights or the "parent-child relationship," regardless of the specific conduct that is alleged, shock the conscience.  But see Plaintiffs' Brief at 33 ("interference with a protected relationship, particularly the parent-child relationship, is itself conscience-shocking").  Plaintiffs have waived this argument and should not be allowed to pursue it now.  "This Court has repeatedly warned litigants that arguments not made initially to the district court cannot be raised on appeal."  *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 34 (1st Cir. 2001) (citation omitted; internal quotation marks omitted).  See also, *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021); *Thomas v. Rhode Island*, 542 F.3d 944, 949 (1st Cir. 2008).  In their

opposition to defendants' motion to dismiss plaintiffs argued that the amended complaint sufficiently alleges conduct that shocks the conscience but did not argue that no such showing is required in this case. See Supp. A.18-20. At oral argument on defendants' motion to dismiss, plaintiffs acknowledged that sufficiently alleging conduct that shocks the conscious is a required element of their substantive due process claims and argued that the amended complaint meets their burden. See, e.g., A.120-124. Plaintiffs have waived any argument that they are not required to allege conduct that shocks the conscience to support their substantive due process claims or that all alleged deprivations of parental rights, regardless of the specific conduct alleged, shock the conscience.

## B.    <u>Plaintiffs' Current Position is Wrong</u>.

Plaintiffs' argument, that whether defendants' alleged conduct shocks the conscience is not an essential element of their substantive due process claims, is contrary to the clear precedent of the Supreme Court of the United States, this Court, and the United States Courts of Appeals for Third, Tenth, and Eleventh Circuits. The district court did not err in evaluating (without objection from plaintiffs) whether the conduct alleged in the amended complaint shocks the conscience.

This Court rejected essentially the same argument that plaintiffs are advancing for the first time now approximately thirteen years ago, in *Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010). In *Martinez*, the plaintiff, who alleged that she had been digitally

raped, argued that the district court's jury instructions should have required only a finding that she suffered a deprivation of the right to bodily integrity and that she was not required to show that the conduct alleged shocked the conscience. See *Id.* at 63.

According to the Court, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), "clarified that the shocks-the-conscience test, first articulated in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), governs *all* substantive due process claims based on executive,[4] as opposed to legislative, action." *Martinez*, 608 F.3d at 64 (citations omitted; emphasis in original). See also, *DePoutot v. Raffaelly,* 424 F.3d 112, 118 n.4 (1st Cir. 2005).

As this Court stated, "*Lewis* held that plaintiffs must show, not only that the official's actions shock the conscience, but also that the official violated a right

---

[4] Plaintiffs concur with the district court and defendants that the conduct at issue constitutes executive action. See Plaintiffs' Brief at 11, 30, 32, 38-41, 48. Two of plaintiffs' amici assert that plaintiffs' challenge is to legislative action. See Amicus Brief of The Family Foundation et al., pp. 4-8; Amicus Brief of Center for American Liberty, pp. 4-13. However, this Court does not "consider an argument raised by amicus curiae where the 'argument was not raised by the parties or passed on by the lower court [].'" *Doe v. Hopkinton Pub. Schs.,* 19 F.4th 493, 505 n.9 (1st Cir. 2021), quoting *FTC v. Phoebe Putney Health Sys., Inc.,* 568 U.S. 216, 226 n.4 (2013). See also, *Gonzalez-Droz v. Gonzalez-Colon,* 660 F.3d 1, 12 n.6 (1st Cir. 2011) ("we repeatedly have held that '[w]hile amicus briefs are helpful in assessing litigants' positions, an amicus cannot introduce new arguments into a case'"), quoting *United States v. Sturm, Ruger & Co.,* 84 F.3d 1, 6 (1st Cir. 1996). Further, as a matter of Massachusetts law, municipal school committees are not legislative bodies. See generally, M.G.L. c. 71, §§ 34; 37.

otherwise protected the substantive Due Process Clause." *Id.* at 64 (citations

omitted).

> *Lewis* justified this two-tiered approach on theoretical and practical grounds. *Lewis* explained that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," 523 U.S. at 845, 118 S.Ct. 1708 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)) (alteration in original), and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *id.* at 846, 118 S.Ct. 1708 (quoting *Collins v. Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Restricting substantive due process on executive official actions also prevents the Fourteenth Amendment from becoming a "font of tort law." *Id.* at 848–49, 118 S.Ct. 1708 (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)) (internal quotation marks omitted). Only conscience-shocking behavior can be sufficiently arbitrary and egregious to be of constitutional significance. *Id.* at 846–47 & n. 8, 118 S.Ct. 1708. Once plaintiffs have shown a constitutionally significant level of culpability, they then may turn to establishing that a protected right was offended. *Id.* at 847 n. 8, 118 S.Ct. 1708; *see also Washington v. Glucksberg,* 521 U.S. 702, 719–24, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (outlining how to determine whether the substantive Due Process Clause protects a proposed right).

*Martinez,* 608 F.3d at 64–65 (footnote omitted). Plaintiffs' assertion that an analysis

of whether the conduct alleged in the amended complaint shocks the conscience is

inappropriate is foreclosed by *Rochin*, *Lewis*, and *Martinez*. See also, *DePoutot,* 424

F.3d at 118 n.4; *McConkie v. Nichols,* 446 F.3d 258, 260-261 (1st Cir. 2006);

*Mongeau v. City of Marlborough*, 492 F.3d 14, 17-19 (1st Cir. 2007); *Harron v.*

*Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011); *Abdisamad v. City of Lewiston*,

960 F.3d 56, 60 (1st Cir. 2020) ("Only after show[ing] a constitutionally significant

level of culpability may a plaintiff turn to establishing that a protected right was offended") (citation omitted; internal quotation marks omitted).

*McConkie, supra,* and *Grendell v. Gillway*, 974 F. Supp. 46 (D. Me. 1997), do not support plaintiffs' position.  In *McConkie*, this Court rejected the plaintiff's argument that a police detective's lying to the plaintiff during a non-custodial interview by telling the plaintiff that his statement would remain confidential shocked the conscience.  See *McConkie,* 446 F.3d at 261-262.  The Court, citing *Grendell*, amongst other cases, stated, in *dicta*, that "Conscience-shocking conduct usually entails physical or psychological abuse, or significant interference with a protected relationship, such as the parent-child relationship."  *Id.* at 261.  The Court did not, however, hold that all interference with the parent-child relationship shocks the conscience.

In *Grendell*, the district court found that:

> The lying to and threatening of an eleven year old girl by the police in order to force her to incriminate her parents is contemptible and exceeds all notions of fair play and decency. It is not as if Grendell alleges that she volunteered the information freely and without reservation; rather, Grendell surely felt as if she had no choice but to answer the policeman's questions. This type of coercive extraction of indicting information from an eleven year old girl about her parents is reprehensible behavior unworthy of constitutional protection.

*Grendell*, 974 F. Supp. at 51. *Grendell* did not hold that all interference with the parent-child relationship shocks the conscience, and it is factually distinct from this case.[5]

Plaintiffs' characterization of the current analysis employed by the Tenth, Third, and Eleventh Circuits is inaccurate. Even assuming (without conceding) that plaintiffs' reading of *Dubbs v. Head Start*, 366 F.3d 1194 (10th Cir. 2003), is the correct one, it does not represent the state of the law in the Tenth Circuit. But see *Id*. at 1204. According to the Tenth Circuit:

> In *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018), we recently recounted that the Supreme Court recognizes two types of substantive due process claims: (1) claims that the government has infringed a "fundamental" right, *see, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721-22, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (assessing asserted right to assisted suicide); and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience, *see, e.g.*, *City of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (examining a high-speed police chase). *Halley*, 902 F.3d at 1153. "[W]e apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*." *Id*. <u>The Does' substantive due process claims—violation of the parental right to direct medical care and to familial association—challenge executive action, *id.* at 1154, and therefore are "shocks the conscience" claims.</u>

---

[5] Plaintiffs' assertion that defendants' conduct "tore apart the fabric of love, trust, and faith between Plaintiffs and their children" inappropriately borrows from *Grendell* (without citing it) and is offered without citation to the amended complaint, which does not contain this allegation. Compare Plaintiffs' Brief at 34-35, with *Grendell*, 974 F. Supp. at 51.

*Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (italics in original; further emphasis added).

In *Gruenke v. Seip,* 225 F.3d 290, 303 (3d Cir. 2000), the Third Circuit held that a swim coach was entitled to qualified immunity on the plaintiff parents' claims that his conduct violated their rights to family integrity by intruding into the management of a teenage pregnancy. *Gruenke* did not address whether or not the defendant coach's conduct shocked the conscience but it also did not hold that a shocks the conscience analysis was inappropriate. It simply held that the underlying rights at issue were not clearly established.

In **Kane v. Barger**, 902 F.3d 185, 192 (3d Cir. 2018), the Third Circuit described the elements of a substantive due process claim. "To demonstrate that her substantive due process rights were violated, [a plaintiff] must establish that 'the particular interest at issue is protected by the substantive due process clause,' and that 'the government's deprivation of that protected interest shocks the conscience.'" *Id*., quoting *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008). The *Kane* court then went on to address the elements of the claim in that order.

Similarly, in *Mammaro v. New Jersey Div. of Child Prot. & Permanency,* 814 F.3d 164, 169 (3d Cir. 2016), the Third Circuit addressed whether the plaintiff had alleged violation of a protected right to parent her child before analyzing whether the conduct at issue shocked the conscious. See *Id.* at 169-171. The Third Circuit

28

was clear that "In bringing a substantive due process claim, one alleges that the government has abused its power in an arbitrary manner that 'shocks the conscience.'" *Id.* at 169, citing *Lewis,* 523 U.S. at 846–48. The fact that Third Circuit (sometimes or, possibly, always) addresses whether a plaintiff has identified a protected right before examining whether a defendant's alleged conduct shocks the conscience does not aid plaintiffs.

In *Arnold v. Bd. of Educ. of Escambia Cnty. Ala*., 880 F.2d 305 (11th Cir. 1989), the Eleventh Circuit reversed, in part, a district court order dismissing the plaintiffs' complaint and held that the complaint sufficiently alleged a violation of the familial right to privacy. "Coercing a minor to obtain an abortion or to assist in procuring an abortion and to refrain from discussing the matter with the parents unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* at 313. *Arnold* does not suggest that whether or not a defendant's alleged conduct shocks the conscience is irrelevant where parental or familial rights are issue. It simply did not address the issue.

In fact, the Eleventh Circuit has clearly stated, in the context of parental rights:

> [P]laintiffs face a high bar when attempting to establish a substantive due process violation as "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell* [*v. Hemerson*, 329 F.3d 1300, 1305 (11th Cir. 2003)]. Even intentional wrongs seldom violate the Due Process Clause, *id.,* and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *Cnty. of Sacramento,* 523 U.S.

