

**Mary E. McAlister, Esq.**

Senior Litigation Counsel

ATLANTA, GA | **LYNCHBURG, VA** | ST. LOUIS, MO

September 19, 2023

Via CM/ECF

Maria R. Hamilton, Clerk
UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

RE: No. 23-1069 *Stephen Foote, et. v. Ludlow School Committee et. al.* Notice of Supplemental Authority

Dear Ms. Hamilton:

On behalf of Plaintiffs-Appellants Stephen Foote and Marissa Silvestri, counsel is submitting supplemental authority pursuant to FRAP 28j. On September 14, 2023, one day after oral arguments in the above-described case, Judge Roger Benitez of the United States District Court for the Southern District of California issued an order granting a preliminary injunction and denying motions to dismiss in *Mirabelli et al v. Olson et al,* Case No. 3:23-cv-00768-BEN-WVG, attached hereto.

*Mirabelli* involved a challenge to a school district policy similar to the policy at issue in *Foote v. Ludlow School Committee* which directed district staff to not disclose a child's alternate gender identity and related name and pronoun requests to parents. The school district in *Mirabelli,* like the school district in *Foote* relied on the state's non-discrimination law to validate the policy. In granting the preliminary injunction and denying the motion to dismiss, the *Mirabelli* court addressed the issue of social gender affirmation in the form of alternate names and pronouns as mental health care, about which the panel asked during oral argument and Plaintiffs-Appellants addressed in their Opening Brief [Doc. 00117988877] at pp. 13-22 and Reply Brief [Doc. 00118029127] at pp. 3-6.

The *Mirabelli* court also addressed the issue of whether the district's policy violated fundamental parental rights, about which the panel asked in oral argument and was addressed in Appellants' Opening Brief at pp. 42-46 and Reply Brief at pp. 12-20.

Sincerely,

*/s/Mary E. McAlister*
Mary E. McAlister
Counsel for Plaintiffs/Appellants

## CERTIFICATE OF SERVICE

I, Mary E. McAlister, counsel for Plaintiffs-Appellees, certify that on September 19, 2023, a copy of the foregoing Rule 28(j) letter was filed electronically through the appellate CM/ECF system with the Clerk of Court. I further certify that all parties required to be served have been served.

*/s/Mary E. McAlister*
Mary E. McAlister
Counsel for Plaintiffs/Appellants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,<br><br>           Plaintiffs,<br><br>v.<br><br>MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,<br><br>           Defendants. | Case No.:  3:23-cv-00768-BEN-WVG<br><br>**ORDER:**<br><br>**(1) GRANTING MOTION FOR PRELIMINARY INJUNCTION;**<br><br>**(2) DENYING MOTIONS TO DISMISS**<br><br>**[ECF Nos. 5, 7, 17, 25]** |

Plaintiffs Elizabeth Mirabelli and Lori Ann West ("Plaintiffs") are teachers with fifty-five years of experience between them in the Escondido Union School District ("EUSD").  They bring claims against members of the EUSD Board of Education and certain members of the EUSD administrative staff (collectively, "EUSD Defendants"), as well as members of the California State Board of Education and the State Superintendent (collectively, "State Defendants") for school district policies that violate the First Amendment to the United States Constitution, under 42 U.S.C. § 1983.  Plaintiffs move

for a preliminary injunction and the EUSD Defendants and the State Defendants move to dismiss the claims.  A hearing was held on August 30, 2023.

## I.  BACKGROUND

If a school student suffers a life-threatening concussion while playing soccer during a class on physical fitness, and the child expresses his feelings that he does not want his parents to find out, would it be lawful for the school to require its instructor to hide the event from the parents?  Of course not.  What if the child at school suffers a sexual assault, or expresses suicidal thoughts, or expresses aggressive and threatening thoughts or behavior?  Would it be acceptable not to inform the parents?  No.  These would be serious medical conditions to which parents have a legal and federal constitutional right to be informed of and to direct decisions on medical treatment.  A parent's right to make decisions concerning the care, custody, control, and medical care of their children is one of the oldest of the fundamental liberty interests that Americans enjoy.  However, if a school student expresses words or actions during class that may be the first visible sign that the child is dealing with gender incongruity or possibly gender dysphoria, conditions that may (or may not) progress into significant, adverse, life-long social-emotional health consequences, would it be lawful for the school to require teachers to hide the event from the parents?

Plaintiffs Elizabeth Mirabelli and Lori Ann West are two teachers at Rincon Middle School, which is part of EUSD.  Mrs. Mirabelli teaches English, and Mrs. West teaches physical education.  According to the Complaint, both have been named "Teacher of the Year" at different times while teaching for EUSD.  The district is a public school district with approximately 16,000 students in kindergarten through eighth grades.  As a government-created entity it is obligated to follow the laws of the State of California and the California Constitution as well as the laws of the United States and the U.S. Constitution.  Local school districts have traditionally been guided by local school boards familiar with the needs and opportunities of the local community.  In the process of providing a public education for Escondido's school-age children, EUSD hires, trains,

and supervises teachers and as part of their duties its teachers must communicate from time to time with the parents of students.

One current subject that EUSD faces in its community is how to address changing concepts of gender identification, gender diversity, gender dysphoria, gender incongruence, and self-transitioning among its student body.  Gender dysphoria[1] is a clinically diagnosed incongruence between one's gender identity and assigned gender.  If untreated, gender dysphoria may lead to anxiety, depression, eating disorders, substance abuse, self-harm, and suicide.  *Eknes-Tucker v. Marshall*, No. 2:22-cv-184-LCB, 2022 WL 1521889, at *1 (M.D. Ala. May 13, 2022).  Plaintiffs allege in their Complaint that EUSD has a newly adopted policy of: (1) school-wide recognition of a student's newly expressed gender identification, and (2) when communicating with a student's parents, an enforced requirement of faculty confidentiality and non-disclosure regarding a student's newly expressed gender identification.  The policy is known as AR 5145.3.

---

[1] According to DSM-5, the criteria for Gender Dysphoria is:
A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 months in duration, as *manifested by at least two of the following*:
A.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
B.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
C.    A strong desire for the primary and/or secondary sex characteristics of the other gender
D.    A strong desire to be of the other gender (or some alternative gender different from one's designated gender)
E.    A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)
F.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)
The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

The result of the new EUSD policy is that a teacher ordinarily may not disclose to a parent the fact that a student identifies as a new gender, or wants to be addressed by a new name or new pronouns during the school day – names, genders, or pronouns that are different from the birth name and birth gender of the student.  Under the policy at issue, accurate communication with parents is permitted *only if* the child first gives its consent to the school.  A teacher who knowingly fails to comply is considered to have engaged in discriminatory harassment and is subject to adverse employment actions.

EUSD has other formal policies that are consistent with existing law but are in tension with the new policy.  For example, BP 0100(7) states that, "Parents/guardians have a right and an obligation to be engaged in their child's education and to be involved in the intellectual, physical, emotional, and social development and well-being of their child."  Compl. Exh. 15(7).  And BP 4119.21(9) states that, "Being dishonest with students, parents/guardians, staff, or members of the public, including . . . falsifying information in  . . . school records" is inappropriate employee conduct.  Compl. Exh. 14 (9).  Both existing policies BP 0100(7) and BP 4119.21(9) are consistent with federal constitutional rights but appear to be at odds with AR 5145.3.

