# United States Court of Appeals
## For the First Circuit

No. 23-1069

STEPHEN FOOTE, individually and as Guardian and next friend of
B.F. and G.F., minors; MARISSA SILVESTRI, individually and as
Guardian and next friend of B.F. and G.F., minors,

Plaintiffs, Appellants,

JONATHAN FELICIANO; SANDRA SALMERON,

Plaintiffs,

v.

LUDLOW SCHOOL COMMITTEE; TODD GAZDA, former Superintendent; LISA
NEMETH, Interim Superintendent; STACY MONETTE, Principal, Baird
Middle School; MARIE-CLAIRE FOLEY, school counselor, Baird
Middle School; JORDAN FUNKE, former librarian, Baird Middle
School; TOWN OF LUDLOW,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Montecalvo, Thompson, and Rikelman,
Circuit Judges.*

---

* Judge Lipez heard oral argument in this matter, but
thereafter recused. He did not participate in the issuance of the
panel's opinion in this case. Judge Montecalvo was substituted
for Judge Lipez on the panel pursuant to Internal Operating
Procedure VII(D)(4) by order dated August 26, 2024.

Mary E. McAlister, with whom Vernadette R. Broyles, Child & Parental Rights Campaign, Inc., Andrew Beckwith, Samuel J. Whiting, and Massachusetts Family Institute were on brief, for appellants.

David S. Lawless, with whom Nancy Frankel Pelletier and Robinson Donovan, P.C. were on brief, for appellees.

Ilya Shapiro and Manhattan Institute on brief for amici curiae Manhattan Institute and Dr. Leor Sapir.

Adam C. Shelton and Goldwater Institute on brief for amicus curiae Goldwater Institute.

William A. Estrada and Parental Rights Foundation on brief for amicus curiae Parental Rights Foundation.

Steven W. Fitschen and National Legal Foundation on brief for amici curiae The Family Foundation; Illinois Family Institute; Concerned Women for America; National Legal Foundation; and Pacific Justice Institute.

Gene C. Schaerr, Annika Boone Barkdull, Schaerr Jaffe LLP, Jennifer C. Braceras, and Independent Women's Law Center on brief for amicus curiae Independent Women's Law Center.

Katherine L. Anderson, David A. Cortman, Vincent M. Wagner, Tina Seideman, and Alliance Defending Freedom on brief for amicus curiae Alliance Defending Freedom.

J. Marc Wheat and Advancing American Freedom, Inc. on brief for amici curiae Advancing American Freedom, Inc.; Able Americans; American Cornerstone Institute; American Principles Project; American Values; Center for Political Renewal; Center for Urban Renewal And Education; Christians Engaged; Citizens United; Citizens United Foundation; Coalition for Jewish Values; Committee for Justice; Common Sense Club; Dr. James Dobson Family Institute; Eagle Forum; Faith and Freedom Coalition; Family Institute of Connecticut; Missouri Center-Right Coalition; My Faith Votes; National Association of Parents; National Center for Public Policy Research; National Religious Broadcasters; New Jersey Family Policy Center; Project 21; Religious Freedom Institute; Russell Kirk Center for Cultural Renewal; Tea Party Patriots Action, Inc.; The Family Foundation; The Justice Foundation; and Young America's Foundation.

Luke N. Berg and Wisconsin Institute for Law & Liberty on brief for amicus curiae Dr. Erica E. Anderson, Ph.D.

Gary M. Lawkowski and Dhillon Law Group, Inc. on brief for amicus curiae Center for American Liberty.

Austin Knudsen, Montana Attorney General, Christian B. Corrigan, Montana Solicitor General, and Peter M. Torstensen, Jr., Assistant Solicitor General, on brief for amici curiae State of Montana and 18 Other States.

Jeffrey M. Gutkin, Reece Trevor, Maureen P. Alger, Cooley LLP, Karen L. Loewy, Paul D. Castillo, and Lambda Legal Defense and Education Fund, Inc. on brief for amici curiae PFLAG, Inc.; Massachusetts Commission on LGBTQ Youth; Fenway Community Health Center, Inc.; The Trevor Project; Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth; Equality Maine; Girls Inc. of the Valley; Massachusetts Transgender Political Coalition; North Shore Alliance of Gay, Lesbian, Bisexual, and Transgender Youth, Inc.; OUT Maine; Out Now; Seacoast Outright; Thundermist Health Center; and We Thrive LGBTQ Community Center of Cape Cod and the Islands of Martha's Vineyard and Nantucket.

Jon W. Davidson, Harper S. Seldin, American Civil Liberties Union Foundation, Ruth A. Bourquin, Mary F. Brown, Alexandra Arnold, and American Civil Liberties Union Foundation of Massachusetts, Inc. on brief for amici curiae American Civil Liberties Union and American Civil Liberties Union of Massachusetts, Inc.

Mary L. Bonauto, Gary D. Buseck, Bennett H. Klein, Chris Erchull, and GLBTQ Legal Advocates & Defenders on brief for amicus curiae Massachusetts Association of School Superintendents.

Shannon Minter, National Center for Lesbian Rights, Arielle B. Kristan, Elizabeth E. Monnin-Browder, and Hirsch Roberts Weinstein LLP on brief for amici curiae Professors of Psychology & Human Development.

Andrea Joy Campbell, Attorney General of Massachusetts, Adam M. Cambier, Assistant Attorney General, and Cassandra J. Thomson, Assistant Attorney General, on brief for amici curiae Massachusetts; California; Colorado; Connecticut; the District of Columbia; Hawai'i; Illinois; Maine; Maryland; Minnesota; New Jersey; New York; Oregon; Rhode Island; Vermont; and Washington.

---

February 18, 2025

---

**PER CURIAM**.  Courts nationwide have faced all manner of important litigation involving matters of gender identity and gender expression, including use of folks' preferred pronouns. Today's case falls under that broad header.  More specifically, it presents for our review challenging issues arising from the Ludlow School Committee's protocol ("the Protocol") requiring its staff to use a student's requested name and gender pronouns within the school without notifying the parents of those requests unless that student consents.  Our appellants are the parents ("the Parents") of a Ludlow student who chose -- at school but not at home -- to go by a different name and to use different pronouns than those given to them at birth.[1]  The Parents assert that Ludlow's practice of accommodating and concealing their child's requested name and pronouns while at school interferes with their parental rights as guaranteed by the United States Constitution.[2]  Ludlow counters that its Protocol is appropriate and necessary to ensure a safe and inclusive school learning environment for students.

In this litigation, the competing concerns of the Parents and Ludlow raise heretofore unanswered questions about the

---

[1] Our opinion uses gender-neutral "they/them" pronouns to refer to the Student.

[2] The defendants include the Ludlow School Committee, the Ludlow Superintendent, various Ludlow educators, as well as the Town of Ludlow.  For clarity, we refer to the defendants collectively, where appropriate, as "Ludlow."

scope of parental rights protected by the Due Process Clause of the Fourteenth Amendment.  But when all is said and done, we, like the district court, conclude that the Parents have failed to state a plausible claim that Ludlow's implementation of the Protocol as applied to their family violated their fundamental right to direct the upbringing of their child.

