## No. 23-1069

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

STEPHEN FOOTE, individually and as Guardian and next friend of B.F. and G.F., minors; MARISSA SILVESTRI, individually and as Guardian and next friend of B.F. and G.F., minors,
*Plaintiffs-Appellants*,

JONATHAN FELICIANO; SANDRA SALMERON,
*Plaintiffs*

v.

LUDLOW SCHOOL COMMITTEE; TODD GAZDA, former Superintendent; LISA NEMETH, Interim Superintendent; STACY MONETTE, Principal, Baird Middle School; MARIE-CLAIRE FOLEY, school counselor, Baird Middle School; JORDAN FUNKE, former librarian, Baird Middle School; TOWN OF LUDLOW,
*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 22-cv-30041
District Judge Mark G. Mastroianni

## BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 18 OTHER STATES SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL

AUSTIN KNUDSEN
Montana Attorney General

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
peter.torstensen@mt.gov

CHRISTIAN B. CORRIGAN
*Solicitor General*

PETER M. TORSTENSEN, JR.
*Assistant Solicitor General*

*Counsel for Amicus Curiae
State of Montana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

INTERESTS OF AMICI CURIAE.......................................................1

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT.......................................................................................5

I.    Parents Possess a Longstanding, Fundamental Right to Direct the Care and Custody of Their Children. ............................5

II.    Ludlow's Actions and Policies Violated Appellants' Fundamental Right to Care for Their Children. ..........................10

   A. Ludlow authorized school officials to make decisions about a child's gender identity behind parents' backs..........................10

   B. The District Court incorrectly applied the "shock the conscience" standard...................................................................14

   C. School districts across the country have adopted parental exclusion policies. ...................................................................21

CONCLUSION ...................................................................................24

CERTIFICATE OF COMPLIANCE .................................................26

CERTIFICATE OF SERVICE ..........................................................26

# TABLE OF AUTHORITIES

## Cases

*Barrie v. Grand Cnty., Utah*
119 F.3d 862 (10th Cir. 1997) .......................................................... 16

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ...................................................... 14, 15, 16, 18

*Collins v. City of Harker Heights*,
503 U.S. 115 (1992) .......................................................................... 14

*Coyne v. Cronin*,
386 F.3d 280 (1st Cir. 2004) ................................................. 15, 17, 18

*Daniels v. Williams*,
474 U.S. 327 (1986) ...................................................................... 15–16

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ................................................................... 6, 7

*Doe v. Pub. Health Tr.*,
142 S. Ct. 901 (11th Cir. 1983) ............................................................ 8

*Dubbs v. Head Start, Inc.*,
336 F.3d 1194 (10th Cir. 2003) ......................................................... 18

*Gonzalez-Fuentes v. Molina*,
607 F.3d 864 (1st Cir. 2010) ..................................................... *passim*

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ................................................................ 9

*Irish v. Fowler*,
979 F.3d 65 (1st Cir. 2020) ............................................................... 20

*Kennedy v. Ridgefield City*,
439 F.3d 1055 (9th Cir. 2006) ........................................................... 15

*Martinez v. Hongyi Cui*,
608 F.3d 54 (1st Cir. 2010) ............................................................... 18

*Mason v. Morrisette,*
    403 F.3d 28 (1st Cir. 2005) .................................................. 5

*May v. Anderson,*
    345 U.S. 528 (1953) ........................................................ 1

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ..................................................... 1, 6

*Parham v. J.R.,*
    442 U.S. 584 (1979) ............................................... *passim*

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925) ........................................................ 6

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) .................................................... 6–7

*Reno v. Flores,*
    507 U.S. 292 (1993) ........................................................ 1

*Rivera v. Rhode Island,*
    402 F.3d 27 (1st Cir. 2005) ....................................... 4–5, 15

*Stanley v. Illinois,*
    405 U.S. 645 (1972) ..................................................... 1, 7

*Thompson v. Oklahoma,*
    487 U.S. 815 (1988) .................................................... 7–8

*Troxel v. Granville,*
    530 U.S. 57 (2000) ................................................ *passim*

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................... 6, 14

*Welch v. City of Biddeford Police Dep't,*
    12 F.4th 70 (1st Cir. 2021) ............................................. 17

*Weyant v. Okst,*
    101 F.3d 845 (2nd Cir. 1996) ........................................... 16

*Whitley v. Albers,*
    475 U.S. 312 (1986) ..................................................... 18

