No. 23-1069

---

# United States Court of Appeals
# For the First Circuit

---

STEPHEN FOOTE, individually and as Guardian and next friend of B.F. and G.F., minors and MARISSA SILVESTRI, individually and as Guardian and next friend of B.F. and G.F., minors,

*Plaintiffs-Appellants,*

v.

LUDLOW SCHOOL COMMITTEE, TODD GAZDA, former Superintendent; LISA NEMETH, Interim Superintendent; STACY MONETTE, Principal, Baird Middle School; MARIE-CLAIRE FOLEY, school counselor, Baird Middle School; JORDAN FUNKE, former librarian, Baird Middle School; TOWN OF LUDLOW

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, INC. IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

Jon W. Davidson (admitted only in California)
Harper S. Seldin (admitted only in Pennsylvania)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(323) 536-9880
jondavidson@aclu.org

Ruth A. Bourquin (1st Cir. No. 13282)
Mary F. Brown (1st Cir. No. 1206049)
Alexandra Arnold (1st Cir. No. 1205706)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
rbourquin@aclum.org
mbrown@aclum.org
aarnold@aclum.org

i

# TABLE OF CONTENTS

Table of Authorities ................................................................ iii

Corporate Disclosure Statement .......................................... vii

Statement of Interest .............................................................. 1

Introduction .......................................................................... 2

Argument ............................................................................... 7

I.    There is no fundamental constitutional right for parents to immediately be notified of a student's gender identity presentation at school or to force schools to address a student contrary to the student's preferences. ....... 8

    A.    Parental rights are broad and important but not absolute ..................... 8

    B.    Plaintiffs-Appellants would extend parental control over the school day beyond the scope of any constitutionally protected parental rights. ................................................. 10

    C.    Respecting gender identity is not medical treatment. ........................ 13

II.    Schools have a compelling interest in fostering an educational environment conducive to learning and free of discrimination, and the Guidance is narrowly tailored to serve that interest. ..................................... 16

    A.    An environment conducive to learning includes affirming transgender and non-binary students' gender identity. ...................... 17

    B.    Case-by-case assessment of students' needs and individual circumstances is essential to ensuring students' wellbeing and ability to focus on learning. ................................................. 19

    C.    Inclusivity benefits schools as a whole. ............................................ 21

D.    The Guidance is narrowly tailored to further compelling state interests. ..... 23

Conclusion ........................................................................... 27

Certificate of Compliance ..................................................... 29

Certificate of Service ............................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*,
  503 F.3d 256 (3d Cir. 2007)................................................................. 13

*Bailey v. Va. High Sch. League, Inc.*,
  488 F. App'x 714 (4th Cir. 2012) (per curiam) ........................... 10-11

*Blau v. Fort Thomas Pub. Sch. Dist.*,
  401 F.3d 381 (6th Cir. 2005)......................................................... 10, 16

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ....................................................................... 21

*Brown v. Bd. of Educ.*,
  347 U.S. 483 (1954),
  *supplemented*, 349 U.S. 294 (1955)............................................... 16, 22

*Brown v. Hot, Sexy & Safer Prods., Inc.*,
  68 F.3d 525 (1st Cir. 1995) ................................................................ 10

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005).................................................................. 9

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*,
  973 F.3d 1010 (9th Cir. 2020)
  *cert. denied sub nom.*, 141 S. Ct. 2583 (2021)................................... 8-9

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
  276 F. Supp. 3d 324 (E.D. Pa. 2017),
  *aff'd*, 897 F.3d 518 (3d Cir. 2018) ..................................................... 22

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018),
  *cert. denied,* 139 S. Ct. 2636 (2019) ........................................... *passim*

*Doe v. Alpine Sch. Dist.*,
  2023 WL 4108337 (D. Utah June 21, 2023) ...................................... 13

*Doe v. Hopkinton Pub. Sch.*,
  19 F.4th 493 (1st Cir. 2021)................................................................. 2

*Doe v. Irwin*,
  615 F.2d 1162 (6th Cir. 1980)............................................................ 12

*Doe v. Ladapo,*
2023 WL 3833848 (N.D. Fla. June 6, 2023) ................................................. 13, 20

*Evancho v. Pine-Richland Sch. Dist.,*
237 F. Supp. 3d 267 (W.D. Pa. 2017) ......................................................... 20, 22

*Fleischfresser v. Dirs. of Sch. Dist. 200,*
15 F.3d 680 (7th Cir. 1994) .................................................................................. 10

*Grimm v. Gloucester Cnty. Sch. Bd.,*
400 F. Supp. 3d 444 (E.D. Va. 2019),
*aff'd*, 972 F.3d 586 (4th Cir. 2020, *as amended* Aug. 28, 2020) ........................ 22

