No. 23-1069

# United States Court of Appeals
## for the First Circuit

STEPHEN FOOTE, INDIVIDUALLY AND AS GUARDIAN AND NEXT FRIEND OF B.F.
AND G.F., MINORS; MARISSA SILVESTRI, INDIVIDUALLY AND AS GUARDIAN AND
NEXT FRIEND OF B.F. AND G.F., MINORS,
*Plaintiffs-Appellants*,
JONATHAN FELICIANO; SANDRA SALMERON,
*Plaintiffs,*
*v.*
LUDLOW SCHOOL COMMITTEE; TODD GAZDA, FORMER SUPERINTENDENT;
LISA NEMETH, INTERIM SUPERINTENDENT; STACY MONETTE, PRINCIPAL,
BAIRD MIDDLE SCHOOL; MARIE-CLAIRE FOLEY, SCHOOL COUNSELOR, BAIRD
MIDDLE SCHOOL; JORDAN FUNKE, FORMER LIBRARIAN, BAIRD MIDDLE SCHOOL;
TOWN OF LUDLOW,
*Defendants-Appellees.*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, CASE NO. 3:22-CV-30041-MGM

**BRIEF OF AMICI CURIAE MASSACHUSETTS, CALIFORNIA, COLORADO,
CONNECTICUT, THE DISTRICT OF COLUMBIA, HAWAIʻI, ILLINOIS,
MAINE, MARYLAND, MINNESOTA, NEW JERSEY, NEW YORK, OREGON,
RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
Adam M. Cambier, First Cir. No. 1194497
Cassandra J. Thomson
*Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2278
adam.cambier@mass.gov
*(Additional counsel on signature pages.)*

# TABLE OF CONTENTS

INTERESTS OF AMICI ........................................................................1

ARGUMENT ......................................................................................3

    I.    The States Have Broad Discretion To Shape The School Environment To Ensure Students Succeed. ..........................................3

        A.    States use the public school system to educate the next generation of citizens. ..................................................3

        B.    States are vested with meaningful discretion to shape school policies. ..............................................................6

        C.    Plaintiffs' proposed framework creates significant burdens on State and local governments' ability to fulfill their schools' missions. ..............................................9

    II.    States Have An Interest In Making Schools A Safe And Supportive Environment For All Youth, Including Transgender Youth. ........................................................................15

        A.    All students benefit from safe and supportive schools. ............15

        B.    Transgender youth face unique struggles that are addressed through a safe and supportive school environment. ..........................................................21

CONCLUSION ...................................................................................29

CERTIFICATES OF COMPLIANCE AND SERVICE ........................................32

# TABLE OF AUTHORITIES

**Cases**

*Ambach v. Norwick*,
     441 U.S. 68 (1979)...............................................................4, 5, 6, 8

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-*
     *Padilla*, 490 F.3d 1 (1st Cir. 2007) ...............................................7

*Bailey v. Va. High Sch. League, Inc.*,
     488 F. App'x 714 (4th Cir. 2012).....................................................9

*Bethel Sch. Dist. No. 403 v. Fraser*,
     478 U.S. 675 (1986).........................................................................4

*Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
     457 U.S. 853 (1982).........................................................................7

*Blau v. Ft. Thomas Pub. Sch. Dist.*,
     401 F.3d 381 (6th Cir. 2005) ......................................................7, 9

*Brown v. Bd. of Education*,
     347 U.S. 483 (1954).........................................................................3

*Brown v. Hot, Sexy and Safer Prods., Inc.*,
     68 F.3d 525 (1st Cir. 1995) ............................................................7

*Curtis v. Sch. Comm. of Falmouth*,
     652 N.E.2d 580 (Mass. 1995).........................................................8

*Earls ex rel. Earls v. Bd. of Ed. of Tecumseh Pub. Sch. Dist.*,
     242 F.3d 1264 (10th Cir. 2001) ...................................................11

*Edwards v. Aguillard*,
     482 U.S. 578 (1987).........................................................................6

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ..........................................................................6

*Fields v. Palmdale Sch. Dist.*,
    427 F.3d 1197 (9th Cir. 2005) .......................................................12

*Foote v. Town of Ludlow*,
    No. 22-cv-30041-MGM, 2022 WL 18356421 (D. Mass.
    Dec. 14, 2022) ........................................................................12, 14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ...........................................................7

*Griswold v. Driscoll*,
    616 F.3d 53 (1st Cir. 2010) ..........................................................5, 7

*Herndon v. Chapel Hill-Carrboro City Bd. of Ed.*,
    89 F.3d 174 (4th Cir. 1996) .............................................................9

*Howe v. Aytes*,
    No. 2:14-cv-00077, 2016 WL 3262600 (M.D. Tenn. June
    10, 2016) .........................................................................................9

*Immediato v. Rye Neck Sch. Dist.*,
    73 F.3d 454 (2d Cir. 1996) ...........................................................8-9

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*,
    No. 8:20-cv-3552-PWG, 2022 WL 3544256 (D. Md. Aug.
    18, 2022) ..........................................................................................2

*Kahn v. East Side Union High Sch. Dist.*,
    75 P.3d 30 (Cal. 2003) ...................................................................11

*Kite v. Marshall*,
    661 F.2d 1027 (5th Cir. 1981) ..........................................................9

*Littlefield v. Forney Indep. Sch. Dist.*,
    268 F.3d 275 (5th Cir. 2001) .........................................................8, 9

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021)...................................................................15

*McCollum v. Bd. of Ed. of Sch. Dist. No. 71*,
    333 U.S. 203 (1948)............................................................. 4-5, 8

*Parker v. Hurley*,
    514 F.3d 87 (1st Cir. 2008) ............................................5, 7, 8, 14

*Quintero de Quintero v. Aponte-Roque*,
    974 F.2d 226 (1st Cir. 1992) ...........................................................5

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)....................................................................... 3-4

*Sch. Dist. of Abington Twp. v. Schempp*,
    374 U.S. 203 (1963)........................................................................5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)....................................................................6, 7

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995)......................................................................11

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972).....................................................................5, 6

## Constitutional Provisions, Statutes, and Rules

Cal. Educ. Code § 220 .............................................................28