> at 846, 118 S.Ct. at 1716 (quoting *Collins,* [v. *City of Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992)]. "Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision.*" *Waddell,* 329 F.3d at 1305. Conduct intended to injure in some way that is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level, *id.,* and we must conduct an "exact analysis of circumstances before any abuse of power is condemned as conscience shocking," *Cnty. of Sacramento,* 523 U.S. at 850, 118 S.Ct. at 1718–19.

*Maddox v. Stephens,* 727 F.3d 1109, 1119 (11th Cir. 2013) (emphasis in original). See *Id*. at 1121 (holding defendant was "entitled to qualified immunity because the law was not clearly established that Stephens' actions were so conscience shocking as to violate Maddox's liberty interest in the care, custody, and management of J.O."). See also, *Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*, No. 4:21CV415-MW/MJF, 2022 WL 18670372, at *5 (N.D. Fla. Dec. 22, 2022) ("There are very few cases where the Eleventh Circuit has found conduct to be conscience-shocking, which is not surprising given the high bar plaintiffs face in establishing such claims.").

Plaintiffs current position, that whether a defendant's conduct shocks the conscience is irrelevant in the context of fundamental rights, is contrary to the mandatory authority of the Supreme Court, the law of this Circuit, and the law of the circuit courts of appeals on which plaintiffs purport to rely. The district court did

not err in recognizing that establishing conduct that shocks the conscience is an essential element of plaintiffs' claims.

### C.   The District Court's Determination that Defendants' Alleged Conduct Does Not Shock the Conscience Should Be Affirmed.

Plaintiffs' argument resolves to the faulty proposition that, where there is time for reflection, liability for violation of parental rights should be imposed without fault. Their analysis is fundamentally flawed. The district court undertook an appropriate analysis of plaintiffs' claims and its conclusion that the defendants' conduct, as alleged, does not shock the conscience should be affirmed.

The Fourteenth Amendment is not a "font of tort law;" "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. Government action "shocks the conscience" only if it is "arbitrary and capricious, runs counter to the concept of ordered liberty, or violates universal standards of decency." See *Cruz-Erazo v. Rivera-Montanez,* 212 F.3d 617, 622 (1st Cir. 2000). It is settled law that "mere violations of a state regulatory scheme are not the stuff of which substantive due process claims are constituted." See *Barrington Cove, Ltd. Partnership v. Rhode Island Housing & Mortgage Finance Corp.,* 246 F.3d 1, 7 (1st Cir. 2001), *citing, Coyne v. City of Somerville,* 972 F.2d 440, 444 (1st Cir. 1992). As stated in *Coyne*, "it is bedrock law in this Circuit . . . that violations of state law - even where arbitrary, capricious, or undertaken in bad faith - do not, without more,

give rise to a denial of substantive due process under the U.S. Constitution." *Id.* Further, "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process . . . ." *Lewis*, 523 U.S. at 849 (citations omitted). See also, *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010).

Plaintiffs misstate the district court's decision and the applicable law when they urge that the district court applied the wrong standard in evaluating whether defendants' conduct, as alleged, shocks the conscience. As the district court clearly recognized, and as discussed above, all substantive due process claims require conduct that shocks the conscience. That is the "cognizable level of executive abuse of power" necessary to ground a claim. *Lewis*, 523 U.S. at 846. See also, *Id.* at 847 n.8. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of action most likely to rise to the conscience-shocking level." *Id.* at 849 (citation omitted).

Even where a plaintiff relies on deliberately indifferent behavior to ground a claim it remains true that:

> The burden to show state conduct that "shocks the conscience" is extremely high, requiring "stunning" evidence of "arbitrariness and caprice" that extends beyond "[m]ere violations of state law, even violations resulting from bad faith" to "something more egregious and more extreme." *DePoutot v. Raffaelly,* 424 F.3d 112, 119 (1st Cir.2005).

*J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010).

In describing the shocks the conscience standard, the district court quoted from this Court's decision in *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011), which arose from a town's refusal to transfer or issue a liquor license to a tavern (not an emergency situation).  See A.162; *Harron*, 660 F.3d at 536.  The district court did not err by relying on this Court's description of the shocks the conscience standard in *Harron*.

Deliberate indifference to constitutional rights can sometimes (rarely) rise to the level of fault required to a support a claim but "deliberately indifferent behavior does not per se shock the conscience." *J.R.*, 593 F.3d at 80. "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.  Notably, the district court quoted from the foregoing passage in *Lewis* as the jumping-off point for its analysis.  See A.163.  It then performed an "exact analysis of circumstances."  See *Id.*  It considered defendants' conduct as alleged by plaintiffs and the requirements of Massachusetts law and regulations (which plaintiffs did not challenge) that "establish a significant government interest in providing students with a school environment in which they may safely express their gender identities regardless of their ages or the preferences of their parents."  See *Id*.  See also, A.164-167.  The

district court's analysis, including its consideration of the governmental interests at issue, was appropriate.  See *Martinez*, 608 F.3d at 66, and cases cited.

Plaintiffs attack the district court's analysis but they do not actually apply the relevant standards to attempt to show that the allegations in the amended complaint support a plausible inference that defendants' deliberate indifference to their rights rose to the level of behavior that shocks the conscience.  Instead, they appear to argue, incorrectly, that where there is time for deliberation developing an imperfect policy (or, by extension, making any other error that results in a violation of parental rights) constitutes deliberate indifference sufficient to shock the conscience.  See Plaintiffs' Brief at 41.  As set forth above, that position is incorrect.

The amended complaint alleges that defendants repeatedly stated that they were acting pursuant to their understanding of what Massachusetts law and the DESE Guidance required.  See A.34, ¶ 91; A.38 at ¶¶ 107-110; A.39 at ¶ 111, 113; A.45 at ¶¶ 136-138; A.46 at ¶¶ 140-141; A.98-99.  At best, the amended complaint supports an inference that defendants were negligent in their reading or application of the DESE Guidance.  However, implementing a flawed understanding of Massachusetts anti-discrimination law does not shock the conscience.  See *Coyne*, 972 F.2d at 444.  None of the conduct alleged in the amended complaint rises to level of shocking the conscience.  Therefore, the district court's decision dismissing Counts I and II of the amended complaint should be affirmed.

**IV.    Defendants' Alleged Conduct Cannot Be Evaluated Without Considering the Massachusetts Law and Regulations Governing Public Schools.**

Plaintiffs assert that the district court "subordinated" plaintiffs' rights to Massachusetts anti-discrimination laws and regulations, and to the DESE Guidance. It did not.  The district court appropriately considered the context in which plaintiffs' claims arise, which includes the relevant legal background and guidance from DESE, defendants' licensing body.[6]  See *Lewis*, 523 U.S. at 850; *Irish v. Fowler*, 979 F.3d 65, 74 (1st Cir. 2020), *cert. denied*, 142 S. Ct. 74 (2021) ("In evaluating whether the defendant's actions shocked the conscience, we also consider whether the defendants violated state law or proper police procedures and training"); *DePoutot*, 424 F.3d at 120 (defendant's "legally authorized decision to utilize the standard breath test procedure . . . is not the kind of conscience-shocking act on which a substantive due process claim can be premised").

Plaintiffs have waived any challenge to M.G.L. c. 76, § 5, and more broadly to "the non-discrimination statutes, regulations or DESE Guidance."  See Plaintiffs' Brief at 42 n.6.  Therefore, to the extent that plaintiffs allege conduct on the part of defendants that is consistent with defendants' obligations under Massachusetts statutes and regulations, such cannot shock the conscience.  Plaintiffs cannot insist

---

[6] DESE is the licensing body for all of the individual defendants.  See M.G.L. c. 71, § 38G.

that Massachusetts law, regulations, and policy be simply ignored, either by educators, the district court, or this Court.

As noted above, M.G.L. c. 76, § 5, bars discrimination on the basis of gender identity in Massachusetts public schools.  It provides, in part:

> No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation.

M.G.L. c. 76, § 5 (emphasis added).  It is impossible to comply with the statute without recognizing and respecting a student's preferred name and pronouns, at least where a school district recognizes the preferences of cisgender students.  See M.G.L. c. 76, § 5.  The statute does not create an exception where a parent demands discriminatory treatment for their children.  Complying with M.G.L. c. 76, § 5 in the face of a parents' contrary wishes does not shock the conscience.  Cf. *Irish*, 979 F.3d at 74.

Defendants' alleged conduct is also consistent with state law and proper pedagogical procedures and training as established by 603 CMR 26.00.

> 603 CMR 26.00 is promulgated to insure that the public schools of the Commonwealth do not discriminate against students on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation and that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges and courses of study at such schools. 603 CMR 26.00 shall be liberally construed for these purposes.

603 CMR 26.01.  603 CMR 26.03 prohibits discrimination on the basis of gender

identity "in accessing the courses of study and other opportunities available through

the school system of the city or town in which [a student] resides."  603 CMR 26.03.

603 CMR 26.07 requires schools to undertake "Active Efforts" to prevent

discrimination.

> (1)  The school committee of each school district shall establish policies and procedures, and implement monitoring and evaluation practices that insure that all obstacles to equal access to school programs for all students regardless of . . . gender identity . . . are removed.  Such policies shall include a requirement for an annual evaluation of all aspects of the K through 12 school program to insure that all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation are given an opportunity to participate in all programs offered by the school including athletics and other extra-curricular activities.
>
> (2)  All public schools shall strive to prevent harassment or discrimination based upon students' race, color, sex, gender identity, religion, national origin or sexual orientation, and all public schools shall respond promptly to such discrimination or harassment when they have knowledge of its occurrence.

603 CMR 26.07 (1), (2).  Like M.G.L. c. 76, § 5, 603 CMR 26.00 does not provide

for parental notice and the opportunity to opt out of its mandate.  In light of 603 CMR

26.00, defendants' conduct does not shock the conscience.

Further, defendants' alleged conduct complied with the DESE Guidance.

Under the heading "Understanding Gender Identity," the Guidance states:

> The responsibility for determining a student's gender identity rests with
> the student or, in the case of young students not yet able to advocate for

themselves, with the parent. One's gender identity is an innate, largely inflexible characteristic of each individual's personality that is generally established by age four, although the age at which individuals come to understand and express their gender identity may vary based on each person's social and familial social development. As a result, the person best situated to determine a student's gender identity is that student himself or herself. . . .

Consistent with the statutory standard, a school should accept a student's assertion of his or her gender identity when there is "consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity." If a student's gender-related identity, appearance, or behavior meets this standard, the only circumstance in which a school may question a student's asserted gender identity is where school personnel have a credible basis for believing that the student's gender-related identity is being asserted for some improper purpose.

In most situations, determining a student's gender identity is simple. A student who says she is a girl and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of her life, should be respected and treated like a girl. So too with a student who says he is a boy and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of his life. Such a student should be respected and treated like a boy.