The plaintiffs in this action are two experienced, well-qualified, teachers.  The teachers maintain sincere religious beliefs that communications with a parent about a student should be accurate; communications should not be calculated to deceive or mislead a student's parent.  The teachers also maintain that parents enjoy a federal constitutional right to make decisions about the care and upbringing of their children. The teachers allege a well-founded fear of adverse employment action should they violate the EUSD gender identification confidentiality policy by communicating accurately to a student's parents her own observations or concerns, as a teacher, about the student's gender incongruence.

The plaintiffs bring a facial and as-applied challenge to the EUSD policy, and seek a preliminary injunction to enjoin the defendants from taking any adverse employment action against them in the event that they violate the gender identification confidentiality

policy.  Because the plaintiffs have shown a likelihood of success on the merits as applied to them, a preliminary injunction would restore the status quo ante, and the other preliminary injunction factors tip in the plaintiffs' favor, the motion for preliminary injunction is granted.

## II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions.  Plaintiffs seeking injunctive relief must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Baird v. Bonta*, __F.4th __, 2023 WL 5763345, *2 (9th Cir. Sept. 7, 2023).  "It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury.  If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."  *Id.* at *3 (citations omitted).  "And his likelihood of succeeding on the merits also tips the public interest sharply in his favor because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'"  *Id.* (citations omitted).  The Ninth Circuit evaluates "these factors on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.' When the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Fellowship of Christian Athletes v. San Jose Unified School District et al*, No. 22-15827, 2023 WL 5946036, at *35 (9th Cir. Sept. 13, 2023) (en banc) (citations omitted).

## III.  DISCUSSION

Since 2003, EUSD has maintained a nondiscrimination policy and a policy against discriminatory harassment that prohibits, *inter alia,* harassment based on a student's actual or perceived gender identity.  *See* BP 0410 and BP 5145.3.  Those policies are not questioned here.  However, on August 13, 2020, during the COVID-19 pandemic and

related school shutdowns, it is alleged that EUSD adopted Administrative Regulation ("AR") 5145.3.  AR 5145.3 gives definition to what is considered discriminatory harassment under BP 5145.3.  Compl. at ¶¶ 115-116.  It is this regulation (AR 5145.3) and its application that is at the center of this controversy.

It is alleged that AR 5145.3 was not discussed at a public school board meeting.  It is alleged that AR 5145.3 was not passed upon by the EUSD Board of Trustees.  It is alleged that AR 5145.3 was not widely circulated to all staff.  Rather, it is alleged that AR 5145.3 was adopted by school district administrative staff, without fanfare, and without opportunity for parental or public input.  In fact, apparently few even knew of its existence or significance until February 3, 2022.  On that day it is alleged that EUSD held a district-wide video conference meeting for certificated staff (*i.e.*, teachers) regarding the rights of gender diverse students under the newly adopted AR 5145.3, *et al*.  Compl. at ¶¶ 118 and Exh. 4.

Among the policy points discussed was an instruction that a teacher who knew of a student's transgender status and revealed that status to "individuals who do not have a legitimate need for the information," the teacher's communication would be considered discriminatory harassment.  *Parents* were specifically identified as individuals who do not have a legitimate need for the information.  And the presentation made it clear that a student's consent to reveal gender information is required, regardless of the age of the student.  Compl. at ¶ 129.

According to the Complaint, the February 2022, training presentation was conducted by Defendant Tracy Schmidt, Director for Integrated Student Supports, and introduced by Albert Ngo, Director of Certificated Human Resources.  In the presentation, Schmidt describes the rights of "protected students."  Schmidt says,

> "So, now, lets go through what these rights [of protected students] are.  And this is taken from our own adopted EUSD policy on discrimination and harassment.  So, first off, determining gender identity.  The school or District shall accept the student[']s assertion of their gender identity and begin to

treat the student immediately, consistently with that gender identity.  The student's assertion is enough.  There is no need for a formal declaration.  There's no requirement for *parent or caretaker agreement or even for knowledge* for us to begin treating that student consistent with their gender identity.  Students also have a right to privacy.  A student's status is their private information, and the District shall only disclose the information to others with the student's prior consent.  When disclosure of a student's gender identity is made to a District employee by a student, that employee shall seek the student's permission to share with others including *parents* or . . . caretakers.  The main take away is this: It always comes back to the student's comfort.  If one wants to take any action to share a student's status, they must be granted that permission, and *that includes parents*, caretakers, other teachers, administrators, even support staff.  You have to seek out permission first."

Compl. at Exh. 4, p 3-4 (emphasis added).  Schmidt then describes actions deemed to be discrimination or harassment -- which includes revealing a student's gender diverse status to people without a legitimate need for the information.  Schmidt says that parents are included among those who do not have a legitimate need to know.  Schmidt instructs that discrimination/harassment includes, "revealing a student's transgender status or gender diverse status to individuals who do not have a legitimate need for the information without the student's consent, and *this includes parents* or caretakers."  Compl. at Exh. 4, p 7 (emphasis added).

In August 2022, at the outset of the new school year, the plaintiffs received emails from school staff with a list of students with student-preferred names and pronouns.  The list included directions on whether or not said names and pronouns were to be disclosed to the students' parents.  Compl. at ¶¶ 163-164; Exh. 23.  For example, Mirabelli received an email with a list of students and entries such as: "[student name]: Preferred name is [redacted] (pronouns are he/him).  Dad and stepmom are NOT aware, please use [redacted] and she/her when calling home."

Both plaintiffs sought relief from EUSD in the form of a religious accommodation. Although it did not contest the sincerity of their religious convictions, EUSD did not extend that accommodation to the plaintiffs for communications with parents.  *See e.g.,* Compl. Exh. 7 (Letter from attorney for EUSD, dated Feb. 8, 2023) ("Finally, (4) teachers are required to follow the 'privacy' policy that requires them to not share a student's gender identity status with their parent or guardian without the student's permission."); Compl. Exh. 9 (Letter from attorney for EUSD, dated Mar 10, 2023) ("Question (1): What if a parent directly asks [the teachers] to reveal a student's gender identity?  Clarification.  Your clients should respond that that [sic] the inquiry is outside the scope of the intent of their interaction and state that the intent of the communication, may involve behavior as it relates to school and class rules, assignments, etc.  If your clients have questions about questions from parents related to gender identification or equity laws/regulations, they should contact the principal, who will provide the necessary guidance.").

Consequently, when it comes to communicating with parents, the plaintiffs have been told by EUSD through its attorneys that they can say only: "*the inquiry is outside the scope of the intent of [my] interaction and state that the intent of the communication, may involve behavior as it relates to school and class rules, assignments, etc*."  Teachers may refer the parent to the school principal, but the principal will not disclose more information either, without the student's consent.  Without a student's consent (regardless of the student's age), the school district operates within a veritable cone of silence. Parents are left outside.  This was explained at the hearing.