## I.  BACKGROUND

As usual, our appellate work begins with an overview of the facts that give rise to the issues now before us.  As we jut through that procedural landscape, our recitation assumes the truth of all well-pled allegations in the complaint and draws all reasonable inferences in the Parents' favor.  See Zell v. Ricci, 957 F.3d 1, 4 (1st Cir. 2020).

### A.  Student Experience at Baird Middle School

Baird Middle School is a public school in Ludlow, Massachusetts.  Early in the 2020-21 school year, sixth-grade students at Baird, including eleven-year-old B.F. ("the Student"), were given an assignment by the school's librarian to create biographic videos about themselves.  According to the Parents' complaint, the librarian, Jordan Funke, encouraged students to include their pronouns in their videos.  The Parents' complaint does not state how the Student, designated the female sex at birth, responded to this school assignment.  But in the months that followed the assignment, the Student's school Google account

started receiving "unsolicited LGBTQ-themed video suggestions" on their school-issued computer.  After watching these clips, the Student began questioning whether they "might be attracted to girls" and whether they "ha[d] 'gender identity' issues."

By December 2020, the Student sought out their teacher, Bonnie Manchester, to have a meeting to discuss some personal issues.  At that meeting, the Student indicated they were depressed and struggling with insecurity, low self-esteem, poor self-image, and a perceived lack of popularity.  The Student told Manchester they needed help, but they were unsure of how to ask their parents about getting that help.  Manchester offered to call the Student's parents and -- after reviewing the Student's situation with other teachers during a school planning meeting and hearing other teachers agree that the Student seemed depressed -- Manchester contacted the Parents.

Manchester told the Student's mother, appellant Marissa Silvestri, that the Student felt depressed, was experiencing self-image issues, and may have been attracted to members of the same sex.  Silvestri "was grateful" Manchester reached out "so that [Silvestri] and" the Student's father, appellant Stephen Foote, "could address [the Student's] mental health issues" themselves. To that end, Silvestri sent the following email in December 2020 to Baird's principal, Stacy Monette; the then-Superintendent of

Ludlow Public Schools, Todd Gazda; members of the Ludlow School Committee; and all the Student's teachers:

> It has been brought to the attention of both Stephen and myself that some of [the Student's] teachers are concerned with her mental health. I appreciate your concern and would like to let you know that her father and I will be getting her the professional help she needs at this time. With that being said, we request that you do not have any private conversations with [the Student] in regards to this matter. Please allow us to address this as a family and with the proper professionals.

Unbeknownst to the Parents, in a February 28, 2021 email sent to Baird's teachers and the school's counselor, Marie-Claire Foley, and to Superintendent Gazda, the Student announced, "I am genderqueer." According to the Student's email declaration, that meant that the Student would "use any pronouns (other than it/its)," and it also meant the Student preferenced a name change -- they asked to go by the name "R***" instead of "B***". Upon receipt of the email and after meeting privately with the Student, Counselor Foley learned that the Student was still in the process of explaining these identity developments to their parents. Consistent with the Student's request, Foley directed Baird staff to use the name "B***" and she/her pronouns when communicating with the Student's parents, but during school times, to address the Student as "R***".

Following this directive, some teachers immediately started referring to the Student as "R***" and changed nametags accordingly. Funke, the school librarian, spoke with the Student

one-on-one about gender identity and provided the Student with LGBTQ-related resources. And Counselor Foley told the Student that they could choose which bathroom to use -- boys', girls', or the gender-neutral facilities at the school.[3]

### B. DESE Guidance and the Protocol

This is where Ludlow's Protocol comes into play. To explain it and its implementation, though, it behooves us to interrupt our narrative in order to provide the gentle reader with some important background on how the Protocol came to be.

In 2012, the Commonwealth's Department of Elementary and Secondary Education ("DESE") issued a non-binding guidance document regarding gender-identity issues ("DESE Guidance").[4] The DESE Guidance was published to help school districts comply with Massachusetts's then newly enacted statutory prohibition against

---

[3] The Student's twelve-year-old sibling attended Baird Middle School at the same time as the Student. Around the same time as the above-described events were playing out, the Student's sibling also started using a name and pronouns differing from those provided to the sibling at birth. Though the Parents allege that Ludlow applied the Protocol with respect to both of their children, the operative complaint provides scant relevant details specific to the Student's sibling. We therefore conclude that a claim was not stated for the Student's sibling and focus our coming analysis solely on the Protocol as applied to the Student.

[4] A pause here to note that the Parents' complaint quotes portions of the DESE Guidance. We may take judicial notice of other parts of the document. See, e.g., Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of relevant facts provided on a government website that were "not subject to reasonable dispute").

discrimination based on gender identity in public schools.  See Mass. Gen. Laws ch. 76, § 5 (effective July 1, 2012).[5]  The Guidance contains policy suggestions for schools navigating issues related to gender discrimination.  For example, when a student consistently asserts a particular gender identity, the DESE Guidance recommends that the school accept that student's stated gender.  This approach aligns with the Commonwealth's statutory recognition that a person's gender identity may be based on their "identity, appearance or behavior," rather than that person's "physiology or assigned sex at birth."  Mass. Gen. Laws ch. 4, § 7.

The DESE Guidance also addresses potential conflict between parents and students.  Noting that "[s]ome transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance," the DESE Guidance suggests that "[s]chool personnel should speak with [a] student first before discussing [that] student's gender nonconformity or transgender status with the student's parent or guardian."  Consistent with that suggested deference to the student, the

_____

[5] In 2011, the Massachusetts legislature approved amendments to several antidiscrimination statutes to add gender identity as a protected classification, along with race, color, sex, religion, national origin, and sexual orientation.  See 2011 Mass. Acts 866. Among the amended statutes is a provision prohibiting discrimination against protected classes in public schools.  See Mass. Gen. Laws ch. 76, § 5.  In July 2012, DESE in turn included gender identity as a protected class in certain antidiscrimination regulations.  See 603 Mass. Code Regs. 26.00.

document directs "school personnel [to] discuss with the student
how the school should refer to the student, e.g., appropriate
pronoun use, in written communication to the student's parent or
guardian." These recommendations reflect the general Commonwealth
philosophy stated in the DESE Guidance that "the person best
situated to determine a student's gender identity is that student."

Now, to Ludlow and Baird Middle School, where the School
Committee and some individual defendants (like Superintendent
Gazda) used the DESE Guidance to establish and implement the
Protocol. The Protocol is an unwritten policy that allows students
of any age "to determine whether their parents will be notified
about decisions related to affirming [their own] discordant gender
identity." In other words, Ludlow's Protocol is one of
nondisclosure, instructing teachers not to inform parents about
their child's expressions of gender without that student's
consent. And as relevant here, Superintendent Gazda asserted that
the district's actions with respect to the Student complied with
the DESE Guidance and laws and regulations of Massachusetts.

With that explanation of the Protocol in the backdrop,
let's get back to how things unfolded at Baird Middle School.