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ...................................................... 7, 18

## OTHER AUTHORITIES

### United States Code

  10 U.S.C. § 505 ............................................................ 8
  23 U.S.C. § 158 ............................................................ 8
  42 U.S.C. § 1983 ........................................................ 4, 14

### United States Constitution

  U.S. Const. amend. XIV ............................................. 5–6
  U.S. Const. amend. XXVI .............................................. 8

### Publications

*After Being Denied Tattoo, Sixth Grader Decides to Have Gender
Reassignment Surgery Instead*, THE BABYLON BEE (Apr. 13, 2022)...... 12

Charlotte-Mecklenburg Schs., *Supporting Transgender Students*
(June 20, 2016) ...................................................... 23

Chi. Pub. Schs., *Guidelines Regarding the Support of Transgender
and Gender Nonconforming Students* (2019) ...................................... 22

D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y
Guidance* (2015)........................................................ 22

Elie Vandenbussche, *Detransition-Related Needs and Support:
A Cross-Sectional Online Survey*, 69 J. HOMOSEXUALITY 1602 (2021) .. 13

Haw. Dep't of Educ., *Guidance on Supports for Transgender
Students* ............................................................. 23

iv

*Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022 .............. 12

L.A. Unified Sch. Dist., Pol'y Bulletin BUL-2521.3, *Title IX Policy/ Nondiscrimination Complaint Procedures* (Aug. 14, 2020).................. 22

Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights* (Am. Enter. Inst.), Mar. 2022 ................................................. 13

M.D. Kittle, *Wisconsin School District: Parents are not 'Entitled to Know' if Their Kids are Trans*, FEDERALIST (Mar. 9, 2022).................. 22

N.J. Dep't of Educ., *Transgender Student Guidance for Sch. Dists.*, ... 23

N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students*............................... 23

Sch. Dist. of Phila., *Transgender and Gender Non-Conforming Students* (June 16, 2016)...................................................................... 22

Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), INT'L J. OF TRANSGENDERISM ............................ 13

## INTERESTS OF AMICI CURIAE

The States of Montana, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Nebraska, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia file this amicus brief to ensure that parents retain their fundamental right to direct the upbringing of their minor children—a right the Supreme Court has described as "essential" and "far more precious … than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) and *May v. Anderson*, 345 U.S. 528, 533 (1953)).

## SUMMARY OF ARGUMENT

Our constitutional system has "historically … recognized that the natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). So without a reason to believe a parent is unfit, courts presume that the State may not "inject itself into the private realm of the family [and] question the ability of that parent to make the best decisions concerning the rearing of [their] children." *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000) (plurality op.) (citing *Reno v. Flores*, 507 U.S. 292, 304 (1993)). And that presumption is

not overcome "[s]imply because the decision of a parent [about a child's medical treatment] is not agreeable to [the] child or because it involves risks." *See Parham*, 442 U.S. at 603. School districts can't shut a parent out of their child's decision about their gender identity because the child objects or because the school believes the parent isn't supportive enough of an immediate gender transition.

During the 2020-21 school year, Stephen Foote and Marissa Silvestri ("Appellants") sent their children—B.F., an eleven-year-old girl, and G.F., a twelve-year-old boy—to Ludlow Public Schools. In December 2020, they learned that B.F. talked with one of her teachers about depression, low self-esteem, and possible same-sex attraction. Appx.26–28, ¶¶ 58–68. Afterwards, Silvestri emailed B.F.'s other teachers, informing them that they would be getting B.F. professional help and asking that no one "have any private conversations with B.[F.] in regards to this matter." Appx.28, ¶ 70. But when B.F. emailed her teachers that she identified as "genderqueer" two months later, a school counselor disregarded that request and met privately with B.F. Appx.31–32, ¶ 81. After that meeting, the counselor emailed school staff and told them to conceal B.F.'s new name and pronouns from her parents. Appx.32, ¶ 82.

Around that time, Appellants learned that their son, G.F., had also expressed an alternate gender identity. Appx.30–31, ¶¶ 78–80. As it happens, the school's librarian—who was affiliated with Translate Gender, an organization that shares resources about gender and gender identity, *see* Appx.40, ¶¶ 116–17—was meeting secretly with both G.F. and B.F. Appx.25, ¶ 53. In these meetings, the librarian actively promoted gender experimentation. *See* Appx.25–26, ¶ 52–55. And earlier in the school year, he gave students in B.F.'s sixth grade class an assignment to make biographical videos, where he invited students to include their gender identity and preferred pronouns in their videos. *See* Appx.24, ¶¶ 47–50. He also encouraged B.F. to visit Translate Gender's website. *See* Appx.40, ¶¶ 116–17.