*Grimm v. Gloucester Cnty. Sch. Bd.,*
972 F.3d 586 (4th Cir. 2020, *as amended* Aug. 28, 2020),
*cert. denied,* 141 S. Ct. 2878 (2021) ............................................................. *passim*

*H.B. Rowe Co., Inc. v. Tippett,*
615 F.3d 233 (4th Cir. 2010) ............................................................................... 24

*Hodge v. Jones,*
31 F.3d 157 (4th Cir. 1994) .................................................................................... 8

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
622 F. Supp. 3d 118 (D. Md. 2022) ................................................................... 7, 8

*Kowalski v. Berkeley Cnty. Schs.,*
652 F.3d 565 (4th Cir. 2011) ............................................................................... 16

*Lee v. York Cnty. Sch. Div.,*
484 F.3d 687 (4th Cir. 2007) ............................................................................... 16

*Leebaert v. Harrington,*
332 F.3d 134 (2d Cir. 2003) .................................................................................. 9

*Martinez v. Cui,*
608 F.3d 54 (1st Cir. 2010) ................................................................................. 10

*New York v. Ferber,*
458 U.S. 747 (1982) ............................................................................................ 16

*Parents for Privacy v. Barr,*
949 F.3d 1210 (9th Cir. 2020) ...................................................................... *passim*

*Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.,*
148 F.3d 260 (3d Cir. 1998) ............................................................................ 9-10

*Parker v. Hurley,*
514 F.3d 87 (1st Cir. 2008) ........................................................................ 2, 8, 11

*Regino v. Staley*,
   2023 WL 2432920 (E.D. Cal. Mar. 9, 2023) ................................................ *passim*

*Shanks v. Blue Cross & Blue Shield United of Wis.*,
   979 F.2d 1232 (7th Cir. 1992)................................................................... 14

*Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*,
   2021 WL 1617206 (D. Conn. Apr. 25, 2021),
   *aff'd*, 2022 WL 17724715 (2d Cir. Dec. 16, 2022) ....................................21-22

*Thomas v. Evansville-Vanderburgh Sch. Corp.*,
   258 F. App'x 50 (7th Cir. 2007) ............................................... 9, 10, 11

*Troxel v. Granville*,
   530 U.S. 57 (2000) ..................................................................................... 8

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017)................................................................. 21

## United States Constitution

Fourteenth Amendment ..................................................................... 7

## Statutes

Mass. Gen. Laws ch. 76, § 5 .................................................... *passim*

Mass. Gen. Laws ch. 127, § 32A ......................................................... 15

## Rules

Fed. R. App. P. 29(a)(2)................................................................. 1

Fed. R. App. P. 32(a) ................................................................... 29

Fed. R. App. P. 32(g) ................................................................... 29

## Regulations

603 C.M.R. § 26.05(1) .......................................................... 3, 15, 17

603 C.M.R. § 26.07(1) .......................................................... 3, 15, 17

**Other Authorities**

Augustus Klein & Sarit A. Golub, *Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults 193-99*, LGBT HEALTH (2016)..........................19

Brandon A. Robinson, *Conditional Families and Lesbian, Gay, Bisexual, Transgender, and Queer Youth Homelessness: Gender, Sexuality, Family Instability, and Rejection 383-96*, J. MARRIAGE & FAM. (2018)........19-20

Brenda Alvarez, *Why Pronouns Matter*, neaToday (Oct. 5, 2022) ........................15

Gerald T. Montano, et al*., Disparities in Parental Support and Parental Attachment Between Heterosexual and Sexual Minority Youth: A Meta-Analysis* S32–S33, J. ADOLESCENT HEALTH (2018) ...............................19

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici curiae* the American Civil Liberties Union of Massachusetts, Inc., and the American Civil Liberties Union certify that neither has a parent corporation and that no publicly held corporation owns 10% or more of either's stock.

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-profit, non-partisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution. The American Civil Liberties Union of Massachusetts, Inc. ("ACLUM") is a statewide non-profit membership organization and an affiliate of the ACLU dedicated to the principles of liberty and equality embodied in the constitutions and laws of Massachusetts and the United States.

As organizations that advocate for lesbian, gay, bisexual, and transgender people to live openly without discrimination and enjoy equal rights and personal autonomy, the ACLU, ACLUM, and their members have a strong interest in ensuring equal opportunities for transgender and gender nonconforming students in public schools. The ACLU has appeared as counsel-of-record and as amicus curiae in many cases nationwide to ensure that transgender students can participate fully in public schools, including as counsel-of-record in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020, as amended Aug. 28, 2020), *cert. denied*,

---

[1]Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the ACLU and ACLUM certify that no person or entity, other than the ACLU or ACLUM, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored the brief in whole or in part. The parties have consented to the filing of amicus briefs.