Mass. Gen. Laws ch. 69, § 1P....................................................17, 21

Mass. Gen. Laws ch. 76, § 5 ......................................................28

N.Y. Education Law art. 2 ..........................................................21

iv

**Miscellaneous**

*2022 National Survey on LGBTQ Youth Mental Health*, The Trevor
  Project (2022) ..........................................................................22, 24

*About*, Nat'l Ctr. on Safe Supportive Learning Environments (2022) ...................16

Ashley Austin et al., *Suicidality Among Transgender Youth:
  Elucidating the Role of Interpersonal Risk Factors*, 37 J.
  Interpersonal Violence 2696 (2022) ...............................................24

Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review
  on Student-teacher Trust and School Identification*, The
  European Conference on Ed. 2021 (Sept. 2021) ...........................................19

D.C. Office of the State Superintendent of Educ., *School Climate
  and Culture* (2023), https://osse.dc.gov/page/school-climate-
  and-culture ......................................................................21

Linda Darling-Hammond et al., *Implications for educational
  practice of the science of learning and development*, 24
  Applied Developmental Sci. 97 (Feb. 17, 2019).........................16, 17, 19, 20

*Equality Maps: Safe Schools Laws*, Movement Advancement Project
  (2022)..........................................................................28

Marina Feijo et al., *Improving School Outcomes for Transgender
  and Gender-Diverse Youth: A Rapid Review*, 9(1) Policy
  Insights from the Behavioral and Brain Sciences 27 (2022)...................20, 22

*Frequently Asked Questions*, Cal. Dep't of Educ. (2021) .......................................29

*Guidance for Massachusetts Public Schools Creating a Safe and
  Supportive School Environment*, Mass. Dep't of Elementary
  and Secondary Ed. (2022) ..............................................................28

Ann P. Haas et al., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, Am. Found. for Suicide Prevention & Williams Inst. (2014) ...........................................24

V. Jadva, et al., *Predictors of self-harm and suicide in LGBT youth: The role of gender, socio-economic status, bullying and school experience,* 45 J. Pub. Health 102 (Nov. 27, 2021) ........................23

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equal. 131 (2016) ...........................22, 24

Michelle M. Johns, et al., *Strengthening Our Schools to Promote Resilience and Health Among LBGTQ Youth: Emerging Evidence and Research Priorities from 'The State of LGBTQ Youth Health and Wellbeing' Symposium,* 6 LGBT Health 4 (May 29, 2019) ..............................................................22, 23, 24

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Weekly Report 67 (2019)..........................................23

Michelle Marie Johns et al., *Protective factors among transgender and gender variant youth: A systematic review by socioecological level*, 39(3) J. Primary Prevention 263 (2018) ...................27

Michelle Marie Johns et al., *Trends in violence victimization and suicide risk by sexual identity among high school students — Youth Risk Behavior Survey, United States, 2015-2019*, 69(Suppl-1) Morbidity and Mortality Weekly Report Suppl. (Aug. 21, 2020)..........................................................25

Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90(5) Review of Ed. Rsch. 711 (Aug. 4, 2020) .......................................................................19

Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2019) ...............................26

Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN (2022).................................................................................22, 23, 25

Benjamin Kutsyuruba et al., *Relationships among school climate, school safety, and student achievement and well-being: a review of the literature*, 3 British Ed. Rsch. Ass'n 103 (June 30, 2015) ......................................................................................17

*Legal Advisory*, Cal. Dep't of Educ. (2021) ...........................................29

Nicole Legate et al., *Is Coming Out Always a "Good Thing"? Exploring the Relations of Autonomy Support, Outness, and Wellness for Lesbian, Gay, and Bisexual Individuals*, 3 Social Psychological & Personality Sci. 145 (2012).................................13

Jenifer K. McGuire et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, J. Youth & Adolescence 1187 (April 2010) ...................26

Roxanne Mitchell et al., *Student trust in teachers and student perceptions of safety: positive predictors of student identification with school*, 21 Int'l J. Leadership Ed. 135 (May 2016) ...........................................................................17, 18, 19

New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 2023) ("NYSED Best Practices") .................................21, 29

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics (2016)............................................................................................27

Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Ed. 688 (2021) ...........................................10

M D Resnick et al., *Protecting adolescents from harm. Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823 (Sept. 10, 1997) .........................................20, 21

Sara Rimm-Kaufman & Lia Sandilos, *Improving Students' Relationships with Teachers to Provide Essential Supports for Learning*, Am. Psychological Ass'n (2015) ...................................................10

Stephen T. Russell, et al., *Promoting School Safety for LGBTQ and All Students,* 8 Pol'y Insights from Behav. Brain Scis. 103 (Oct. 2021) ...............................................................................................26

*Safe & Supportive Schools*, Office of Elementary and Secondary Ed. (2022) ...............................................................................................16

*Safe and Supportive Schools Project*, Am. Psychological Ass'n (2014) ...............................................................................................16

*Safe and Supportive Schools Self-Reflection Tool*, Mass. Dep't of Elementary and Secondary Ed. (2022) ...........................................21

*School Connectedness Helps Students Thrive*, Ctrs. for Disease Control and Prevention (Sept. 28, 2022) .......................................17

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN (2017) .................22, 23, 25, 27

Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144(1) Pediatrics 1 (Jul. 1, 2019) .........................................20, 21

*The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (December 2020) ...............................................27

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 327 (Aug. 2020) ............................................................................16

Nhan L. Truong et al., *Erasure and Resilience: The Experiences of LGBTQ Students of Color—Black LGBTQ Youth in U.S. Schools*, GLSEN (2020) .................................................................23

Megan Tschannen-Moran et al., *Student Academic Optimism: A confirmatory factor analysis*, 51 J. Educ. Admin. 151 (Mar. 2013) ...................................................................................18, 19

Russell M. Viner et al., *Adolescence and the social determinants of health*, 379(9826) Adolescent Health 1641 (Apr. 28, 2012).........................20

Fang Zheng, *Fostering Students' Well-Being: The Mediating Role of Teacher Interpersonal Behavior and Student-Teacher Relationships,* 12 Psych. (Jan. 2022) ................................................18, 20, 21

**INTERESTS OF AMICI**

The *Amici* States—Massachusetts, California, Colorado, Connecticut, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington—file this brief pursuant to Fed. R. App. P. 29(a)(2) because we share sovereign and compelling interests in making schools safe for all students.  Defendants-Appellees Ludlow School Committee and various school officials (together, "Ludlow"), like other school authorities around the country, are charged with one of the most important functions of government: nurturing successive generations of children into capable citizens of a diverse and unified nation.  In recognition of the paramount importance of this responsibility, courts (including this Court) have long afforded State and local governments significant discretion to shape school policies to best serve this goal, so long as they act within the constraints of federal law, including the Constitution and antidiscrimination law.