Add.2-3 (footnote omitted; emphasis added). As set forth above, when a child is able to advocate for themselves, "the person best situated to determine a student's gender identity is that student himself or herself." See *Id*. Here, as alleged, plaintiffs' children were able to advocate for themselves and did so. The DESE Guidance states nothing more is required for a school to recognize and respect their gender identity. See *Id*.

The DESE Guidance suggests that:

> Some transgender and gender nonconforming students are not openly
> so at home for reasons such as safety concerns or lack of acceptance.
> School personnel should speak with the student first before discussing
> a student's gender nonconformity or transgender status with the
> student's parent or guardian. For the same reasons, school personnel
> should discuss with the student how the school should refer to the
> student, e.g., appropriate pronoun use, in written communication to the
> student's parent or guardian.

Add.4. Defendants submit that the DESE Guidance suggests speaking with a student

before discussing the student's gender identity with parents specifically because the

student might not be openly transgender or gender nonconforming at home. The

fact that the DESE Guidance plainly suggests that a student may be referred to by

one set of pronouns in school and another set when communicating with parents

indicates that the intent of the recommendation is not simply to advise students prior

to parental notification of their gender identity. In other words, the DESE Guidance

does not contemplate that a school will confer with a student and then notify their

parents of their gender identity against the student's wishes. Cf. *Arroyo Gonzalez v.

Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("The Commonwealth's

forced disclosure of plaintiffs' transgender status violates their constitutional right

to decisional privacy"). Defendants' conduct, as alleged, was consistent with the

DESE Guidance and does not shock the conscience.

Defendants recognize that the district court interpreted this section of the

DESE Guidance as "advising that parents be informed after the student is advised

that such communication will occur" and found that defendants' interpretation, as alleged by plaintiffs, was flawed. See A.166. Assuming that the district court was correct and defendants' interpretation of the DESE Guidance, as alleged, was flawed, such does not shock the conscience. As the district court found, "even if Defendants' policy was imperfect and contrary to the non-binding DESE Guidance, the alleged policy was consistent with Massachusetts law and the goal of providing transgender and gender nonconforming students with a safe school environment." A.166-167. Plaintiffs' assertion that they have absolute, generalized parental rights that somehow both supersede and co-exist with valid state antidiscrimination mandates is "simply wrong." See *Martinez,* 608 F.3d at 66.

## V.     The District Court Correctly Concluded that the Doctrine of Qualified Immunity Precludes the Imposition of Liability as Against the Individual Defendants.

The district court's determination that the individual defendants are entitled to qualified immunity because the right(s) asserted by plaintiffs were not "clearly established" at the time of defendants' alleged conduct should be affirmed. There are two prongs to the qualified immunity analysis. See *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 325 (1st Cir. 2015). "A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263,

269 (1st Cir. 2009) (citation omitted).  The district court correctly decided the first prong in defendants' favor as to each of Count I-III, continued its analysis, and determined that even if the facts alleged in the amended complaint made out a violation of plaintiffs' rights, those rights were not clearly established.

It must be noted that, at least as to Counts I and III, plaintiffs have attacked the district court's analysis of whether defendants' alleged conduct shocks the conscience, but they have not provided an analysis that reaches the level of appellate argument and demonstrates that, as alleged, they have been deprived of a right protected by the Fourteenth Amendment.  "Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations, alterations, and internal quotation marks omitted).  See also, *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997).  Plaintiffs have assumed that the alleged conduct at issue violated protected interests in directing the upbringing of their children (Count I) and in family integrity (Count III) but have not provided a "careful description" of those rights or authority that establishes their existence in the context of this case.  Minimally, plaintiffs' failure to do so militates in favor of affirming the district court's conclusion that the rights asserted by plaintiffs are not "clearly established."

The district court's determination that the individual defendants are entitled to qualified immunity because the underlying rights asserted by plaintiffs in Counts I-III are not clearly established should be affirmed.  "A clearly established right is one that is 'sufficiently clear that <u>every reasonable official</u> would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015), quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (emphasis added).  "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* at 12 (citations omitted; internal quotation marks omitted).

This Court has taught that "[t]he second prong (whether the law was clearly established at the time of the incident) is itself divisible into two inquiries.  First, <u>the plaintiff must identify</u> either controlling authority or a consensus of persuasive authority sufficient to put [an official] on notice that his conduct fell short of the constitutional norm.  Second, <u>the plaintiff must show</u> that an objectively reasonable [official] would have known that his conduct violated the law."  *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018) (citations omitted; emphasis added).

**1.     Plaintiffs Have Failed to Meet Their Burden of Identifying Authority Sufficient to Put Defendants on Notice that Their Alleged Conduct Was Unconstitutional.**

Plaintiffs have not identified either controlling precedent or a consensus of persuasive authority that would have put defendants on notice that their alleged

conduct violated plaintiffs' rights. The Supreme Court has strongly emphasized "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017), quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). See also, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-1153 (2018); *Mullenix*, 577 U.S. at 12. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 12, quoting *al-Kidd*, 563 U.S. at 742 (emphasis in original). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. (citations omitted; internal quotation marks omitted). See also, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) ("Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate") (citation and internal quotation marks omitted).

For purposes of the "clearly established" inquiry, the Due Process Clause has never been interpreted to grant the parental right(s) asserted by plaintiffs in this case. See *Parker v. Hurley*, 514 F.3d 87, 101-103 (1st Cir. 2008), *cert. denied*, 555 U.S. 815. For example, there is no case cited by plaintiffs that stands for the proposition that a parent is entitled to notice of their child's gender so that they can control it (or attempt to do so). The Fourteenth Amendment's protection of "the fundamental right of parents to make decisions concerning the care, custody, and control of their

children," as currently recognized, is much more limited than plaintiffs would have it. See *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion).

The right has its genesis in *Meyer v. Nebraska,* 262 U.S. 390 (1923), and *Pierce v. Society of Sisters,* 268 U.S. 510, 535 (1925). See *Brown v. Hot, Sexy & Safer Prods., Inc*., 68 F.3d 525, 533 (1st Cir. 1995); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1229 n.14 (9th Cir.), *cert. denied*, 141 S. Ct. 894 (2020). In *Meyer*, the Supreme Court struck down a Nebraska law that forbade instruction in German and other foreign languages "in part because it arbitrarily interfered with the 'right of parents' to procure such instruction for their children." *Brown*, 68 F.3d at 533, citing *Meyer,* 262 U.S. at 400. In *Pierce*, the Court held that a statute that made public school attendance compulsory, barring secular and parochial private education, "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. 510, 534–535.

> The *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education. *Meyer,* 262 U.S. at 402, 43 S.Ct. at 627–28, *discussed in,* Tribe, *supra*, § 15–6 at 1319.

*Brown*, 68 F.3d at 533. *Meyer* and *Pierce* do not clearly establish that the "particular conduct" defendants are alleged to have engaged in violated plaintiffs' rights. See *Mullenix*, 577 U.S. at 12 (emphasis omitted).

In *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Supreme Court held that the First and Fourteenth Amendments prevented the State of Wisconsin from enforcing its compulsory school attendance law as against members of the Older Order Amish religion and Conservative Amish Mennonite Church. See *Id*. at 207, 234-236.

> The heart of the *Yoder* opinion is a lengthy consideration of "the interrelationship of belief with [the Amish] mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization," and how as a result compulsory high school education would "substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community."

*Parker*, 514 F.3d at 99, quoting *Yoder*, 406 U.S. at 218, 235. *Yoder* does not provide clearly established law here.

In *Troxel v. Granville*, 530 U.S. 57, 72–73 (2000), the Supreme Court held that, as applied, a Washington nonparental visitation statute violated the Fourteenth Amendment. "*Troxel* concerned a state government's interference with a mother's decision about the amount of visitation with her daughters' paternal grandparents that was in her daughters' best interests; it did not address the extent of parents' rights to direct the policies of the public schools that their children attend." *Parents*

45

*for Priv.*, 949 F.3d at 1230.  See also, *Parker*, 514 F.3d at 101.  *Troxel* does not provide clearly established law in the specific context of this case as alleged.

The decisions relied on by plaintiffs for the proposition that parents have a Fourteenth Amendment right to control their children's health care, to the extent relevant, stand for the proposition that parents do not have absolute rights when it comes to their children and that children, as well as adults, enjoy constitutional protections.  They do not clearly establish the existence of the rights asserted by plaintiffs.

*Parham v. J.R.*, 442 U.S. 584 (1979), dealt with the voluntary commitment of children by their parents.

> In defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply. We also conclude, however, that the child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized. They, of course, retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment.

*Id.* at 604.  *J.R.* does not provide clearly established law for purposes of this case.

In *Colon v. Collazo*, 729 F.2d 32 (1st Cir. 1984), this Court considered the procedures used by Puerto Rico' Department of Social Services in connection with the temporary commitment of non-delinquent juveniles with their parents' consent.

It held, "that the procedures applied by the Department protect a juvenile from a faulty admission decision in a manner that neither unduly burdens the state nor inhibits parents from seeking state assistance." *Colon v. Collazo*, 729 F.2d 32, 34 (1st Cir. 1984). Like *Parham*, *Colon* arises from a very different context than this case and does not provide clearly established law for purposes of qualified immunity.

None of the foregoing decisions clearly establishes the right(s) asserted by plaintiffs. The First Circuit has repeatedly rejected attempts to transform the holdings of these cases into sweeping grants of parental rights. See *Parker,* 514 F.3d at 101-103 & n.15 ("*Troxel* is not so broad as plaintiffs assert") (rejecting asserted right to prior notice and the opportunity for exemption from young children's exposure to books containing positive portrayals of gay marriage); *Brown*, 68 F.3d at 534 ("the rights of parents as described by *Meyer* and *Pierce* do not encompass a broad-based right to restrict the flow of information in the public schools). See also, *Parents for Priv.*, 949 F.3d at 1231 (rejecting claim that policy allowing transgender students to use bathrooms, locker rooms and showers corresponding to their gender identity violated the rights of parents of cisgender children).

The district court recognized that this is an evolving area of law. See A.168. It is notable that, as of this writing, there are multiple cases pending around the country that raise issues that are similar to the issues here. See, e.g., *Perez v. Broski*,

Case No. 3:22-cv-0083-TJC-JBT (M.D. Fla.); *Littlejohn v. Sch. Bd. of Leon County*, Case No. 4:21-cv-00415 (N.D. Fla.) (appeal pending); *Parents 1 v. Montgomery County Board of Ed.*, Civil Action 8:20-3552-PWG, Dkt. No. 60 (D. Md. August 18, 2022) (appeal pending). This is an emerging area of law, not one where the rights asserted by the plaintiffs are clearly established. The district court's determination that the law was not clearly established at the time of defendants' alleged conduct is correct and should be affirmed.