> EUSD Attorney:  Yes.  So ultimately, though, to go back to your question, if a child went through this whole process, and then we get to a parent, and the teacher is not being told to lie but saying this is beyond my purview; they speak to an administrator; ultimately, an administrator would respect the child's wishes not to disclose and respect their privacy.

Hearing Transcript, at 98.  It is alleged that neither plaintiff Mirabelli nor plaintiff West have a desire to telephone parents to specifically report a child's gender identification; on the other hand, to be consistent with their sincerely-held religious beliefs, they cannot conceal pertinent information that can impact the health and well-being of a student or affirmatively mislead a student's parent.  Compl. at ¶ 212.

EUSD responds in part, that AR 5415.3 is required by California law as explained and communicated through the California Department of Education's publication titled *Frequently Asked Questions* about the School Success and Opportunity Act (Assembly Bill 1266) (hereinafter "FAQs").  Compl. Exh. 4; Hearing Transcript at 26.  Page 5 of the FAQs provides an answer to the question, "May a student's gender identity be shared with the student's parents, other students, or members of the public?  It says,

> A transgender or gender nonconforming student may not express their gender identity openly in all contexts, including at home.  Revealing a student's gender identity or expression to others may compromise the student's safety.  Thus, preserving a student's privacy is of the utmost importance.  The right of transgender students to keep their transgender status private is grounded in California's antidiscrimination laws as well as federal and state laws.  Disclosing that a student is transgender without the student's permission may violate California's antidiscrimination law by increasing the student's vulnerability to harassment and may violate the student's right to privacy.

FAQs page 7 explains that if a student chooses to be addressed by a name or pronoun all school district personnel are required to use said chosen name/pronoun.  The student's age is not a factor, "as children as early as age two are expressing a different gender identity."

To this end, the state Department of Education's FAQs contemplate a sort of double set of books to be kept by a school district – specifically for transgender or gender nonconforming students.  For example, FAQs page 6 says, "it is strongly recommended that schools keep records that reflect a transgender student's birth name and assigned sex

(e.g., copy of the birth certificate) apart from the student's school records.  Schools should consider placing physical documents in a locked file cabinet in the principal's or nurse's office."  And at FAQs page 7, "[i]f the school district has not received documentation supporting a legal name or gender change, the school should nonetheless update all unofficial school records (e.g. attendance sheets, school IDs, report cards) to reflect the student's name and gender marker that is consistent with the student's gender identity."

The upshot of the Board of Education direction seems to be that once a student, whether in kindergarten, eighth grade, or somewhere in between, expresses a desire to be called by a new name or new pronouns, school faculty and staff are to refer to that student by the newly preferred indicators.  "Unofficial" school records such as attendance sheets, school IDs, and report cards are to be changed.  From that point forward, the student may go through each school day with the faculty and staff addressing the student in person and on records according to the changed moniker.

However, under the antidiscrimination policy, a teacher is not permitted to inform the parents of this change without the student's consent.  Classroom teachers who are in the best position to observe the student and forms the opinion that the intellectual or social health and well-being of the student may be at risk related to gender nonconformance or dysphoria, under the antidiscrimination policy, is not permitted to inform the parents without the student's consent.  Regarding gender confidentiality and nondisclosure, FAQs page 6 says, "schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family.  With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, *including not sharing that information with the student's parents*."  (Emphasis added.)

### A.  Medical Opinion

The government approach articulated in AR 5145.3 is dramatically inconsistent with respected medical opinions.  The plaintiffs in this case provide a declaration from an

expert in the field of children and adolescents dealing with gender-identity related issues. *See* Declaration of Dr. Erica E. Anderson, Dkt. 5-2.  Dr. Erica E. Anderson, is a well-credentialed clinical psychologist with forty years of experience.  As part of her clinical practice, Anderson has seen and supported hundreds of children and adolescents for gender-identity-related issues, many of which have transitioned socially, medically, or both, to a gender identity that differs from their natal sex.  *Id*. at ¶ 3.  Anderson describes herself as a transgender woman.  *Id*. at ¶ 5.  Anderson's testimony is summarized in the following excerpts:

"A child or adolescent who exhibits a desire to change name and pronouns should receive a careful professional assessment prior to transitioning;" "A request to change name and pronouns may be the first visible sign that the child or adolescent may be dealing with gender dysphoria or related coexisting mental-health issues;" "Parental involvement is necessary to obtain professional assistance for a child or adolescent experiencing gender incongruence, to provide accurate diagnosis, and to treat any gender dysphoria or other coexisting conditions;" "A school-facilitated transition without parental consent interferes with parents' ability to pursue a careful assessment and/or therapeutic approach prior to transitioning, prevents parents from making the decision about whether a transition will be best for their child, and creates unnecessary tension in the parent-child relationship.  Nor is facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts, in their best interests."  *Id*. at ¶ 8.

Anderson opines, "a social transition represents one of the most difficult psychological changes a person can experience.  [And] embarking upon a social transition based solely upon the self-attestation of the youth without consultation with parents and appropriate professionals is unwise."  *Id*. at ¶ 42.  Opining directly on the point of concern for the plaintiffs/teachers, Anderson says, "to place teachers in the position of accepting without question the preference of a minor and further direct such teachers to withhold the information from parents concerning their

minor children is hugely problematic." *Id*. at ¶ 43.  Anderson continues, "it can be appropriate for parents to say 'no' to a social transition (whether at school or elsewhere) to, among other things, allow time for assessment and exploration with the help of a mental health professional before making such a significant change.  Part of parents' job is to help their children avoid making bad decisions." *Id*. at ¶ 60.  Concerning medical standards, the World Professional Association for Transgender Health's ("WPATH") Standards of Care ("SOC") 7 and 8 recognize, "it is appropriate for parents to decide whether to 'allow' a social transition for their children.   Neither SOC 7 nor SOC 8 suggest that school personnel should decide whether a minor should socially transition, let alone doing so and hiding this information from parents." *Id.* at ¶ 60.

Parental involvement is not optional for correct medical diagnosis of gender incongruence.  After all, "Parents are often the only people who have frequently and regularly interacted with a child or adolescent throughout the child's or adolescent's entire life, and therefore they have a unique view of the child's development over time.  Indeed, parents often have more knowledge than even the child or adolescent does of whether their child or adolescent exhibited any signs of gender incongruence or gender dysphoria during the earliest years of life." *Id*. at ¶ 65.  Consequently, as Anderson explains, "parental involvement is a critical part of the diagnostic process to evaluate how long the child or adolescent has been experiencing gender incongruence, whether there might be any external cause of those feelings, and a prediction of how likely those feelings are to persist." *Id*. at ¶ 66.  Anderson continues,

> And, as WPATH notes, "a parent/caregiver report may provide critical context in situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social media influence on a young person's current self-gender concept."
> . . .
> Indeed, WPATH's SOC 8 recommends "involving parent(s) or primary caregiver(s) in the assessment process … in almost all

> situations," and adds that "including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available."

*Id*. at ¶¶ 68-69.  Concealing from a parent the fact of a student's transitioning at school is not in the best medical interests of a student, according to Anderson.  "By facilitating a social transition at school over the parents' objection, a school would drive a wedge between the parent and child.  Similarly, facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts, is not in their best interest." *Id*. at ¶¶ 77-78.  After all, "[c]ircumventing, bypassing, or excluding parents from decisions about a social transition undermines the main support structure for a child or adolescent who desperately needs support." *Id.* at ¶ 80.