### C. The Parents Discover Ludlow's Protocol

In early March, soon after the Student sent their
February 28 email to school staff, the Parents learned about the
Student's alternate school name from Manchester, the teacher in

whom the Student had initially confided.  This discovery prompted the Parents to speak with Principal Monette and Superintendent Gazda in March 2021.  In these conversations, the Parents expressed concern that Ludlow educators had disregarded Silvestri's December 2020 email, which had provided "specific instructions that school staff not engage with [the Parents'] children regarding mental health issues."  As the Parents' complaint tells it, the school's recognition of the Student's chosen name and pronouns constituted a "psychosocial" mental health treatment because "social transitioning"[6] -- including the assertion of chosen names and pronouns -- is "recognized as a medical/mental health treatment for children with gender dysphoria."[7]

Superintendent Gazda, in response, defended the educators who did not disclose information about the Student's gender identity to the Parents.  Under the laws and regulations of Massachusetts, said Gazda, Counselor Foley and other Baird staff treated the Student appropriately.

Baird educators continued to affirm the Student's chosen gender and name.  For instance, the Parents noticed in April 2021

---

[6] According to the Parents, a "social transition" involves "changes that bring the child's outer appearance and lived experience into alignment with the child's core gender."  For example, "changes in clothing, name, pronouns, and hairstyle" may indicate a child's social transition.

[7] Although the Parents mention gender dysphoria in passing, they do not define the phrase or otherwise discuss it.

that one of the Baird teachers had mailed a card to the Student and addressed it to R.F., the Student's newly adopted name, rather than to B.F.  And, throughout April and May 2021, Counselor Foley corresponded with the Student via text messages and online chat about their gender identity, and further encouraged the Student to meet with her weekly to discuss any gender-related concerns.  In one chat message conversation, Foley asked the Student if their parents "were providing B.F. with appropriate care."  In another discussion, Foley asked if the Student was comfortable discussing issues with the non-school counselor chosen by their parents.

Superintendent Gazda voiced his support for Ludlow's "gender-affirming" practices at a May 2021 School Committee meeting, explaining that the district's policies fostered inclusion and sought to make schools safe for all children.  He added that, under his leadership, Ludlow would "continue to help . . . children 'express who they are' despite parents' wishes to the contrary."  He emphasized that for many students, "school is their only safe place, and that safety evaporates when they leave the confines of our buildings."  Gazda reiterated his view that the school's approach adhered to Massachusetts's non-discrimination laws and educational guidelines.[8]  Gazda

---

[8] In a June 2021 School Committee meeting, Committee Chairman Michael Kelliher repeated Gazda's sentiment that Ludlow's actions were "in compliance" with the relevant laws.

explained that the district's actions complied with the DESE Guidance (that guidance document we mentioned a few pages ago).

### D.  How The Case Got Here

In time, the Parents sued the Town of Ludlow and the Ludlow School Committee as well as Todd Gazda, Stacy Monette, Marie-Claire Foley, and Jordan Funke in federal court, asserting constitutional claims under 42 U.S.C. § 1983.  Their operative complaint chiefly alleges that the defendants' conduct restricted their fundamental parental rights protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, including: (1) the right to direct the education and upbringing of their children (Count I); (2) the right to make medical and mental health decisions for their children (Count II); and (3) the right to familial privacy (Count III).[9]

In response, the defendants moved to dismiss the action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  In a thoughtful rescript, the district court granted the defendants' motion, and in doing so, made several determinations. In short, as to Count II, it held that the Parents had failed to allege that Ludlow's conduct involved medical treatment.  See Foote v. Town of Ludlow, Civ. No. 22-30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022).  As for the remaining claims, the court

---

[9] The Parents do not mount a challenge to the DESE Guidance in this litigation.

concluded more broadly that the Parents had not alleged the sort of "conscience-shocking" conduct required by Supreme Court precedent to establish a substantive due process violation.  Id. at *8.  The court went on to hold that even if the Parents could state a substantive due process claim, the individual educators would be entitled to qualified immunity.  Id.  The Parents dissatisfied, this appeal followed and here we are.

We review the district court's Rule 12(b)(6) dismissal of the Parents' complaint de novo.  See Burt v. Bd. of Trs. of Univ. of R.I., 84 F.4th 42, 50 (1st Cir. 2023).  In undertaking this task, we remind that "[w]e are not bound by the district court's reasoning but, rather, may affirm . . . on any ground made manifest by the record."  Id.

## II.  DISCUSSION

Out of the starting gate, we reasonably begin by getting our constitutional law bearings on the Fourteenth Amendment Due Process Clause doctrine at play here.  That doctrinal provision declares that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  And as our judicial superiors repeatedly tell us, it uncontrovertibly protects against governmental infringement of both procedural and substantive rights.  Elaborating on those safeguards, the Supreme Court has held for nearly one hundred years that the Due Process Clause's explicit promise of "liberty" ensures

certain fundamental rights.  Pertinently among those substantive liberty interests is the right of parents to make decisions concerning "the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion); see also Pierce v. Soc'y of Sisters, 268 U.S. 510, 534 (1925) (the right to "direct the upbringing and education of children"); Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (the right to "bring up children").  Such fundamental rights, urge the Parents, are the big-picture items at stake in today's proceedings.

Ordinarily, to determine whether some government conduct has violated substantive due process rights, courts must undertake, as our precedent dictates, a layered inquiry.  It begins by asking whether the challenged government conduct "is legislative or executive in nature."  DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005).  We ask that question because the answer to it directs which analytical pathway we must follow and which level of scrutiny we will apply to determine if the Parents' due process rights have been violated.[10]

Let's begin.

---

[10] Rational basis applies where plaintiffs have failed to identify a fundamental right or when, even if plaintiffs have done so, the challenged governmental action does not restrict that right.

### A.  Executive or Legislative Conduct

Categorizing   government   conduct   as   executive   or
legislative is not necessarily an easy task, particularly when the
boundary between the two is not always well-defined and when some
government conduct can even straddle the line.   As has been
observed, sorting these close calls requires an eye for function,
not form.  See Hancock v. Cnty. of Rensselaer, 882 F.3d 58, 65 n.2
(2d Cir. 2018).   In that vein, sometimes the inquiry is simple.
In most cases where a substantive due process challenge is brought,
we see that statutes and governmental policies are typically deemed
legislative; indeed, statutes are plainly legislative.   See Cook
v. Gates, 528 F.3d 42, 56-60 (1st Cir. 2008) (analyzing substantive
due process challenge to "Don't Ask, Don't Tell" statute without
reference   to   the   shock-the-conscience   test).     On   the
executive-conduct front, individual acts of government officials
are often and ordinarily executive in nature, untethered from any
policy.  See Rochin v. California, 342 U.S. 165, 166, 172 (1952)
(treating as executive action the forced pumping of a suspect's
stomach  by  police  officers,  which  shocked  the  conscience);
Martínez v. Cui, 608 F.3d 54, 63-64 (1st Cir. 2010) (applying the
conscience-shocking test when a state employee was alleged to have
committed a sexual assault).  Although administrative regulations
and executive orders are both forms of executive policymaking,
they have nonetheless been classified as legislative in nature

when they are broadly applicable.  See Nicholas v. Pa. State Univ.,
227 F.3d 133, 139 n.1 (3d Cir. 2000) (Alito, J.).  Same has been
deemed true for concerted actions by multiple government employees
if taken "pursuant to broad governmental policies" -- such actions
are closer to legislative conduct.  Abdi v. Wray, 942 F.3d 1019,
1027-28 (10th Cir. 2019) (emphasis omitted) (declining to apply
the shock-the-conscience test when a plaintiff challenged the
FBI's "No-Fly List," an executive policy akin to a legislative
act).