Appellants complained that Ludlow's personnel had concealed critical information about B.F. and G.F., but the administration brushed aside the parents' concerns and defended the actions as consistent with school policy. *See* Appx.154–55. School officials, moreover, publicly maligned Appellants' assertion of parental rights as "thinly-veiled intolerance." Appx.155. Even though the district court rejected Appellants' claims, it agreed that "it is disconcerting that school administrators or a

school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child." Appx.164. But the school's actions aren't simply disconcerting—they're *disturbing*.

Ludlow's policy violates parents' fundamental right "to direct the upbringing of their children"—"perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65. The school's actions violated Appellants' substantive due process rights by withholding information about whether their child has taken any action concerning his or her gender identity, leaving parents completely in the dark about their child's mental and emotional well-being. And this is no isolated occurrence: school districts across the country have adopted similar policies under the mistaken belief that to do otherwise would be unlawful.

The district court erred by misapplying this Court's shock the conscience standard for constitutional liability under 42 U.S.C. § 1983. Because Appellees "had an opportunity to reflect and make reasoned and rational decisions[,] their *deliberately indifferent* behavior toward Appellants was sufficient to shock the conscience." *Rivera v. Rhode Island*,

402 F.3d 27, 36 (1st Cir. 2005) (quotations omitted) (emphasis added). Instead of applying (or even considering) the deliberate indifference standard, the court applied the version of the shock-the-conscience test reserved for situations, unlike here, "where government officials must act in haste, under pressure, and without an opportunity for reflection." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010) (quotations omitted). Under the deliberate indifference standard, Appellants' allegations suffice to survive a motion to dismiss. Given that "whether behavior is conscience shocking varies with regard to the circumstances of the case," *Rivera*, 402 F.3d at 36, the district court's failure to even consider the deliberate indifference analysis, at a minimum, warrants remand.

## ARGUMENT

This Court reviews a district court's dismissal under Rule 12(b)(6) *de novo* and asks whether the well-pleaded facts, taken as true, justify recovery on any supportable legal theory. *Mason v. Morrisette*, 403 F.3d 28, 30 (1st Cir. 2005).

## I. Parents Possess a Longstanding, Fundamental Right to Direct the Care and Custody of Their Children.

Under the Fourteenth Amendment, States may not "deprive any person of … liberty … without due process of law." U.S. Const. amend.

XIV.  The Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," *see Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))—including those unenumerated rights that are "deeply rooted in this Nation's history and tradition," *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (quoting *Glucksberg*, 521 U.S. at 721).

The right of parents to direct the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65; *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) (declaring that "the child is not the mere creature of the State," but rather "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations").  And over the last century, the Supreme Court has reaffirmed that right time and again.  *See Meyer*, 262 U.S. at 399 (the Due Process Clause protects parents' right to "establish a home and bring up children"); *Pierce*, 268 U.S. at 534–35 (the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); *Prince v.*

6

*Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Stanley*, 405 U.S. at 651 (raising one's children has been deemed an "essential" and "basic civil right[] of man" (citation and quotation marks omitted)); *see Dobbs*, 142 S. Ct. at 2257 (identifying, among a list of longstanding rights, "the right to make decisions about the education of one's children"). Nearly a century after *Meyer*, this much is clear: "Th[e] primary role of the parents in the up-bringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

That parental authority is based on the commonsense recognition "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. The law thus makes a basic assumption about children as a class: "[It] assumes that they do not yet act as adults do, and thus [it] act[s] in their interest by restricting certain choices that … they are not yet ready to make with full benefit of the costs and benefits attending such decisions." *Thompson v. Oklahoma*, 487 U.S.

815, 826 n.23 (1988). That basic assumption restricts minor children's rights in myriad ways, such as restricting their right to vote, *see* U.S. Const. amend. XXVI, their right to enlist in the military without parental consent, *see* 10 U.S.C. § 505, or their right to drink alcohol, *see, e.g.,* 23 U.S.C. § 158. And that same principle is traditionally at work in public schools, which routinely require parental consent before a student can receive medication or participate in certain school activities.