141 S. Ct. 2878 (2021); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020); and *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019). ACLUM has appeared before this Court on many issues, including those related to students' educational rights. *See, e.g.*, *Doe v. Hopkinton Pub. Sch.*, 19 F.4th 493 (1st Cir. 2021); *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).

## INTRODUCTION[2]

For schools to provide an educational environment conducive to learning, students must feel safe, supported, and welcomed. When students face hostility or discrimination at school or when their identity is undermined, their ability to learn is compromised. Referring to students by the name and pronouns that reflect who they understand themselves to be is an important element of ensuring a supportive educational environment for all students, including for transgender and gender nonconforming students.

The Massachusetts Legislature has prohibited discrimination on the basis of gender identity in public schools. Mass. Gen. Laws ch. 76, § 5 ("No person shall be . . . discriminated against. . . in obtaining the advantages, privileges and courses of study of such public school on account of . . . sex, gender identity, . . . or sexual

---

[2]ACLU and ACLUM submit this brief in support of affirmance of the district court decision based solely on the grounds expressly stated in this brief.

orientation"). As a result, schools must "encourage respect for the human and civil rights of all individuals regardless of . . . gender identity," 603 C.M.R. § 26.05(1), and remove "all obstacles to equal access to school programs for all students" based on gender identity, 603 C.M.R. §26.07(1).

Consistent with these mandates and recognizing that transgender and gender nonconforming students often face hostility, discrimination, bullying, and worse, the Massachusetts Department of Elementary and Secondary Education ("DESE") has issued non-binding guidance (the "Guidance") of best practices for affirming transgender and gender nonconforming students' gender identities in school. App'x 157.[3] The Guidance suggests that "[s]chool personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian" and "discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian." *Id*. at 158.

Although Plaintiffs-Appellants purport not to challenge the Guidance, their claims are inconsistent with it and the educational principles on which it is based. They claim the Constitution mandates that public schools immediately inform a

---

[3]Order on Motion to Dismiss, pp. 7-8 (discussing DESE "Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment," available at https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html#5).

student's parents about what name and pronouns the student asks to be referred to at school, at least where they might imply a gender identity different than that of which the parents approve. This "right" seemingly would mean that parents must be informed, even before the school has had an opportunity to consult with the student about their own intentions to inform their parents or to evaluate whether there may be risks associated with such notification, and regardless of any harmful or discriminatory impact on the student's educational opportunities and wellbeing. Plaintiffs-Appellants also assert that the Constitution mandates that schools cease using a student's chosen name and pronouns at school if the parents object. These positions are not correct. The constitutional protection for parental rights does not encompass a constitutional right to mandatory notification by public school officials of information relevant to a child's gender identity or transgender status, and it does not alter or limit a school's obligation to create an equal educational environment.

Parents who choose to enroll their children in public school do not have a constitutional right to control what is taught or how the school is run. Schools have pedagogical and legal obligations to ensure equal and supportive educational environments for their students, while also taking into account the real harms that transgender and gender nonconforming students may face at school and at home— including lack of support, parental rejection, and even threats to their safety. To assess the contours of the circumstances in a particular case, public school officials

need to be able to evaluate the individual situation, including by consultation first with the student, before deciding when, how and whether to discuss the situation with the parents. By providing the necessary flexibility to navigate potentially complex situations, Massachusetts law and the Guidance are tailored to serve legitimate and compelling ends.

Plaintiffs-Appellants also argue that the Guidance infringes on their constitutional right to make medical and mental health decisions for their children. But a school's decision to refer to students by the names and pronouns that reflect who they are is not medical treatment: being transgender is not a psychiatric condition, and calling people (including children and adolescents) by the names and pronouns that reflect how they identify is the floor of respect in civil society. School staff do not become medical providers by simply respecting all students and ensuring that they are safe and welcome at school.

Even if the Guidance or the conduct of the Defendants-Appellees implicated any fundamental rights of parents—which the district court correctly decided they did not—the Guidance is narrowly tailored to further compelling state interests and therefore survives even strict scrutiny. Such interests include providing a safe and supportive learning environment for all students, including transgender and gender nonconforming students, who "face unique challenges in the school setting," *Grimm*, 972 F.3d at 597, as well an interest in preventing discrimination on the basis of

gender identity. *See* Mass. Gen. Laws ch. 76, § 5; *Boyertown*, 897 F.3d at 525, 528-29 (schools have a "compelling interest in protecting the physical and psychological wellbeing of minors" and "a compelling state interest in not discriminating against transgender students" and "in protecting transgender students from discrimination.").