The *Amici* States respectfully submit this brief to underscore the breadth of this discretion invested in local schools, the problems posed by Plaintiffs' proposed judicial intervention in school policymaking, and the reasons why policies like Ludlow's serve important governmental purposes.  Ludlow has exercised its discretion to balance parents' involvement in their child's education with the recognition that not all students are open about their gender identity at home.

Where a student does not want the school to disclose their status to others, including parents, information on the student's gender identity is not shared.[1]  This policy endeavors to keep transgender students supported and safe at school, while providing students space and support to initiate these conversations about their identities within their own families.  Conversely, the rule urged by Plaintiffs—one in which the school is constitutionally bound to share information about students' gender identity with parents against students' wishes—undermines trust between students and teachers, creates significant administrative burdens, and improperly inserts school officials into private conversations that should happen between children and their parents at the time and in the manner chosen by the family.  Policies like Ludlow's are supported by social science research indicating that safe and supportive school environments are critically important for all students—and for transgender and gender-nonconforming students in particular.  Schools and educators that build trust and support students' identities set these students up for higher academic achievement, improved mental health outcomes, and bigger and better plans for the future.

---

[1]    Unlike other schools that have seen similar policies challenged, *see, e.g.*, *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*, No. 8:20-cv-3552-PWG, 2022 WL 3544256, at *2 (D. Md. Aug. 18, 2022), Ludlow has not adopted a formal written policy, *see* JA19.  This brief thus bases its characterization of Ludlow's policy on Plaintiffs' allegations in the complaint.

We therefore urge this Court to affirm the decision below dismissing

Plaintiffs' complaint.

## ARGUMENT

### I. The States Have Broad Discretion To Shape The School Environment To Ensure Students Succeed.

#### A. States use the public school system to educate the next generation of citizens.

Public schools play a foundational role in society.  For decades, courts have

recognized that these institutions serve as States' primary tool in raising successive

generations of citizens, providing them with the tools they need to lead fulfilled

lives and creating the buildings blocks of broader societal cohesion.  In *Brown v.*

*Board of Education*, for instance, the Supreme Court observed that public schools

are "a principal instrument in awakening the child to cultural values, in preparing

him for later professional training, and in helping him to adjust normally to his

environment," such that "it is doubtful that any child may reasonably be expected

to succeed in life if he is denied the opportunity of an education."  347 U.S. 483,

493 (1954).  Indeed, the *Brown* Court noted, the public school system is "the very

foundation of good citizenship" and of key "importance to our democratic

society."  *Id.*

Since *Brown*, the Court has repeatedly "express[ed] an abiding respect for

the vital role of education in a free society" and recognized "the grave significance

of education both to the individual and to our society." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973) (collecting cases; cleaned up).  In *Ambach v. Norwick*, the Court upheld a State statute limiting employment as a teacher to American citizens because of "[t]he importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests."  441 U.S. 68, 76 (1979).  In doing so, the Court explained how a robust public school system also benefits the States and society as a whole:  Common education serves as an "'assimilative force' by which diverse and conflicting elements in our society are brought together on a broad but common ground" and "inculcat[es] fundamental values necessary to the maintenance of a democratic political system."  *Id.* at 77; *see also id.* at 79 ("[A] teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities.  This influence is crucial to the continued good health of a democracy.").

Similarly, in *Bethel School District No. 403 v. Fraser*, the Court observed that public schools "prepare pupils for citizenship in the Republic" by "inculcat[ing] the habits and manners of civility as values in themselves conducive to happiness" and also recognized that such values are "indispensable to the practice of self-government in the community and the nation."  478 U.S. 675, 681 (1986).  This principle has also been emphasized in oft-cited concurrences.  *See,*

4

*e.g.*, *McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 U.S. 203, 216, 231 (1948) (Frankfurter, J., concurring) (public schools are "perhaps the most powerful agency for promoting cohesion among a heterogenous democratic people" and are "at once the symbol of our democracy and the most pervasive means for promoting our common destiny"); *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 241-42 (1963) (Brennan, J., concurring) (stating that "public schools serve a uniquely public function: the training of American citizens" and observing that a "public secular education" serves "uniquely democratic values").  So too has this Court repeatedly recognized the key role schools play in shaping the character of future citizens.  *See, e.g.*, *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 229 (1st Cir. 1992); *Parker v. Hurley*, 514 F.3d 87, 95 (1st Cir. 2008); *Griswold v. Driscoll*, 616 F.3d 53, 58 (1st Cir. 2010).

In light of the indispensable benefits public schools provide, the *Brown* Court observed that "education is perhaps the most important function of state and local governments."  347 U.S. at 493.  The Court has echoed this observation in ensuing decades.  *See, e.g.*, *Ambach*, 441 U.S. at 75-76 (the provision of education "goes to the heart of representative government" and "fulfills a most fundamental obligation of government to its constituency" (cleaned up)); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State.").

Public schools thus lie at the heart of both an obligation and an opportunity for States—an obligation to provide people with the skills they need as citizens, and an opportunity to forge a unified society that will stand the test of time.

**B.     States are vested with meaningful discretion to shape school policies.**

In order to fulfill our critical educational mission, States have latitude to shape the school environment.  The Supreme Court has repeatedly underscored that "States and local school boards are generally afforded considerable discretion in operating public schools."  *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *see also, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials … to prescribe and control conduct in the schools."); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities.").  And this discretion stems from the States' paramount interest in educating our citizenry.  *See, e.g.*, *Yoder*, 406 U.S. at 213 ("There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education."); *Ambach*, 441 U.S. at 78 ("In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way course

6

material is communicated to students."); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863-64 (1982) (noting that "local school boards have broad discretion in the management of school affairs" and "must be permitted to establish and apply their curriculum … to transmit community values" (cleaned up)).