> **2. Plaintiffs Have Failed to Show that an Objectively Reasonable Educator Would Have Known that Defendants' Alleged Conduct Violated the Law.**

Plaintiffs have not shown that every reasonable official would have known that defendants' alleged conduct violated the constitution. A reasonable defendant would not understand that complying with state and federal law would violate plaintiffs' rights. As set forth above, defendants' conduct was consistent with M.G.L. c. 76, § 5, and 603 CMR 26.00. Students have constitutional rights and plaintiffs cannot point to a single case where a parent's rights have been held to supplant a child's rights under the circumstances as alleged. Cf. *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506 (1969) (children do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate").

Specifically in this context, the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681(a), protect transgender students from discrimination by public schools.  See *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1039, 1049, 1054 (7th Cir. 2017); *Grimm v. Gloucester County School Board,* 972 F.3d 586, 606-615, 616-619 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878 (school board's refusal to allow a transgender male high school student to use boys' bathrooms violated his equal protection rights and his rights pursuant to Title IX).  Contrast, *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 521 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636; *Parents for Priv. v. Barr*, 949 F.3d 1210, 1230 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020).  Cf. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1737 (2020) (Title VII of the Civil Rights Act of 1964 prohibits employers from firing individuals for being homosexual or transgender).  A reasonable official could believe that a parent had no right to request or require that a school not recognize a child's gender identity and that a parent had no right to prior notice of non-discrimination.

While the age of a child may have some bearing on the relevant analysis, no court has established a rule that establishes a parent's asserted right trumps the rights of an eleven-year-old or twelve-year-old who asserts their gender identity, and M.G.L. c. 76, § 5 does not impose an age threshold on its protections.  See M.G.L. c. 76, § 5.  Particularly given that gender identity has been found to be immutable and that it is usually established at an early age, a reasonable official could understand

49

themselves bound to accept a pre-teen's assertion of their gender identity. See
*Grimm,* 972 F.3d at 612-613.

Additionally, a reasonable administrator, guidance counselor, or school
librarian would not understand DESE's Guidance to suggest conduct that would
violate plaintiffs' Fourteenth Amendment rights. Cf. *Irish*, 979 F.3d at 77 (when an
officer violates police procedure it supports an argument that a reasonable officer
would have known that the conduct violated the Constitution). Minimally, the DESE
Guidance can be read to suggest that a school should honor a student's request that
their gender identity not be shared with their parents. See Add.4 ("school personnel
should discuss with the student how the school should refer to the student, e.g.,
appropriate pronoun use, in written communication to the student's parent or
guardian").

In light of the foregoing, a reasonable school official could conclude that
accepting a student's assertion of gender identity and complying a request to keep
that gender identity confidential from parents would not violate plaintiffs' rights.
Therefore, Counts I-III were properly dismissed as against the individual defendants.

### 3. Plaintiffs Have Waived Any Challenge to the Application of the Doctrine of Qualified Immunity.

Plaintiffs appear to assert that qualified immunity should not be available to
educators in the context of this case. See Plaintiffs' Brief at 47-48. Plaintiffs have
waived any such argument by failing to raise it before the district court. See

*DiMarco-Zappa*, 238 F.3d at 34.  See Supp. App.22-27.  Therefore, plaintiffs'

assertions to the effect that the doctrine of qualified immunity should be limited or

abrogated should be disregarded.

## CONCLUSION

For the foregoing reasons, the order of the district court should be affirmed.

Respectfully submitted,

/s/ *David S. Lawless*

David S. Lawless, 1st Circuit #119792
Nancy Frankel Pelletier, 1st Circuit #86904
Robinson Donovan, P.C.
1500 Main Street, Suite 2300
Springfield, Massachusetts 01115
Phone (413) 732-2301
Direct Fax (413) 452-0342
npelletier@robinsondonovan.com
dlawless@robinsondonovan.com

Dated: June 20, 2023

## CERTIFICATE OF COMPLIANCE

I.     This brief complies with the type-volume limitation of Fed. App. P. 32(a)(7)(B)(1) because this brief contains 12,863 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

II.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

/s/ *David S. Lawless*
_____
David S. Lawless, 1st Circuit #119792
Nancy Frankel Pelletier, 1st Circuit #86904
Robinson Donovan, P.C.
1500 Main Street, Suite 2300
Springfield, Massachusetts 01115
Phone (413) 732-2301
Direct Fax (413) 452-0342
npelletier@robinsondonovan.com
dlawless@robinsondonovan.com

Dated: June 20, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023 this document was filed electronically with the United States Court of Appeals for the First Circuit by using the CM/ECF system. A copy of this document will be sent by using the CM/ECF system and/or by priority mail, postage prepaid upon Counsel of Record and Pro Se parties.

/s/ *David S. Lawless*

David S. Lawless, 1st Circuit #119792
Nancy Frankel Pelletier, 1st Circuit #86904
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301
Direct Fax (413) 452-0342
npelletier@robinsondonovan.com
dlawless@robinsondonovan.com

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

DESE Guidance ................................................................................ 1

M.G.L. c. 71, § 38G ....................................................................... 9

M.G.L. c. 76, § 5 ........................................................................... 16

M.G.L. c. 112, § 275 ..................................................................... 17

603 CMR 26.01 .............................................................................. 19

603 CMR 26.03 .............................................................................. 20

603 CMR 26.07 .............................................................................. 21

**MASSACHUSETTS DEPARTMENT OF
ELEMENTARY AND SECONDARY
EDUCATION**

<u>Student and Family Support (SFS)</u>

# Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment

## Nondiscrimination on the Basis of Gender Identity

*An Act Relative to Gender Identity* (Chapter 199 of the Acts of 2011),[1] which became effective on July 1, 2012, amended several Massachusetts statutes prohibiting discrimination on the basis of specified categories, to include discrimination on the basis of gender identity. Among the statutes amended is G.L. c. 76, § 5, prohibiting discrimination on the basis of gender identity against students who enroll in or attend the public schools. G.L. c. 76, §5 now reads as follows:

> **Every person shall have a right to attend the public schools of the town where he actually resides, subject to the following section. No school committee is required to enroll a person who does not actually reside in the town unless said enrollment is authorized by law or by the school committee. Any person who violates or assists in the violation of this provision may be required to remit full restitution to the town of the improperly-attended public schools. No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, *gender identity*, religion, national origin or sexual orientation.** (Emphasis added)

In June 2012, the Massachusetts Board of Elementary and Secondary Education (Board) adopted revised Access to Equal Education Opportunity Regulations, 603 CMR 26.00, and Charter School Regulations, 603 CMR 1.00, to reflect the broadened student anti-discrimination provision in G.L. c. 76, §5. The Board also directed the Department of Elementary and Secondary Education (Department) to provide guidance to school districts to assist in implementing the gender identity provision.

All students need a safe and supportive school environment to progress academically and developmentally. Administrators, faculty, staff, and students each play an important part in creating and sustaining that environment. This guidance is intended to help school and district administrators take steps to create a culture in which transgender and gender nonconforming students feel safe, supported, and fully included, and to meet each school's obligation to provide equal educational opportunities for all students, in compliance with G.L. c. 76, §5 and the state regulations. The guidance sets out general principles based on the law, and addresses common issues regarding transgender and gender nonconforming students. It offers case studies based on experiences of schools and students in Massachusetts, and reflects the need to consider issues on a case-by-case basis. The list of issues is not exhaustive, and the examples are intended to be illustrative, not prescriptive.

In preparing this guidance, the Department reviewed policies and guidance from several states, organizations, and athletic associations and consulted with the field. We appreciate the input we received from school and district administrators, advocacy groups, parents, students, and other interested constituents.

## Definitions

Understanding the terminology associated with gender identity is important to providing a safe and supportive school environment for students whose rights are protected under the law. The following terms appear in this document and are defined to assist in understanding the guidance presented. Although these are the most commonly used terms, students may prefer other terms to describe their gender identity, appearance, or behavior. The term "gender identity" is specifically defined in the Mass. General Laws, as amended by *An Act Relative to Gender Identity* (the gender identity law).

Add. 1

* **Gender expression**: the manner in which a person represents or expresses gender to others, often

Gender expression: how a person represents or expresses gender identity to others, often through behavior, clothing, hairstyles, activities, voice, or mannerisms.

- **Gender identity**: as defined in part at G.L. c. 4, § 7, is "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth ..."

- **Gender nonconforming**: a term used to describe people whose gender expression differs from stereotypic expectations. The terms "gender variant" or "gender atypical" are also used.

- **Transgender**: an umbrella term used to describe a person whose gender identity or gender expression is different from that traditionally associated with the assigned sex at birth.

## The Law

The gender identity law amended G.L. c. 76, § 5,[2] to establish that no person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of *gender identity*, among other characteristics. The amended Access to Equal Educational Opportunity regulations, 603 CMR 26.00, and the non-discrimination provision of the Charter School regulations, 603 CMR 1.00, require schools to establish policies and procedures, provide training, and implement and monitor practices to ensure that obstacles to equal access to school programs are removed for all students, including transgender and gender nonconforming students.

All districts and schools should review existing policies, handbooks, and other written materials to ensure that they are updated to reflect the new law. At a minimum, this means including the category of "gender identity" within the identification of legally protected characteristics. For example:

> The [   ] Public Schools strives to provide a safe, respectful, and supportive learning environment in which all students can thrive and succeed in its schools. The [   ] Public Schools prohibits discrimination on the basis of race, color, sex, gender identity, religion, national origin, or sexual orientation and ensures that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges, and courses of study.

The gender identity law reflects the reality that transgender and gender nonconforming students are enrolled in Massachusetts public schools. These students, because of widespread misunderstanding and lack of knowledge about their lives, are at a higher risk for peer ostracism, victimization, and bullying. The 2011 National School Climate Survey by the Gay, Lesbian & Straight Education Network (GLSEN), found that 75.4% of transgender students had been verbally harassed in the previous year, 32.1% had been physically harassed, and 16.8% had been physically assaulted. Educators play an essential role in advocating for the well-being of these students and creating a school culture that supports them.

## Understanding Gender Identity

The gender identity law defines "gender identity" to mean "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth."[3] The law also states that " [g]ender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose."[4]

Transgender youth are those whose assigned birth sex does not match their internalized sense of their gender (their "gender-related identity"), and gender nonconforming youth are those whose gender identity does not meet the stereotypically expected norms associated with their assigned sex at birth. A transgender boy, for example, is a youth who was assigned the sex of female at birth but has a clear and persistent identity as male. A transgender girl is a youth who was assigned the sex of male at birth but has a clear and persistent identity as female. Gender nonconforming youth range in the ways in which they identify as male, female, some combination of both, or neither.