Anderson's opinion regarding EUSD's confidentiality and parental exclusion policies is,

> contrary to widely accepted mental health principles and practice.  I am not aware of any professional body that would endorse EUSD's policies which envision adult personnel socially transitioning a child or adolescent without evaluation of mental health professionals and without the consent of parents or over their objection.
>
> Rather, when a child presents with a desire to use a new name or pronouns, the very first step should be a careful professional assessment by a mental health professional with expertise in child gender incongruence.  The first step should not be, as EUSD's policies provide, the immediate and unhesitating affirmation of the child's request without parental involvement or knowledge.

*Id*. at ¶¶ 82-83.  Anderson concludes,

> EUSD's policies are contrary to best practices regarding maintaining the relationship between parents and their children.  Best mental health practices abhor activity that drives a wedge between parents and children, creating distrust and tension.  In all cases, parental consent is required to provide medical and

23-cv-00768-BEN-WVG

> psychological treatment to minors.  In part, this is because the science of mental health recognizes that the best evidence regarding a minor's mental and emotional well-being comes from first-hand accounts by parents, rather than biased accounts from immature children.

*Id.* at ¶85.

To sum up, the plaintiffs correctly understand that the EUSD policy of confidentiality and non-disclosure to parents explicated by AR 5414.3 is not conducive to the health of their gender incongruent students.  Anderson's expert opinion is unrebutted.  As such, for purposes of a motion for preliminary injunction, it is entitled to substantial weight.

## B.  Youthful Impetuosity

Though it does not require the wisdom of a Supreme Court Justice to see, the Supreme Court recognizes that youth tend to make impetuous and ill-considered life decisions.  "First, as any parent knows and as the scientific and sociological studies . . . tend to confirm, 'a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citations omitted).  In the same vein, and perhaps especially true in the school setting, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure."  *Id.* And "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed."  *Id.* at 570 (citation omitted).  "Indeed, notes the Court, "the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."  *Id.*

## C.  Federal Constitutional Rights of Parents

Although the plaintiffs ultimately seek a declaration that EUSD's AR 5415.3 policy violates state law, a decision on that claim need not be made in order to grant

14

preliminary injunctive relief.  This is because the plaintiffs also correctly understand that EUSD's policies are in direct tension with the federal constitutional rights of parents to direct the upbringing and education of their children.  The interpretation of federal constitutional rights is plainly committed to both state and federal courts and is a subject upon which federal courts may decide legal questions with authority.  Indeed, it is the duty of federal courts to do so.

The United States Supreme Court has historically and repeatedly declared that parents have a right, grounded in the Constitution, to direct the education, health, and upbringing, and to maintain the well-being of, their children.  In *Troxel v. Granville*, 530 U.S. 57, 67-68 (2000), the Court remarked, "the custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture, and educate the child.  The parental right stems from the liberty protected by the Due Process Clause of the Fourteenth Amendment."  The Court commented that the principle, first formulated in *Myer* and *Pierce*, "long ha[s] been interpreted to have found in Fourteenth Amendment concepts of liberty an independent right of the parent in the 'custody, care and nurture of the child,' free from state intervention."

Beginning with *Myer v. Nebraska*, 262 U.S 390, 400 (1923), the Court said, "[t]he American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. . . . Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life."

In *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925), the Court acknowledged "the liberty of parents and guardians to direct the upbringing and education of children under their control," and said, "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

In *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), the Court pointed out that "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the

parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

In *Stanley v. Illinois*, 405 U.S. 645 (1972), the Court recounted that it "has frequently emphasized the importance of the family, and explained, "[t]he rights to conceive and to raise one's children have been deemed 'essential.'"

In *Parham v. J.R.*, 442 U.S. 584, 604 (1979), the Court declared, "[o]ur jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.  Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare their children for additional obligations.'" The Court continued, "[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id.* (citations omitted). "The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition." *Id.* at 603.  The *Parham* court recognized the parental right to be involved in -- and even override their child's opinion on -- the need for medical care or treatment.

> Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.  The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure.  Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment.  Parents can and must make those judgments.

*Parham*, 442 U.S. at 603-04 ("The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child.").

In *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), the Court recognized that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ."

In *Hodgson v. Minnesota*, 497 U.S 417, 447 (1990) (plurality), the Court said, "[a] natural parent who has demonstrated sufficient commitment to his or her children is thereafter entitled to raise the children free from undue state interference."

In *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007), the Court said, "it is not a novel proposition to say that parents have a recognized legal interest in the education and upbringing of their child."

These are not strange or novel notions. The United States Court of Appeals for the Ninth Circuit recently acknowledged, yet again, the continuing vitality of a parent's constitutionally protected interest in raising a child. In *David v. Kaulukukui*, 38 F.4th 792, 799 (2022), the court observed, "[t]he interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court. Our caselaw has long recognized this right for parents and children under the Fourth and Fourteenth Amendments." (citations omitted).

The constitutional right of parents to direct their child's education is further protected through Congressional policy, as exemplified by the Family Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR part 99). FERPA requires schools to provide parents the opportunity and the right to inspect and review their child's education records (34 CFR 99.10 - 99.12). FERPA speaks to the Congressional elevation of the importance of parents being involved in their child's education. That involvement includes more than academics and extends to matters of health. The privacy right of a child, according to FERPA, takes second place to his or her parents' right to know.

In the end, EUSD's policy of elevating a child's gender-related choices to that of paramount importance, while excluding a parent from knowing of, or participating in, that kind of choice, is as foreign to federal constitutional and statutory law as it is medically unwise.

### D.  State Law Right to Privacy

EUSD responds that the policy is required by state law.  AR 5145.3 is not a state statute.  Rather, the argument goes that AR 5145.3 gives meaning to a child's state right to privacy as applied to the school setting.  A state's highest court is the final arbiter of the meaning of state law and federal courts look to decisions of a state's highest court for binding interpretations.  *Hewitt v. Joyner*, 940 F.2d 1565 (9th Cir. 1995).  Where there are none, federal courts look to decisions from state appellate courts for guidance in predicting the decision of the state's highest court.  In *American Academy of Pediatrics v. Lungren*, 16 Cal.4th 307, 315 (1997), California's Supreme Court observed that the "requirement that medical care be provided to a minor only *with the consent of the minor's parent or guardian* remains the general rule, both in California and throughout the United States." (Emphasis added.)  It did note the existence of several statutory exceptions to the general rule (*i.e.*, "medical emancipation" statutes)[2] permitting minors to obtain specific types of medical services without a parent's consent, however gender transitioning is not among the exceptions.

Concerning the California's state constitutional right to privacy for minors and regulations like AR 5415.3, the state's highest court has not had occasion to issue a binding interpretation, and no state appellate court decisions have been identified. Whether a child's state law right to privacy includes a right of confidentiality from their own parents after the child has expressed a desire to be publicly (at school) known by a

---

[2] These are described as "statutes that authorize minors, without parental consent, to obtain medical care only for specific, designated conditions, without authorizing the minor to consent to medical care for other medical needs."  *Id*. at 316.

new name and referred to by new pronouns, seems unlikely.  After all, one element of a right to privacy is a reasonable expectation of privacy.  A student who announces the desire to be publicly known in school by a new name, gender, or pronoun and is referred to by teachers and students and others by said new name, gender, or pronoun, can hardly be said to have a reasonable expectation of privacy or expect non-disclosure.