Challenges to executive versus legislative conduct
garner different judicial examinations.  For a substantive due
process challenge to an executive action to proceed, the conduct
must first satisfy the shock-the-conscience test.  See Martínez,
608 F.3d at 64-65.  That test asks "whether the behavior of the
governmental officer is so egregious, so outrageous, that it may
fairly be said to shock the contemporary conscience."  González-
Fuentes, 607 F.3d at 880 (quoting Cnty. of Sacramento v. Lewis,
523 U.S. 833, 847 n.8 (1998)); see also DePoutot, 424 F.3d at
119.[11]  If executive conduct does not shock the conscience, the

_____

[11] To round things out for the curious reader, Lewis taught
that "[t]he touchstone of due process is protection of the
individual against arbitrary action of government," 523 U.S. at
845 (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974))
(alteration in original), and "only the most egregious official
conduct can be said to be 'arbitrary in the constitutional sense,'"

plaintiff has failed to state a constitutional violation and the inquiry ends.  See González-Fuentes, 607 F.3d at 880 n.13.  Only if the executive conduct does shock the conscience will the analysis move on to the substantive due process framework's next stage (whether the conduct restricts a protected fundamental right).  See id.

On the other hand, legislative conduct (like a statute, a regulation, or a governmental policy of any kind) need not be conscience-shocking for further judicial inquiry to occur; rather, courts proceed directly to the next layered step of the substantive due process framework (asking whether a fundamental right is involved and whether the government conduct restricts that fundamental right) before moving on.  See Washington v. Glucksberg, 521 U.S. 702, 722 (1997).

The general executive versus legislative parameters noted, we get back to our case and what transpired below.  When the defendants' motion to dismiss came before the district court, the court did not undertake this initial "executive or legislative" inquiry.  Instead, it followed the parties' lead and treated the Protocol as an executive action, thus examining whether Ludlow's actions "were so egregious as to shock the conscience," Harron v.

---

id. at 846 (quoting Collins v. Harker Heights, 503 U.S. 115, 129 (1992)).

Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (quoting Pagán
v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006)), i.e., using the
standard applied in substantive due process cases challenging only
individual actions by particular government officials, unmoored
from any government policy, see Rochin, 342 U.S. at 172; Martínez,
608 F.3d at 63-64.  The court then reasoned that Ludlow's conduct
was not "so extreme, egregious, or outrageously offensive as to
shock the contemporary conscience," Foote, 2022 WL 18356421, at *8
(quoting DePoutot, 424 F.3d at 119), and it therefore held the
Parents had failed to state a viable substantive due process
claim.[12]

    But by our lights, the district court, in following the
parties' lead, jumped the gun in not analyzing the type of
government conduct involved.  Though all roads, in the end, still
lead to Rome, in our de novo review, we conclude the shock-the-
conscience test was not the appropriate legal standard to utilize
here in examining the Parents' claims because the Parents are
challenging a school policy, which, after our careful scrutiny of
the policy involved, we conclude is legislative, not executive
conduct.  Here's why that is so.

_____

[12] To be clear, technically, we note that the district court
applied the shocks-the-conscience test only to Counts I and III.
Foote, 2022 WL 18356421, at *5-8.  Before it deployed the shocks-
the-conscience test, the court dismissed Count II because the
Parents hadn't adequately stated sufficient facts to support it
(more on that later).  Id. at *5.

In our assessment of the precedent, as between legislative and executive conduct, the Protocol (the chief target of the Parents' complaint) better fits into the legislative bucket. We so conclude because it is a policy which applies broadly to all students in the Ludlow School District and is administered by multiple governmental actors. See Nicholas, 227 F.3d at 139 n.1. And although the Parents also challenge some individual actions of Ludlow educators -- for example, the complaint objects to teachers discussing gender identity with students, providing gender-identity resources to some students, and allowing transgender students to use the bathroom of their choosing -- those discrete decisions by individual educators were taken to "actively implement and reinforce the Protocol," as alleged by the Parents. See Abdi, 942 F.3d at 1027-28. In applying the Protocol to their interactions with students, those educators did not exercise the sort of "instant judgment" typically associated with executive conduct. See, e.g., Lewis, 523 U.S. at 837, 853 (aggressive maneuver by law enforcement officers to apprehend a suspect during a high-speed chase). So again, the Parents' complaint, at bottom, is better viewed as a challenge to legislative conduct.[13]

_____

[13] By the way, we do not treat the Parents' request that the district court apply the shock-the-conscience test as a waiver because parties may not waive or stipulate to the appropriate legal test. See TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be

Accordingly, with the "legislative conduct" box ticked, we proceed to the next phase of our substantive due process analysis and ask whether the Parents have adequately alleged that Ludlow's conduct restricted a fundamental right.[14]  See Glucksberg, 521 U.S. at 722.

### B.  A Fundamental Right

The Parents say yes:  They claim Ludlow's conduct restricted their parental right to control the upbringing, custody, education, and medical treatment of their child.[15]  Our

_____

tainted by self-interest.  Courts, accordingly, 'are not bound to accept as controlling, stipulations as to questions of law.'" (quoting Sanford's Est. v. Comm'r, 308 U.S. 39, 51 (1939))); see also Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

[14] As we embark on this enquiry, recall that the substantive due process analysis involves a series of queries.  We'll unpack all of this in more detail in the pages to come, but here's our 50,000-foot view of the basic progression we glean from the precedent.  First, we ask whether a party has adequately alleged a right recognized as fundamental.  Then, we assess whether the government conduct at issue is alleged to have restricted that right.  The work does not stop there -- because regardless of how that second question is answered, the conduct still must withstand the appropriate level of constitutional scrutiny.  Indeed, if the answer is yes, the conduct is alleged to have restricted a fundamental right, then we examine whether the restriction satisfies the appropriate level of heightened scrutiny; if the answer is no, then we determine whether the government conduct survives rational basis review.

[15] The Parents' complaint distinguishes between the parental right to direct the education and upbringing of their children (Count I), the parental right to direct the medical treatment of their children (Count II), and the parental right to family privacy

- 21 -

job, in resolving this contention, is twofold:  We must first determine whether the Parents have identified a right recognized as fundamental, and, if so, we must examine whether the Parents have sufficiently pled that Ludlow's conduct did, in fact, restrict that right.  This section attempts to do just that, starting with the claimed right itself.