To be sure, this broad parental authority is not absolute—parents have no license to abuse or neglect their children. *See Parham*, 442 U.S. at 602–04. Nor does the parental relationship give parents the right to disregard lawful limitations on the use of medical procedures or drugs. *See Doe v. Pub. Health Tr.*, 696 F.2d 901, 903 (11th Cir. 1983) ("John Doe's rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself."). Relatedly, some parental decisions concerning their child's medical care may be "subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604; *but see id.* ("[Yet parents] retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and the traditional presumption that the parents act in the best interests of

their child should apply."). But parents are not stripped of their authority to act in the best interest of their children "[s]imply because the[ir] decision … is not agreeable to a child or because it involves risks." *See id.* at 603–04 ("Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments."). Indeed, "a fit parent"—*i.e.*, a parent who "adequately cares for his or her children"—is presumed to "act in the best interest of his or her child." *Troxel*, 530 U.S. at 68–69.

When a school district's legitimate policies "conflict with the fundamental right of parents to raise and nurture their child," "the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000). But school districts have no interest—much less a compelling one—in actively concealing minor students' gender transitions from their parents.

## II.  Ludlow's Actions and Policies Violated Appellants' Fundamental Right to Care for Their Children.

### A. Ludlow authorized school officials to make decisions about a child's gender identity behind parents' backs.

In 2012, the Massachusetts Legislature amended the student anti-discrimination statute to include gender identity as a protected class.  *See* H.B. 3810, 2011 Reg. Sess., ch. 199 (Mass. 2011) (effective July 1, 2012). On the heels of that update, the Massachusetts Board of Elementary and Secondary Education revised the affected regulations and directed the Department of Elementary and Secondary Education ("DESE") to provide guidance to school districts to help implement those revised regulations.  *See* Appx.17, ¶¶ 22–23.  As requested, DESE published a guidance document that suggested school policies and procedures to address these legal and regulatory changes.  *See* Appx.17, ¶ 24.

That guidance, which does not carry the force of law, encourages schools to accept a student's assertion of his or her gender identity when the student consistently and uniformly asserts a specific gender identity or when there is evidence that the identity is sincerely held as part of the student's core identity.  *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment: Nondiscrimination on*

*the Basis of Gender Identity*, MASS. DEP'T OF ELEMENTARY & SECONDARY EDUC., https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.  It further recommends that "[s]chool personnel … speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian." *Id.*

Rather than encouraging personnel to speak with students before talking with parents, as DESE's guidance suggests, Ludlow implemented a policy forbidding school personnel from notifying parents regarding a student's gender identity issues—*at all*—unless the student consents. *See* Appx.20, ¶¶ 34–36.  Appellees implemented this policy across all Ludlow public schools, requiring all personnel to conceal information regarding a student's transgender status from their parents, including the use of alternative names or pronouns, unless the student consents. *See* Appx.21–22, ¶¶ 37–40.  And the policy provides that personnel should "deliberately deceive parents" by using the student's birth name and pronouns in their parents' presence and using the alternative name and pronouns elsewhere. *Id.*  Under Ludlow's policy, students of any age can

11

insist that their parents are kept in the dark about their transgender status, even when they must get parental consent for lesser matters.[1]

Ludlow's policy gives ultimate decisionmaking authority to children and displaces parents of their longstanding, primary role in ensuring their child's safety and well-being. Now, the question is, do schools have an obligation to facilitate the immediate transition of a student who believes they are transgender and to hide this change from parents who aren't on board? The answer is obviously: No. As a recent review of youth gender treatments recognized, "[s]ocial transition" is "an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning."[2] Ludlow presumably does not treat a child's depression or other mental health issues without involving parents, and it has no duty or right to keep parents in the dark about gender-related distress either.

---

[1] One rightly fears what's next. *See After Being Denied Tattoo, Sixth Grader Decides to Have Gender Reassignment Surgery Instead*, THE BABYLON BEE (Apr. 13, 2022). After all, today's satire too often becomes tomorrow's reality.

[2] *Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022, at 62, https://perma.cc/D5XP-EXAL.

Worse still, Ludlow's 'immediate transition' approach lacks any solid, scientific foundation. Many medical professionals believe that this approach "can become self-reinforcing and do long term harm." Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, at 3, (Mar. 2022).[3] Given the recent explosion of students dealing with gender identity issues, there is a greater need for caution. *See id.* Not only that, but existing research suggests that these feelings eventually recede for most children—that is, for those who do not transition. *See id.* Even so, there are a growing number of "detransitioners," which further supports a cautious, rather than hasty, approach. *See id.* (citing Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. HOMOSEXUALITY 1602 (2021)).