The interest in ensuring transgender and gender nonconforming students are provided a safe and supportive educational environment free of hostility and discrimination is an urgent one. These students face heightened risks to their educational focus, safety and wellbeing, including from harassment and bullying from their peers, familial rejection and homelessness, and higher rates of suicidal ideation and suicide attempts. But despite these risks, transgender and gender nonconforming students can thrive when they are able to participate in school life consistent with their gender identity. Calling students by the name and pronouns congruent with their identity is a core aspect of providing this environment. Allowing school officials to honor students' wishes pending an individualized evaluation of how, whether and when to inform parents, including in the hopefully rare situation when serious family conflict might result, is not a violation of parental rights.

**ARGUMENT**

The due process clause of the Fourteenth Amendment does not encompass a fundamental right of parents to be immediately informed by school authorities if their child chooses to use a name or pronouns or expresses a gender identity at school that differs from that usually associated with their sex assigned at birth. *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 130 (D. Md. 2022); *accord Regino v. Staley*, 2023 WL 2432920, at \*3 (E.D. Cal. Mar. 9, 2023) (declining to find a constitutional violation where plaintiff parent provided no case law supporting schools "affirmative duty to inform parents of their child's transgender identity"). Given that no fundamental right is substantially implicated, the Guidance and the Defendants-Appellees' alleged conduct based on the Guidance are lawful because they are clearly supported by a rational basis. But even if the Guidance or the Defendants-Appellees' alleged conduct infringed to some extent upon a fundamental constitutional right and were subject to strict scrutiny—which the district court correctly determined they did not—they are narrowly tailored to advance the state's compelling interests in ensuring student safety and wellbeing and in avoiding an educational environment that discriminates based on gender identity.

**I.    There is no fundamental constitutional right for parents to immediately be notified of a student's gender identity presentation at school or to force schools to address a student contrary to the student's preferences.**

Though parents possess broad rights over the care of their minor children, those rights are not absolute and do not extend to control over the type of school decision-making at issue here. *See Regino*, 2023 WL 2432920, at *3; *John & Jane Parents 1*, 622 F. Supp. 3d at 130.

**A.    Parental rights are broad and important but not absolute.**

Parents do not have an absolute or unqualified right to make decisions concerning their children. While parents have a fundamental right "to make decisions concerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion), that liberty interest "does not reside there exclusively," nor is it beyond regulation "in the public interest." *Barr*, 949 F.3d at 1231; *see also Hodge v. Jones*, 31 F.3d 157, 163-64 (4th Cir. 1994) ("The maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest.").

The proposition that "while parents can choose between public and private schools, they do not have a constitutional right to direct *how* a public school teaches their child" is "well-recognized." *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008) (collecting cases) (internal quotation omitted). Parents possess "the right to choose the educational forum, but not what takes place inside the school." *Cal. Parents for*

the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020), *cert. denied sub nom.*, 141 S. Ct. 2583 (2021). Parents "do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities," and parental rights are "substantially diminished" once they elect to send their children to public school. *Id*. Parents who disagree with school policies "have the right to remove their children from" public schools, but their rights do not extend to requiring that public schools follow particular policies. *Barr*, 949 F.3d at 1240 n.16.

Courts have consistently applied this long-standing principle in a broad range of contexts. *See, e.g., id.* at 1231-33 (no fundamental right to object to school policy allowing transgender students to use single-sex facilities consistent with their gender identity); *Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 F. App'x 50, 54 (7th Cir. 2007) (private conversation between school counselor and student regarding school performance did not violate parent's right to direct child's upbringing); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005) (parental rights not violated by child's participation in survey seeking information about drug and alcohol use, sexual activity, physical violence, and suicide attempts); *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) (upholding school's mandatory health classes against father's claim of violation of fundamental rights); *Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 148 F.3d 260, 277 (3d Cir. 1998)

9

(upholding school's consensual condom distribution program); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995) (upholding compulsory high school sex education assembly program), *abrogated on other grounds by Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010); *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994) (parents lacked constitutional right to exempt child from reading program).

**B.  Plaintiffs-Appellants would extend parental control over the school day beyond the scope of any constitutionally protected parental rights.**

Courts have recognized the broad authority of schools to control the school day. "Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (internal quotation marks and citations omitted); *see also Thomas*, 258 F. App'x at 52, 54 (no violation of parental rights based on failure to inform parent of counselor's conversations with student, which were "academically oriented conversations when they occurred" about "difficulties functioning and performing at school"). In short, parents' "right to control individual components of their [child's] education . . . is not constitutionally protected." *Bailey v. Va. High Sch.*

10

*League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (per curiam); *see also Thomas*, 258 F. App'x at 54 (parental rights do not extend "to control[ling] every aspect of [their] child's education at a public school.").

Not allowing parents to control what transpires during the school day is a practical necessity: "accommodating the different personal, moral, or religious concerns of every parent would be impossible for public schools, because different parents would often likely . . . prefer opposite and contradictory outcomes." *Barr*, 949 F.3d at 1233 (internal quotations omitted). As a result, even when a school provides an educational environment inconsistent with the parents' own views about how their child should be raised, "the substantive due process clause by itself, either in its parental control or its privacy focus, does not give plaintiffs the degree of control over their children's education that their requested relief seeks." *Parker*, 514 F.3d at 102-03.