Of course, States' latitude to control the school environment is subject to restraints imposed by federal law, including prohibitions against discrimination contained in the Equal Protection Clause and Title IX of the Education Amendments of 1972. *See, e.g.*, *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 11 (1st Cir. 2007); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606-19 (4th Cir. 2020). States' discretion is also subject to constitutional constraints. *See, e.g.*, *Tinker*, 393 U.S. at 507; *see also Parker*, 514 F.3d at 107 (recognizing "the many competing constitutional demands made by parents, students, teachers, and the schools' other constituents").

Against this backdrop, this Court has echoed the "well-recognized" proposition that "while parents can choose between public and private schools, they do not have a constitutional right to 'direct *how* a public school teaches their child.'" *Parker*, 514 F.3d at 102 (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)); *see also Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995); *Griswold*, 616 F.3d at 58. Consequently,

States retain a "general power … to regulate education," *Parker*, 514 F.3d at 102, and parents' rights are viewed as "not absolute in the public school context and can be subject to reasonable regulation," *id.* (quoting *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001)).  Thus, as this Court has made clear, local officials have meaningful discretion to determine how to operate schools to best serve their students.

Moreover, contrary to Plaintiffs' suggestion, Br. 23-26, States' authority within schoolhouse walls is not limited strictly to issues of curriculum.  The Supreme Court has recognized the States' discretion vis-à-vis schools' broader educational operations, including teachers' "direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school."  *Ambach*, 441 U.S. at 78.  As the Court has noted, "a teacher's function as an example for students … exists independently of particular classroom subjects."  *Id.* at 80; *cf., e.g.*, *McCollum*, 333 U.S. at 224 (Frankfurter, J., concurring) (noting in a discussion of "released time" for religious instruction that "education was more than instruction in a classroom").

In keeping with this guidance, courts in this State and around the country have routinely rejected parental liberty claims touching on a wide array of non-curricular issues.  *See, e.g.*, *Curtis v. Sch. Comm. of Falmouth*, 652 N.E.2d 580, 584-87 (Mass. 1995) (voluntary condom distribution program); *Immediato v. Rye*

*Neck Sch. Dist.*, 73 F.3d 454, 462 (2d Cir. 1996) (community service requirement);

*Herndon v. Chapel Hill-Carrboro City Board of Education*, 89 F.3d 174, 176 (4th

Cir. 1996) (community service requirement); *Bailey v. Va. High Sch. League, Inc.*,

488 F. App'x 714, 716 (4th Cir. 2012) (eligibility for interscholastic athletics); *Kite*

*v. Marshall*, 661 F.2d 1027, 1029-30 (5th Cir. 1981) (attendance at summer

athletic training camps); *Littlefield*, 268 F.3d at 291 (dress code); *Blau*, 401 F.3d at

395-96 (dress code); *Howe v. Aytes*, No. 2:14-cv-00077, 2016 WL 3262600, at *1-

4 (M.D. Tenn. June 10, 2016) (student pickup procedures requiring parents to wait

inside vehicles).  The breadth and variety of these holdings underscore the

importance of schools' leeway to guide students in the manner the schools

themselves deem best suited to achieve their critical educational goals.[2]

### C. Plaintiffs' proposed framework creates significant burdens on State and local governments' ability to fulfill their schools' missions.

The rule suggested by Plaintiffs here—that the Constitution rigidly and

mechanistically requires schools to inform parents of conversations with students

---

[2]     While Plaintiffs suggest the lower court erred by "promoting Defendants' assertion they have a duty to 'protect' gender discordant children from their parents," Br. 27, the existence *vel non* of such a legal "duty" is irrelevant here. Even absent a legally cognizable tort-based or statutory duty to prevent harm to students, Ludlow is not (as Plaintiffs would have it) *forbidden* from exercising its discretion to act in what it deems students' best interests.

about gender identity regardless of circumstances against those students' wills—would interfere with critical functions of public education.

Perhaps most important, this rule would chill open communication and damage the trust between students and their teachers, coaches, and guidance counselors. Trusting relationships with school staff aid students in manifold ways: Students who trust their teachers are more engaged in learning, have improved academic achievement, are less likely to avoid school, are more self-directed, and have greater confidence in their own ability to process information even after leaving school.[3] These kinds of benefits lie at the very heart of the civic purpose of public education.

These benefits would be undermined by a rule requiring school officials to provide parents with information about a student's gender identity against the student's will—particularly where the student's request is based on fears of negative reactions, or even for their own safety. A student not wanting information about their gender identity shared with their family would not share that information with their teachers either, creating distance that otherwise might not

---

[3]    *See* Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Ed. 688-697 (2021), https://doi.org/10.1111/1467-9752.12560; Sara Rimm-Kaufman & Lia Sandilos, *Improving Students' Relationships with Teachers to Provide Essential Supports for Learning*, Am. Psychological Ass'n (2015), https://www.apa.org/education-career/k12/relationships.

exist and preventing the student from reaping the benefits that can result from close relationships with school staff. Indeed, in other contexts, courts and others have decried legal rules that destroy trust between students and their teachers and coaches. *See, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 664 (1995); *Earls ex rel. Earls v. Bd. of Ed. of Tecumseh Pub. Sch. Dist.*, 242 F.3d 1264, 1280 (10th Cir. 2001) (Ebel, J., dissenting) (noting that *Vernonia* stated that "any suspicion-based [drug] testing changes the relationship between students and teachers from one of trust and cooperation to one of distrust and adversarial interactions"); *see also Kahn v. East Side Union High Sch. Dist.*, 75 P.3d 30, 52 (Cal. 2003) (Kennard, J., concurring in part) (failure to assign coaches a duty to ensure school sports are conducted safely "puts an end to [students'] trust" in coaches "not to carelessly and needlessly expose them to injury" that arises from coaches' roles as "a mentor or role model").