The responsibility for determining a student's gender identity rests with the student or, in the case of young students not yet able to advocate for themselves, with the parent.[5] One's gender identity is an innate, largely inflexible characteristic of each individual's personality that is generally established by age four, although the age at which individuals come to understand and express their gender identity may vary based on each person's social and familial social development.[6] As a result, the person best situated to determine a student's gender identity is that student himself or herself.[7]

Add. 2

*In one Massachusetts town, the parents of a pre-school-age biologically female child noted throughout the child's early years that their child identified as a boy. For as long as the parents could remember, the child preferred to play with boys rather than girls, wanted a short haircut, rejected wearing any clothing that the child identified as "something a girl would wear," and ignored anyone who called him by his stereotypically feminine name. When it was time for the child to enter kindergarten, the child said to his parents, "You have to tell them when I go to kindergarten that I'm a boy."*

Consistent with the statutory standard, a school should accept a student's assertion of his or her gender identity when there is "consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity." If a student's gender-related identity, appearance, or behavior meets this standard, the only circumstance in which a school may question a student's asserted gender identity is where school personnel have a credible basis for believing that the student's gender-related identity is being asserted for some improper purpose.

In most situations, determining a student's gender identity is simple. A student who says she is a girl and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of her life, should be respected and treated like a girl. So too with a student who says he is a boy and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of his life. Such a student should be respected and treated like a boy.

The statute does not *require* consistent and uniform assertion of gender identity as long as there is "other evidence that the gender-related identity is sincerely held as part of [the] person's core identity." Many transgender people experience discrimination, and some experience violence due to their status. Some environments may feel safe and inclusive, and others less so, challenging a person's ability to live consistently with one gender identity in all aspects of life. For example, it is possible that a biologically male student with a female gender identity who lives as a girl does not express her female gender identity all the time. In one case, such a student agreed to present as a boy when visiting relatives until the student's parents could explain the student's transgender identity to them. The fact that the student did not exclusively assert her female identity did not alter the fact that she had a female gender identity.

Confirmation of a student's asserted gender identity may include a letter from a parent, health care provider, school staff member familiar with the student (a teacher, guidance counselor, or school psychologist, among others), or other family members or friends. A letter from a social worker, doctor, nurse practitioner, or other health care provider stating that a student is being provided medical care or treatment relating to her/his gender identity is one form of confirmation of an asserted gender identity. It is not, however, the exclusive form upon which the school or student may rely. A letter from a clergy member, coach, family friend, or relative stating that the student has asked to be treated consistent with her/his asserted gender identity, or photographs at public events or family gatherings, are other potential forms of confirmation. These examples are intended to be illustrative rather than comprehensive.

*In one Massachusetts middle school, a biologically male student explained to her guidance counselor that she was a transgender girl who expressed her female gender identity only at home. The stress associated with having to hide her female gender identity at school was having a negative impact on her mental health, as well as on her academic performance. The student and her parents asked if it would be okay if she expressed her female gender identity at school. The guidance counselor assured the student and her parents that she could do so. The fact that the student presented no documentation to support her gender identity was not a concern since the school had no reason to believe the request was based on anything other than a sincerely held belief that she had a female gender identity.*

## Gender Transition

Many, though not all, transgender youth undergo the experience of gender transition. The term "gender transition" describes the experience by which a person goes from living and identifying as one gender to living and identifying as another. For most youth, and for all young children, the experience of gender transition involves no medical intervention. Rather, most transgender youth will undergo gender transition through a process commonly referred to as "social transition," whereby they begin to live and identify as the gender consistent with their gender-related identity. Some transgender youth who are close to reaching puberty, or after commencing puberty, may complement social transition with medical intervention that may include hormone suppressants, cross-gender hormone therapy, and, for a small number of young people, a range of gender-confirming surgeries. The decision about whether and how to undergo gender transition is personal and depends on the unique circumstances of each individual. There

Add.53

is no threshold medical or mental health diagnosis or treatment requirement that any student must meet in order to have his or her gender identity recognized and respected by a school.

Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance. School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian. For the same reasons, school personnel should discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian.

## Names and Pronouns

The issue of the name and pronoun to use in referring to a transgender student is one of the first that schools must resolve to create an environment in which that student feels safe and supported. Transgender students often choose to change the name assigned to them at birth to a name that is associated with their gender identity. As with most other issues involved with creating a safe and supportive environment for transgender students, the best course is to engage the student, and in the case of a younger student, the parent, with respect to name and pronoun use, and agree on a plan to initiate that name and pronoun use within the school. The plan also could include when and how this is communicated to students and their parents. In the case of a transgender student who is enrolling at a new school, it is important that the school respect the student's privacy (see the following section) and chosen name.

> *In one situation where a transgender girl was entering high school, she and her parent asked the principal to inform her teachers that even though her school records indicate that her name is John, she goes by the name Jane and uses female pronouns. The school principal sent the following memorandum to the student's classroom teachers: "The student John Smith wishes to be referred to by the name Jane Smith, a name that is consistent with the student's female gender identity. Please be certain to use the student's preferred name in all contexts, as well as the corresponding pronouns. It is my expectation that students will similarly refer to the student by her chosen name and preferred pronouns. Your role modeling will help make a smooth transition for all concerned. If students do not act accordingly, you may speak to them privately after class to request that they do. Continued, repeated, and intentional misuse of names and pronouns may erode the educational environment for Jane. It should not be tolerated and can be grounds for student discipline. If you need any assistance to make sure that Jane Smith experiences a safe, nondiscriminatory classroom atmosphere, please contact me or Ms. O'Neill. - Mr. Jones, Principal."*

Massachusetts' law recognizes common law name changes. An individual may adopt a name that is different from the name that appears on his or her birth certificate provided the change of name is done for an honest reason, with no fraudulent intent. Nothing more formal than usage is required.[7] Hence, when requested, schools should accurately record the student's chosen name on all records, whether or not the student, parent, or guardian provides the school with a court order formalizing a name change.

The Department has a procedure in place to update name changes and gender markers in the Student Information Management System (SIMS) upon request. The document *Assigning State Assigned Student Identifiers (SASIDs) to Massachusetts' Public School Students* guides schools through changing names and gender markers on school records.

In sum, school personnel should use the student's chosen name and pronouns appropriate to a student's gender identity, regardless of the student's assigned birth sex. For those students who have been attending a school and undergo gender transition while attending the same school, it is important to develop a plan for initiating use of the chosen name and pronouns consistent with the student's gender identity.

## Privacy, Confidentiality, and Student Records

Under state law, information about a student's assigned birth sex, name change for gender identity purposes, gender transition, medical or mental health treatment related to gender identity, or any other information of a similar nature, regardless of its form, is part of the individual's student record (*see* Massachusetts Student Records Regulations, 603 CMR 23.00), is confidential, and must be kept private and secure, except in limited circumstances. 603 CMR § 23.04.[8] One circumstance is when authorized school personnel require the information to provide administrative, teaching, counseling, or other services to the student in the performance of their official duties. For transgender students, authorized school personnel could include individuals such as the principal, school nurse, classroom teacher(s), or guidance or adjustment counselor.

When a student new to a school is using a chosen name, the birth name is considered private information and may be disclosed only with authorization as provided under the Massachusetts Student Records Regulations. If the student has previously been known at school or in school records by his or her birth

Add. 4

name, the principal should direct school personnel to use the student's chosen name. Every effort should be made to update student records (for example, Individualized Education Programs) with the student's chosen name and not circulate records with the student's assigned birth name. Records with the student's assigned birth name should be kept in a separate, confidential file.

*One school nurse dealt with information in the student's file by starting a new file with the student's chosen name, entered previous medical information (for example, immunizations) under the student's chosen name, and created a separate, confidential folder that contained the student's past information and birth name.*

When determining which, if any, staff or students should be informed that a student's gender identity is different from the assigned birth sex, decisions should be made in consultation with the student, or in the case of a young student, the student's parent or guardian. The key question is whether and how sharing the information will benefit the student.

*In one case, parents of a transgender male-to-female elementary school student requested that only the school principal and the school nurse be aware that the student was assigned the sex of male at birth. After a discussion with the school principal, the parents agreed that the student's teacher, the school secretary, and the district superintendent would also be informed. In this situation, the school principal kept the student's birth certificate in a separate, locked file that only the principal could access, and put a note in the student's other file saying that the principal had viewed the student's birth certificate. In another situation, where a biological male came to school after April vacation as a girl, the school principal and guidance counselor, in collaboration with the student and her parents, developed a plan for communicating information regarding the student's transition to staff, parents, and students. The plan included who was going to say what to whom, and when the communication would take place.*

Transgender and gender nonconforming students may decide to discuss and express their gender identity openly and may decide when, with whom, and how much to share private information. A student who is 14 years of age or older, or who has entered the ninth grade, may consent to disclosure of information from his or her student record. If a student is under 14 and is not yet in the ninth grade, the student's parent (alone) has the authority to decide on disclosures and other student record matters.[9]

## Gender Markers on Student Records

A gender marker is the designation on school and other records that indicates a student's gender. For most students, records that include an indication of a student's gender will reflect a student's assigned birth sex. For transgender students, however, a documented gender marker (for example, "male" or "female" on a permanent record) should reflect the student's gender identity, not the student's assigned sex. This means that if a transgender student whose gender identity is male has a school record that reflects an assigned birth sex as female, then upon request by the student or, in the case of young students not yet able to advocate for themselves, by the parent or guardian, the school should change the gender marker on the record to male.[10] Schools are advised to collect or maintain information about students' gender only when necessary.

*One school reviewed the documentation requests it sent out to families and noticed that field trip permission forms included a line to fill in indicating the student's gender. Upon consideration, the school determined that the requested information was irrelevant to the field trip activities and deleted the line with the gender marker request.*

In addition, transgender students who transition after having completed high school, may ask their previous schools to amend school records or a diploma or transcript that include the student's birth name and gender. When requested, and when satisfied with the gender identity information provided, schools should amend the student's record, including reissuing a high school diploma or transcript, to reflect the student's current name and gender.