While the Court is unaware of state appellate court decisions recognizing a child's right to quasi-privacy about their gender identity expressions, and none placing such a right above a parent's right to know, there are decisions describing parents' rights and obligations.  For example, in *Brekke v. Wills*, 125 Cal.App.4th 1400 (Cal. App. 2005), a California court of appeal made clear that a parent's rights are superior to a child's rights.  "We categorically reject the absurd suggestion that defendant's freedom of association trumps a parent's right to direct and control the activities of a minor child, including with whom the child may associate.  *Id*. at 1410 (citations omitted).  "The liberty interest ... of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by the United States Supreme Court."  *Id.* (quoting *Troxel*, 530 U.S. at 65).  *Brekke* continues, "[w]hether a child likes it or not, parents have broad authority over their minor children."  *Id.*  *Brekke* then lays out parents' obligations regarding children.  "Not only do parents have a constitutional right to exercise lawful control over the activities of their minor children, the law requires parents to do so."  *Id.* at 1410-11 (citing Cal. Penal Code, § 272, subd. (a)(1), (a)(2) [parents of a child "under the age of 18 years shall have the duty to exercise reasonable care, supervision, protection, and control over their minor child" so as not to "encourage" or "cause" the child to "become or to remain a person within the provisions of Section 300 [juvenile dependency], 601 [habitually disobedient or truant], or 602 [juvenile delinquency] of the Welfare and Institutions Code" and are subject to criminal punishment for a violation of that duty]; Ed.Code, §§ 48260.5, subds. (b), (c); 48293 [parents who fail to compel their child's attendance at school are subject to criminal prosecution]; *see also* Civ.Code, § 1714.1 [parents may be liable for the torts of their

minor child]; Gov.Code, § 38772, subd. (b) [parents are jointly and severally liable with their minor child for the child's defacement of property by graffiti]; Ed.Code, § 48904, subd. (a) [parents are liable for damages caused by the willful misconduct of their minor child in injuring or killing a pupil or school employee or volunteer, or in damaging property belonging to a school or school employee]; Pen.Code, § 490.5, subd. (b) [parents may be liable for petty theft committed by a minor child under their custody and control].)

Another California court of appeal made it clear that, in a similar Fourth Amendment context, a child's right to privacy and to object to a warrantless search of his room must give way to a parent's superior right to consent.  *See In re D.C.*, 188 Cal.App.4th 978 (Cal.App. 2010).  The appellate court wrote,

> [The minor] Appellant argues the officers' failure to honor his objection to their entry constituted a violation of his constitutional rights, noting minors are entitled to the protections of the Constitution and, in particular, the search and seizure provisions of the Fourth Amendment.  While there is no question minors are entitled to the protection of the Fourth Amendment, adults and minors are not necessarily entitled to the same degree of constitutional protection.

*Id.* at 989-90 (citations omitted).  *In re D.C.* explains why.  "To fulfill their duty of supervision, parents must be empowered to authorize police to search the family home, even over the objection of their minor children."  *Id.* at 990.  A child's right to privacy may be superior to other, unrelated individuals.  Nevertheless, California appellate courts recognize that parents have constitutional rights and legal responsibilities and that generally a parent's rights are superior to a right of privacy belonging to their child.[3]

---

[3] In the case of a child's home bedroom, where a child ordinarily has a high expectation of privacy as to others, parents have the stronger case to authorize a search over the child's objection.

> "When the child is a minor, there is an even stronger case for apparent authority in a parent to consent to the search of the

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

In their motion for preliminary injunction, plaintiffs claim their First Amendment rights to free speech and the free exercise of religion are being violated.  Tangentially, plaintiffs claim that the federal constitutional rights of parents of school district students are being violated.  As an initial impression, it would seem so.  However, no parents have joined as plaintiffs at this time.  Moreover, at least for purposes of their preliminary injunction motion, plaintiffs are not claiming to stand in the place of parents. Consequently, the issue is not resolved here.

### A.  Section 1983 liability

Local government units such as public school districts are included among those persons to whom 42 U.S.C. § 1983 applies.  "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."  *Id*. at 692; *cf. United States v. Town of Colo. City*, 935 F.3d 804, 808 (9th Cir. 2019) (same).

### B.  Freedom Speech Clause

Plaintiffs first claim for relief asserts that EUSD's policy conflicts with their own constitutional right to freedom of speech.  They argue that their right to speak freely on

---

child's bedroom.  Unlike the parents of adult children, the parents of minor children have legal rights and obligations that both permit and, in essence, require them to exercise common authority over their child's bedroom…  Most fundamentally, parents have the "responsibility" to support their minor children (Fam. Code, § 3900) and must "exercise reasonable care, supervision, protection, and control" over their conduct."

*In re D.C.,* 188 Cal.App.4th at 984 (quoting *Brekke*, 125 Cal.App.4th at 1410).

matters of public concern do not end at the schoolhouse door and that the policy forces them to adhere to an ideological orthodoxy (with which they directly disagree), as a condition of their employment.  *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969).

It is clear from the supporting documents that plaintiffs have a direct disagreement with the policy.  However, the argument that they may speak freely on matters of curricular speech is foreclosed by *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011).  *Johnson* considered the speech of a high school math teacher whose expression took the form of posters about history on his classroom walls.  There, the court "recognize[d] that 'expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary.'"  *Id*. at 967.  "Certainly, Johnson did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee," according to *Johnson*.  *Id.*  The court explained that because the speech was that of a school teacher, the speech belonged not to the teacher, but to the school district.  "Because the speech at issue owes its existence to Johnson's position as a teacher, Poway acted well within constitutional limits in ordering Johnson not to speak in a manner it did not desire."  *Id.* at 970.  *Johnson* concluded, "[a]ll the speech of which Johnson complains belongs to the government, and the government has the right to 'speak for itself.'  When it does, 'it is entitled to say what it wishes,' 'and to select the views that it wants to express.'"  *Id.* at 975.

Here, like *Johnson,* the plaintiffs are public school government teachers.  The plaintiffs are not asserting that they are simply acting ad hoc as citizens when they go to school and teach class, take attendance, supervise students, or regulate their comings-and-goings, as employees.  These activities are part of their employee duties.  Included among their duties as teachers is the duty to communicate with a student's parents from time to time about the student's school performance.  It is difficult to say that their speech during the school day as teachers is their own and not the school district's during the regular

course of their employment duties.  Consequently, at least where the teachers' compelled speech takes place during the school day on curricular matters in carrying out the duties of their positions, *Johnson* appears to foreclose a freedom of speech claim.[4]

The teachers could make out a freedom of speech claim if they are compelled to speak in accordance with the school policy in casual, non-school contexts.  Here, neither plaintiff has said that they have been conversing with parents in casual, non-school settings where the AR 5145.3 policy stifled their speech.  The teachers could also make out a freedom of speech claim if the policy compels them to violate the law or deliberately convey an illegal message.  Here, the plaintiffs' come closest to making out a successful freedom of speech claim on the merits.  This is because the policy of AR 5145.3, as presented to faculty, and EUSD's response to the plaintiffs' request for accommodations, appears to demand that these teachers communicate misrepresentations to parents about the names and pronouns adopted by their students.  As discussed above, that would *likely* be unlawful and in derogation of the constitutional rights of parents.  The merits of the first claim for relief for violation of the Free Speech Clause can be decided later, however, because the teachers' second and third claims for relief are sufficiently clear to be entitled to preliminary injunctive relief.