Our guiding light in this realm is a trio of Supreme Court parental right cases: Meyer v. Nebraska, 262 U.S. 390; Pierce v. Society of Sisters, 268 U.S. 510; and Troxel v. Granville, 530 U.S. 57.  Those cases define the parental right broadly as a fundamental right to direct the care, custody, and upbringing of one's children.  These rights are "perhaps the oldest of the fundamental liberty interests recognized by th[e] Court."  Troxel, 530 U.S. at 65 (collecting cases).  The Supreme Court made clear more than a century ago that the Due Process Clause gives parents the right to "bring up children" and "to control the education of their own."  Meyer, 262 U.S. at 399, 401 (invalidating a ban on foreign-language instruction).

_____

(Count III).  But the Parents do not explain how those three rights differ, or how those differences would alter our analysis.  Indeed, the Parents' briefing generally refers to those rights as one and the same.  That approach makes sense because, at bottom, the Parents challenge Ludlow's conduct as restricting their fundamental right to direct the care, custody, and upbringing of their children as recognized in Meyer, Pierce, and Troxel.
    Thus, we collectively refer to the rights at issue as "parental rights under the Due Process Clause."

When we drill down on the Supreme Court's teachings, we observe that the Supreme Court's parental rights cases have never described an asserted right by reference to the specific conduct at issue. Meyer did not define the parents' asserted liberty interest as the right to allow their child to learn German before the eighth grade. See id. at 397, 403 (striking down a Nebraska statute prohibiting the teaching of foreign languages to students before completing the eighth grade). Nor did Pierce describe the parental interest at stake as the right to send one's child to religious school. See 268 U.S. at 534-35 (invalidating Oregon's compulsory public education statute). And Troxel did not define the right at issue as the right to prevent a grandparent from visiting with one's grandchild. See 530 U.S. at 72-73 (rejecting application of a Washington statute that allowed any person to petition for visitation rights with a child, at any time, with the only requirement being that the visitation serve the best interest of the child).

Rather, in each of those decisions, the Court instead considered whether the conduct at issue fell within the broader, well-established parental right to direct the upbringing of one's child. See Meyer, 262 U.S. at 399-403; Pierce, 268 U.S. at 534-35; Troxel, 530 U.S. at 65-67.

We necessarily follow that approach in the instant matter and thus decline to define the right at issue with

microscopic granularity.  See Moore v. City of E. Cleveland, 431
U.S. 494, 503 (1977) (plurality opinion) ("Appropriate limits on
substantive due process come not from drawing arbitrary lines but
rather from careful 'respect for the teachings of history (and)
solid recognition of the basic values that underlie our society.'"
(quoting Griswold v. Connecticut, 381 U.S. 479, 501 (1965) (Harlan,
J., concurring))).  So, with that guidance in mind, we conclude
that the Parents have identified a fundamental right in their
complaint with sufficient specificity.  See Troxel, 530 U.S. at
67.

    But as noted earlier, our inquiry does not end there.
Notwithstanding the Parents' adequately pled rights, we must still
determine whether the Parents have sufficiently alleged Ludlow
engaged in conduct that actually restricted those fundamental
rights.

    Here, the Parents argue that Ludlow's conduct restricted
their substantive due process rights in three ways: (1) Ludlow
performed "medical treatment" on the Student through accepting the
Student's social transition without parental consent; (2) Ludlow
facilitated the Student's social transition to alternate genders
via curricular and administrative decisions without parental
consent; and (3) Ludlow implemented the Protocol, which deprived
the Parents of information about the Student's expression of
gender.  We address each in turn, evaluating whether the Parents'

claims are plausibly alleged in line with the broad principles set forth by the Supreme Court's substantive due process canon.

### (1) Medical Treatment

We begin with the Parents' allegation that Ludlow's conduct restricted their fundamental right to direct medical treatment for their child. To repeat, parents do have a "fundamental right to make decisions concerning the care, custody, and control of" their children. Troxel, 530 U.S. at 72. That right includes the parental right "to seek and follow medical advice" concerning one's children. Parham v. J.R., 442 U.S. 584, 602 (1979). Ludlow, the Parents allege, "socially transitioned" their child to a new gender identity by accommodating their child's request to use a new name and pronouns at school. And, the Parents contend, because "'social transitioning' . . . is recognized as a medical/mental health treatment for children with gender dysphoria," Ludlow was "implementing a psychosocial treatment" on their child. The Parents conclude that, because Ludlow educators performed a "psychosocial treatment" without parental knowledge or consent, Ludlow usurped the Parents' fundamental right to direct medical treatment for their child.

The district court dismissed this claim (Count II) because the Parents provided only "conclusory statements describing the use of preferred names and pronouns as mental health treatment." Foote, 2022 WL 18356421, at *5. The Parents, for

example, failed to allege that Ludlow's use of the Student's requested pronouns involved a "treatment plan" of any sort. Id. The district court, setting aside the conclusory allegations in the Parents' complaint, held that the Parents had not adequately pled that Ludlow "usurped their right to make medical and mental health treatment decisions for their children." Id.

We agree with the district court.[16] Although the Parents described the decisions made by Ludlow educators as "mental health treatment," their labeling, without more, cannot transform the alleged conduct into a medical intervention. The Parents allege, for example, that Ludlow educators spoke in private with their child to promote exploring and experimenting with alternative or discordant gender identities and facilitate their child's gender-affirming social transitioning, which, the Parents say, constitutes mental health treatment. Am. Compl. ¶¶ 46, 52, 53, 78. But on this appellate record, we are unconvinced that merely alleging Ludlow's use of gender-affirming pronouns or a gender-affirming name suffices to state a claim that the school provided medical treatment to the Student. In fact, while the Supreme Court

---

[16] The district court properly separated the factual allegations from the legal conclusions in the Parents' complaint. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (instructing courts to disregard "statements in the complaint that merely offer 'legal conclusions couched as fact'" (alterations and ellipses omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))). We do the same.

has "never specifically defined the scope of a parent's right to direct her child's medical care," PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197 (10th Cir. 2010), the Parents fail to state a claim because their allegations as stated do not suffice to describe medical treatment at all. The leading Supreme Court decision on parental control of medical care, Parham, involved a child's institutionalization at a mental health hospital. See 442 U.S. at 615.[17] The Sixth Circuit's decision in Kanuszewski v. Michigan Department of Health and Human Services suggested that a state actor's retention of blood samples from children without parental consent violated substantive due process. See 927 F.3d 396, 420 (6th Cir. 2019). And the Tenth Circuit, in Dubbs v. Head Start, Inc., suggested that a government-funded preschool program violated parents' right to direct their children's medical care where a nurse performed physical examinations and blood tests on children without parental notice or consent. See 336 F.3d 1194, 1203-04 (10th Cir. 2003).