---

[3] *See, e.g.*, Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), INT'L J. OF TRANSGENDERISM, at 7 (arguing that "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence").

## B. The District Court incorrectly applied the "shock the conscience" standard.

Appellants properly alleged facts showing that Ludlow deliberately violated their fundamental right to direct the care and custody of their children. *See, e.g.*, *Troxel*, 530 U.S. at 65; *Parham*, 442 U.S. at 603; *Glucksberg*, 521 U.S. at 722. Yet the district court determined that those facts didn't satisfy the "shock the conscience" standard for claims under 42 U.S.C. § 1983 because the decision to withhold information about B.F. and G.F. from Appellants was not "so extreme, egregious, or outrageously offensive as to shock the contemporary conscience." Appx.167 (quotation omitted). But this misunderstands and misapplies the shock the conscience standard.

Executive action violates substantive due process "when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). But the difficulty lies in the fact that "the measure of what is conscience-shocking is no calibrated yard stick." *Id.* Indeed, this Court has said that "[d]escriptions of what actions qualify as 'conscience-shocking' often descend into a morass of adjectives that are as nebulous as they

14

are pejorative, including 'truly irrational,' 'extreme and egregious,' 'truly outrageous, uncivilized, and intolerable,' and 'stunning.'" *Gonzalez-Fuentes*, 607 F.3d at 880 (citations omitted); *see also Kennedy v. Ridgefield City*, 439 F.3d 1055, 1064–65 (9th Cir. 2006) (stating that "the use of subjective epithets as 'gross' 'reckless' and 'shocking' sheds more heat than light on the thought process courts must undertake").

This Court has recognized that "whether behavior is conscience shocking varies with regard to the circumstances of the case." *Rivera*, 402 F.3d at 36; *see also Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004) ("The conscience-shocking standard is not a monolith; its rigorousness varies from context to context."). *Lewis* defined those circumstances along a spectrum of constitutional liability: beginning with negligence and ending with intentional conduct. *See* 523 U.S. at 849–50. On one end, "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849 (emphasis added). On the other, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.; see also Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been

applied to deliberate decisions of government officials to deprive a person of life, liberty, or property.").

But between these two poles lies "recklessness" or "gross negligence," which, depending on the circumstances, may result in a due process violation.  *See Lewis*, 523 U.S. at 849–50; *see also Gonzalez-Fuentes*, 607 F.3d at 881 ("Anything between those two poles is 'a matter for closer calls.'" (quoting *Lewis*, 523 U.S. at 849)).  *Lewis* noted, for example, that prison officials' "deliberately indifferent" conduct towards the medical needs of prisoners fell into this middle category and satisfied the constitutional fault requirement for a due process violation.  523 U.S. at 850 (citing, *e.g.*, *Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 867 (10th Cir. 1997); *Weyant v. Okst*, 101 F.3d 845, 856 (2nd Cir. 1996)).  So, governmental actions—even those not specifically *intended* to violate constitutional rights—may be evaluated for substantive due process liability under the deliberate indifference standard.  *But see id.* (recognizing that due process rules aren't "subject to mechanical application in unfamiliar territory," but instead "demand[] an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking").

16

This Court has held that one relevant circumstance in the shock-the-conscience analysis is whether the government official had an opportunity to reflect before acting.  *Welch v. City of Biddeford Police Dep't*, 12 F.4th 70, 76 (1st Cir. 2021) ("[W]here officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience …."); *accord Gonzalez-Fuentes*, 607 F.3d at 881 ("[I]n situations 'where actual deliberation on the part of a governmental defendant is practical, the defendant may be held to have engaged in conscience-shocking activity' by exercising 'deliberate indifference.'" (quoting *Coyne*, 386 F.3d at 288)).

Those situations stand in stark contrast to "situations 'where government officials must act in haste, under pressure, and without an opportunity for reflection,'"—in such situations, "even applications of deadly force by those officials cannot be conscience-shocking unless undertaken maliciously and sadistically for the very purpose of causing harm.'" *Gonzalez-Fuentes*, 607 F.3d at 881 (quoting *Coyne*, 386 F.3d at 288).  These situations appear most often in the context of law enforcement.  And because law enforcement personnel in these high-pressure situations "have obligations that tend to tug against each other," the standard for due

process liability in these situations is higher than deliberate indifference. *See Lewis*, 523 U.S. at 853; *Coyne*, 386 F.3d at 288; *see also Whitley v. Albers*, 475 U.S. 312, 320 (1986) (higher standard of fault than deliberate indifference must be shown for officer liability in a prison riot). Ludlow's actions are thus entitled to less deference than that afforded to law enforcement's split-second decisions.