A contrary conclusion could lead to a requirement that schools must provide constant updates on students' day-to-day conduct and demeanor, tailored to each parent's specific concerns about how their child should be raised. *See, e.g.*, *Regino*, 2023 WL 2432920, at *4 (observing that the parent plaintiff's "argument in this case has implications beyond gender identity and expression and can be applied to any personal aspect of a child's expression in school that a parent deems relevant to their health and well-being; thus, sexual orientation, the expression of one's racial, ethnic,

or cultural identity, and other topics subject to school policies could be subject to legal scrutiny . . ."). For example, a parent might want to know if their child was using makeup—especially if that was not permitted at home—but it does not violate the parents' constitutional right to raise their child as they see fit if the school has a policy of allowing all students to wear makeup, regardless of the gender identity of the student at issue. Nor does a parent have a constitutional right to require the school to inform the parent, on a continuous, immediate, or any basis, whether or not their child is following the parents' rules about makeup while at school. Similarly, parents of the Muslim or Jewish faiths might wish to know whether their child was regularly wearing hijab or a yarmulke at school, but that does not mean they have a constitutional due process right to require the school to monitor and report back, or to require school administrators to instruct their children to comply with their parents' directives while in school.

For the same reasons, schools are not constitutionally required to report a student's gender expression,  including a request to use a different name or pronouns. Although a parent's desire to know about—and even control—the name and pronouns their children use in public school may be understandable, it is not constitutionally protected. *See, e.g.*, *Doe v. Irwin*, 615 F.2d 1162, 1169 (6th Cir. 1980) ("The desire of the parents to know of such activities by their children is understandable. However[,] the only issue before the district court and this court is

whether there is a constitutional obligation on the Center to notify them" regarding contraceptive distribution); *see also*, *e.g.*, *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 269 (3d Cir. 2007) (holding that there is "no constitutional right to parental notification of a minor child's exercise of reproductive privacy rights."); *Doe v. Alpine School Dist.*, 2023 WL 4108337 *2 (D. Utah June 21, 2023) (parents "cannot wield the constitutional right to parent as a sword to require the district to adopt policies that help them to direct and control their son's choices").

### C.  Respecting gender identity is not medical treatment.

Everyone has a gender identity. Simply put, gender identity is a person's core sense of belonging to a particular gender. *See, e.g., Doe v. Ladapo*, 2023 WL 3833848, at *1 (N.D. Fla. June 6, 2023). There exists a broad societal intuition that cisgender people know their own gender identity and do not need a medical professional to confirm it. No one asks a boy who is not transgender for a doctor's note before using his pronouns. And the same is true of transgender and gender nonconforming individuals: their sense of self is just as deeply felt.[4] Using gendered honorifics (like "Sir" or "Ms.") or pronouns (whether gendered, like "he/him" or

---

[4] For cisgender people, "their gender identity—or their deeply felt, inherent sense of their gender—aligns with their sex-assigned-at-birth." *Grimm*, 972 F.3d at 594 (internal citation omitted). "Just like being cisgender, being transgender is natural and is not a choice." *Id.*

"she/her," or not, like "they/them") is an acknowledgement of this core sense of self, regardless of whether the person in question is transgender or cisgender.

Social transition may be medically indicated for the subset of transgender youth who receive a diagnosis of gender dysphoria.[5] But those who use gender-affirming names and pronouns for transgender students—whether or not the students have a gender dysphoria diagnosis—are not themselves providing medical care. They are simply practicing basic civil decency and acting consistent with the need to ensure a welcoming and supportive educational environment.

"Treatment, as commonly understood, occurs when a *health care provider* takes steps to remedy or improve a malady that caused the patient to seek [the provider's] help." *Shanks v. Blue Cross & Blue Shield United of Wis.*, 979 F.2d 1232, 1233 (7th Cir. 1992) (emphasis added). Calling people by names that match who they are and how they feel (whether a given name, nickname, or honorific) and using their pronouns (whether corresponding with a sex assigned at birth or not) is not itself the provision of medical care, even if it may be medically indicated for some transgender youth. Being transgender is not a mental health condition, and students

---

[5]According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders, "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth. *See, e.g.*, *Grimm*, 972 F.3d at 594-95.

who are transgender have the same rights as cisgender students to have their gender identity respected. *See* Mass. Gen. Laws ch. 76, § 5; 603 C.M.R. §§ 26.05(1), 26.07(1); *see also* Mass. Gen. Laws ch. 127, § 32A (gender identity of prisoners to be recognized "with or without a diagnosis of gender dysphoria").