Plaintiffs' proposed constitutional rule would also impose significant administrative burdens on schools. Plaintiffs broadly frame their argument around the notion that they—and not schools—bear sole responsibility for making "decisions regarding a child's well-being," Br. 25, but this notion is unaccompanied by any coherent limiting principle. These particular Plaintiffs object to a policy regarding students' gender identity, but other parents may have wholly different objections to a school's operations and their bearing on a student's

11

amorphously defined well-being.  If school officials were constitutionally required to share *any* such school-related information with parents, schools could be required to make time-consuming and burdensome case-by-case determinations of what kinds of information to disclose to parents.  Further, officials would be required to create systems to ensure that such disclosures were made, adding another layer of complication to schools' daily operation.  "Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent.  Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy."  *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005), *opinion reaff'd and amended on denial of reh'g sub nom. Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187 (9th Cir. 2006).

Finally, Plaintiffs' rule requiring disclosure of information on students' gender identity would force school officials to interfere with sensitive familial relationships.  The question of whether and how to share information on one's gender identity is deeply personal; as the district court recognized, such disclosures implicate "many complicated and emotional issues" and may "evoke negative or harmful reactions."  *Foote v. Town of Ludlow*, No. 22-cv-30041-MGM, 2022 WL 18356421, at *8 (D. Mass. Dec. 14, 2022).  Were Plaintiffs to prevail, school officials would be *required* to insert themselves into these highly sensitive

12

discussions and to share information that should come from the child in the context
of family conversations.  This kind of forced disclosure would have obvious
negative repercussions for children who are not yet ready to have this discussion
with their parents or who perceive their parents as unsupportive of their identity[4]—
and if anything, this represents *more* of an intrusion on the parent-child
relationship than the restraint from such communications about which Plaintiffs
complain.[5]  Conversely, Ludlow in this case worked to provide Plaintiffs' child
with the time and support they needed to come out to their parents themselves.
When Plaintiffs' child first informed a teacher of mental health issues and feelings
of same-sex attraction, the teacher "offered to talk with Plaintiffs about those

---

[4]    *Cf.* Nicole Legate et al., *Is Coming Out Always a "Good Thing"?  Exploring the Relations of Autonomy Support, Outness, and Wellness for Lesbian, Gay, and Bisexual Individuals*, 3 Social Psychological & Personality Sci. 145-52 (2012), https://journals.sagepub.com/doi/10.1177/1948550611411929 (LGB individuals who disclose sexual identity in environments less supportive of authentic self-expression are less likely to reap mental well-being benefits of coming out).

[5]    Plaintiffs also suggest that Ludlow unconstitutionally interfered in the parent-child relationship by inquiring after their child's feelings of safety and support at home (thus, as Plaintiffs would have it, implying that the student was unsafe and unsupported).  Br. 34-35; JA40-43.  Adoption of a rule that inquiries about students' safety in the home are constitutionally suspect would have significant negative consequences for all students.  If asking about a student's safety puts schools at risk of constitutional violations, schools will be severely disincentivized to ask such questions—thus depriving students who may be suffering of an invaluable source of support, care, and in some cases even protection from abuse and neglect.  This cannot be what our Constitution demands.

concerns"; when the student later identified as genderqueer, school staff exchanged emails noting that the student was "'still in the process of telling' Plaintiffs about [their] gender identity," and the district court recognized that school staff were "wait[ing] to use the new name and pronouns *until after [the student] told Plaintiffs about them*." *Foote*, 2022 WL 18356421, at *2, *7 (emphasis added). Approaches like Ludlow's thus allow children or parents to initiate these conversations about students' identity within their own families, leaving school officials free to focus on creating a positive and supportive environment for education.[6]

In sum, while schools could take several possible approaches in communicating with parents about their children's gender identity, to constitutionalize a single approach—mandated reporting in all cases as soon as possible regardless of the consequences—would be not only incompatible with the Supreme Court's longstanding respect for State and local governments' discretion in education, but also harmful, unwise, and unworkable.

---

[6]    The parties dispute whether Plaintiffs' substantive due process claim should be subject to the "shocks the conscience" or "deliberate indifference" standard. *See* Pls.' Br. 39-42; Ludlow Br. 32-34. This dispute is immaterial. This Court has disposed of similar parental rights claims without addressing this issue, *see Parker*, 514 F.3d at 87, and it can do the same here. In any event, Ludlow's policy would satisfy either standard for the reasons described above.

## II.     States Have An Interest In Making Schools A Safe And Supportive Environment For All Youth, Including Transgender Youth.

States have a strong interest in fostering safe and supportive schools for all children to learn, thrive, and grow into contributing members of society.  Safe and supportive school environments that nurture the whole student, foster trusting relationships, and promote a sense of belonging are a crucial component of both academic outcomes and student well-being—particularly for transgender and gender-nonconforming youth.  Transgender youth often experience discrimination, harassment, and stigma, causing tangible mental and physical harm and restricting their ability to realize their potential.  Meanwhile, robust data confirm that transgender students who feel safe expressing their gender identity at school are happier, healthier, and more academically successful.  The experiences of *Amici* States and other jurisdictions show that policies and practices that support all facets of students' identities and facilitate trusting student-teacher relationships are beneficial for all students, including and especially transgender and gender-nonconforming youth.

### A.     All students benefit from safe and supportive schools.

Courts have recognized that the States' responsibility to provide public education encompasses protecting students from harm.  *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021).  Considering the vast influence that education has over the trajectory of students' lives, it is essential that States

provide them with a safe educational environment that allows them to succeed and thrive.

*Amici* States and other governmental institutions,[7] as well as medical and educational organizations,[8] have recognized that physically and psychologically safe schools are indispensable to obtaining optimal health and educational outcomes for all students. While there is no exhaustive list of what constitutes a safe and supportive educational environment, research has emphasized both physical safety and security alongside emotional well-being, connectedness of staff and students, and norms and policies.[9] This framework is heavily supported by extensive developmental science and neuroscience research affirming that educational environment and school culture influence many facets of a child's development, including social-emotional and academic learning.[10] In contrast, fear

---

[7]　*See, e.g.*, *Safe & Supportive Schools*, Office of Elementary and Secondary Ed. (2022), https://oese.ed.gov/offices/office-of-formula-grants/safe-supportive-schools/; *About*, Nat'l Ctr. on Safe Supportive Learning Environments (2022), https://safesupportivelearning.ed.gov/about.