## Restrooms, Locker Rooms, and Changing Facilities

All students are entitled to have access to restrooms, locker rooms and changing facilities that are sanitary, safe, and adequate, so they can comfortably and fully engage in their school program and activities. In meeting with the transgender student (and parent) to discuss the issues set forth in this memorandum, it is essential that the principal and student address the student's access to the restrooms, locker room and changing facility. Each situation needs to be reviewed and addressed based on the particular circumstances of the student and the school facilities. In all cases, the principal should be clear with the student (and parent) that the student may access the restroom, locker room, and changing facility that

Add.5

corresponds to the student's gender identity. While some transgender students will want that arrangement, others will not be comfortable with it. Transgender students who are uncomfortable using a sex-segregated restroom should be provided with a safe and adequate alternative, such as a single "unisex" restroom or the nurse's restroom. Similarly, some transgender students may not be comfortable undressing in the changing facilities that correspond to the student's gender identity. The following are examples of ways in which school officials have responded to these situations:

> *In one elementary school, a transgender second-grader socially transitioned from female to male. The principal informed the staff: For the remainder of this year, he will use Nurse Margaret's restroom, and toward the end of the year we will make future determinations of restroom use in consultation with his family.*

> *In one middle school, a male-to-female transgender sixth-grader socially transitioned after spring break. For the rest of the school year, she used the nurse's restroom and the other unisex restrooms at the school. Beginning in seventh grade, she used the girls' restroom.*

> *In one high school, a transgender male-to-female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility.*

Some students may feel uncomfortable with a transgender student using the same sex-segregated restroom, locker room or changing facility. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff should work with students to address the discomfort and to foster understanding of gender identity, to create a school culture that respects and values all students.

The Department strongly recommends that districts include an appropriate number of gender-neutral restrooms commensurate with the size of the school, and at least one gender-neutral changing facility, into the design of new schools and school renovations.

School staff as well as students and their families may find the use of restrooms and changing facilities to be among the more challenging issues presented by the gender identity law, perhaps due to issues of personal privacy. As emphasized in other sections of this guidance, these issues should be resolved on a case-by-case basis, through dialogue with students and parents, and through leadership in creating safe and supportive learning environments.

## Physical Education Classes and Intramural and Interscholastic Athletic Activities

Physical education is a required course in all grades in Massachusetts' public schools, and school-based athletics are an important part of many students' lives. Most physical education classes in Massachusetts' schools are coed, so the gender identity of students should not be an issue with respect to these classes. Where there are sex-segregated classes or athletic activities, including intramural and interscholastic athletics, all students must be allowed to participate in a manner consistent with their gender identity. With respect to interscholastic athletics, the Massachusetts Interscholastic Athletic Association will rely on the gender determination made by the student's district; it will not make separate gender identity determinations.

> *At one school, a transgender girl joined the girls' cheerleading squad. The school supported the student's participation on the team. When the team was going to a regional competition, however, several of the team members raised a concern that the school would be made to compete in the coed cheerleading portion of the competition rather than in the all-girls portion for which they prepared. With the permission of the student, the principal wrote a letter that she gave to the coach to take to the competition in case officials at the competition questioned the team's participation in the all-girls' portion of the event. The letter explained: "Student, Jane Smith, is a transgender girl who has been a member of the girls' team since (date). Jane has a sincerely held female gender identity and, therefore, according to state law must be permitted to participate as a girl on the girls' cheerleading team." The team participated in the regional competition without incident.*

## Other Gender-Based Activities, Rules, Policies, and Practices

Add. 6

As a general matter, schools should evaluate all gender-based policies, rules, and practices and maintain only those that have a clear and sound pedagogical purpose. Gender-based policies, rules, and practices can have the effect of marginalizing, stigmatizing, and excluding students, whether they are gender nonconforming or not. In some circumstances, these policies, rules, and practices may violate federal and state law. For these reasons, schools should consider alternatives to them.

Whenever students are separated by gender in school activities or are subject to an otherwise lawful gender-specific rule, policy, or practice, students must be permitted to participate in such activities or conform to such rule, policy, or practice consistent with their gender identity.

The new law on gender identity provides a good opportunity for schools to review their gender-distinct policies. For example, some schools require students to wear gender-based garb for graduation or have gender-based dress codes for prom, special events, and daily attire. Schools should eliminate gendered policies and practices such as these. For example, one school that previously had blue graduation gowns for boys and white ones for girls switched to blue gowns for all graduates. The school also changed its gender-based dress code for the National Honor Society ceremony, which had required girls to wear dresses.

Similarly, some classroom teachers may routinely include gender-based practices in the classroom. For example, some teachers may have boys and girls line up separately to leave the classroom to go to lunch, the gymnasium, restrooms, or recess, and may never have considered the educational value of non-gendered alternatives, such as having students line up in the order of their birthdays, or alphabetically by name, or in the order in which they are sitting.[11]

## Education and Training

In order to further a safe and supportive school environment for all students, schools should incorporate education and training about transgender and gender nonconforming students into their anti-bullying curriculum, student leadership trainings, and staff professional development.

As with other efforts to promote a positive school culture, it is important that student leaders and school personnel, particularly school administrators, become familiar with the gender identity law, regulations, guidance, and related resources, and that they communicate and model respect for the gender identity of all students.

Professional development for school staff could include topics on gender identity and gender nonconformity such as: the *Massachusetts Student Anti-discrimination Law and Regulations*; the DESE Guidance on *Notifying Parents When a Student Has Been Bullied Based on Sexual Orientation or Gender Identity/Expression*; key terms related to gender identity and expression; the development of gender identity; the experiences of transgender and other gender nonconforming students; risk and resilience data regarding transgender and gender nonconforming students; ways to support transgender students and to improve the school climate for gender nonconforming students; gender-neutral language and practices; and this guidance.

## Communication with School Community and Families

Superintendents and principals need to review existing policies, handbooks, and other written materials to ensure that they are updated to reflect the inclusion of *gender identity* in the student antidiscrimination law, and may wish to inform all members of the school community, including school personnel, students, and families, of the recent change to state law and its implications for school policy and practice. This could take the form of a letter that states the school's commitment to being a supportive, inclusive environment for all students, as well as the school's legal obligation to provide equal educational opportunities for all students. Such a letter might include the definitions provided at the beginning of this document and some basic information about transgender and gender nonconforming youth; a link to the school's anti-bullying and anti-harassment policies; a link to this guidance; and other resources, including individuals to contact with additional questions.[12]

## Conclusion

This guidance cannot anticipate every situation in which questions may come up in the implementation of this law, and the needs of each transgender or gender nonconforming student should be assessed and addressed on a case-by-case basis. The Department will continue to provide assistance, support, and resources as we work together to create a safe and supportive school environment for all students.

For further information or questions about the content of this guidance, please contact the Safe Schools

Add. 7

Program for LGBTQ Students via Safeschoolsprogram@doe.mass.edu ✉.

**Note:**

[1] The Act can be found at An Act Relative to Gender Identity

[2] The Act amends several other statutes as well, including G.L. c. 151B (governing nondiscrimination in employment), to prohibit discrimination on the basis of gender identity.

[3] Mass. Gen. Laws. Ch. 4, § 7 (2012).

[4] *Id.*

[5] When used in this document, the term "parent" refers to parent as well as legal guardian.

[6] *See* Gerald P. Mallon, "Practice with Transgendered Children," in *Social Services with Transgendered Youth* 49, 55-58 (Gerald P. Mallon ed., 1999). *See also* Stephanie Brill & Rachel Pepper, "Developmental Stages and the Transgender Child," in The *Transgender Child,* 61-64.

[7] For certain transactions, such as banking and applying for governmental benefits or licenses, it may be necessary to have a formal legal document establishing one's change of name for identity and other purposes.

[8] The federal Family Educational Rights and Privacy Act, 20 USC 1232g, also protects the privacy of education records and requires that personally identifiable information be kept secure and confidential.

[9] See 603 CMR §§23.01 and 23.07. If a student is from 14 through 17 years of age or has entered ninth grade, both the parent and the student may make decisions concerning the student record, or either the student or the parent acting alone may decide.

[10] As discussed in the section on Names and Pronouns, the Department's publication *Assigning State Assigned Student Identifiers (SASIDs) to Massachusetts' Public School Students* guides district staff through the process of adding or revising SIMS data.

[11] Gender and Children: A Place to Begin for Educators

[12] For example, a letter from one principal explained: "*All people have a gender identity. For most people, their gender identity matches their assigned sex at birth. For transgender people, that is not the case. Transgender girls are individuals who were assigned the male sex at birth but whose lived experience of who they are is female. Transgender boys are individuals who were assigned the female sex at birth but whose lived experience of who they are is male. As a school community, we want to provide a safe environment and support all of our students so they can achieve academically. That means making sure that our school's policies and practices are inclusive and respectful of all students, including transgender students. Toward that end, we have* [describe steps taken to implement the law].*"*

Last Updated: October 28, 2021

Add. 8



KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
      Title XII. Education (Ch. 69-78a)
         Chapter 71. Public Schools (Refs & Annos)

M.G.L.A. 71 § 38G

§ 38G. Certification for certain teaching and administrative positions; provisional and standard certificates; policies and guidelines regarding requirements and qualifications; applications; recommendations; review; continuing education; renewal of certificate

Effective: August 5, 2022
Currentness

As used in this section the following words shall have the following meanings:

"Board", the board of education established by chapter fifteen.

"Military spouse certificate", a license to teach that the commissioner of education shall issue to a person who is the spouse of a service member who is: (i) in the armed forces of the United States, a reserve unit of the armed forces of the United States or the National Guard of another state; and (ii) serving in the commonwealth or in a bordering state while residing in the commonwealth, when such spouse holds a valid teaching certificate from another state in good standing but has not satisfied the certification testing requirements in this section. The military spouse certificate shall be valid for not less than 3 years. Service under a military spouse certificate shall be counted as service in acquiring professional teacher status, contingent upon the teacher passing the applicable certification tests necessary for acquiring professional teacher status.

"Provisional educator", a person who holds a provisional educator certificate.

"Provisional educator with advanced standing", a person who holds a provisional educator certificate with advanced standing; said certificate shall be valid for five years of employment as an educator in the schools of the commonwealth and may be renewed for an additional five years of employment in accordance with regulations adopted by the board.

"Provisional educator certificate", a license to teach issued to a person who has successfully met the preparation and eligibility requirements as established by the board. The provisional educator's certificate shall be valid for five years of employment as an educator in the schools of the commonwealth.

"Provisional educator certificate with advanced standing", a license to teach issued to a person who has successfully met the preparation and eligibility requirements as established by the board for provisional certification and completed (1) a college program, graduate or undergraduate, approved by the board of education for the preparation of teachers; or (2) a college preparation program included in the National Association of State Directors of Teacher Education and Certification (NASDTEC); or (3) an out of state teacher education program approved by the National Council for the Accreditation of Teacher Education (NCATE); or (4) other program approved by the board.

"Regionally licensed or certified educator", an applicant for a teacher's certificate in Massachusetts who has been granted a regional license or certificate by another state jurisdiction under terms of a contract entered into pursuant to chapter seven hundred and forty-eight of the acts of nineteen hundred and sixty-eight, the Interstate Agreement on Certification of Educational Personnel. Such certificate shall be equivalent to the provisional educator certificate with advanced standing.

"Reciprocity of certified educators", the process and requirements established by the commissioner for candidates to obtain certification who have completed (1) a college preparation program included in the alternative certification reciprocity system of the National Association of State Directors of Teacher Education and Certification (NASDTEC); (2) out-of-state programs approved by the National Council for the Accreditation of Teacher Education (NCATE); or (3) other programs approved by the board. Such certificate shall be equivalent to the provisional educator with advanced standing certificate.