## C. Free Exercise Clause

The plaintiffs' second and third claims for relief assert that EUSD's policy requiring non-disclosure (or parental exclusion) violates their right to the free exercise of religion as guaranteed by the First Amendment.  Both Mirabelli and West hold sincere religious beliefs.  Their beliefs are well-articulated, integrated, and comprehensive.  Their beliefs are better described and developed than mentioned in the limited space here.  In

---

[4] Plaintiffs argue that *Johnson* is no longer controlling law, citing to *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) and *Oyama v. University of Hawaii*, 813 F.3d 850 (9th Cir. 2015).  However, these cases address issues of "academic freedom" in the post-secondary education context, which the Court is not convinced apply in this instance.

short, Mirabelli believes that the relationship between parents and children is an inherently sacred and life-long bond, ordained by God, in which the parents have the ultimate right and responsibility to care for and guide their children.  Compl. at 257.  In a similar vein, West believes that the relationship between parents and their child is created by God with the intent that the parents have the ultimate responsibility to raise and guide their child.  Both Mirabelli and West believe that God forbids lying and deceit.  Compl. at 269-70.

EUSD preliminarily argues that AR 5145.3 does not infringe on plaintiffs' religious beliefs at all because the policy does not require plaintiffs to "lie" to parents.  But that cannot be fairly said when the policy requires plaintiffs to conceal from parents, by misdirection and substitution, accurate information about their child's use of a new name, gender, or pronouns at school.  It is one thing if the policy merely delegated the task of talking with parents about a student's gender incongruence to dedicated, trained personnel.  It is quite another to require teachers to withhold this information with the knowledge that the information will be *impossible for the parents to obtain* from the school.  It is that aspect which infringes on the plaintiffs' free exercise of their religious beliefs.  *See* Hearing Transcript, at 100.

"The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion.'"  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021); C*hurch of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993) (same).  "Nor may the government 'act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.'"  *Fellowship of Christian Athletes,* 2023 WL 5946036, at *38 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018)).  To avoid violating the Constitution, "the government must demonstrate that 'a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests.'"  *Id*. (quoting *Lukumi*, 508 U.S. at 546).  And while "religious beliefs need not be

acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection,"[5] in this case Mirabelli's and West's beliefs are logical, acceptable, consistent, and align with federal constitutional principles, state law, and EUSD policies BP 4119.21(9) (required honesty) and BP 0100(7) (right to parental involvement).

"Distilled, Supreme Court authority sets forth three bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny.  First, a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions.'  Second, the government may not 'treat . . . comparable secular activity more favorably than religious exercise.'  Third, the government may not act in a manner 'hostile to . . . religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle departures from neutrality.'  The failure to meet any one of these requirements subjects a governmental regulation to review under strict scrutiny." *Fellowship of Christian Athletes*, 2023 WL 5946036, at *40-41 (citations omitted).

Under the First Amendment, a plaintiff makes out her case if she shows "that a government entity has burdened her sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022) (quoting *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022)). General applicability requires, among other things, that the laws be enforced in an evenhanded manner.  *Id.* (citations omitted).  "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'  Failing either the neutrality or

---

[5] *Fulton,* 141 S. Ct. at 1876 (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 714 (1981)).

general applicability test is sufficient to trigger strict scrutiny." *Kennedy,* 142 S. Ct. at 2422 (citations omitted).

        1.  <u>General Applicability</u>.

   "A law is not generally applicable if it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (citations omitted). Moreover, "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given." *Id.* at 1879 (citations omitted). That is so because such a policy "'invites' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id*.

   *Categorical exemptions*. EUSD argues the policy is generally applicable because it provided training on the policy to all staff – not just to teachers. However, this does not appear to be wholly accurate. EUSD cites the declaration of its trainer, Tracy Schmidt. EUSD Oppo. Dkt 16 at 16. But Schmidt declares that she trained all certificated staff in January 2018 and classified staff in June 2018. *See* Declaration of Schmidt, Dkt 16-1 at ¶2. Yet, AR 5145.3 was adopted two years later (in 2020), and the first training on AR 5145.3 specifically took place in 2022. To date, the only evidence presented supports the teachers claim: that training regarding AR 5145.3 was limited to full-time teachers. Evidence is lacking showing the policy is being applied to instructional aides, substitute teachers, office staff, or non-teaching administrators.

   *Discretionary exemption*. EUSD next asserts that the policy is generally applicable because the only exceptions in the policy are "exceptions to discipline" for teachers who violate the policy. EUSD Oppo at 17. Not only is potential disciplinary action exactly the harm plaintiffs seek to prevent, but this argument tends to prove the plaintiffs' point. Under the policy, communications to parents are deemed discrimination/harassment when EUSD decides that the parent lacks a legitimate need for the information. There are no standards written in the policy for determining what is a "legitimate need[,]" only that it requires a case-by-case decision. This means whether disciplinary action is taken

by EUSD depends on an undefined *ad hoc* determination of whether the parent receiving gender-related information has a legitimate reason to be informed.  This is the very definition of a discretionary exemption.  "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877.  "Properly interpreted, *Fulton* counsels that the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Fellowship of Christian Athletes*, 2023 WL 5946036, at *43 (citation omitted).

> 2.  Scrutiny.

The reasons proffered by the defendants for the policy pass neither the strict scrutiny nor the rational basis tests.  "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546.

EUSD contends that the government purpose of protecting gender diverse students from (an undefined) harm is a compelling governmental interest and the policy of non-disclosure to parents is narrowly tailored.  EUSD Oppo at 17.  This argument is unconvincing.  First, both the Ninth Circuit and the Supreme Court have found overly broad formulations of compelling government interests unavailing.  *See Green v. Miss United States of Am., LLC*, 52 F.4th 773, 791-92 (9th Cir. 2022) (citation omitted) (identifying the issue as "not whether [the government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [plaintiff].")  Second, keeping parents uninformed and unaware of significant events that beg for medical and psychological experts to evaluate a child, like hiding a gym student's soccer concussion, is precisely the type of inaction that is likely to cause greater harm and is not narrowly tailored.

The record includes an instance where a substitute teacher, unaware of a student's preferred name, referred to the student by the student's official name, which was met

with laughter by the class.  One would think that a teacher would want to inform the parents about such an event.  If the child really does have gender incongruence, then being the subject of laughter and potential ridicule could have profound effects.  If informed, the parents could do something, whether it be arranging counseling or holding at home discussions.  On the other hand, if the child is acting to amuse himself or herself, or others, or to be disruptive and discourteous, the parents could also do something to approach the problem.  Either way, ignoring the issue or concealing it within the school universe disregards plaintiffs' right to free exercise in particular, and parents' constitutional rights in general.  Ignoring a problem is seldom an appropriate solution.