Each of those cases involved intrusions upon the bodily integrity of the child or other conduct with clinical significance -- whether through a medical procedure, examination, or hospitalization. Thus, although precedent indicates that

---

[17] Although Parham primarily addressed a procedural due process claim, the Court's analysis relied on canonical cases establishing the substantive due process rights of parents, such as Meyer and Pierce. See Parham, 442 U.S. at 602-04.

parents have the right to direct their children's medical treatment, whether that treatment is complex or more routine, the allegations here do not involve clinical conduct at all. Solely as pled here, we do not believe that using the Student's chosen name and pronouns -- something people routinely do with one another, and which requires no special training, skill, medication, or technology -- without more, can be reasonably viewed as evidencing some indicia of medicalization. Indeed, when we view the complaint in the light most favorable to the Parents, we conclude their bare contention that Ludlow's practice constituted medical treatment that restricted their parental right to control their child's medical care is not plausible.[18] As the Supreme Court reminds us, we need not abandon our "judicial experience and common sense" in our scrutiny of allegations pled. <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 679 (2009). Hence, the district court correctly dismissed Count II of the Parents' complaint.

### (2) Curricular and Administrative Decisions

The Parents also claim that the actions of Ludlow's teachers and staff restricted their parental rights by "facilitat[ing]" the Student's gender-affirming social transition. They cite librarian Funke's request that students state their

---

[18] We need not opine on whether, under certain circumstances, acceding to a student's use of a chosen name and pronouns could ever constitute medical treatment.

pronouns as part of an academic, biographic video assignment, the
teachers' use of the Student's requested name and pronouns at
school, counselor Foley's permitting the Student to use the
bathroom of their choice, and Foley's discussion of gender
identity-related concerns with the Student.  The Parents allege
that these actions, taken without their knowledge or consent,
restricted their fundamental right to direct the upbringing of
their child.

     The measures the Parents cite, however, all involve
decisions by Ludlow's staff about how to reasonably meet diverse
student needs within the school setting.  The Supreme Court has
never suggested that parents have the right to control a school's
curricular or administrative decisions.  Rather, the Court's
parental rights cases more essentially provide "that the state
cannot prevent parents from choosing a specific educational
program."  Parker v. Hurley, 514 F.3d 87, 101 (1st Cir. 2008)
(quoting Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 533
(1st Cir. 1995), abrogated on other grounds by DePoutot, 424 F.3d
at 118 n.4).  Meyer, for example, struck down a Nebraska statute
prohibiting the teaching of foreign languages in part because the
law interfered with the parental right to procure such instruction
for their children.  See 262 U.S. at 401.  And Pierce invalidated
an Oregon law requiring parents to send their children to public
school between the ages of eight and sixteen.  See 268 U.S. at

534-35.  In both cases, the state had barred parents from enrolling their children in a particular educational track.  Yet neither Meyer nor Pierce undermines "the state's power to prescribe a curriculum for institutions which it supports."  Meyer, 262 U.S. at 402; see also Pierce, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools . . . [and] to require . . . that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.").

We have consistently applied these principles in rejecting parental control over curricular and administrative decisions.  In Parker, for example, the plaintiff parents claimed a right to "be given prior notice by the school and the opportunity to exempt their young children from exposure to books they f[ound] religiously repugnant."  514 F.3d at 90.  Two books at issue "portray[ed] diverse families, including families in which both parents [were] of the same gender," while another book "depict[ed] and celebrate[d] a gay marriage."  Id.  In rejecting the parents' substantive due process claim, we noted that no federal court had ever held that the Due Process Clause "permitted parents to demand an exemption for their children from exposure to certain books used in public schools."  Id. at 102.  We concluded that, once parents choose to send their children to public school, "they do not have a constitutional right to 'direct how a public school

teaches their child.'"  Id. (quoting Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 395 (6th Cir. 2005)).[19]

Likewise, in Brown, we considered a high school's failure to notify parents of their ability to exempt their children from a sex education presentation.  68 F.3d at 529-30.  Those parents sued, claiming the school's action -- well, inaction -- restricted their substantive due process right to direct the upbringing of their children and educate them according to their

---

[19] This principle has been recognized in most circuits for decades.  See, e.g., Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1206 (9th Cir. 2005), amended by 447 F.3d 1187 (9th Cir. 2006) ("[O]nce parents make the choice as to which school their children will attend, their fundamental right to control the education of their children is, at the least, substantially diminished."); Crowley v. McKinney, 400 F.3d 965, 971 (7th Cir. 2005) (noting "the only federal constitutional right vis-à-vis the education of one's children that the [Supreme Court's] cases as yet recognize . . . is the right to choose . . . among different types of school with different curricula, educational philosophies, and sponsorship (e.g., secular versus sectarian).  It is not a right to participate in the school's management . . . ."); Leebaert v. Harrington, 332 F.3d 134, 141 (2d Cir. 2003) ("Meyer, Pierce, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what [their] child will and will not be taught."); Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 291 (5th Cir. 2001) ("While Parents may have a fundamental right in the upbringing and education of their children, this right does not cover the Parents' objection to a public school Uniform Policy."); Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 699 (10th Cir. 1998) ("[P]arents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject."); Herndon ex rel. Herndon v. Chapel Hill-Carrboro City Bd. of Educ., 89 F.3d 174, 177-79 (4th Cir. 1996) (holding that a requirement for high school students to perform community service does not violate the parental right to control their child's education).

own views.  Id. at 532.  In rejecting the parents' claim, we
explained that Meyer and Pierce protect against "the state
proscribing parents from educating their children," not situations
where parents seek to "prescrib[e] what the state [should] teach
their children."  Id. at 534 (emphases added).  In so doing, we
emphasized that schools need not "cater a curriculum for each
student whose parents had genuine moral disagreements with the
school's choice of subject matter."  Id.

        The Parents' objections here are no different.  To the
extent the Parents oppose certain academic assignments, the use of
a student's pronouns in the classroom, decisions about bathroom
access, and a guidance counselor speaking to a student, none of
those concerns restrict parental rights under the Due Process
Clause.  Rather, the Parents are challenging how Baird Middle
School chooses to maintain what it considers a desirable and
fruitful pedagogical environment.  Though the parents in Parker
and Brown specifically challenged curricula, our rejection of
those claims recognized the broad discretion of schools to manage
academic and administrative functions.  See, e.g., Parker, 514
F.3d at 102; Brown, 68 F.3d at 534.  Indeed, "[w]hether it is the
school curriculum, the hours of the school day, school discipline,
the timing and content of examinations, the individuals hired to
teach at the school, the extracurricular activities offered at the
school or . . . dress code[s], these issues of public education

are generally 'committed to the control of state and local authorities.'" Blau, 401 F.3d at 395-96 (quoting Goss v. Lopez, 419 U.S. 565, 578 (1975)). So it is here.

Because public schools need not offer students an educational experience tailored to the preferences of their parents, see Brown, 68 F.3d at 534, the Due Process Clause gives the Parents no right to veto the curricular and administrative decisions identified in the complaint.

### (3) The Protocol

We come now to the Parents' challenge to Ludlow's nondisclosure Protocol. As alleged by the Parents' complaint, the Protocol provides that "parents are not to be informed of their child's transgender status and gender-affirming social transition to a discordant gender identity unless the child, of any age, consents." The Protocol, the Parents argue, restricted their right to direct their child's upbringing in that it deceived them and, in doing so, deprived them of information about the Student. But, as we'll unpack, the Parents' challenge here fails.