Not only does the nature of the decision matter—*i.e.*, high-pressure decisions or unhurried judgments—but the question "whether behavior is conscience-shocking may be informed in some cases by the nature of the right violated."[4] *See Martinez v. Hongyi Cui*, 608 F.3d 54, 66 (1st Cir. 2010) (citing *Lewis*, 523 U.S. at 847 n.8). And here, Appellants seek to vindicate their rights by ensuring that school personnel provide them with the information necessary to help their children navigate potentially life-altering decisions regarding their gender identity. *Yoder*, 406 U.S. at 232 ("primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.");

---

[4] *See also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) (explaining that while Lewis's "shocks the conscience" standard applies to tortious conduct under the Fourteenth Amendment, "it does not … eliminate more categorical protection for 'fundamental rights' as defined by the tradition and experience of the nation").

*Troxel*, 530 U.S. at 65 (explaining that parents' right to direct the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court"). Without any urgent need to facilitate a student's immediate transition—a particularly challenging showing with presumptively "fit parent[s]," *see Troxel*, 530 U.S. at 68–69—actively concealing important information from parents about their child's well-being should shock the conscience.

The district court itself recognized troubling nature of Ludlow's actions, finding it "disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child." Appx.164. Even so, it found that the countervailing "government interest in providing students with a school environment in which they may safely express their gender identities" weighed in favor of finding that Ludlow's actions didn't satisfy the shock-the-conscience standard. Appx.163; *see also* Appx.163–67. But this misunderstands the nature of parents' fundamental right here: to be informed of critical information about their child's mental health and well-being. Absent some reason to believe Appellants are unfit—such as evidence of abuse or

neglect—Ludlow's personnel had *no right* to conceal this information from Appellants. *See Troxel*, 530 U.S. at 68–69.

Nor can Ludlow hide behind a government policy to lessen the magnitude of its actions. *See Irish v. Fowler*, 979 F.3d 65, 74 (1st Cir. 2020) ("In evaluating whether the defendant's actions shocked the conscience, we also consider whether the defendants violated state law or proper police procedures and training."). As the district court found, Ludlow "ignored the plain language [of DESE guidance] advising that parents be informed." Appx.166 (citation omitted). Not only that, but the district court also admitted that it was "apprehensive about the alleged policy and actions of the Ludlow Public Schools with regard to parental notification." Appx.167.

Even so, the district court found that the facts didn't satisfy its perception of the shock-the-conscience standard. *See* Appx166–67. But nowhere in its analysis did it even mention or consider the deliberate indifference standard. Instead, the court relied on a string of "adjectives that are as nebulous as they are pejorative," *see Gonzalez-Fuentes*, 607 F.3d at 880—looking for conduct that was "stunning," "brutal and inhumane," or "extreme, egregious, or outrageously offensive," *see* Appx.162, 167—to

20

find that Ludlow's actions didn't shock the conscience. And it failed entirely to consider the difference between situations, like here, where actors have an opportunity to reflect and make unhurried judgments and situations, unlike here, where government officials must act in haste, under pressure, and without an opportunity for reflection. *See* Appx163–67. Appellants alleged facts that plausibly satisfy the deliberate indifference standard for due process liability. At a minimum, this Court should remand the case to the district court with instructions to consider whether Appellants plausibly alleged facts sufficient satisfy the deliberative indifference standard.

### C. School districts across the country have adopted parental exclusion policies.

Regrettably, Ludlow's policy is neither groundbreaking nor unique. In recent years, school districts nationwide have quietly implemented similar gender transition guidelines. These parental exclusion policies differ in execution—*i.e.*, whether they place students or school officials in the driver's seat—but they both relegate parents to the back seat. All such policies thus prevent parents from helping their children make crucial decisions about their identity and mental health, in direct violation of parents' fundamental rights. *Parham*, 442 U.S. at 603.