School personnel perform any number of tasks during the school day that may relate to a medical condition—for example, reminding a child to use their reading glasses, or providing noise-cancelling headphones or a fidget device to a student requiring sensory accommodations—but that is not the same as providing medical treatment, and a teacher does not become a medical provider by facilitating learning with tools that can help students focus. Using a student's name and pronouns is that kind of facilitation: the focus on school work by transgender and gender nonconforming students can be interrupted if they are persistently addressed using a name and pronouns that undermine their sense of self.[6] Schools are charged with helping students focus and thrive, and the Guidance does precisely that: it creates an opportunity for transgender and gender nonconforming students to learn from their teachers and peers by eliminating the distress and distraction of persistent misgendering.

---

[6]*See* Brenda Alvarez, *Why Pronouns Matter*, neaToday (Oct. 5, 2022), https://www.nea.org/advocating-for-change/new-from-nea/why-pronouns-matter.

II.    **Schools have a compelling interest in fostering an educational environment conducive to learning and free of discrimination, and the Guidance is narrowly tailored to serve that interest.**

Because the school's actions did not substantially intrude on constitutionally protected parental rights, they need only be supported by a rational basis, *see, e.g.*, *Blau*, 401 F.3d at 393*,* which they clearly are. In fact, the state's interests are compelling such that strict scrutiny is satisfied if applicable.

The state has a compelling interest in fostering an environment conducive to learning, which includes ensuring the safety and wellbeing of transgender and gender nonconforming students and avoiding discrimination. The state's compelling interest in protecting children is well-established. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling" (internal citation omitted)). When the state provides public education, "perhaps the most important function of state and local governments," it "is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954), *supplemented*, 349 U.S. 294 (1955). A school board's "responsibility includes the well-being of the students," *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007), and school administrators are charged with "provid[ing] a safe school environment conducive to learning," *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 572 (4th Cir. 2011). That "compelling interest in

protecting the physical and psychological well-being of minors" extends to "a compelling state interest in not discriminating against transgender students" and "in protecting transgender students from discrimination." *Boyertown*, 897 F.3d at 525, 528, 529.

Massachusetts has expressly recognized that compelling state interest by prohibiting discrimination on the basis of gender identity in public schools, *see* Mass. Gen. Laws ch. 76, § 5, and requiring schools to "encourage respect for the human and civil rights of all individuals regardless of . . . gender identity," 603 C.M.R. § 26.05(1), and to remove "all obstacles to equal access to school programs for all students" based on gender identity, 603 C.M.R. § 26.07(1).

### A.    An environment conducive to learning includes affirming transgender and non-binary students' gender identity.

The state's compelling interest in fostering an environment conducive to learning justifies the creation of a welcoming and non-discriminatory experience for transgender and gender nonconforming students. Affirming their gender identity is central to such an environment. "Transgender students face unique challenges in the school setting." *Grimm*, 972 F.3d at 597. "When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Boyertown*, 897 F.3d at 529. Transgender and gender nonconforming youth encounter social stigma and hostility, often leading to violence and discrimination, including harassment at alarming rates in schools. *See Grimm*,

972 F.3d at 612 (explaining that 78% of transgender students are harassed in schools).

Affirming transgender and gender nonconforming students' gender identity fosters a school environment conducive to learning: transgender students perform as well as their cisgender peers when their gender identity is affirmed with appropriate pronouns and names. *See Boyertown*, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers.") (internal quotation marks and footnote omitted). While harassment at school is correlated with negative mental health outcomes, the "opposite is also true []: transgender students have better mental health outcomes when their gender identity is affirmed." *Grimm*, 972 F.3d at 597. Affirming students in this way correlates with lower rates of psychological distress and improved emotional functioning. *See, e.g.*, *Boyertown*, 897 F.3d at 522-23 (discussing social gender transition).

That affirmation—including the use of names and pronouns consistent with a student's gender identity—is an essential component of transgender and gender nonconforming students' access to equal educational opportunity.

**B.    Case-by-case assessment of students' needs and individual circumstances is essential to ensuring students' wellbeing and ability to focus on learning.**

A process through which school officials are able to evaluate each student's needs and circumstances on a case-by-case basis before they might inform—or recommend to the student that the student inform—the parents of their gender identity directly serves the compelling interest in ensuring a safe, supportive and equal educational environment.