[8]　*See, e.g.*, *Safe and Supportive Schools Project*, Am. Psychological Ass'n (2014), https://www.apa.org/pi/lgbt/programs/safe-supportive.

[9]　Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 327-29 (Aug. 2020), https://www.researchgate.net/publication/343619376_Conceptualizing_and_Measuring_Safe_and_Supportive_Schools.

[10]　*See* Linda Darling-Hammond et al., *Implications for educational practice of the science of learning and development*, 24 Applied Developmental Sci. 97-98 (Feb. 17, 2019), https://doi.org/10.1080/10888691.2018.1537791.

and anxiety weaken a child's cognitive capacity and disrupt the learning process:
In essence, without physical and psychological safety, students are biologically
unable to learn effectively.[11]  Accordingly, safe and supportive school
environments allow students to develop positive relationships, regulate their
emotions and behavior, and maintain physical and psychological well-being—in
turn contributing to academic and non-academic success.[12]

In particular, safe and supportive schools foster a student's belief that both
adults and peers at school care about their education and about them as
individuals.[13]  Schools depend on interpersonal relationships that set students up to
succeed emotionally, socially, and academically.[14]  Trust in an educational space

---

[11]    *Id.* at 102.

[12]    Mass. Gen. Laws ch. 69, § 1P.

[13]    *School Connectedness Helps Students Thrive*, Ctrs. for Disease Control and
Prevention (Sept. 28, 2022), https://www.cdc.gov/healthyyouth/protective/
school_connectedness.htm.

[14]    *See* Benjamin Kutsyuruba et al., *Relationships among school climate, school
safety, and student achievement and well-being: a review of the literature*, 3
British Ed. Rsch. Ass'n 103-35 (June 30, 2015), https://doi.org/10.1002/rev3.3043;
Roxanne Mitchell et al., *Student trust in teachers and student perceptions of safety:
positive predictors of student identification with school*, 21 Int'l J. Leadership Ed.
135-54 (May 2016), https://doi.org/10.1080/13603124.2016.1157211.

depends on a student's willingness to be vulnerable, which requires confidence that the other party is benevolent, honest, open, reliable, and competent.[15]

Because the student-teacher relationship in particular holds enormous importance in the school environment, the degree and quality of trust between student and teacher significantly impacts a student's educational experience. Yet trust does not arise in all student-teacher relationships: Research indicates that teachers must first demonstrate caring and goodwill by showing concern about students as people outside of the school context and communicating openly.[16] And even after student-teacher trust is developed, subsequent violations of that trust are difficult to repair.[17]

When students share warm, trusting, independent, and conflict-free relationships with their teachers, there is a positive effect on the overall school climate and on that student's optimism, academic outcomes, and identification

---

[15]    Megan Tschannen-Moran et al., *Student Academic Optimism: A confirmatory factor analysis*, 51 J. Educ. Admin. 151-52 (Mar. 2013), https://doi.org/10.1108/09578231311304689; Fang Zheng, *Fostering Students' Well-Being: The Mediating Role of Teacher Interpersonal Behavior and Student-Teacher Relationships,* 12 Psych. (Jan. 2022) https://doi.org/10.3389/fpsyg.2021.796728.

[16]    Tschannen-Moran et al., *supra* note 15, at 153-54, 168.

[17]    Mitchell et al., *supra* note 14, at 138.

with their school.[18]  These positive relationships—at all stages, from early

childhood to young adulthood—have been shown to benefit student engagement,

academic achievement, self-esteem, and social skills, while reducing a student's

likelihood of being suspended or dropping out.[19]  Indeed, the presence of a strong,

trusting, and supportive connection to *any* adult at school (e.g., mentors, advisors)

is also connected to a greater likelihood that a student will attend, graduate, and

succeed academically.[20]  And strong student-staff relationships affect students

beyond the individuals involved in the relationship, as students who trust their

teachers and administrators are likelier to report unsafe situations and prompt

interventions.[21]

Of note, students have been shown to learn most effectively when in an

environment with positive adult-student relationships that are culturally sensitive

---

[18]    Tschannen-Moran et al., *supra* note 15, at 153-54, 168-70; Mitchell et al., *supra* note 14, at 138, 148-49; Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90(5) Review of Ed. Rsch. 711-12 (Aug. 4, 2020), https://journals.sagepub.com/doi/abs/10.3102/0034654320946836.

[19]    *Id*. at 712; Tschannen-Moran et al., *supra* note 15, at 150-54, 157-58, 167-71; Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-teacher Trust and School Identification*, The European Conference on Ed. 2021 (Sept. 2021), https://papers.iafor.org/wp-content/uploads/papers/ece2021/ECE2021_60608.pdf.

[20]    Darling-Hammond et al., *supra* note 10, at 103.

[21]    Mitchell et al., *supra* note 14, at 136.

and recognize a student's identity as one that belongs and deserves value.[22]

Furthermore, students experiencing poverty, trauma, and discrimination are

particularly susceptible to interference with their learning and opportunities to

succeed.[23] However, these consequences are mitigated by the presence of strong

relationships and support systems at school.[24]

Moreover, a student's sense of connectedness to their school affects much

more than just academic achievement.[25] Over two decades of research has

demonstrated that school connectedness directly promotes positive outcomes and

buffers the negative effects of risk factors related to mental health, violence, sexual

behavior, and substance use.[26] Recent work has demonstrated that the influence of

---

[22]    Darling-Hammond et al., *supra* note 10, at 102.

[23]    *Id.* at 103.

[24]    *Id*.

[25]    Russell M. Viner et al., *Adolescence and the social determinants of health*, 379(9826) Adolescent Health 1641-52 (Apr. 28, 2012), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(12)60149-4/fulltext; M D Resnick et al., *Protecting adolescents from harm. Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823-32 (Sept. 10, 1997), https://pubmed.ncbi.nlm.nih.gov/9293990/; Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9(1) Policy Insights from the Behavioral and Brain Sciences 27-34 (2022), https://journals.sagepub.com/doi/abs/10.1177/23727322211068021.