"Standard educator", a person who holds a standard educator certificate.

"Standard educator certificate", a license to teach issued to a person who has successfully met the preparation and eligibility requirements as established by the board. The standard educator's certificate shall be valid for renewable terms of five years.

"Temporary certificate", a license to teach which the commissioner of education may, at his discretion, issue to a person who holds a valid teaching certificate from another state and who has been employed under the certificate for a minimum of three years but has not satisfied the certification testing requirements contained in this section. The temporary certificate shall be valid for one year and is nonrenewable. Service under a temporary certificate shall be counted as service in acquiring professional teacher status, contingent upon the teacher passing the applicable certification tests.

The commissioner of education shall have authority to grant, upon application, provisional educator, provisional educator with advanced standing, temporary, military spouse and standard educator certificates to persons who have satisfied the requirements for such certificates as established by the board. The board shall define the knowledge of subject matter and demonstration of competencies commensurate with attainment and renewal of such certificates.

To be eligible for certification as a provisional educator, the candidate shall (1) hold a bachelor's degree in arts or sciences from an accredited college or university with a major course in the arts or sciences appropriate to the instructional field; (2) pass a test established by the board which shall consist of two parts: (A) a writing section which shall demonstrate the communication and literacy skills necessary for effective instruction and improved communication between school and parents; and (B) the subject matter knowledge for the certificate; and (3) be of sound moral character. Candidates who complete the requirements in this paragraph shall be issued provisional educator certificates which will permit them to seek employment in teaching positions requiring instructional certification in districts which have an approved provisional educator preparation program.

The commissioner shall establish standards for the training, support and supervision of provisional educators. During the period of employment, a person holding a provisional teaching certificate pursuant to this section shall be under the direct supervision of the principal or other appropriate supervisor who shall regularly observe and evaluate the performance of assigned duties by such holder of a provisional teaching certificate. Such evaluation shall be according to relevant to[1] nationally recognized professional standards for personnel evaluation.

Each public school district seeking to hire a provisional educator must submit an provisional educator program plan to the department of education. No district shall be authorized to employ a provisional educator unless it has submitted a plan for such a program and received approval of the commissioner. Each plan shall describe the key elements of the proposed provisional educator program in accordance with guidelines established and published by the department. Such guidelines shall require that provisional educators in district-based programs meet the equivalent standards that provisional educators with advanced standing meet in approved college and university programs. Districts shall show either evidence of joint sponsorship or collaboration of training programs with (1) colleges or universities, or (2) other districts, or (3) other programs approved by the commissioner to provide such programs. The department shall issue standard district plans which districts may implement

in lieu of developing original plans. The department shall coordinate the training efforts of districts, shall insure that district programs meet fair, substantive and comprehensive professional development standards and shall establish regional programs for provisional educators. The department shall also provide orientation programs for support team members. Provisional educators shall be observed by a professional support team. The department of education shall devise standardized criteria for a final comprehensive evaluation of each provisional educator, conducted at the end of the provisional educator period by the professional support team. All such evaluations shall be conducted according to nationally recognized professional standards for personnel evaluation.

At the conclusion of each year of the approved district training program for provisional educators, the chairperson of the support team shall prepare a comprehensive evaluation report of the provisional educator's performance. Such report shall be submitted by the chairperson directly to the department of education. The final comprehensive evaluation report on each provisional educator shall be made on forms provided by the department of education. Said report shall include an assessment of the individual's on the job performance and one of the following recommendations:

(1) Approved: recommends that advanced standing status be granted upon completion of the other preparation and eligibility requirements as established by the board;

(2) Insufficient: recommends that the candidate be allowed to seek entry in the future into a district training program; or a candidate found insufficient twice shall not be allowed to enter another district training program; or

(3) Disapproved: recommends that advanced standing status not be granted and that the candidate not be allowed to enter into a district training program.

The support team chairperson shall provide the provisional educator with a copy of the written evaluation report and certification recommendation before submitting it to the commissioner of education.

If the recommendation is to disapprove, the provisional educator may, within fifteen days, submit to the chairperson written materials documenting the reasons why the provisional educator believes his provisional educator certification should continue to remain valid or a recommendation of insufficient granted. The chairperson shall forward all such documentation to the commissioner of education along with the evaluation report and recommendation concerning certification.

Candidates who receive a recommendation of "disapproved" or two or more recommendations of "insufficient" may appeal to the commissioner for approval of additional opportunities to seek provisional educator employment in districts other than those in which they received unfavorable recommendations. The candidate shall be responsible for demonstrating why he would be likely to succeed if granted the requested opportunity.

To be eligible for certification as a provisional educator with advanced standing, the candidate shall provide evidence that he (1) holds a bachelor's degree in arts or sciences from an accredited college or university with a major course in the arts or sciences appropriate to the instructional field or the equivalent baccalaureate degree; (2) has passed a test established by the board which shall consist of two parts: (A) a writing section which shall demonstrate the communication and literacy skills necessary for effective instruction and improved communication between school and parents; and (B) the subject matter knowledge for the certificate; (3) has satisfactorily completed a board of education approved teacher preparation program; and (4) is of sound moral character. A candidate who completes the requirements of this paragraph shall be issued a provisional educator certificate with advanced standing which will permit him to seek employment in a teaching position requiring instructional certification.

Each public school district seeking to hire a provisional educator with advanced standing must submit a plan to the department of education which details how the district will supervise and support such provisional educators with advanced standing. No

district shall be authorized to employ a provisional educator with advanced standing unless it has submitted a plan for the support and evaluation of such educator to the commissioner and received the approval of the commissioner. The department of education shall issue standard plans for provisional educators with advanced standing which districts may implement in lieu of developing an original plan.

In not less than one year after the issuance of a provisional educator certificate, the commissioner upon receipt of a proper application shall issue a standard educator certificate to such provisional certificate holder who has provided the commissioner with evidence, in such manner and form as prescribed by the board, that he has met the preparation and eligibility requirements set by the board through a master's degree program approved by the commissioner, or through an equivalent district program for standard certification approved by the commissioner, or other equivalent programs approved by the commissioner; and has met the requirements set by the commissioner for demonstration of successful performance.

Each standard educator certificate shall be valid for five years and continued every five years thereafter upon the successful completion of an individual professional development plan that meets the subject matter knowledge and teaching skill requirements set by the board. Such plan shall be designed to increase the ability of the person to improve student learning.

Certificates granted by the board prior to October first, nineteen hundred and ninety-four are hereby deemed standard certificates which shall be renewed every five years. All such certificates must be renewed by June eighteenth, nineteen hundred and ninety-nine.

The commissioner shall develop alternative paths for certifying school management and educational leadership personnel which shall facilitate a process whereby persons with significant managerial experience can obtain such certification.

Any certificate issued by the commissioner may be revoked for cause, pursuant to standards and procedures established by the board.

The board shall have the authority to promulgate, amend and rescind such rules and regulations as may be necessary to carry out the provisions of this section. Such regulations shall be presented to the joint committee for informational purposes ninety days before implementation.

All applications for any certificates granted under this section shall be accompanied by a fee to be determined annually by the commissioner of administration under the provisions of section three B of chapter seven. Said fees shall be established and limited to allow the department to carry out the certification and recertification responsibilities but in no case shall said applications exceed one hundred dollars per year with an annual increase no greater than the consumer price index.

Notwithstanding the foregoing, the board shall establish for each certification area alternate methods for fulfilling the professional development requirement, at least one of which shall be provided at no cost to persons employed by a school district, including paraprofessionals or assistant teachers, who are engaging in such activity for the purpose of satisfying the professional development requirement of this section.

No person shall be eligible for employment as a teacher, guidance counselor, director, school psychologist, school adjustment counselor, school social worker, school nurse, library media specialist, school business administrator, principal, supervisor, director, assistant superintendent of school, and superintendent of schools by a school district unless he has been granted by the commissioner a provisional, or standard certificate with respect to the type of position for which he seeks employment; provided, however, that nothing herein shall be construed to prevent a school committee from prescribing additional qualifications; and provided further, that a superintendent may upon request be exempt by the commissioner for any one school year from the requirement in this section to employ certified personnel when compliance therewith would in the opinion of the commissioner constitute a great hardship in securing teachers for that school district. During the time that such a waiver is in effect, service

of an employee of a school district to whom the waiver applies shall not be counted as service in acquiring professional teacher status or other rights under section forty-one.

In addition to any other requirements of this section, the board shall require, as a provision of an administrator's or educator's initial certification, that all educators and administrators shall have training in strategies for effective inclusive schooling for children with disabilities, instruction of students with diverse learning styles and classroom organization and management. Such training shall include, at a minimum, practical experience in the application of these strategies.

In addition to any other requirements in this section, in order to receive a provisional or standard educator certificate, persons applying for such certification shall have completed such courses or training sessions as the board shall require in second language acquisition.

Competence in Braille instruction shall be a requirement for initial certification as a teacher of students with vision impairments. Such competence shall be verified through a testing program which meets the standards of the Library of Congress National Library Service for the Blind or its successor.

For the purposes of certifying educators, the board shall establish policies and guidelines and the commissioner may approve preparation programs devoted to the preparation of teachers and other educational personnel. A college or university or school or district or other institution offering such an approved program shall certify to the commissioner that a student has demonstrated satisfactory competence in the skills and knowledge expected of college graduates in the most advanced nations, and has completed the program approved. The college or university or school district or other institution shall also provide the commissioner with a transcript of the student's record.

At the end of each five-year period each standard educator shall attest to and provide appropriate supporting evidence and documentation to the state department of education, in such form and at such time as the commissioner shall prescribe, that the standard educator has successfully completed a professional development plan which meets the standards set by the board.

In addition to any other requirements of this section, the board shall require, as a provision of an administrator's or educator's recertification, that all educators and administrators shall have training in strategies for effective inclusive schooling for children with disabilities, including children with autism, instruction of students with diverse learning styles and classroom organization and management. Such training shall include, at a minimum, practical experience in the application of these strategies.

It shall be one of the objectives of all school districts' professional development plans to satisfy the individual professional development plans required by this section; provided, however, that this requirement shall not be construed to require that a school district or the commonwealth provide funding for the fulfillment of the professional development requirements of this section and section thirty-eight Q beyond the foundation budget.

The board shall establish policies and guidelines for approval for any continuing education units, inservice seminars, projects, courses and other activities which would be deemed sufficient to maintain the development of professional skills and the knowledge of subject matter pertinent to particular certificates in accordance with the same procedures used for initial approval of collegiate preparation programs. The commissioner shall establish for each certification alternate methods for fulfilling the professional development requirement, at least one of which must be at no cost to persons employed by a school district who are engaging in such an activity for the purpose of satisfying the professional development requirements for recertification of this section.