EUSD has at best articulated an overly broad state interest, as applied to these plaintiffs.  EUSD has not demonstrated a narrowly tailored policy, tailored so as not to unnecessarily impinge on the plaintiffs' free exercise rights.  EUSD's blanket prohibition on the plaintiffs' (and any EUSD employee's) accurate communications, in all instances, with all parents, of all of their assigned students, does not fit the notion of narrow tailoring.  EUSD has not offered any showing that it has genuinely considered less restrictive measures than those implemented here, although plaintiffs offered at least  six different potential accommodations.  As such, EUSD's policy as applied to the plaintiffs fails at least the tailoring prong of the strict scrutiny test.  *Cf. Fellowship of Christian Athletes*, 2023 WL 5946036, at *56.

In the end, Mirabelli and West face an unlawful choice along the lines of: "lose your faith and keep your job, or keep your faith and lose your job."  *Cf. Keene v. City & Cnty. of San Francisco*, U.S. App. LEXIS 11807, *6 (9th Cir. May 15, 2023).  Yet, "[r]espect for religious expressions is indispensable to life in a free and diverse Republic."  *Kennedy*, 142 S. Ct. at 2432-33.  The only meaningful justification the District offers for its insistence that the plaintiffs not reveal to parents gender information about their own children rests on a mistaken view that the District bears a duty to place a child's right to privacy above, and in derogation of, the rights of a child's parents.  The Constitution neither mandates nor tolerates that kind of discrimination.  The plaintiffs

1  have demonstrated a strong likelihood of success on the merits for their free exercise

2  claim against EUSD.

3       In their opposition briefing, the state defendants do not argue the merits of

4  plaintiffs' First Amendment claims for relief.  Instead, the state defendants argue the

5  plaintiffs lack Article III standing and that state defendants enjoy Eleventh Amendment

6  immunity.  These are addressed *infra* in the discussion on the motions to dismiss.

### D. Remaining *Winter* Factors

8       The plaintiffs have succeeded in demonstrating a likelihood of success on the

9  merits, which is the first and most important factor for awarding a preliminary injunction.

10  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

11  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

12  that the balance of equities tips in his favor, and that an injunction is in the public

13  interest." *Winter*, 555 U.S. at 20.  The remaining factors easily tip towards the plaintiffs,

14  as well.

15       "[A] finding that the plaintiff is likely to succeed on the merits of [a constitutional]

16  claim sharply tilts in the plaintiff's favor both the irreparable harm factor and the merged

17  public interest and balance of harms factors."  *Baird v. Bonta*, 2023 U.S. App. LEXIS

18  23760, *15 (citations omitted).  It is black letter law that the deprivation of constitutional

19  rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

20  (1976); *see also Fellowship of Christian Athletes*, 2023 WL 5946036, at *56 (describing

21  the principle as "axiomatic").  Moreover, "'irreparable harm is relatively easy to establish

22  in a First Amendment case' because the party seeking the injunction 'need only

23  demonstrate the existence of a colorable First Amendment claim.'" *Id*. (citation omitted).

24  Plaintiffs have accomplished that in this case.  Under 42 U.S.C. § 1983, the plaintiffs may

25  be entitled to an award of money damages for past mental anguish, cancellation of

26  summer teaching contracts, and constitutional damages, after proof at trial.  These are

27  reparable harms.  However, without an injunction, it is certain that plaintiffs will continue

28  to suffer present and future irreparable constitutional harm due to the existence of the

state and EUSD policies and the fact that plaintiffs have involuntarily been placed on administrative leave from their teaching positions.

When the nonmovant is the government, the last two *Winter* factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Fellowship of Christian Athletes*, 2023 WL 5946036, at *57 ("Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest— "merge.").  Here, the balance of the equities favor issuance of a preliminary injunction as the defendants have not established that they will be harmed if an injunction preserving the status quo ante stands while further proceedings take place for a final judgment on the merits.  Finally, the public interest is always furthered by enjoining unconstitutional policies.  *Riley's Am. Heritage Farms v. Elsasser,* 32 F.4th 707, 731 (9th Cir. 2022) ("it is always in the public interest to prevent the violation of a party's constitutional rights.").

## V.  MOTIONS TO DISMISS[6]

Both groups of defendants move to dismiss the Complaint.

### A.  *State Defendants*

In their motion to dismiss and opposition to plaintiffs' motion for preliminary injunction, the state defendants do not argue the merits of AR 5145.3.  Instead, the state defendants argue the plaintiffs lack Article III standing and that state defendants enjoy Eleventh Amendment immunity.  The briefing makes fair arguments.  However, statements at the hearing and subsequent litigation by the state against another school district seriously undercut their arguments.

The state defendants argue that plaintiffs lack standing because the FAQs page at issue does not directly affect the plaintiffs.  Counsel for EUSD at the hearing, in contrast, twice said that EUSD adopted AR 5145.3 precisely because of the state's FAQs page.

---

[6] For purposes of a motion to dismiss, the Court assumes the facts pled in the complaint are true.  *Mazarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

First, at the outset of the hearing counsel was asked, "Is the school district's position that this rule that you've adopted that says that parents are not entitled to notice, that that rule is mandated by the state?"  Counsel responded, "Yes, we are taking that position." Hearing Transcript at 3.  Later, a similar question was asked and the same answer was given.  "The Court: Okay.  So to cut to the chase, you're telling me that this rule exists because the state is telling the school board that they must do this; am I correct?  EUSD Attorney: Yes, your honor."  Hearing Transcript at 37.

The state defendants maintain that the State Board of Education FAQs publication is not a state law but only attempts to describe state law.  EUSD, on the other hand, considers itself bound by the statements in the FAQs publication as a matter of law. Suggesting that EUSD is correct in its characterization, the Attorney General for the State of California recently relied on the FAQs publication in suing a school district for violating state law.

The Attorney General filed a lawsuit against another California public school district and obtained a temporary restraining order stopping school employees from disclosing gender identification information to the parents of students.  *See People v. Chino Valley Unified School Dist*., San Bernardino Superior Court Case No. CIV SB 2317301 (filed Aug. 28, 2023).  In its Complaint, the Attorney General asserts that the school district is violating state law by adopting a policy of notifying parents whenever a student requests to be identified as a gender other than the student's biological sex or gender listed on a birth certificate.  Complaint, ¶67.  As part of the Complaint filed against the Chino Valley Unified School District, the Attorney General specifically refers to the same FAQs publication identified in this proceeding.  The Complaint asserts, "the California Department of Education has issued statewide guidance since at least 2014, generally recommending that school officials and staff members not 'out' student to their parents or guardians against the student's wishes.  (Cal. Dept. of Ed., Frequently Asked Questions, https;//www.cde.ca.gov/re/di/eo/faqs.asp.)."  Complaint, ¶ 37 (emphasis added).