For starters, Ludlow's Protocol of deference to a student's decision about whether to disclose their gender identity to their parents lacks the "coercive" or "restraining" conduct that other courts have found to restrict parental rights in this context. J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 934 (3d Cir. 2011) (quoting Anspach ex rel. Anspach v.

City of Phila., Dep't of Pub. Health, 503 F.3d 256, 266 (3d Cir.
2007)).  In Arnold v. Board of Education of Escambia County, for
example, the Eleventh Circuit held that school officials violated
parental rights by coercing a minor into having an abortion and
concealing the decision from her parents.  880 F.2d 305, 312-13
(11th Cir. 1989), overruled on other grounds by Leatherman v.
Tarrant Cnty. Narcotics Intel. and Coordination Unit, 507 U.S. 163
(1993).  There, a school counselor demanded that the student have
an abortion, and school officials provided the money and
transportation necessary for the procedure.  Id. at 309, 313.  And,
unlike Ludlow's deference to the Student, school officials in
Arnold "coerced the minors to refrain from consulting with their
parents."  Id. at 312.

        Here, by contrast, there are no allegations of coercive
conduct towards the Student.  The Parents object to Ludlow
employees sharing resources about gender expression and to the
messages from Counselor Foley to the Student asking if the Parents
and the Parents' counselor were providing adequate care for the
Student.  But providing educational resources about LGBTQ-related
issues to a child who has shown interest imposes no more compulsion
to identify as genderqueer than providing a book about brick laying
could coerce a student into becoming a mason.  See Anspach, 503
F.3d at 266 (rejecting assertion that "the atmosphere at the Center
was sufficiently coercive").  Nor are the chat messages coercive,

even when viewed in a light most favorable to the Parents.  Those messages cannot reasonably be viewed as strongarm statements; rather, they are essentially questions from a school counselor trying to assess the well-being of a student.

The Parents, however, also claim that Ludlow "deliberately deceive[d] parents . . . by continuing to refer to their child by [their] birth name and pronouns in the presence of the parents, [while using] the child's preferred alternative name and pronouns at all other times."  Viewed in the light most favorable to the Parents, this allegation arguably challenges a restraining act by Ludlow -- that is, deceptive communication to the Parents about a child's expression of gender in school.  Cf. Snyder, 650 F.3d at 934 (noting that "manipulative" conduct by the government could interfere with parental rights under the Due Process Clause (quoting Anspach, 503 F.3d at 265)).

This theory of affirmative misrepresentation is unavailing here.  The complaint contains only general allegations that, under the Protocol, Ludlow educators were directed to "intentionally misinform[] and lie[]" to the Parents about the Student's requested name and pronouns.  But, and as the Parents contradictorily state in their complaint, when a teacher mailed a card to the Student at home, it was addressed to "R.F.", the Student's newly identified name, not "B.F.," the Student's assigned-at-birth name.  And no allegation suggests that, when the

Parents tried to speak with school officials about the Student, the officials misrepresented the name the Student had chosen for in-school use.   Rather, the officials (beyond Manchester's communications with the Parents) just declined to discuss the Student's gender identity issues with the Parents.

Beyond this theory of affirmative deception, the Parents also mount a challenge to the withholding of information about a student's expression of gender while at school.   But this nondisclosure angle similarly does not state a constitutional deprivation.   That is because it is clear to us from precedent that in attempting to establish a constitutional deprivation of this sort, it is not enough for the Parents to allege that the nondisclosure Protocol makes their parenting more challenging. The guarantee of substantive due process limits "the State's power to act" by forbidding governments from "depriv[ing] individuals of life, liberty, or property without 'due process of law.'"   See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989) (rejecting substantive due process claim based on social workers' failure to protect a child from abuse).   Yet the Supreme Court has made clear that the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." Id.

As other circuits have concluded, this limiting principle applies to parental rights. See, e.g., Anspach, 503 F.3d at 262; Doe v. Irwin, 615 F.2d 1162, 1168 (6th Cir. 1980). In Anspach, the parents of a sixteen-year-old girl sued a city-run health center that provided their daughter with emergency contraception medication, alleging that the facility violated their substantive due process right to family relations. 503 F.3d at 259-61. The center, according to the parents, not only "failed to encourage [the minor] to consult with her parents before deciding whether to take emergency contraception," but even "intended to influence [the minor] to refrain from discussing with her parents her possible pregnancy." Id. at 262. And, more broadly, the parents alleged "that the [c]enter's policies were aimed at preventing parents from learning of their minor daughter's possible pregnancies." Id. at 261.

The Third Circuit rejected the parents' claim because there is no "constitutional obligation on state actors to contact parents of a minor or to encourage minors to contact their parents." Id. at 262. In elaborating, the court observed that the "real problem" alleged by the parents was "not that the state actors interfered with the [plaintiffs] as parents; rather, it [wa]s that the state actors did not assist [the plaintiffs] as parents or affirmatively foster the parent/child relationship." Id. at 266.

A cognizable parental rights claim under the Due Process Clause, the Third Circuit explained, generally requires restraining conduct by the government, not mere nondisclosure of information.  Id. at 266.  The court held that the health center engaged in no such conduct because it did not "prevent[] [the minor] from calling her parents before she took the pills she had requested."  Id. at 264.  "Although [the parents'] moral and religious sensibilities may have been offended by their daughter seeking out and using emergency contraception, her decision was voluntary."  Id. at 268.  Thus, because the Due Process Clause "does not protect parental sensibilities, nor guarantee that a child will follow their parents' moral directives," the parents' constitutional rights were not restricted.  Id.

The Sixth Circuit adopted a similar view of parental rights under the Due Process Clause in Doe v. Irwin.  There, parents of minor children sued a publicly funded family planning clinic, alleging that the clinic's distribution of contraceptives to minors without parental notice violated their parental rights. 615 F.2d at 1163.  The district court, which enjoined that practice, held that the clinic interfered with the parents' fundamental rights because the parents were "prevented from being made aware of the actions of a state-run agency which facilitate[d] a situation inimical to the values the parents [we]re attempting to teach their children."  Id. at 1166.  The Sixth Circuit

reversed, explaining that the Supreme Court's parental rights cases -- such as Meyer and Pierce -- each involved situations where "the state was either requiring or prohibiting some activity." Id. at 1168. The clinic, in contrast, never "require[d] that the children of the plaintiffs avail themselves of the services offered." Id. Nor did the clinic prohibit the parents from "participating in decisions of their minor children on issues of sexual activity and birth control." Id. In fact, the parents remained "free to exercise their traditional care, custody and control over their unemancipated children." Id. The bottom line was that "the practice of not notifying [parents] of their children's voluntary decisions" did not deprive the parents of a protected liberty interest. Id.