Some policies leave parental involvement to the student's discretion. These policies forbid school officials from disclosing information about a student's transgender status to parents unless the student has authorized the disclosure. Policies like this have shown up in large cities like Washington, D.C.,[5] Philadelphia,[6] Chicago,[7] and Los Angeles,[8] as well as smaller cities like Eau Claire, Wisconsin.[9] And the New Jersey

---

[5] *See* D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance*, at 8 (2015) (instructing educators to not share transgender status with parents without permission from the child), https://perma.cc/G94K-YQ9C.

[6] *See* Sch. Dist. of Phila., *Transgender and Gender Non-Conforming Students*, at 3 (June 16, 2016) ("School personnel should not disclose … a student's transgender identity … to others, including parents … unless the student has authorized such disclosure."), https://www.philasd.org/src/wp-content/uploads/sites/80/2017/06/252.pdf.

[7] *See* Chi. Pub. Schs., *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students*, at 4 (2019) (asserting that children have a right to keep their transgender status from their parents), https://perma.cc/WT5W-E52T.

[8] *See* L.A. Unified Sch. Dist., Pol'y Bulletin BUL-2521.3, *Title IX Policy/Nondiscrimination Complaint Procedures*, at 18 (Aug. 14, 2020) (describing gender identity as confidential), https://perma.cc/2LLZ-5XAH.

[9] *See* M.D. Kittle, *Wisconsin School District: Parents are not 'Entitled to Know' if Their Kids are Trans*, FEDERALIST (Mar. 9, 2022), https://thefederalist.com/2022/03/08/wisconsin-school-district-parents-are-not-entitled-to-know-if-their-kids-are-trans/.

Department of Education has issued similar guidance to all public-school districts in the State.[10]

Other policies require school officials to determine whether it is appropriate to disclose the student's transgender status to their parents. To one degree or another, these policies give school officials discretion to determine whether parents should be involved in a student's transition plan. Policies like this have shown up in school districts in Charlotte[11] and New York,[12] as well as Hawaii's Department of Education.[13] While these policies condition parental involvement on school officials' consent, they still impair parents' fundamental right to raise their children.

---

[10] *See* N.J. Dep't of Educ., *Transgender Student Guidance for Sch. Dists.*, at 2–3 ("A school district shall accept a student's asserted gender identity; parental consent is not required.), https://nj.gov/education/students/safety/sandp/transgender/Guidance.pdf.

[11] *See* Charlotte-Mecklenburg Schs., *Supporting Transgender Students*, at 34 (June 20, 2016) (describing a case-by-case approach to involve parents in transition plans), https://perma.cc/3GAV-UHHM.

[12] *See* N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students* ("[S]chools [must] balance the goal of supporting the student with the requirement that parents be kept informed about their children."), https://perma.cc/RT86-YQXT.

[13] *See* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students*, at 5 ("[I]nitial meeting[s] may or may not include the student's parents."), https://perma.cc/ECZ6-NJGE.

These policies—no matter how laudable their aims—cannot displace parents' longstanding right to care for their children.

## CONCLUSION

When a student considers transitioning gender, parents have a fundamental, constitutional right to be involved in that decisionmaking process. *Troxel*, 530 U.S. at 65. Yet school districts across the country, strong-armed by ideologically driven advocacy groups, have shut parents out of the process and trampled on their fundamental rights. This Court should therefore reverse or, at a minimum, remand for new analysis.

DATED March 20, 2023.

Austin Knudsen
MONTANA ATTORNEY GENERAL

Christian B. Corrigan
  *Solicitor General*

*s/Peter M. Torstensen, Jr.*
Peter M. Torstensen, Jr.
  *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
peter.torstensen@mt.gov

*Counsel for Amicus Curiae*
*State of Montana*

24

**ADDITIONAL COUNSEL**

STEVE MARSHALL
*Attorney General of
Alabama*

TIM GRIFFIN
*Attorney General of
Arkansas*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

DANIEL CAMERON
*Attorney General of
Kentucky*

JEFF LANDRY
*Attorney General of
Louisiana*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

GENTNER F. DRUMMOND
*Attorney General of
Oklahoma*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

JONATHAN SKRMETTI
*Attorney General and
Reporter of Tennessee*

KEN PAXTON
*Attorney General of
Texas*

SEAN D. REYES
*Attorney General of
Utah*

JASON MIYARES
*Attorney General of
Virginia*

PATRICK MORRISEY
*Attorney General of
West Virginia*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,640 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

/s/     *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: March 20, 2023          /s/     *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.