The challenges facing transgender and gender nonconforming students are real and urgent. Although many parents are supportive of their children, it is not uncommon for parents to reject their children's transgender or gender nonconforming identity, leading to significant familial conflict. *See, e.g.*, Gerald T. Montano, et al., *Disparities in Parental Support and Parental Attachment Between Heterosexual and Sexual Minority Youth: A Meta-Analysis* S32–S33, J. ADOLESCENT HEALTH (2018). Such lack of parental support is a strong predictor of suicidal ideation and suicide attempts, *see* Augustus Klein & Sarit A Golub, *Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults* 193-99, LGBT HEALTH (2016), and leads to heightened rates of homelessness among transgender youth, *see* Brandon A. Robinson, *Conditional Families and Lesbian, Gay, Bisexual,*

*Transgender, and Queer Youth Homelessness: Gender, Sexuality, Family Instability, and Rejection* 383–96, J. MARRIAGE & FAM. (2018).

Given the intimate, personal nature of gender identity, and the undeniable and well-documented harms that transgender people experience, there is a compelling interest in establishing a thoughtful process to evaluate an individual student's context in deciding when, how and whether to inform parents. *See Grimm*, 972 F.3d at 611-12 (explaining the historical discrimination against transgender people, the current challenges facing transgender people in housing and employment, the prevalence of harassment in schools, and transgender people's lack of political power); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (finding that "transgender people as a class have historically been subject to discrimination or differentiation"); *see also Doe v. Ladapo*, 2023 WL 3833848, at *9 (observing that transgender individuals "continue to suffer widespread private opprobrium and governmental discrimination"). And because the students themselves are a key source of information about their lives, it is appropriate to give school officials the opportunity to work with them to assess relevant circumstances and to develop a plan to support the students and mitigate any potential harms of disclosing the students' gender identities to their parents, including any disruption of the students' focus on school. Forcing educators to communicate a student's gender identity or their exploration of their gender identity to their parents, without

time to carefully consider how to address any potential negative outcomes, would be inconsistent with the school's compelling interest in ensuring a conducive learning environment and the safety of students. It would also interfere with the trusting relationships between educators and students that are essential to a productive learning environment.

### C.    Inclusivity benefits schools as a whole.

The benefits of affirming every student's gender identity extend to the school environment at large. Policies that protect transgender and gender nonconforming students may also "foster[] an environment of inclusivity, acceptance, and tolerance," which "not only serves the compelling interest of protecting transgender students, but it benefits all students by promoting acceptance." *Boyertown*, 897 F.3d at 529.

Those principles of inclusivity, acceptance, and tolerance are not idiosyncratic: they are consistent with an ever-growing body of caselaw regarding transgender and gender nonconforming individuals' constitutional and statutory rights. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1753 (2020) (holding that Title VII prohibits discrimination on the basis of, *inter alia*, transgender status); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (same under Equal Protection Clause and Title IX); *see also Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 3:20-CV-00201 (RNC),

2021 WL 1617206, at *10 (D. Conn. Apr. 25, 2021), *aff'd*, No. 21-1365-CV, 2022 WL 17724715 (2d Cir. Dec. 16, 2022) ("Courts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 458-62 (E.D. Va. 2019), *aff'd*, 972 F.3d 586 (4th Cir. 2020, as amended Aug. 28, 2020) (discrimination against transgender student violated Equal Protection Clause and Title IX); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 390 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018) (collecting cases for the proposition that school districts violate the Equal Protection Clause and Title IX by precluding transgender students from using the restrooms); *Evancho*, 237 F. Supp. 3d at 294 (discrimination against transgender students violated Equal Protection Clause).

Given the "importance of education to our democratic society" as "the very foundation of good citizenship," including "awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment," *Brown*, 347 U.S. at 493, it is well within schools' purview to foster an environment of inclusivity, acceptance, and tolerance for transgender and gender nonconforming students, not only for the benefit of those particular students, but for all students.

**D.    The Guidance is narrowly tailored to further compelling state interests.**

The Guidance is narrowly tailored to ensure that schools can provide for the inclusion, safety and wellbeing of students by allowing schools to make individualized determinations, including as to when, how and whether to inform parents that their children are exploring gender identity issues. The Guidance specifically notes that it "sets out general principles based on the law . . . and reflects the need to consider issues on a case-by-case basis." It also highlights that "the needs of each transgender or gender nonconforming student should be assessed and addressed on a case-by-case basis." As the district court put it, the Guidance "also encourages schools to consult with students who assert a different gender identity at school before disclosing information about a student's gender identity to the student's family," i.e. "the plain language advis[es] that parents be informed after the student is advised that such communication will occur." (App'x 165-166). As another district court recently observed, "[i]t is not necessarily a school's duty to act as an impenetrable barrier between student and parent on intimate, complex topics like gender expression and sexuality . . . On the other hand, granting parents unimpeded access to and control over a student's personal life can result in conflict that makes students feel vulnerable and unsafe both at home and at school . . ." *Regino*, 2023 WL 2432920, at *5.