[26]    Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144(1) Pediatrics 1-11 (Jul. 1, 2019), https://doi.org/10.1542/peds.2018-3766; Zheng, *supra* note 15; M D Resnick et al., *supra* note 25, at 831-32.

school connectedness experienced as an adolescent continues to impact students as they become adults, resulting in reduced emotional distress and suicidal ideation, a lower likelihood of physical violence victimization and perpetration, and less prescription or illicit drug use in adulthood.[27]

Recognizing the paramount importance of fostering these safe and trusting relationships, *Amici* States and their localities have created a number of policies to ensure a positive school culture.  For example, Massachusetts has codified a Safe and Supportive Schools framework, and released detailed implementation guidance to help school staff gauge where progress needs to be made and identify available methods for improving conditions and outcomes within their specific school community based on local context, resources, and capacity.[28]

### B.    Transgender youth face unique struggles that are addressed through a safe and supportive school environment.

Providing a safe and supportive school environment is especially important

---

[27]    *Id.*

[28]    Mass. Gen. Laws ch. 69, § 1P; *Safe and Supportive Schools Self-Reflection Tool*, Mass. Dep't of Elementary and Secondary Ed. (2022), http://www.sassma.org/; *see also, e.g.*, N.Y. Education Law art. 2; New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 2023) ("NYSED Best Practices"), https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf; D.C. Office of the State Superintendent of Educ., *School Climate and Culture* (2023), https://osse.dc.gov/page/school-climate-and-culture.

to transgender and gender-nonconforming youth, who experience levels of discrimination and violence higher than their cisgender peers.[29]

According to a 2022 mental health survey, 71% of transgender and nonbinary youth respondents reported being discriminated against because of their gender identity.[30]  A 2017 study suggested that as many as 75% of transgender students surveyed felt unsafe at school as a result of their gender identity or gender expression,[31] which corresponds with recent data suggesting that youth questioning their gender identity similarly faced a risk of a hostile school climate.[32]

---

[29]    Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN xxvii, 93 (2022) https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf. Michelle M. Johns, et al., *Strengthening Our Schools to Promote Resilience and Health Among LBGTQ Youth: Emerging Evidence and Research Priorities from 'The State of LGBTQ Youth Health and Wellbeing' Symposium*, 6 LGBT Health 4 (May 29, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6551982/.

[30]    *2022 National Survey on LGBTQ Youth Mental Health*, The Trevor Project 17 (2022), https://www.thetrevorproject.org/survey-2022/; *see also* Feijo et al., *supra* note 25, at 27-28.

[31]    *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 4 (2017), https://www.glsen.org/research/separation-and-stigma-transgender-youth-and-school-facilities; *see also* Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equal. 131-35 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf (A 2015 national survey of students out as transgender and those who believed they were perceived as transgender or questioning found that 77% of respondents reported negative experiences at school in grades K–12, such as harassment or having been attacked).

[32]    Kosciw et al., *supra* note 29, at 94.

Transgender students are more likely than cisgender students to be threatened or injured with a weapon at school and may be as much as four times more likely to experience bullying and harassment as compared to cisgender peers.[33] Additionally, transgender and gender-nonconforming students of color, students with disabilities, and students from low-income families face compounded levels of discrimination based on their intersecting identities.[34] This discrimination, violence, and harassment has been shown to reduce transgender and gender-nonconforming students' sense of connection to their schools and their own sense of belonging as compared to other students.[35]

Discrimination based on gender identity and expression in educational settings can result in severe health consequences for transgender and gender-nonconforming youth. Transgender and gender-nonconforming youth who have

---

[33] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Weekly Report 67, 69 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6803a3.htm; *see also* Movement Advancement Project & GLSEN, *supra* note 31, at 3; *see also* Johns, et al., *supra* note 29, at 147, 150.

[34] *See, e.g.,* Nhan L. Truong et al., *Erasure and Resilience: The Experiences of LGBTQ Students of Color—Black LGBTQ Youth in U.S. Schools*, GLSEN (2020), https://www.glsen.org/research/black-lgbtq-students; V. Jadva, et al., *Predictors of self-harm and suicide in LGBT youth: The role of gender, socio-economic status, bullying and school experience,* 45 J. Pub. Health 102 (Nov. 27, 2021) https://academic.oup.com/jpubhealth/article/45/1/102/6444311.

[35] Kosciw et al., *supra* note 29, at xix-xx.

had negative experiences at school such as bullying and harassment are more likely
to be under serious psychological distress, to have experienced homelessness, and
to have attempted suicide.[36]  Furthermore, transgender and gender nonconforming
youth experience significantly higher rates of suicidal thoughts and attempts than
in the overall U.S. population.[37]  A 2022 mental health survey found that over half
of transgender and nonbinary youth reported having seriously considered suicide in
the past year, and nearly one in five attempted suicide in that timeframe.[38]  One
study found that a lack of school belonging, familial emotional neglect, and
internalized self-stigma contributed to suicidal thoughts among transgender
youth.[39]

Discrimination, harassment, and stigma based on gender identity also
detrimentally impact transgender and gender-nonconforming students' academic

---

[36]     Johns, et al., *supra* note 29, at 147; *see also* James et al., *supra* note 31, at
131-35.

[37]     *See, e.g.,* Ann P. Haas et al., *Suicide Attempts Among Transgender and
Gender Non-Conforming Adults: Findings of the National Transgender
Discrimination Survey*, Am. Found. for Suicide Prevention & Williams Inst. 2
(2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-
Suicide-Attempts-Jan-2014.pdf.

[38]     The Trevor Project, *supra* note 30, at 4.

[39]     Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the
Role of Interpersonal Risk Factors*, 37 J. Interpersonal Violence 2696 (2022),
https://doi.org/10.1177/0886260520915554.

outcomes.  Transgender students who experienced higher levels of victimization in school as a result of their gender expression are less likely to plan to graduate high school, twice as likely to report that they did not plan to pursue post-secondary education, have lower grade point averages (GPAs), and are three times more likely to have missed school in a given month.[40]  Questioning students are also more likely than cisgender students to miss school because they feel unsafe.[41]  In the absence of safe and supportive school environments, transgender and gender-nonconforming students also frequently avoid attending school functions and participating in extracurricular activities.[42]

Because harms commonly experienced by transgender students and gender-nonconforming students are related to the way they are treated at school, increased acceptance and affirmation like that fostered by safe and supportive school environments are effective means of counteracting such harm.[43]  Supportive educators have been shown to have an immensely positive influence on

---

[40]    Movement Advancement Project & GLSEN, *supra* note 31, at 4; Kosciw et al., *supra* note 29, at xix, 35.