Such policies shall provide that a teacher who is to be employed in a position in an area of certification in which he is not currently employed, but for which he held a certificate which had been valid within five years immediately preceding the starting date of employment in this position, shall be given a reasonable period, as determined by the board, to fulfill a professional

development plan which demonstrates currency in the subject matter knowledge and requalify him for certification in said area. In every instance, all evaluations and assessments shall follow nationally recognized professional standards.

Each local and regional school district shall attest to the department of education, in such form and at such time as the commissioner shall prescribe, that professional development activities for which credit toward certification renewal is granted meet the requirements set by the board and are documented in accordance with procedures established by the board.

The board shall, in establishing said policies and criteria for professional development, give special consideration to the best interests of the students in the commonwealth, including the need for high quality teachers of English learner programs established under chapter 71A and the need to maintain the highest performance standards of teachers while taking into proper consideration the financial or time constraints these policies may require. In developing such policies, guidelines and assessment methods, the board shall obtain the input of teachers, administrators, educational experts, parents, business leaders and others interested in the improvement of the professional status of teachers.

Except as otherwise specifically provided in this section, no rights of any employees of a school district under the provision of this chapter shall be impaired by the provisions of this section.

Anyone granted either a provisional or standard certificate under this section or currently holding such certification shall be required to maintain the development of professional skills and the knowledge of subject matter pertinent to the areas of certification.

Teachers who were authorized, permitted or approved to teach in a subject or area for which there was no certification standard before September first, nineteen hundred and eighty-two, shall acquire and maintain the development of the skills and training required of persons certified to teach in said subject or areas after that date.

This section shall not apply to trade, vocational, temporary substitute teachers, exchange teachers, regionally licensed or certified teachers or to teaching or administrative interns; provided, however, that approval for the employment of such personnel shall be generated by the board under such rules and regulations as it may adopt.

The requirements of this section shall not apply to the certification of teachers of adult education. Nothing in this section or section 1H of chapter 69 shall be construed to prohibit a school committee from employing a teacher certified under this section to teach adult education.

**Credits**

Added by St.1951, c. 278, § 1. Amended by St.1952, c. 530; St.1953, c. 264; St.1956, c. 122; St.1960, c. 20, § 1; St.1960, c. 333, § 1; St.1965, c. 172; St.1965, c. 345; St.1968, c. 599; St.1970, c. 454, §§ 1, 2; St.1972, c. 64; St.1972, c. 684, § 5; St.1973, c. 847, § 5; St.1980, c. 572, § 25; St.1985, c. 188, § 15; St.1989, c. 467; St.1991, c. 151; St.1993, c. 71, § 41; St.1993, c. 495, § 26; St.1995, c. 209, § 1; St.1996, c. 275; St.1996, c. 374, § 3; St.1996, c. 450, §§ 124 to 126; St. 1998, c. 194, § 127; St.2000, c. 159, §§ 143, 144; St.2000, c. 264; St.2000, c. 284, §§ 1, 2; St.2002, c. 218, §§ 8, 9; St.2014, c. 226, § 22, eff. Nov. 3, 2014; St.2017, c. 138, §§ 23, 24, eff. Feb. 20, 2018; St.2022, c. 154, §§ 10, 11, eff. Aug. 5, 2022.

Notes of Decisions (33)

Footnotes

1       So in enrolled bill.

M.G.L.A. 71 § 38G, MA ST 71 § 38G

Current through Chapter 6 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
      Title XII. Education (Ch. 69-78a)
         Chapter 76. School Attendance (Refs & Annos)

M.G.L.A. 76 § 5

## § 5. Place of attendance; violations; discrimination

Effective: July 1, 2012
Currentness

Every person shall have a right to attend the public schools of the town where he actually resides, subject to the following section. No school committee is required to enroll a person who does not actually reside in the town unless said enrollment is authorized by law or by the school committee. Any person who violates or assists in the violation of this provision may be required to remit full restitution to the town of the improperly-attended public schools. No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation.

**Credits**

Amended by St.1971, c. 622, § 1; St.1973, c. 925, § 9A; St.1993, c. 282; St.2004, c. 352, § 33, eff. Sept. 17, 2004; St.2011, c. 199, § 4, eff. July 1, 2012.

Notes of Decisions (31)

M.G.L.A. 76 § 5, MA ST 76 § 5
Current through Chapter 6 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

> Massachusetts General Laws Annotated
>     Part I. Administration of the Government (Ch. 1-182)
>         Title XVI. Public Health (Ch. 111-114)
>             Chapter 112. Registration of Certain Professions and Occupations (Refs & Annos)

M.G.L.A. 112 § 275

## § 275. Sexual orientation and gender identity change efforts

Effective: April 8, 2019
Currentness

(a) As used in this section, the following words shall, unless the context clearly requires otherwise, have the following meanings:-

"Gender identity", shall have the same meaning as under clause Fifty-ninth of section 7 of chapter 4.

"Health care provider", a health care professional licensed under this chapter including, but not limited to, a physician, psychologist, social worker, nurse or allied mental health and human services professional, including marriage and family therapist, rehabilitation counselor, mental health counselor or educational psychologist.

"Sexual orientation", having an orientation for or being identified as having an orientation for heterosexuality, bisexuality or homosexuality.

"Sexual orientation and gender identity change efforts", any practice by a health care provider that attempts or purports to impose change of an individual's sexual orientation or gender identity including, but not limited to, efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex; provided, however, that "sexual orientation and gender identity change efforts" shall not include practices that: (i) (A) provide acceptance, support and understanding of an individual's sexual orientation, gender identity or gender expression; (B) facilitate an individual's coping, social support and identity exploration and development; or (C) are sexual orientation-neutral or gender identity-neutral, including interventions to prevent or address unlawful conduct or unsafe sexual practices; and (ii) do not attempt or purport to impose change of an individual's sexual orientation or gender identity.

(b) A health care provider shall not advertise for or engage in sexual orientation and gender identity change efforts with a patient who is less than 18 years of age.

(c) A health care provider who violates this section shall be subject to discipline by the appropriate licensing board. Such discipline may include suspension or revocation of license.

(d) A violation of this section by a health care provider shall be a violation of section 2 of chapter 93A. Such a claim brought under this section shall be subject to sections 5A and 7 of chapter 260.

**Credits**
Added by St.2019, c. 8, eff. April 8, 2019.

Add. 17

M.G.L.A. 112 § 275, MA ST 112 § 275

Current through Chapter 6 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.    Add-18   

Code of Massachusetts Regulations
    Title 603: Department of Elementary and Secondary Education
        Chapter 26.00: Access to Equal Educational Opportunity (Refs & Annos)

603 CMR 26.01

## 26.01: Purpose and Construction; Definition

Currentness

(1) 603 CMR 26.00 is promulgated to insure that the public schools of the Commonwealth do not discriminate against students on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation and that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges and courses of study at such schools. 603 CMR 26.00 shall be liberally construed for these purposes.

(2) The obligation to comply with 603 CMR 26.00 is not obviated or alleviated by any local law or rule or regulation of any organization, club, athletic or other league or association that would limit the eligibility or participation of any student on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.

(3) For purposes of 603 CMR 26.01, gender identity shall mean a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth. Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose.

The Massachusetts Administrative Code titles are current through Register No. 1496, dated May 26, 2023. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 603, § 26.01, 603 MA ADC 26.01

**End of Document**                                                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Massachusetts Regulations
  Title 603: Department of Elementary and Secondary Education
    Chapter 26.00: Access to Equal Educational Opportunity (Refs & Annos)

603 CMR 26.03

26.03: Admission to Courses of Study

Currentness

(1) All courses of study offered by a public school shall be open and available to students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation.

(2) A public school shall determine what courses or units of study are required of a student without regard to the race, color, sex, gender identity, religion, national origin or sexual orientation of that student.

(3) A public school shall not schedule students into courses or units of study on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation.

(4) No student, on the basis of race, color, sex, gender identity, religion, national origin, limited English-speaking ability or sexual orientation, shall be discriminated against in accessing the courses of study and other opportunities available through the school system of the city or town in which he or she resides.

(5) Nothing in 603 CMR 26.03 shall be construed to prevent schools from providing separately to each sex those segments of a program of instruction dealing exclusively with human sexuality.

The Massachusetts Administrative Code titles are current through Register No. 1496, dated May 26, 2023. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 603, § 26.03, 603 MA ADC 26.03

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Massachusetts Regulations
  Title 603: Department of Elementary and Secondary Education
    Chapter 26.00: Access to Equal Educational Opportunity (Refs & Annos)

603 CMR 26.07

26.07: Active Efforts

Currentness

(1) The school committee of each school district shall establish policies and procedures, and implement monitoring and evaluation practices that insure that all obstacles to equal access to school programs for all students regardless of race, color, sex, gender identity, religion, national origin, limited English-speaking ability or sexual orientation, are removed. Such policies shall include a requirement for an annual evaluation of all aspects of the K through 12 school program to insure that all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation are given an opportunity to participate in all programs offered by the school including athletics and other extra-curricular activities.

(2) All public schools shall strive to prevent harassment or discrimination based upon students' race, color, sex, gender identity, religion, national origin or sexual orientation, and all public schools shall respond promptly to such discrimination or harassment when they have knowledge of its occurrence.

(3) The school committee and the superintendent shall provide in-service training for all school personnel at least annually regarding the prevention of discrimination and harassment based upon race, color, sex, gender identity, religion, national origin and sexual orientation, and the appropriate methods for responding to such discrimination and harassment in a school setting.

(4) The superintendent, as an agent of the school committee, shall promote and direct effective procedures for the full implementation of 603 CMR 26.00, and shall make recommendations to the s chool committee for the necessary policies, program changes, and budget resource allocations needed to achieve adherence to 603 CMR 26.00.

(5) The superintendent of each school system shall require employers who recruit new employees in and through the schools of that district to sign a statement that the employer complies with applicable federal and state laws prohibiting discrimination in hiring or employment practices.

(6) Adults serving on athletic regulatory boards shall fairly represent the interest of all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation.

(7) Any contributions to a school for activities and monetary awards within or sponsored by the school or for scholarships administered by the school by any person, group or organization shall be free from any restrictions based upon race, color, sex, gender identity, religion, national origin or sexual orientation. Schools may post or print information regarding private restricted scholarships as long as no preferential treatment is given to any particular scholarship offered and as long as the school does not endorse or recommend any such scholarship nor advise or suggest to a particular student that he or she apply for such a scholarship.

(8) The opportunity to receive guidance and counseling in a student's primary language should be made available to students from homes where English is not the primary language spoken.


The Massachusetts Administrative Code titles are current through Register No. 1496, dated May 26, 2023. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 603, § 26.07, 603 MA ADC 26.07

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.