1    The state Board of Education, the state Department of Education, the
2    Superintendent of Public Instruction and the Attorney General are all arms of the State of
3    California.  The state defendants do not argue otherwise.  They agree that "[i]n
4    California, the 'State' includes state offices, officers, departments, boards and agencies."
5    *See* State-Level Defendants Mot., Dkt. 25 at 9 (citing Cal. Govt. Code § 900.6).  The
6    attorney for EUSD asserts that the District is compelled by the State to adopt and enforce
7    AR 5145.3 based on the State's FAQs page.  The Attorney General, another arm of the
8    state, is currently suing another school district for not following the State's FAQs page
9    and its rationale.  With no evidence to the contrary at this point, it must be concluded that
10   the State is the driving force behind EUSD's alleged violations of plaintiffs'
11   constitutional rights.  If the plaintiffs succeed in proving their case, a permanent
12   injunction against the state defendants will be necessary to accord full relief.  Therefore,
13   plaintiffs have Article III standing.

14   The state defendants also assert that they enjoy Eleventh Amendment immunity
15   from suit.  Insofar as the defendants are sued in their official capacities they are treated as
16   arms of the State of California, and because the state has not waived its immunity from
17   suit, the state defendants are correct.  However, to the extent that plaintiffs seek only
18   prospective injunctive relief to remedy an ongoing violation of federal or constitutional
19   law, there is no immunity.  *See Ex parte Young*, 209 U. S. 123, 159-160 (1908).

20   Here, the state defendants named are not arbitrarily chosen governmental officers
21   with only general responsibilities but are the officers and board members responsible for
22   and empowered to change state education policy.  "A plaintiff seeking injunctive relief in
23   a § 1983 action against the government 'is not required to allege a named official's
24   personal involvement in the acts or omissions constituting the alleged constitutional
25   violation.'  Instead, 'a plaintiff need only identify the law or policy challenged as a
26   constitutional violation and name the official within the entity who can appropriately
27   respond to injunctive relief.'"  *Riley's Am. Heritage Farms*, 32 F.4th at 732 (citation
28   omitted).  Therefore, the *Ex parte Young* exception applies and the motion to dismiss on

the basis of Eleventh Amendment immunity is denied. *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2197 (2022) ("So usually a plaintiff will sue the individual state officials most responsible for enforcing the law in question and seek injunctive or declaratory relief against them." (citation omitted)); *Pennhurst State School & Hospital v. Halderman,* 456 U.S. 265, 275 (1986).

## B. *Escondido Union School District Defendants*

The EUSD defendants also move to dismiss for failure to state a claim. Additionally, they seek qualified immunity. Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) may occur where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable, plausible claim. In contrast, a complaint may survive a motion to dismiss if, taking all well pled factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The EUSD defendants repeat their arguments regarding the merits from the preliminary injunction briefing, claiming that EUSD's policies are consistent with state and federal law. As a preliminary matter, that is not wholly accurate, but the question is to be fully and finally determined later in the case. These are issues of law and fact that are to be decided later on a fuller record. The claims as articulated in the Complaint, at the time the Complaint was filed, describe plausible claims of violations of constitutional rights of free speech and free exercise sufficient to merit further proceedings. There is a sufficient question to raise plausible claims for relief and permit the claims to proceed. *See* generally discussion on likelihood of success on the merits, *supra*. The EUSD defendants will have the opportunity to assert their defenses more forcefully and completely on summary judgment or at trial. However, at this juncture, the motion to dismiss for failure to state a claim is denied.

Finally, the EUSD defendants ask for a ruling that they are entitled to qualified immunity. Certainly, "a plaintiff seeking injunctive relief for an ongoing First

Amendment violation (e.g., a retaliatory policy) may sue individual board members of a public school system in their official capacities to correct the violation." *Riley's Am. Heritage Farms*, 32 F.4th at 732.  The EUSD defendants posit that "[t]here is no possibility that the school employees could have known that complying with their employer's policy could have violated the Plaintiffs' right to free speech or religion." *See* School Employee Defendants' Mot., Dkt 17 at 18-19.  There is no evidence presented with the motion to support this factual assertion.  The EUSD defendants, or some of them, may be entitled to qualified immunity after a motion for summary judgment or a trial on the merits.  Without testimony on a full record, however, qualified immunity in this case is unwarranted.  Therefore, the motion to dismiss and for qualified immunity is denied.

### C. *Objections to judicial notice of miscellaneous documents*

All parties make objections to miscellaneous documents attached to, or made supplements to, their pleadings.  The objections are overruled.

## VI. CONCLUSION

A request to change one's own name and pronouns may be the first visible sign that a child or adolescent may be dealing with issues that could lead to gender dysphoria or related coexisting mental-health issues.  Communicating to a parent the social transition of a school student to a new gender — by using preferred pronouns and non-conforming dress — is called discrimination/harassment by the defendants, despite having little medical or factual connection to actual discrimination or harassment.  Plaintiffs Elizabeth Mirabelli and Lori Ann West have represented in their pleadings that they are committed to treating all transgender or gender diverse children with kindness, respect, and love.  They are entitled to preliminary injunctive relief from what the defendants are requiring them to do here, which is to subjugate their sincerely-held religious beliefs that parents of schoolchildren have a God-ordained right to know of significant gender identity-related events.  There are, no doubt, some teachers that have

no disagreement with AR 5145.3.  This injunction does no violence to their constitutional rights.

Parental involvement in essential to the healthy maturation of schoolchildren. The Escondido Union School District has adopted a policy without parent input that places a communication barrier between parents and teachers.  Some parents who do not want such barriers may have the wherewithal to place their children in private schools or homeschool, or to move to a different public school district.  Families in middle or lower socio-economic circumstances have no such options.  For these parents, the new policy appears to undermine their own constitutional rights while it conflicts with knowledgeable medical opinion.  An order enjoining the new district policy is in the better interests of the entire community, as well as the plaintiff teachers.

The school's policy is a trifecta of harm: it harms the child who needs parental guidance and possibly mental health intervention to determine if the incongruence is organic or whether it is the result of bullying, peer pressure, or a fleeting impulse.  It harms the parents by depriving them of the long recognized Fourteenth Amendment right to care, guide, and make health care decisions for their children.  And finally, it harms plaintiffs who are compelled to violate the parent's rights by forcing plaintiffs to conceal information they feel is critical for the welfare of their students -- violating plaintiffs' religious beliefs.

**THEREFORE, IT IS ORDERED THAT:**

1. The Plaintiffs' Motion for Preliminary Injunction is GRANTED.  The Escondido Union School District Defendants, the State Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, and those who gain knowledge of this injunction order, or know of the existence of this injunction order, are enjoined from enforcing against Plaintiffs Mirabelli or West, EUSD AR 5145.3 or the associated official policy described in the California Department of Education's FAQs page on gender identity-related disclosures

by teachers to parents, and are to restrain any governmental employee or entity from taking any adverse employment actions thereupon against Plaintiffs Mirabelli or West, until further Order of this Court.

2. The EUSD Defendants' Motion to Dismiss is DENIED (Dkt Nos. 7 & 17).

3. The State-Level Defendants' Motion to Dismiss is DENIED  (Dkt No. 25).

**IT IS SO ORDERED.**

Dated: September 14, 2023

**HON. ROGER T. BENITEZ**
United States District Judge