Here, too, the challenged governmental action (the Protocol) merely instructs teachers not to offer information -- a student's gender identity -- without a student's consent. In the instant matter, the Parents remain free to strive to mold their child according to the Parents' own beliefs, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools. See Anspach, 503 F.3d at 266.

The Parents disagree that these alternatives suffice to protect their rights. They allege that the Protocol impermissibly infringes on their ability to use these methods to guide the

upbringing of the Student because they are denied important information about the Student's gender. But the Protocol operates only in the school setting, where -- as we have explained -- parents have less authority over decision-making concerning their children. Outside school, parents can obtain information about their children's relationship to gender in many ways, including communicating with their children and making meaningful observations of the universe of circumstances that influence their children's preferences, such as in clothing, extracurricular activities, movies, television, music, internet activity, and more.

To be sure, knowing that the Student had requested the use of an alternative name and pronouns in school might inform how the Parents respond to and direct their child's gender expressions outside of school. In all likelihood, the Student's lack of consent to share their in-school gender choices with their Parents might mean they would be cautious outside of school to avoid signals that might disclose those choices. Indeed, we are sympathetic to the Parents' interest in having as much information as possible about their child's well-being and behavior in school revealed to them. Nonetheless, as we have explained, our survey of Due Process Clause jurisprudence suggests that this canon does not require governments to assist parents in exercising their fundamental right to direct the upbringing of their children, and

the Parents' objections to the Protocol here in large part take issue with that principle as we understand it to be.

In any event, as the complaint makes clear, the Parents did learn from school staff about the Student's use of a different name and pronouns within days of those changes and discussed those changes with school leadership. In this as-applied challenge, we conclude that the allegations in the Parents' complaint about how the Protocol was implemented with respect to the Student did not restrict any fundamental parental right protected by the Due Process Clause.[20]

## C. Applying Constitutional Scrutiny

Let's regroup: We've concluded that the Parents have not plausibly alleged that Ludlow's conduct restricted a fundamental right. Be that as it may, the conduct still must withstand constitutional scrutiny. Namely, in view of our no-restricted-fundamental-right conclusion, the conduct must survive rational basis review.[21] See, e.g., González-Droz v.

---

[20] In our determinations in this dispute, we emphasize that our analysis here is not intended to categorically preclude parental challenges to policies of public schools under the Due Process Clause. But see Parents for Priv. v. Barr, 949 F.3d 1210, 1232 (9th Cir. 2020).

[21] As we undertake this analysis, we focus on the Protocol itself, not on the actions taken to implement the Protocol. If the Protocol is constitutional, then simply acting in accordance with it cannot independently be unconstitutional. See, e.g., Timothy M. Tymkovich et al., A Workable Substantive Due Process, 95 Notre Dame L. Rev. 1961, 2003 (2020) ("If the policy is

González–Colón, 660 F.3d 1, 9 (1st Cir. 2011) (explaining that rational basis review applies when a plaintiff fails to allege that state conduct has infringed a fundamental right). Under that deferential standard, we presume the challenged conduct is valid so long as it "is rationally related to a legitimate state interest." Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985)). In performing rational basis review, we consider only whether the state could have reasonably concluded that the challenged conduct "might advance its legitimate interests," id. at 10, and, ordinarily, the "reasoning [that] in fact underlay the legislative decision" is "constitutionally irrelevant," Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 49 n.8 (1st Cir. 2003) (quoting U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980)). However, "some objectives -- such as a 'bare desire to harm a politically unpopular group' -- are not legitimate state interests." Cleburne, 473 U.S. at 446-47 (quoting U.S. Dept. of Agric. V. Moreno, 413 U.S. 528, 534 (1973))); see also Lawrence v. Texas, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring) (noting, in the context of the Equal Protection Clause, that "a more searching form of

---

constitutional, then acting in accordance with it cannot 'shock the conscience.'").

rational basis review" may apply where "a law exhibits such a desire to harm a politically unpopular group").[22]

Ludlow asserts an interest in cultivating a safe, inclusive, and educationally conducive environment for students, which allows students to thrive and thus learn. The Parents insist Ludlow "exceeded the bounds of legitimate pedagogical concerns and usurped the role of [the Parents] . . . to direct the upbringing of their children." But in reasonable due deference to Ludlow's articulated policy rationale and based on its asserted interest, we conclude Ludlow's conduct is rationally related to its legitimate stated interest, and thus the Protocol survives rational basis review.

State actors have "a compelling interest in protecting the physical and psychological well-being of minors." Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115, 126 (1989). That interest is at its apex when a school board seeks to protect children who are particularly vulnerable, such as transgender minors. See Doe ex rel. Doe v. Boyertown Area Sch. Dist., 897

---

[22] A quick note. There is potential tension between the rights of the Parents and the rights of the Student that makes this case different from previous parental rights cases decided by the Supreme Court. Like, for example, the Student's right not to be discriminated against on the basis of sex, which is one of the stated rationales for the DESE Guidance. Because this case centers on the state interest and does not take up the rights of the Student, though, our coming analysis is confined to a discussion of the former.

F.3d 518, 528-29 (3d Cir. 2018) (holding that a school district had a compelling interest in protecting the physical and mental well-being of transgender children).   Here, we refer to the Commonwealth's investigative findings (articulated, without refute, in the motion to dismiss) which suggest that though many parents are supportive of their children's expression of gender, it is not uncommon for students exploring their gender identity to fear parental backlash against their choices.   See DESE Guidance ("Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance.").

        The Protocol plausibly creates a space for students to express their identity without worrying about parental backlash. By cultivating an environment where students may feel safe in expressing their gender identity, the Protocol endeavors to remove psychological barriers for transgender students and equalizes educational opportunities.   See, e.g., Boyertown, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers." (internal quotation marks omitted)); Grimm, 972 F.3d at 597 (explaining that "transgender students have better mental health outcomes when their gender identity is affirmed").

In sum, the Protocol bears a rational relationship to the legitimate objective of promoting a safe and inclusive environment for students. Rational basis review requires nothing more.

### III.  FINAL WORDS

Here's where all of this leaves us.

As this opinion has endeavored to illuminate, we acknowledge the fundamental importance of the rights asserted by the Parents to be informed of, and to direct, significant aspects of their child's life -- including their socialization, education, and health. Be that as it may -- as this opinion has also made effort to explicate -- parental rights are not unlimited. Parents may not invoke the Due Process Clause to create a preferred educational experience for their child in public school. As per our understanding of Supreme Court precedent, our pluralistic society assigns those curricular and administrative decisions to the expertise of school officials, charged with the responsibility of educating children. And the Protocol of nondisclosure as to a student's at-school gender expression without the student's consent does not restrict parental rights in a way courts have recognized as a violation of the guarantees of substantive due process.

All told, the Parents have failed to state a claim that Ludlow's Protocol as applied to their family violated their

constitutional right to direct the upbringing of their child.  We therefore <u>affirm</u> the district court's grant of the motion to dismiss.[23]

Costs to appellees.

_____

[23] Having affirmed the dismissal of the Parents' complaint on substantive grounds, we need not address whether the individual defendants are entitled to qualified immunity.