23

The Guidance is narrowly tailored because honoring students' chosen name and pronouns, including pending any parental notification, is the only workable option to protect the state's interests in fostering an environment conducive to learning, avoiding discrimination within the school, and preserving the safety and wellbeing of transgender and gender nonconforming students. *Cf. H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 252 (4th Cir. 2010) (in the context of race, while narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," it does not require that the state "exhaust . . . every conceivable race-neutral alternative") (internal citation omitted).

The Guidance is narrowly tailored to ensuring transgender students are positioned to succeed at school. As discussed in II. A. above, transgender students perform as well as their cisgender peers when their gender identity is affirmed at school with appropriate pronouns and names. *See Boyertown*, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers.") (internal quotation marks and footnote omitted). "[T]ransgender students have better mental health outcomes when their gender identity is affirmed." *Grimm*, 972 F.3d at 597. Affirming students in this way correlates with decreased psychological distress and increased emotional

function. *See, e.g.*, *Boyertown*, 897 F.3d at 522-23 (discussing social gender transition).

In contrast, forcing transgender students to use their birth name and pronouns at school leads "to negative educational outcomes" and indeed can expose them to the "life threatening" risks of discrimination, *see Boyertown*, 897 F.3d at 529, when they are already harassed at alarming rates in schools. *See Grimm*, 972 F.3d at 612. And forcing transgender students to notify their parents exposes them to inordinately high risks of familial rejection, within a population that already disproportionally experiences assault, homelessness, and poverty. *Id.* Transgender and gender nonconforming students most effectively learn when they are referred to by the name and pronoun that match who they are, and for many children, school is a place where they can safely explore and affirm their identity before doing so with their parents at home.

The Guidance provides a workable and narrowly tailored case-by-case approach, whereas categorical rules about when or whether parents must be informed would harm transgender and gender nonconforming students and create a less safe, less supportive learning environment. A categorical rule requiring schools to provide parental notification or obtain consent before honoring a student's choice to use a name and pronouns that reflect who they know themselves to be would interfere with the student's educational focus. It could even endanger those students

who may come to harm because of that disclosure, at least without careful planning as to the right time and circumstances. Indeed, a rule forcing schools to ignore the name and pronoun preferences of transgender and gender-nonconforming students would discriminate against those students, since cisgender students are free to ask that a nickname or other variant of the name their parents prefer be used at school.

The Guidance, by its own account, is limited in scope: it extends no further than the schoolhouse door. If a student wishes to be called by a certain name and pronouns in the school environment, but not elsewhere, then the Guidance provides sufficient flexibility on a case-by-case basis to enable school personnel to use that name and those pronouns in school. The Guidance recognizes that, for many transgender and gender non-conforming children, the right course may be for them not to express their gender identity in certain contexts, but that is not a reason to fail to affirm them in school. *See* Guidance ("Many transgender people experience discrimination, and some experience violence due to their status. Some environments may feel safe and inclusive, and others less so, challenging a person's ability to live consistently with one gender identity in all aspects of life.").  And as the district court concluded, the Guidance does not categorically bar parents being informed on a case-by-case basis after time for evaluation. App'x 165-166.

The Guidance does not require that parents address their child in any particular way nor prevent parents from sharing their own views about gender identity

26

generally or their child's gender identity specifically with their child. The Guidance is written such that students, in school, can be addressed in a manner that is conducive to their focus and learning, including while an evaluation is done about when, how or whether information will be shared with parents. This approach is fully justified by the school's interest—indeed obligations—in ensuring a supportive and successful educational environment. *See* App'x 108 (district court's observation during oral argument that "How the child feels and what they're experiencing with emotional health issues…there's an intersection where that is also part of the educational experience and responsibility of educational providers to address.").

## CONCLUSION

The Plaintiffs-Appellants cannot establish that their parental rights were infringed. They also cannot establish that the Ludlow schools failed to take a narrowly tailored approach consistent with the compelling interests in ensuring a supportive, safe and productive educational environment in which all students can learn and thrive. The district court's decision should be affirmed.

Dated: June 27, 2023                    Respectfully submitted,

/s/ Ruth A. Bourquin

Ruth A. Bourquin (1st Cir. No. 13282)
Mary F. Brown (1st Cir. No.  1206049)
Alexandra Arnold (1st Cir. No. 1205706)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
rbourquin@aclum.org
mbrown@aclum.org
aarnold@aclum.org

Jon W. Davidson (admitted only in California)
Harper S. Seldin (admitted only in
Pennsylvania)
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(323) 536-9880
jondavidson@aclu.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation, typeface requirements, and type style requirements of Fed. R. App. P. 32(a) because it contains 6,401 words and has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word.

Dated: June 27, 2023        By: */s/* Ruth A. Bourquin

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF System, which will send notification of such filing to all counsel of record.

Dated: June 27, 2023        By: */s/* Ruth A. Bourquin

*Counsel for Amicus Curiae*