[41]    Kosciw et al., *supra* note 29, at 84.

[42]    *Id*. at xv, 11, 84.

[43]    *See, e.g.,* Michelle Marie Johns et al., *Trends in violence victimization and suicide risk by sexual identity among high school students — Youth Risk Behavior Survey, United States, 2015-2019*, 69(Suppl-1) Morbidity and Mortality Weekly Report Suppl. (Aug. 21, 2020), https://www.cdc.gov/mmwr/volumes/69/su/su6901a3.htm.

transgender and gender-nonconforming students' academic success and mental health.  LGBTQ+ students with support from many (11 or more) supportive staff at their school were less likely to feel unsafe because of their gender expression and sexual orientation, were less likely to miss school because they felt unsafe or uncomfortable, had higher GPAs, were less likely to say they might not graduate high school, and felt greater belonging to their school community.[44]  Students at schools with more supportive staff also experience higher levels of self-esteem and lower levels of depression.[45]

Trust of school personnel has been found to be an important factor in the academic success of transgender and gender-nonconforming youth specifically, in part because trusting adult relationships were associated with feelings of safety.[46] Transgender and gender-nonconforming youth who had a relationship with a

---

[44]    Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2019), https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf.

[45]    *Id*; Stephen T. Russell, et al., *Promoting School Safety for LGBTQ and All Students,* 8 Pol'y Insights from Behav. Brain Scis. 103 (Oct. 2021), https://journals.sagepub.com/doi/epub/10.1177/23727322211031938.

[46]    Jenifer K. McGuire et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, J. Youth & Adolescence 1187 (April 2010), https://link.springer.com/article/10.1007/s10964-010-9540-7.

supportive educator were less likely to miss school and less likely to drop out.[47]

Transgender students who reported being supported in their transition (e.g.,

addressed by their chosen name and pronouns) also reported mental health

outcomes analogous to their cisgender peers.[48]  Indeed, gender-affirming

environments generally are associated with reduced suicide risk among transgender

and gender-nonconforming youth, and gender-affirming school environments in

particular were found to have the strongest association with reduced odds of

reporting a suicide attempt within the past year of all the spaces studied.[49]

    Cognizant of the importance of education to all our communities' youth, as

well as these broad negative effects of discrimination for transgender and gender-

nonconforming students, many *Amici* States and other jurisdictions protect

transgender and gender-nonconforming students by codifying prohibitions against

---

[47]    Michelle Marie Johns et al., *Protective factors among transgender and gender variant youth: A systematic review by socioecological level*, 39(3) J. Primary Prevention 263-301 (2018), https://link.springer.com/article/10.1007/s10935-018-0508-9.

[48]    *See* Movement Advancement Project & GLSEN, *supra* note 31, at 4*; see also* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4771131/ (finding similar results for transgender children based on parental reports).

[49]    *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (December 2020), https://www.thetrevorproject.org/wp-content/uploads/2021/07/LGBTQ-Affirming-Spaces_-December-2020.pdf.

discrimination in schools on the basis of gender identity.[50]  We also recognize that ensuring safe and supportive school environments is an important part of fulfilling those anti-discrimination obligations.  For example, the Massachusetts Department of Elementary and Secondary Education guidance to school districts from which Ludlow derived its policy outlines anti-discrimination compliance vis-à-vis gender identity in the context of a safe and supportive school, recognizing the deeply personal nature of decisions related to sharing gender identity and explaining best practices.[51]  The guidelines indicate that the best practice is to engage the student in discussion regarding aspects of the school experience such as name and pronoun usage, and that—because some transgender and gender non-conforming students are not openly so at home, due to safety concerns or otherwise—such conversations should occur before discussing a student's gender nonconformity with that student's parent or guardian.[52]  Similarly, California's Department of Education guidelines "support[] healthy communication between educators,

---

[50]     *See, e.g.*, Mass. Gen. Laws ch. 76, § 5; Cal. Educ. Code § 220; *Equality Maps: Safe Schools Laws*, Movement Advancement Project (2022), https://www.lgbtmap.org/equality-maps/safe_school_laws ("nondiscrimination" tab) (compiling laws of all states).

[51]     *See Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment*, Mass. Dep't of Elementary and Secondary Ed. (2022), https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.

[52]     *See id.*

students, and parents" where possible, but also recommend districts consult with a student and respect their wishes to limit disclosure of their transgender status, including to the student's family.[53]  And New York's Education Department guidelines provide that "[t]he student is in charge of their gender transition" and that, with the student's permission, "[s]chools will want to work closely with the students and their parents/guardians," to devise an appropriate plan mindful of "each student's sense of safety."[54]  Policies like that of Ludlow thus reflect common practices within *Amici* States and other jurisdictions to foster an inclusive, supportive educational environment that benefits all students, including and especially transgender and gender-nonconforming youth.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

---

[53]     *See Frequently Asked Questions*, Cal. Dep't of Educ. (2021), https://www.cde.ca.gov/re/di/eo/faqs.asp; *Legal Advisory*, Cal. Dep't of Educ. (2021), https://www.cde.ca.gov/re/di/eo/legaladvisory.asp.

[54]     NYSED Best Practices, *supra* note 28, at 15-16.

Respectfully submitted,

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*
Adam M. Cambier, First Cir. No. 1194497
Cassandra J. Thomson
   *Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2278
adam.cambier@mass.gov

Date: June 27, 2023

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*
400 6th Street NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATES OF COMPLIANCE AND SERVICE

### Certificate of Compliance with Rule 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,489 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/      Adam M. Cambier
Dated:  June 27, 2023


### Certificate of Service

I hereby certify that on June 27, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel of record for all parties are registered as ECF Filers and will therefore be served by the CM/ECF system.

/s/      Adam M. Cambier
Dated:  June 27, 2023